**************************************************************************************
**THIS DISCLOSURE STATEMENT IS SUBJECT TO THE APPROVAL OF THE
BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR
REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT
BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.**
**************************************************************************************

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                              :
In re                                                         :     Chapter 11
                                                              :
MARK IV INDUSTRIES, INC., et al.,                             :     Case No. 09-12795 (SMB)
                                                              :
                                                              :     (Jointly Administered)
                                                              :
                        Debtors.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DISCLOSURE STATEMENT WITH RESPECT TO
JOINT PLAN OF REORGANIZATION OF
MARK IV INDUSTRIES, INC. AND ITS AFFILIATED DEBTORS
AND DEBTORS-IN-POSSESSION**

J. Eric Ivester                          Jay M. Goffman
Matthew M. Murphy                        SKADDEN ARPS SLATE MEAGHER
SKADDEN ARPS SLATE MEAGHER               & FLOM LLP
& FLOM LLP                               Four Times Square
155 N. Wacker Drive, Suite 2700          New York, New York  10036-6522
Chicago, Illinois  60606-1720            Telephone: (212) 735-3000
Telephone: (312) 407-0700                Facsimile: (212) 735-2000
Facsimile: (312) 407-0411

Attorneys for the Debtors and Debtors-in-Possession

Dated:  June 17, 2009

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION OF MARK IV INDUSTRIES, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH THEIR LEGAL AND/OR BUSINESS ADVISORS AS DEEMED APPROPRIATE BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND/OR APPENDICES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101, *ET SEQ.* AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF MARK IV INDUSTRIES, INC. OR ANY OF ITS AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES ISSUED PURSUANT TO THE PLAN, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, MARK IV INDUSTRIES, INC. OR ANY OF ITS AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

# EXECUTIVE SUMMARY

Mark IV Industries, Inc.("Mark IV"), together with its subsidiaries and affiliates (collectively, the "Company"), is a leading diversified manufacturer of highly-engineered systems and components for the worldwide automotive OEM market, automotive aftermarket and transportation markets. The Company operates in 16 countries around the world, generating 29% of its fiscal year 2009 sales in North America with the balance in Europe (63%) and other geographic regions (8%).

On April 30, 2009 (the "Petition Date"), Mark IV and seventeen of its U.S. subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtors' decision to commence chapter 11 reorganization cases was based on a combination of specific factors that placed significant stress on the Debtors' liquidity position in the several months leading up to the Petition Date and hindered the Company's ability to successfully compete in the markets in which it operated. These factors included, among other things, cumbersome obligations under an unworkable capital structure, the recent unprecedented global financial crisis, increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets, pressures from the Company's customers and suppliers, and progressively unsustainable domestic retiree legacy liabilities.

The Debtors' proposal for reorganization of their businesses is set forth in the Joint Plan of Reorganization of Mark IV Industries, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan"), a copy of which is attached hereto as Appendix A.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors, as filed on June 17, 2009 with the United States Bankruptcy Court for the Southern District of New York. Certain provisions of the Plan, and thus the description and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties. Accordingly, the Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 3019, and Section 13.2 of the Plan.

The Plan provides for an equitable and early distribution to creditors of the Debtors, preserves the value of the Debtors' businesses as a going concern, and preserves the jobs of employees. The Debtors, the First Lien Agent and the steering committee for the First Lien Lenders (the "Steering Committee") believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation and costs, the loss of jobs by the Debtors' employees, and/or impaired recoveries. Moreover, the Debtors, the First Lien Agent and the Steering Committee believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, THE DEBTORS, THE FIRST LIEN AGENT AND THE STEERING COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

## Plan Overview and Summary of Distributions

The following summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement with respect to the Plan.

## A.    General Basis for the Plan

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  The Plan, though proposed jointly, constitutes a separate plan of reorganization proposed by each Debtor.  Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that (1) Class 5 Subsidiary Interests shall not apply to the plan proposed by Mark IV and (2) Class 9 Old Equity Interests shall be deemed to apply only to the plan proposed by Mark IV.  After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors will be maximized by the reorganization of the Debtors as contemplated by the Plan.

Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the implied valuation of the Reorganized Company prepared by the Debtors' investment banker and financial advisors, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), the liquidation analysis prepared by management with the assistance of the Debtors' restructuring advisors, Zolfo Cooper Management, LLC ("Zolfo Cooper"), and the other analyses prepared by the Debtors with the assistance of their advisors, the Debtors believe that the value of their Estates is significantly greater in the proposed reorganization than it would be in a liquidation.

Accordingly, the Debtors believe the Plan maximizes the value of the Debtors and represent the best alternative for the Debtors, their Estates and their constituencies.

## B.    Summary of Treatment of Claims and Interests under the Plan

The Plan, though proposed jointly, constitutes a separate plan of reorganization proposed by each Debtor  Each Plan contains separate classes for holders of Claims against and Interests in the applicable Debtor.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.

Appendices B-1 through B-18 attached hereto summarize the classification and treatment of Claims and Interests under the Plan with respect to each Debtor.  These summaries are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Article VII below.  More specifically, Appendices B-1 through B-18 attached hereto set forth (1) the estimated percentage recovery for holders of Claims and Interests in each Class with respect to each Debtor, and (2) the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class with respect to each Debtor based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors and as modified by the Bankruptcy Court through certain hearings, and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS.  EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

**TABLE OF CONTENTS**

**ARTICLE**                                                                                                    **PAGE**

I.      INTRODUCTION ................................................................................................................. 1

II.     PLAN VOTING INSTRUCTIONS AND PROCEDURES ................................................ 2
        A.      Notice to Holders of Claims and Interests ............................................................ 2
        B.      Solicitation Package .............................................................................................. 3
        C.      General Voting Procedures, Ballots, and Voting Deadline ................................... 3
        D.      Confirmation Hearing and Deadline for Objections to Confirmation ................... 4

III.    OVERVIEW OF THE COMPANY'S BUSINESSES ........................................................ 5
        A.      Mark IV's Business Units ..................................................................................... 5
                1.      Power Transmission .................................................................................. 5
                2.      Air Intake & Cooling ................................................................................ 6
                3.      Intelligent Vehicle Highway Systems ...................................................... 6
                4.      Information Display Systems ..................................................................... 6
                5.      Additional Businesses ............................................................................... 7
        B.      Recent Financial Results ....................................................................................... 7

IV.     CORPORATE STRUCTURE AND MANAGEMENT OF THE COMPANY ................... 7
        A.      Current Corporate Structure .................................................................................. 7
        B.      Board of Directors ................................................................................................. 7
        C.      Executive Officers ................................................................................................. 9

V.      PREPETITION CAPITAL STRUCTURE OF THE COMPANY ................................... 10
        A.      Equity ................................................................................................................... 10
        B.      First Lien Credit Agreement ................................................................................ 10
        C.      Second Lien Credit Agreement ............................................................................ 10
        D.      Unsecured Bond Debt .......................................................................................... 11
        E.      Foreign Overdraft Lines, Working Capital Facilities and Factoring Facilities .... 11
        F.      Chieti Mortgage ................................................................................................... 11

VI.     THE CHAPTER 11 CASES ............................................................................................ 11
        A.      Events Leading to Commencement of the Chapter 11 Cases ............................... 11
                1.      Prepetition Obligations ........................................................................... 12
                2.      Customer Pressures ................................................................................. 12
                3.      Supplier Pressures ................................................................................... 12
                4.      Retiree Legacy Liabilities and Operational Restrictions ........................ 13
        B.      Commencement of the Chapter 11 Cases ............................................................ 13
                1.      Continuation of Business ......................................................................... 13
                2.      Stay of Ltigation ..................................................................................... 13
        C.      Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases ....... 13
                1.      First Day Orders ...................................................................................... 13
                2.      Appointment of Statutory Committees .................................................... 14
        D.      Post-Petition Financing ........................................................................................ 15
        E.      Other Significant Events During the Chapter 11 Cases ....................................... 15
                1.      Labor and Employee Matters ................................................................... 15

|  |  | 2. | Rejection of Real Property Leases | 16 |
|  | F. |  | Summary of Claims Process and Bar Date | 17 |
|  |  | 1. | Claims Process | 17 |
|  |  | 2. | Schedules and Statements of Financial Affairs | 17 |
|  |  | 3. | Claims Bar Date | 17 |
|  | G. |  | Workers' Compensation | 17 |
|  | H. |  | Treatment of PBGC Plan | 18 |
|  | I. |  | Litigation | 18 |
|  |  | 1. | Property Damage Litigation Claims | 18 |
|  |  | 2. | Product Liability Issues | 19 |
|  |  | 3. | Other Legal Proceedings | 19 |
|  | J. |  | Environmental Matters | 19 |
|  | K. |  | Accomplishments During Chapter 11; Go-Forward Strategy | 21 |
|  |  | 1. | Strategic Initiatives | 21 |
|  |  | 2. | Reasons for Emergence at This Time | 21 |
|  |  | 3. | The Company's Future Strategy | 21 |

VII. SUMMARY OF THE PLAN ........................................................................... 22
|  | A. |  | Overall Structure of the Plan | 23 |
|  | B. |  | Reorganized Capital Structure Created by Plan | 24 |
|  |  | 1. | Equity | 24 |
|  |  | 2. | Exit Facility | 24 |
|  |  | 3. | Restructured Debt Term Loan Agreement | 25 |
|  |  | 4. | Subsidiary Level Debt | 25 |
|  | C. |  | Classification and Treatment of Claims and Interests | 25 |
|  |  | 1. | Treatment of Unclassified Claims Under the Plan | 26 |
|  |  | 2. | Treatment of Classified Claims Against, and Interest in, the Debtors Under the Plan | 27 |
|  |  | 3. | Reservation of Rights Regarding Claims | 31 |
|  | D. |  | Means for Implementation of the Plan | 31 |
|  |  | 1. | Continued Corporate Existence | 31 |
|  |  | 2. | Corporate Action | 32 |
|  |  | 3. | Certificate of Incorporation and Bylaws | 32 |
|  |  | 4. | Cancellation of Existing Securities and Agreements | 32 |
|  |  | 5. | Authorization and Issuance of New Common Stock | 32 |
|  |  | 6. | Directors and Officers | 33 |
|  |  | 7. | Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs | 33 |
|  |  | 8. | Implementation of the Management Equity Incentive Program | 34 |
|  |  | 9. | Issuance of the New Common Stock | 34 |
|  |  | 10. | The Exit Facility | 35 |
|  |  | 11. | The Restructured Debt Term Loan Agreement | 35 |
|  |  | 12. | Restructuring Transactions and Alternative Structures | 36 |
|  |  | 13. | Preservation of Causes of Action | 36 |
|  |  | 14. | Exclusivity Period | 36 |
|  |  | 15. | Effectuating Documents; Further Transactions | 36 |
|  |  | 16. | Exemption from Certain Transfer Taxes and Recording Fees | 37 |
|  | E. |  | Unexpired Leases and Executory Contracts | 37 |
|  |  | 1. | Assumed Contracts and Leases | 37 |
|  |  | 2. | Rejected Contracts and Leases | 37 |
|  |  | 3. | Exhibits Not Admissions | 38 |

iv

        4.      Payments Related to Assumption of Executory Contracts and Unexpired Leases .............................................................................................................. 38

        5.      Rejection Damages Bar Date ........................................................................ 38

F.      Provisions Governing Distributions ........................................................................ 38

        1.      Time of Distributions .................................................................................... 38

        2.      No Interest on Claims .................................................................................... 38

        3.      Disbursing Agent ........................................................................................... 39

        4.      Claims Administration Responsibility .......................................................... 39

        5.      Delivery of Distributions .............................................................................. 39

        6.      Procedures for Treating and Resolving Disputed and Contingent Claims .......... 39

G.      Allowance of Certain Claims ................................................................................... 40

        1.      DIP Facility Claims ...................................................................................... 40

        2.      Deferred Commitment Fee Claims ............................................................... 40

        3.      Professional Claims ....................................................................................... 40

        4.      Substantial Contribution Compensation and Expenses Bar Date ....................... 41

        5.      Other Administrative Claims ........................................................................ 41

H.      Effect of the Plan on Claims and Interests .............................................................. 41

        1.      Revesting of Assets ....................................................................................... 41

        2.      Discharge of the Debtors ............................................................................... 41

        3.      Compromises and Settlements ...................................................................... 42

        4.      Release of Certain Parties .............................................................................. 42

        5.      Releases by Holders of Claims ..................................................................... 43

        6.      Setoffs .......................................................................................................... 43

        7.      Exculpation and Limitation of Liability ...................................................... 43

        8.      Indemnification Obligations .......................................................................... 43

        9.      Injunction ...................................................................................................... 44

VIII.    CERTAIN FACTORS TO BE CONSIDERED ................................................................ 44

A.      General Considerations ............................................................................................ 44

B.      Certain Bankruptcy Considerations ........................................................................ 44

C.      Claims Estimations .................................................................................................. 45

D.      Business Factors And Competitive Conditions Which May Affect the Company's Businesses .............................................................................................................. 45

        1.      The Continuing Global Economic Crisis May Adversely Affect The Company's Operating Performance .............................................................. 45

        2.      The Cyclical Nature Of Automotive Sales And Production May Adversely Affect The Company's Operating Performance ................................ 45

        3.      Customer Financial Difficulty May Adversely Affect The Company's Operating Performance .............................................................................. 45

        4.      Competition May Adversely Affect The Company's Operating Performance ................................................................................................. 46

        5.      Reduced Sales Volume May Adversely Affect The Company's Operating Performance ................................................................................ 46

        6.      Increases in Costs May Adversely Affect the Company's Operating Performance ................................................................................................. 46

        7.      Certain Disruptions In Supply Of And Changes In The Competitive Environment For Materials Integral To The Company's Products May Adversely Affect The Company's Operating Performance ................................ 47

        8.      The Company May Suffer Future Asset Impairment And Other Restructuring Charges, Including Write Downs Of Goodwill Or Intangible Assets ........................................................................................ 47

9.     The Company May Lose Or Fail To Attract And Retain Key Salaried Employees And Management Personnel ...............................................47

10.   The Company May Incur Material Losses And Costs As A Result Of Warranty Claims And Product Liability Actions......................................47

11.   The Company Is Subject To Other Litigation...........................................48

12.   The Company's Intellectual Property May Be Misappropriated Or Subject To Claims Of Infringement.......................................................48

13.   IVHS May Not Be Successful in Procuring New Contracts With The IAG ........................................................................................................49

14.   The Company Is Subject To Significant Environmental Regulation And Environmental Compliance Expenditures And Liabilities ..................50

15.   Actual Costs For Environmental Matters May Vary From The Estimates..........50

16.   The Company Is An International Company Subject To Uncertainties Which Could Affect Its Operating Results ...........................................51

17.   There Could Be Significant Tax Risks For The Company In Connection With Its International Operations .....................................................52

18.   As A U.S. Corporation, Mark IV Is Subject To The Foreign Corrupt Practices Act And A Determination That It Violated This Act May Affect Mark IV's Businesses And Operations Adversely .....................52

19.   Changes In Interest Rates May Negatively Affect The Company......................53

20.   Adverse Publicity May Negatively Affect The Company's Businesses.............53

E.    Conditions Precedent to Consummation; Timing .........................................................53

F.    Inherent Uncertainty of Financial Projections .............................................................53

G.    Access to Financing and Trade Terms..........................................................................54

H.    Leverage.........................................................................................................................55

I.    Certain Risk Factors Relating to Securities to be Issued Under the Plan .....................56

1.    A Liquid Trading Market for the New Common Stock is Unlikely to Develop.............................................................................................56

2.    Potential Dilution of New Common Stock .........................................................56

3.    Dividends.............................................................................................................56

4.    Change of Control................................................................................................56

IX.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .....................................................................................................................57

A.    Certain U.S. Federal Income Tax Consequences to the Debtors ...................................58

1.    Cancellation of Indebtedness Income.................................................................58

2.    Net Operating Losses..........................................................................................58

B.    Certain U.S. Federal Income Tax Consequences to Claimholders ................................58

1.    First Lien Lenders...............................................................................................58

2.    Holders of General Unsecured Claims ...............................................................58

C.    Information Reporting and Backup Withholding ...........................................................58

D.    Importance of Obtaining Professional Tax Assistance ..................................................58

X.   FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST ...................................58

A.    Feasibility of the Plan ...................................................................................................58

B.    Acceptance of the Plan ..................................................................................................59

C.    Best Interests Test..........................................................................................................59

D.    Estimated Valuation of the Reorganized Company .......................................................60

E.    Application of the Best Interests Test to the Liquidation Analysis and the Valuation of the Reorganized Company........................................................................60

F.      Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative ........................................................................................................ 61

G.      Conditions Precedent ........................................................................................... 62

     1.     Conditions to Confirmation ................................................................... 62

     2.     Conditions to Consummation ................................................................ 62

H.      Waiver of Conditions to Confirmation and Consummation of the Plan ............ 63

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. 63

A.      Continuation of the Bankruptcy Case ................................................................. 63

B.      Alternative Plans of Reorganization ................................................................... 63

C.      Liquidation Under Chapter 7 or Chapter 11 ....................................................... 63

XII.   VOTING REQUIREMENTS .................................................................................................. 64

A.      Parties-in-Interest Entitled to Vote ..................................................................... 65

B.      Classes Unimpaired Under the Plan .................................................................... 66

C.      Classes Impaired Under the Plan ......................................................................... 66

     1.     Impaired Classes of Claims Entitled to Vote ....................................... 66

     2.     Impaired Classes of Claims and Interests Not Entitled to Vote ........... 66

XIII.  CONCLUSION .......................................................................................................................... 66

A.      Hearing on and Objections to Confirmation ....................................................... 66

     1.     Confirmation Hearing ............................................................................ 66

     2.     Date Set for Filing Objections to Confirmation of the Plan ................. 66

B.      Recommendation .................................................................................................. 67

## APPENDICES

Appendix A     —     Joint Plan of Reorganization of Mark IV Industries, Inc. and Its Affiliated Debtors and Debtors-in-Possession

Appendix B     —     Estimated Claimholder Recoveries

Appendix C     —     Historical Financial Results

Appendix D     —     Financial Projections

Appendix E     —     Valuation Analysis

Appendix F     —     Liquidation Analysis

# I.    INTRODUCTION

Mark IV Industries, Inc. ("<u>Mark IV</u>") and seventeen of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "<u>Debtors</u>," and the Debtors, together with their non-Debtor subsidiaries and affiliates, shall be referred to herein as the "<u>Company</u>") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on April 30, 2009 (the "<u>Petition Date</u>").  The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors' cases are pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), and are being jointly administered under Case No. 09-12795.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.

The Debtors' proposal for reorganization of their businesses is set forth in the Joint Plan of Reorganization of Mark IV Industries, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "<u>Plan</u>"), a copy of which is attached hereto as <u>Appendix A</u>.  Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

Prior to soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

This Disclosure Statement sets forth certain information regarding the Debtors' operations and financial history.  Historical financial results for the Company on a consolidated basis are set forth in <u>Appendix C</u> annexed hereto.  This Disclosure Statement also describes the Debtors' need to seek chapter 11 protection, significant events that have occurred during the Debtors' chapter 11 cases (the "<u>Chapter 11 Cases</u>"), and the anticipated operations of the Company after the Effective Date (the "<u>Reorganized Company</u>")).  In addition, this Disclosure Statement describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  Furthermore, this Disclosure Statement discusses the confirmation process and the voting procedures that Claimholders in Impaired Classes entitled to vote must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND THE VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTEREST IN THE DEBTORS, PLEASE SEE <u>ARTICLES VII</u> AND <u>VIII</u> HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION.  TO THE EXTENT ANY PORTION OF THIS DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED HEREIN ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS OR STATUTORY PROVISIONS THEY ARE SUMMARIZING.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE

SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II.        PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.        Notice to Holders of Claims and Interests

The Debtors are causing this Disclosure Statement to be transmitted to certain Claimholders for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the Claimholder to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

By order entered on [●], 2009, the Bankruptcy Court entered an order (the "Solicitation Procedures Order") (1) approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan, (2) setting procedures for voting on the Plan, and (3) scheduling the hearing on confirmation of the Plan (the "Confirmation Hearing"). THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIMHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY AND CONSULT WITH THEIR LEGAL AND/OR BUSINESS ADVISORS AS DEEMED APPROPRIATE BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the projections set forth in Appendix D attached hereto (the "Projections"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Company intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**B.      Solicitation Package**

Accompanying this Disclosure Statement are copies of (1) the Plan (Appendix A hereto); (2) the notice of, among other things, (a) the time for submitting ballot forms (the "Ballots") that are distributed to Claimholders who are included in Classes that are entitled to vote to accept or reject the Plan; (b) the date, time and place of the Confirmation Hearing and related matters; and (c) the time for filing objections to the confirmation of the Plan (such notice, the "Confirmation Hearing Notice"); (3) as applicable, either (x) a Ballot for the Class in which you are entitled to vote, to be used by you in voting to accept or reject the Plan, or (y) in lieu of a Ballot, a notice explaining why you are not entitled to vote; and (4) the Solicitation Procedures Order.

**C.      General Voting Procedures, Ballots, and Voting Deadline**

If you are a Claimholder entitled to vote on the Plan and a Ballot is included herewith, after carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN [●], 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE") BY EPIQ BANKRUPTCY SOLUTIONS, LLC ("EPIQ," OR THE "VOTING AGENT"), AT MARK IV INDUSTRIES BALLOTING CENTER, C/O EPIQ BANKRUPTCY SOLUTIONS, LLC, P.O. BOX 5014, FDR STATION, NEW YORK, NEW YORK 10150-5014. If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please contact:

Epiq Bankruptcy Solutions, LLC
Attn: Mark IV Industries
757 Third Avenue, 3rd Floor
New York, New York 10017
Phone: 646-282-2400
Fax: 646-282-2501

Imaged copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all exhibits, schedules and appendices to the foregoing) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, http://www.nysb.uscourts.gov for a fee (a PACER account is required), or at the Company's restructuring website, http://chapter11.epiqsystems.com/markiv, free of charge. In addition, if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy

of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, you may contact Epiq at the address immediately above.

              FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE <u>ARTICLE XII</u> HEREIN.

**D.     Confirmation Hearing and Deadline for Objections to Confirmation**

              Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to begin on [●], 2009 at [●] (prevailing Eastern time) before the Honorable Stuart M. Bernstein, Chief Judge for the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, Courtroom 723. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are <u>ACTUALLY RECEIVED</u> on or before [●], 2009 at [●] (prevailing Eastern time) by:

Counsel for the Debtors

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
Attn: J. Eric Ivester, Esq.
Attn: Matthew M. Murphy, Esq.

      - and -

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attn: Jay M. Goffman, Esq.

<u>U.S. Trustee</u>

Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn: Paul K. Schwartzberg, Esq.

<u>Counsel for the First Lien Agent and the DIP Agent</u>

Simpson Thacher & Bartlett LLP
425 Lexington Ave.
New York, New York 10017
Attn: Steven M. Fuhrman, Esq.

Counsel for the Creditors' Committee

Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169
Attn: Scott L. Hazan, Esq.

## III.    OVERVIEW OF THE COMPANY'S BUSINESSES

### A.    Mark IV's Business Units

First founded in 1970, Mark IV is a leading manufacturer of highly-engineered systems and components for transportation infrastructure, vehicles and equipment.  The Company's systems and components are generally designed and targeted for two segments of the transportation world – (1) automotive and industrial ("Automotive and Industrial") and (2) transportation technologies ("Transportation Technologies") – and include radio frequency identification technology, information display, power transmission, air admission and cooling, and other technologies.  The Automotive and Industrial products are used to power small, industrial and commercial vehicles, as well as equipment and automobiles.  The Transportation Technologies products help state and other local authorities improve traffic flow on their highways and expressways, and are also used in lighting and information display systems for rail, bus and aircraft.  The Debtors believe that the Company is a market leader in most markets that it serves.  The Company operates in 16 countries around the world, generating 29% of its fiscal year 2009 sales in North America with the balance in Europe (63%) and other geographic regions (8%).

Mark IV manages and reports its Automotive and Industrial and Transportation Technologies operations in four strategic business units, which include: (1) Power Transmission, (2) Air Intake & Cooling, (3) Intelligent Vehicle Highway Systems, and (4) Information Display Systems (collectively, the "Business Units").  The Company's Business Units each offer distinct product technology and serve separate customer market channels.

1.    *Power Transmission*

The Power Transmission Business Unit ("Power Transmission"), headquartered in Troy, Michigan, designs, manufactures and sells high quality engine-related products using mechanical power transmission technology.  Power Transmission is a leading Tier 1 supplier, selling directly to automotive and heavy duty original equipment manufacturers ("OEMs") across North America, Europe and South America.  It is also a market share leader in the aftermarket industry – a segment of the automotive industry concerned with the manufacturing, re-manufacturing, distribution, retailing, and installation of all vehicle parts, chemicals, tools, equipment and accessories for light and heavy duty vehicles after the sale of the vehicle by the OEM to the consumer.  Power Transmission products include light duty systems and components used to facilitate the transfer of power mechanically from an engine to a drive unit, including camshaft drive and accessory drive systems.  Components include timing and poly-rib belts, automatic tensioning devices, pulleys, idlers, brackets and dampers.  The Power Transmission parts, mostly sold under the well-known "Dayco" brand name, allow engines to operate at peak efficiency, thus maximizing fuel economy while reducing emissions, vibration and noise.  Sales of Mark IV's Power Transmission products account for 71% of total annual sales of all such products across Europe and the rest of the non-North American markets.  Mark IV's Power Transmission products are either number 1, 2, or 3 in each of its major OEM and aftermarket customer segments.

2.    *Air Intake & Cooling*

The Air Intake & Cooling Business Unit ("<u>Air Intake & Cooling</u>"), headquartered in Orbey, France, designs, manufactures and sells high quality plastic-based products for air intake and engine cooling applications.  Mark IV uses a proprietary injection-molded composite plastic material that is significantly lighter and costs substantially less than traditional metal air intake manifolds and other resin-based technologies, making Mark IV a recognized leader in these technology areas.  Additional products include air/water ducts and pipes, thermostat housings, water pumps, surge tanks and integrated air intake and cooling systems.  These systems and components supply and manage the airflow to the engine necessary for combustion.  Air Intake & Cooling is a leading Tier 1 supplier and sells directly to OEMs in North America and Europe.

The Company's operating subsidiaries with respect to Air Intake & Cooling are not Debtors in these Chapter 11 Cases or in any reorganization or other similar proceeding in any jurisdiction.

3.    *Intelligent Vehicle Highway Systems*

The Intelligent Vehicle Highway Systems Business Unit ("<u>IVHS</u>") is headquartered in Mississauga, Ontario, Canada (with customer service offices in New Jersey and Maryland) and designs, produces and markets systems and components for a broad range of applications utilizing advanced radio frequency and electronics technologies.  In particular, IVHS is a leading designer and manufacturer of radio frequency-based transponders, readers and antennas for electronic toll collection and intelligent vehicle highway systems.  IVHS produces electronic vehicle identification products, such as the E-ZPass® system, for the electronic toll and traffic management markets.  With over 18 million toll transponders in service, Mark IV is the leading supplier of electronic toll collection equipment to the majority of toll authorities in the midwestern and northeastern part of the United States.  A substantial portion of IVHS's revenue is generated from products provided to the E-ZPass® Interagency Group (the "<u>IAG</u>"), which represents a consortium of over 20 different toll agencies across 14 different states.

In addition to the E-ZPass® technology and products, IVHS is also known for its other innovative vehicle identification products as evidenced by the use of IVHS's technology on Canada's Highway 407, the world's first non-stop all-electronic toll road, as well as by toll collection-related border crossing projects in which IVHS's products facilitate the clearing of heavy commercial vehicles through customs smoothly, efficiently and cost effectively.  IVHS also developed the "Smart Fusion" smart card transponder system and the T3 Tag, which combines three electronic toll protocols in one transponder to give the commercial vehicle market the opportunity for interoperability on electronic toll roads stretching from the East to the West coast.  Furthermore, Mark IV is one of the organizations leading the development of 5.9 GHz technology, which is part of a United States Department of Transportation initiative to decrease accidents and congestion by enabling vehicle-to-vehicle and vehicle-to-roadside communication.  Mark IV IVHS Inc., the Company's U.S. operating subsidiary for IVHS, is not a debtor in these chapter 11 cases.

The Company's operating subsidiaries with respect to IVHS are not Debtors in these Chapter 11 Cases or in any reorganization or other similar proceeding in any jurisdiction.

4.    *Information Display Systems*

The Information Display Systems Business Unit ("<u>IDS</u>"), headquartered in Plano, Texas, designs, produces and markets, among other things, (a) electronic destination signs and information displays for buses and railcars; (b) variable message signs and display components for highways, gasoline pumps and status indicators; and (c) vehicle lighting and passenger information display systems for the

bus, rail transit and aircraft industries. While many of IDS's products are sold directly to OEMs worldwide for installation in mass transit vehicles, the Company is also the leader in the market for replacement parts. The rail and aircraft lighting systems and components business primarily consists of lighting in railcars, indirect fluorescent light fixtures for commuter and inter-city railcars, reading lights for both railcars and aircraft, air diffusers for railcars, landing and recognition lights for aircraft, sidewall fluorescents, information signs, night vision, search lighting and emergency systems for aircraft and other self-illuminating products. Mark IV ranks number 1 in North America for interior lighting systems for railcars and destination signs for buses.

5. *Additional Businesses*

In addition to the four Business Units described above, NRD, LLC, a subsidiary of Mark IV, manufacturers ionization sources for smoke detectors and manufactures and distributes electrostatic control products.

## B. Recent Financial Results

Set forth in <u>Appendix C</u> annexed hereto are certain consolidated historical financial data for the Company derived from the Company's audited consolidated financial statements for each of the previous three fiscal years. The Company's most recent fiscal year ended on February 28, 2009.

## IV. CORPORATE STRUCTURE AND MANAGEMENT OF THE COMPANY

## A. Current Corporate Structure

Mark IV is incorporated in Delaware. It is the parent corporation of the 17 Subsidiary Debtors in these jointly-administered Chapter 11 Cases, as well as 34 additional non-Debtor subsidiaries and affiliates, 33 of which are located outside the United States. None of Mark IV's affiliates located outside the United States sought reorganization relief either in the United States or in its domicile.

## B. Board of Directors

The following persons comprise the Board of Directors of Mark IV:

| Name | Position |
| --- | --- |
| David A. Mezzanotte, Jr. | Director |
| Douglas C. Werking | Director |
| James C. Orchard | Director |
| Michael Diament | Director |
| William E. Redmond, Jr. | Director, Chairman of the Board |

*David A. Mezzanotte, Jr.* Mr. Mezzanotte has served as a director of Mark IV since December 2007. Mr. Mezzanotte is a managing director at Sun Capital Partners, Inc. (together with its affiliates, "<u>Sun Capital</u>"), a private investment firm. Mr. Mezzanotte joined Sun Capital from CHEP International, a $3.5 billion logistics services company, where he served as chief operating officer for three years. Prior to CHEP, Mr. Mezzanotte spent six years with AlliedSignal/Honeywell in a variety of executive roles in technology, sales, and general management having spent the first fifteen years of his career with E.I. DuPont in the nuclear, chemical and fibers businesses. Mr. Mezzanotte received a Bachelor of Science, Masters of Science, and Ph.D. in Metallurgical Engineering and Materials Science from the University of Notre Dame.

*Douglas C. Werking*.  Mr. Werking has served as a director of Mark IV since December 2007.  Mr. Werking is a vice president at Sun Capital with over 17 years experience in finance, restructurings, turnarounds, and general management.  Prior to joining Sun Capital in 2006, he was a Managing Director with an international turnaround and restructuring consulting firm, during which time he served in several interim management positions including Chief Financial Officer with Peregrine, Inc., a Detroit-based automotive parts manufacturer, Chief Restructuring Officer with Mirant Corporation, a large merchant energy company, and Treasurer with Air Transport International, a Little Rock-based air cargo company.  Mr. Werking has worked with companies in the automotive, manufacturing, textile, technology, agricultural, and healthcare industries.  Mr. Werking received his Bachelor of Science and Commerce degree from Santa Clara University and MBA from the University of Chicago.

*James C. Orchard*.  Mr. Orchard has served as a director of Mark IV since August 2008.  Mr. Orchard joined the Company in August 2008 as a director of Mark IV and as Chief Executive Officer of the Company's Power Transmission business.  In addition, he was elected as Interim Chief Executive Officer of Mark IV, effective May 12, 2009.  Mr. Orchard has 40 years of automotive experience.  Prior to joining the Company, Mr. Orchard was the Chief Operating Officer of Noble International, Chief Executive Officer and a member of the board of directors for Faurecia's North American Operations, Executive Vice President and President of North American Operations and Asia-Pacific for Visteon, Chief Executive Officer of North American Operations and Member of Management Board of ZF Friedrichshafen AG, and numerous executive positions in his 20 years with Dana Corporation.  He is a past Chairman and current Director of the Original Equipment Supplier Association (OESA) and a Director of the Motor & Equipment Manufacturers Association (MEMA).  He holds a Bachelor of Science Degrees in Marketing and Business Administration from Indiana University.  Mr. Orchard is based in Detroit, Michigan.

*Michael Diament*.  Mr. Diament has served as a director of Mark IV since March 2009.  Mr. Diament formerly served as Portfolio Manager and Director of Bankruptcies and Restructurings from January 2001 to February 2006 for Q Investments, an investment management firm.  From February 2000 until January 2001, Mr. Diament was a Senior Research Analyst for Sandell Asset Management, an investment management firm, and served as Vice President of Havens Advisors, an investment management firm, from July 1998 to January 2000.  Mr. Diament previously worked at Price Waterhouse LLP, as a Senior Consultant in the Corporate Finance, Recovery & Disputes Consulting practice, primarily involved in litigation consulting related to both antitrust issues and alleged securities violations.  He has been, or currently is, a member of the board of directors of various other companies including Magellan Health Services Inc., J.L. French Automotive Castings, Inc., i2 Technologies, Inc. and WilTel Communications Group, Inc.  Mr. Diament graduated, Beta Gamma Sigma, from Columbia Business School, with a Masters in Business Administration.  Mr. Diament graduated, Magna Cum Laude, from Washington University, with a Bachelor of Arts in Economics, with honors in Psychology.

*William E. Redmond, Jr*.  Mr. Redmond has served as a director of Mark IV since March 2009, and was recently appointed chairman of the board of directors for Mark IV, effective May 12, 2009.  Since May 24, 2005, Mr. Redmond has been the President and Chief Executive Officer of Gentek Inc.  Immediately prior to his employment with Gentek Inc., Mr. Redmond served as President, Chief Executive Officer and Chairman of the Board of Gardenway, Inc., a manufacturer of outdoor garden and power equipment that filed for bankruptcy protection in July 2001 in order to facilitate a sale of substantially all of its assets in August 2001.  Prior to his employment with Gardenway, Inc., Mr. Redmond held various positions at Quaker Oats Company and Pepsi-Cola Company.  Mr. Redmond also serves on the board of directors of Eddie Bauer Holdings, Inc.  Previously, Mr. Redmond has been a member of the board of directors of various other companies including Maxim Crane Works, National Energy and Gas Transmission Company, USA Mobility Inc., Malden Mills Inc., Work Kitchen Inc., Tokehim Corp. and Arch Wireless Inc.

## C.     Executive Officers

The following persons comprise the executive officers of the Debtors:

*Mark G. Barberio* – Vice President and Chief Financial Officer of Mark IV.  Mr. Barberio joined Mark IV in 1985 and has over 23 years of industry experience.  Mr. Barberio was appointed Chief Financial Officer in 2004.  Previously, he was Vice President of Finance and Secretary from 2000 to 2004 in addition to the position of Treasurer, which he held from 1997 to 2008.  Mr. Barberio has also served in various accounting and finance roles including Senior Accountant, Assistant Treasurer and Director – Global Treasury.  He holds a Bachelor of Science Degree in business/accounting from the Rochester Institute of Technology and an M.B.A. with a concentration in Finance from the State University of New York at Buffalo.  Mr. Barberio is based in Amherst, New York.

*Steven K. Kerns* – Vice President, Human Resources of Dayco Products, LLC.  Mr. Kerns joined the Company in 1988.  Prior to joining the Company, Mr. Kerns was Vice President of Human Resources for the Dayco Division at Armtek Corporation, which was acquired by Mark IV in 1988.  Mr. Kerns formally assumed the role of Vice President of Human Resources in 2000.  Mr. Kerns holds bachelor and master degrees in business from the University of Virginia and has over 30 years of industry experience.  Mr. Kerns is based in Detroit, Michigan.

*James C. Orchard* – Interim Chief Executive Officer of Mark IV.  Mr. Orchard's biographical information can be found in <u>Article IV.B</u> above.

*David Orlofsky* – Chief Restructuring Officer of Mark IV.  Mr. Orlofsky, a managing director at Zolfo Cooper, was named Mark IV's Chief Restructuring Officer as of February 13, 2009.  Mr. Orlofsky has been with Zolfo Cooper since 1998.  Before joining Zolfo Cooper, Mr. Orlofsky was an audit manager at Arthur Anderson.  Mr. Orlofsky holds a B.S. degree in business administration from Montclair State University.  Mr. Orlofsky is also a certified insolvency and restructuring advisor.

*Edward R. Steele* – Vice President-Finance, Secretary, Treasurer and Chief Tax Officer of Mark IV.  Mr. Steele joined Mark IV in 1994 and was appointed to his present position in 2008.  Prior to joining Mark IV, he was a Senior Tax Manager with the accounting firm of Coopers & Lybrand, LLP.  In addition, Mr. Steele was Assistant Director of Taxes for Corning Incorporated for the period 1999-2002.  Mr. Steele holds a B.S. degree in Accounting from Elmira College, a Masters degree in Business from The Johns Hopkins University and he has a Master of Science in Taxation Degree from the Golden Gate University School of Law and Taxation.  Mr. Steele is a Certified Public Accountant, licensed in the State of New York.  Mr. Steele is based in Amherst, New York.

*Avi Zisman* – President of Luminator Service, Inc. and Luminator Holding L.P.  Mr. Zisman joined the Company in 2000 as Senior Vice President of Engineering for the Transportation Group before becoming President in 2001 of IDS.  In 2008 he was named chief executive officer of IDS.  Mr. Zisman has over 27 years of industry experience.  Prior to joining the Company, Mr. Zisman worked for Litton Industries and Honeywell in a variety of positions including director of System Development and Vice President of Engineering.  Mr. Zisman holds a Bachelor's degree in Electrical Engineering and Computer Science from the University of New Mexico.  Mr. Zisman is based in Dallas, Texas.

## V. PREPETITION CAPITAL STRUCTURE OF THE COMPANY

### A. Equity

Mark IV, the parent company of each other Debtor, is a privately-held corporation and is 100% owned by Mark IV Global Holding Corp. Also privately held, Mark IV Global Holding Corp. is owned by certain affiliates of Sun Capital, a private investment firm specializing in leverage buyouts and investments in market-leading companies, which acquired Mark IV in December 2007 from funds advised by London-based BC Partners Ltd. and other financial investors.

### B. First Lien Credit Agreement

Mark IV entered into an $865 million Amended and Restated Credit Agreement dated as of June 21, 2004 (as amended, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"), among Mark IV, Dayco Products, LLC (the "U.S. First Lien Borrower"), Dayco Europe S.r.l. (the "Italian First Lien Borrower"), JPMorgan Chase Bank, N.A., as Administrative Agent (in such capacity, the "First Lien Agent"), and the several lenders from time to time parties thereto (such lenders, or any such lender or its Affiliates in their capacity as party to any hedge or swap agreement to which any Debtor is a party, and the First Lien Agent collectively referred to herein as the "First Lien Lenders"). The First Lien Credit Agreement consists of the following: (1) a first lien U.S. revolving loan in the original approximate principal amount of up to $100 million (the "First Lien U.S. Revolving Loan"); (2) a first lien Euro revolving loan in the original approximate principal amount of $50 million (the "First Lien Euro Revolving Loan"); (3) a first lien Tranche A Euro term loan in the approximate principal amount of €82,515,059 (the "First Lien Tranche A Euro Term Loan"); and (4) a first lien Tranche B term loan in the approximate principal amount of approximately $615 (the "First Lien Tranche B Term Loan" and together with the First Lien U.S. Revolving Loan, the First Lien Euro Revolving Loan, and the First Lien Tranche A Term Loan, the "First Lien Loans," and the obligations in connection therewith, and together with related secured hedging and cash management obligations, the "First Lien Obligations").

Under the First Lien Credit Agreement, Mark IV and each of its U.S. subsidiaries are guarantors of amounts borrowed by the U.S. First Lien Borrower under the First Lien US Revolving Loan, the First Lien Euro Revolving Loan and the First Lien Tranche B Term Loan and the other First Lien Obligations of the U.S. First Lien Borrower. Additionally, Mark IV and each of its U.S. subsidiaries and certain of its non-U.S. subsidiaries are guarantors of amounts borrowed by the Italian First Lien Borrower under the First Lien Euro Revolving Loan and the First Lien Tranche A Euro Term Loan and the other First Lien Obligations of the Italian First Lien Borrower.

As of the Petition Date, the Company had an aggregate principal amount outstanding under the First Lien Credit Agreement of approximately $858 million.

### C. Second Lien Credit Agreement

Mark IV also entered into a $150 million Second Lien Credit Agreement dated as of June 19, 2006 (as amended, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement," and together with the First Lien Credit Agreement, the "Prepetition Credit Facilities"), among Mark IV, Dayco Products, LLC, as the Borrower (the "Second Lien Borrower"), Wilmington Trust FSB, as successor to JP Morgan Chase Bank, N.A., as successor to Bear Stearns Corporate Lending Inc., as Administrative Agent (in such capacity, the "Second Lien Agent"), and the several lenders from time to time parties thereto (such lenders and the Second Lien Agent collectively referred to herein as the "Second Lien Lenders," and together with the First Lien Lenders, the "Prepetition Secured Lenders"),

pursuant to which the Second Lien Lenders have made available to the Second Lien Borrower a term loan (the "Second Lien Loan," and the obligations thereunder, the "Second Lien Obligations," which, together with the First Lien Obligations shall be referred to herein as the "Prepetition Obligations") in the original principal amount of approximately $150 million and maturing on December 31, 2011.

Under the Second Lien Credit Agreement, Mark IV and each of its U.S. subsidiaries are guarantors of amounts borrowed by the Second Lien Borrower under the Second Lien Loan and the other Second Lien Obligations of the Second Lien Borrower.

As of the Petition Date, the Company had an aggregate principal amount outstanding under the Second Lien Credit Agreement of approximately $148 million.

## D.     Unsecured Bond Debt

In addition to the indebtedness under the Prepetition Credit Facilities, certain of the Debtors' foreign non-Debtor subsidiaries and affiliates, as applicable, are obligors of unsecured bond debt pursuant to a certain Underwriting Agreement, dated July 25, 2008, by and among Mark IV Systemes Moteurs SAS, as Issuer ("Systemes Moteurs"), Mark IV Air Intake Systems Corp., as Guarantor ("Air Intake Systems"), and Sabèrasu Japan Investments II B.V., as Subscriber ("Sabèrasu") relating to the issue of bonds (the "Cerberus Bonds," and such debt under the Cerberus Bonds shall be referred to herein as the "Bond Debt") in the amount of €29.5 million and with an approximate amount outstanding of $32.4 million as of the fiscal year ended February 28, 2009.  Systemes Moteurs, a non-Debtor, is organized under the laws of France.  Air Intake Systems, also a non-Debtor, is organized under the laws of Nova Scotia.  Sabèrasu, an affiliate of Cerberus Capital Management, L.P., is organized under the laws of the Netherlands.

## E.     Foreign Overdraft Lines, Working Capital Facilities and Factoring Facilities

In addition to the indebtedness under the Prepetition Credit Facilities and the Bond Debt, certain of the Debtors' foreign non-Debtor subsidiaries and affiliates, as applicable, are obligors under various overdraft lines, working capital facilities and accounts receivable factoring facilities (collectively, the "Working Capital Facilities").  The Working Capital Facilities provide the foreign non-Debtor subsidiaries and affiliates additional liquidity with which to operate their businesses.  As of April 24, 2009, the foreign non-Debtor subsidiaries and affiliates had $94.6 million in outstanding amounts under the Working Capital Facilities.

## F.     Chieti Mortgage

On or about June 25, 2008, Dayco Europe S.r.l., a non-Debtor Italian affiliate of Mark IV, entered into a certain Loan Agreement No. 2428707, which had an approximate amount outstanding as of the Petition Date of approximately $26 million (the "Chieti Mortgage").  The Chieti Mortgage is secured by certain real property located in the Italian municipalities of Chieti, Manoppello, and Colonnella.

## VI.     THE CHAPTER 11 CASES

## A.     Events Leading to Commencement of the Chapter 11 Cases

The Debtors' decision to commence chapter 11 reorganization cases was based on a combination of specific factors that placed significant stress on the Debtors' liquidity position in the several months leading up to the Petition Date and hindered the Company's ability to successfully compete in the markets in which it operated.  These factors included, among other things, cumbersome

obligations under an unworkable capital structure, the recent unprecedented global financial crisis, increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets, pressures from the Company's customers and suppliers, and progressively unsustainable domestic retiree legacy liabilities.

In response to these challenges, Mark IV developed a restructuring plan pursuant to which the Company instituted various cost-cutting initiatives, including reducing corporate overhead and consolidating various technical centers and plants into existing operations. In addition, the Company, with the assistance of its advisors, began to search for sources of additional financing or an equity investment. Despite these efforts, neither the Company nor its advisors were successful in attaining a secured loan that afforded the Company sufficient liquidity yet was also subordinated to the liens of the First Lien Lenders. In addition, the Company was unable to obtain financing on an unsecured basis or obtain an equity investment from any potential strategic partner. In the end, the overburdensome capital structure, the world-wide economic downturn and the challenges with respect to liquidity forced the Debtors to file for chapter 11 relief. Certain of these factors, and others, are described below.

### 1.    *Prepetition Obligations*

In the early part of 2009, in an effort to increase liquidity, the Company determined that it could not make certain payments with respect to its Prepetition Obligations. As a result, the Company did not make certain payments of interests and fees owed to the First Lien Lenders and the Second Lien Lenders, which resulted in defaults under both the First Lien Credit Agreement and the Second Lien Credit Agreement. In response, the Company and the First Lien Lenders entered into a forbearance agreement whereby the First Lien Lenders agreed, under certain conditions and for a limited time, to forbear from exercising certain remedies available to them under the First Lien Credit Agreement as a result of the Company's defaults. Because documents governing certain of the Company's other prepetition indebtedness contained cross-default provisions that would be triggered by a default under the First Lien Credit Agreement, the Company also entered into forbearance agreements with certain of its other prepetition lenders.

### 2.    *Customer Pressures*

The market share and overall production of some of the Company's customers, including the OEMs, has declined in recent years in connection with a severe downturn across the automotive industry. Although the Company's businesses are significantly less reliant on the "Big Three" automakers than other similarly-situated part suppliers, the Company typically supplies its customers, some of which are connected to the "Big Three," on an as-needed basis. Accordingly, when the Company's customers and the OEMs decrease production, the volume of the Company's business likewise decreases. In addition, in response to market pressures, some of the Company's customers, particularly in Europe, have asked suppliers, including the Company, to lower prices and/or stretch out their payments.

### 3.    *Supplier Pressures*

As a result of the downturn in the automotive industry, many of the Company's suppliers, both domestic and foreign, have unilaterally requested tighter payment terms from the Company on the parts they supply. This problem has been exacerbated by the commencement of the Chapter 11 Cases, which has caused certain trade credit insurers to refuse to insure accounts receivables owed by the Company. In response, certain of the Company's suppliers have demanded tighter payment terms. In addition, many of the Company's suppliers are working through their own restructuring issues. Because

these suppliers are often sole-source or limited-source providers of parts to the Company, their financial situations necessarily influence and dictate the Company's businesses.

### 4. *Retiree Legacy Liabilities and Operational Restrictions*

Although Mark IV has been able to enjoy a great deal of success, transformation and expansion since its inception, this expansion has not been without an increase in its annual liabilities. Specifically, the Company currently faces a significant number of legacy obligations in connection with its domestic defined benefit pension plan as well as the retiree health and life benefit programs ("Retiree Legacy Liabilities") taken on by Mark IV in connection with its various business acquisitions over the years.

As of February 28, 2009, the Company had obligations related to retiree healthcare and life insurance in the approximate amount of $82 million. During the fiscal year ending February 2010, the Debtors' estimated cash outflow associated with its Retiree Legacy Liabilities will be approximately $10 million. This situation was placing financial burdens on the Company that were no longer supportable.

## B. Commencement of the Chapter 11 Cases

### 1. *Continuation of Business*

On April 30, 2009, Mark IV and seventeen of its wholly-owned U.S. subsidiaries filed voluntary petitions in the Bankruptcy Court for reorganization relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses in the ordinary course of business, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

### 2. *Stay of Litigation*

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing room" necessary to assess and reorganize their businesses. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

## C. Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases

### 1. *First Day Orders*

On the Petition Date, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

The first day orders in the Chapter 11 Cases, which were entered on or soon after the Petition Date, authorized, among other things:

- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

- the payment of employees' accrued prepetition wages and employee benefit claims;

- the payment of certain prepetition obligations to customers and the continuation of certain customer programs and practices;

- the payment of certain prepetition shipping and delivery charges;

- the payment of prepetition amounts due under the Debtors' insurance programs;

- the payment of certain prepetition claims of critical vendors;

- the payment of certain prepetition claims of foreign vendors;

- procedures for the resolution and payment of valid reclamation claims;

- procedures for interim compensation and reimbursement of professional expenses during the Chapter 11 Cases;

- the continuation of utility services during the pendency of the Chapter 11 Cases;

- the payment of certain prepetition tax claims;

- the payment of certain prepetition amounts owed to contractors;

- the grant of administrative expense status to obligations arising from postpetition delivery of goods and services;

- the joint administration of each of the Debtors' bankruptcy cases;

- the retention of the following professionals to serve on behalf of the Debtors: Skadden, Arps, Slate, Meagher & Flom LLP as restructuring counsel; Houlihan Lokey as investment banker and financial advisor; Zolfo Cooper as restructuring advisors; and Epiq as claims, noticing and balloting agent; and

- the continued retention of professionals regularly employed by the Debtors in the ordinary course of their businesses.

2.  *Appointment of Statutory Committees*

On May 8, 2009, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed, pursuant to section 1102 of the Bankruptcy Code, an official committee of unsecured creditors (the "Creditors' Committee"). The following creditors comprise the Creditors' Committee as of the date of this Disclosure Statement: (a) Carlisle Power Transmission Producers, Inc. (b) Kurt Manufacturing Co, Inc.; (c) Regal Research & Mfg, Co., LLC; (d) Norvell Electronics, Inc.; (e) Dongil Rubber Belt America, Inc.; (f) Preferred Rubber Compounding; and (g) GMB North America, Inc.

The Creditors' Committee's legal counsel is Otterbourg, Steindler, Houston & Rosen, and its financial advisor is FTI Consulting, Inc.

## D.    Post-Petition Financing

On April 30, 2009, the Debtors obtained interim approval from the Bankruptcy Court to (1) enter into a $90 million Credit and Guarantee Agreement (the "DIP Agreement"), pursuant to which the Debtors and certain of their non-Debtor foreign subsidiaries and affiliates have obtained postpetition loans and other financial accommodations (the "DIP Financing") from JPMorgan Chase Bank, N.A., as the administrative agent (in such capacity, the "DIP Agent") for itself and other financial institutions from time to time party to the DIP Agreement as lenders (collectively, the "DIP Lenders") and (2) use the cash collateral of the First Lien Lenders for working capital and general corporate purposes in accordance with the terms and conditions of the dip order. More specifically, the DIP Financing permits (a) Dayco Products, LLC to borrow up to an aggregate principal amount not to exceed $35 million, (b) Mark IV Industries Corp. (a Canadian affiliate of Mark IV) to borrow up to an aggregate principal amount of $25 million and (c) Dayco Europe S.r.l. (an Italian affiliate of Mark IV) to borrow up to an aggregate principal amount of $30 million. Mark IV Global Holding Corp. and each of the Debtors are guarantors of the payment and performance of all obligations under the DIP Financing of Dayco Products, LLC, Mark IV Industries Corp. and Dayco Europe S.r.l., secured by liens on substantially all assets of Mark IV Global Holding Corp. and each of the Debtors. A final order with respect to the DIP Financing was approved by the Bankruptcy Court on May 27, 2009.

The Debtors sought approval of the DIP Financing to ensure necessary liquidity during the Chapter 11 Cases. The funds available under the DIP Agreement permitted the Debtors to obtain goods and services on the same terms as prior to filing the Chapter 11 Cases. Specifically, the DIP Agreement provided the necessary security to the Debtors' vendors so that they would continue to do business with the Debtors, thereby minimizing the harm to the Debtors' businesses as they pursued their reorganization efforts.

As of June 12, 2009, the Company had borrowings of $45 million outstanding under the DIP Agreement, and the Company retained $45 million of availability under the DIP Agreement.

## E.    Other Significant Events During the Chapter 11 Cases

1.    *Labor and Employee Matters*

(a)    Appointment of Chief Restructuring Officer

At the outset of the bankruptcy, the Debtors appointed David Orlofsky as Chief Restructuring Officer of the Company. Mr. Orlofsky, as an employee of Zolfo, was designated as an officer pursuant to a Services Agreement that was approved by the Bankruptcy Court on May 27, 2009. Under the terms of the Services Agreement, if a plan of reorganization is confirmed on or within 120 days of the Petition Date, Zolfo Cooper is entitled to a confirmation fee of $1,250,000, with the confirmation fee payable to Zolfo Cooper decreasing if confirmation of a plan of reorganization takes place thereafter. In addition, under the terms of the Services Agreement, Zolfo Cooper is entitled to a performance fee of $500,000 if the Company meets certain operating objectives during its fiscal year 2010.

(b)    Key Employee Incentive Plan

On June 11, 2009, the Debtors filed a motion seeking approval of their proposed Key Employee Incentive Plan (the "KEIP"), which is designed to incentivize ten employees (the "Key

Employees") who were identified as mission-critical management employees with the knowledge, experience and skills necessary to manage the Company's businesses and shepard the Debtors through the chapter 11 process. Payouts under the KEIP will be based on the incremental enterprise value achieved by the Company over and above a minimum threshold value, as measured on the date the Debtors emerge from bankruptcy or sell substantially all of their assets. The maximum aggregate amount of payouts under the KEIP is $2.565 million.

(c)      Fiscal Year 2010 Annual Incentive Compensation Plan

Prior to the Petition Date, the Debtors, in the ordinary course of their businesses, regularly implemented annual incentive compensation programs for their salaried employees designed to provide incentives to motivate the participants under such programs to meet certain corporate and other objectives. On June 11, 2009, the Debtors filed a motion seeking approval of the continuation of their proposed fiscal year 2010 annual incentive compensation plan (the "AICP"). The AICP covers the period from March 1, 2009, through February 28, 2010, which coincides with the Company's fiscal year 2010. The participants in the AICP will be designated by Mark IV's Chief Financial Officer and Board of Directors. Payouts under the AICP will depend on the category of the participant and the achievement of certain corporate, functional and/or regional objectives as determined by the AICP Administrators. For officers of the Company, payouts under the AICP will be based on the final consolidated EBITDA of the Company for fiscal year 2010 as compared to the budgeted EBITDA contemplated by the Business Plan. For participants other than officers, 80% of any payouts under the AICP will be based on the final consolidated EBITDA of the Company for fiscal year 2010 compared to budget, and 20% of payouts will be based on up to 3 specific quantifiable goals for functional areas of responsibility as designated by the administrators of the AICP.

2.      *Rejection of Real Property Leases*

The Debtors devoted effort during the Chapter 11 Cases to analyzing and making final decisions with regard to the approximately 22 real property leases to which the Debtors were party on the Petition Date. The Debtors determined that certain of such leases no longer served any benefit to the Estates. In an effort to reduce postpetition administrative costs and in the exercise of the Debtors' sound business judgment, the Debtors determined to seek authority to reject such leases (the "Rejected Leases"). In some cases, leases were rejected because the Debtors had terminated or planned to terminate operations at certain locations as part of the Debtors' ordinary business operations prior to the Petition Date. Before rejecting such leases, the Debtors considered such factors as the annual rent, the remaining term of the lease (including any renewal options), the condition of the premises, comparable market rents and any previous efforts of the Debtors as to the disposition of the leases. The Debtors also considered their options with respect to the Rejected Leases, such as evaluating the possibility of one or more assignments and/or subleases of such leases. As a result of these analyses, the Debtors determined that the Rejected Leases did not have any marketable value beneficial to the Debtors' estates.

Through the date hereof, the Debtors have filed motions seeking authority to reject two nonresidential real property leases and related agreements. If the motions are granted, the resultant savings from the rejection of such leases and related agreements will favorably affect the Debtors' cash flow and assist the Debtors in managing their future operations.

## F.    Summary of Claims Process and Bar Date

### 1.    *Claims Process*

In chapter 11 cases, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form.  Once established, the claims are either allowed or disallowed.  If allowed, the claim will be recognized and treated pursuant to a plan of reorganization.  If disallowed, the creditor will have no right to obtain any recovery on, or to otherwise enforce, the claim against the debtor.

### 2.    *Schedules and Statements of Financial Affairs*

On June 16, 2009, the Debtors filed with the Bankruptcy Court their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements").  Separate Schedules and Statements were filed for each of the eighteen Debtors.  However, because the Debtors use a consolidated cash management system through which the Debtors pay substantially all liabilities and expenses, certain assets and liabilities were not allocated among the Debtors and, therefore, certain assets and liabilities were presented on a consolidated basis in the Schedules and Statements for the Debtors.

### 3.    *Claims Bar Date*

On [●], 2009, the Bankruptcy Court entered an order (the "Bar Date Order") establishing the general deadline for filing proofs of claim against the Debtors.  The general deadline for Claims established by the Bankruptcy Court was [●], 2009 (the "Bar Date").  However, certain Claims are not subject to the Bar Date, including, among others, (a) the Claims of governmental units, as to which the bar date is [●], 2009, (b) Claims based on the rejection of executory contracts and unexpired leases, as to which the bar date is the later of (i) the Bar Date, (ii) thirty (30) days after the effective date of such rejection or (iii) such date as the Bankruptcy Court may fix in the applicable order authorizing such rejection, and (c) certain Claims affected by the amendment, if any, of the Debtors' Schedules, as to which the bar date is the later of (x) thirty (30) days after the claimant is served with notice that the Debtors have amended their Schedules and (y) such other time as may be established by order of the Bankruptcy Court in connection with a motion to amend the Schedules.  Epiq provided notice of the Bar Date by mailing to each person listed in the Schedules a notice of the Bar Date and a proof of claim form.  In addition, the Debtors published notice of the Bar Date in [●] on [●], 2009.

## G.    Workers' Compensation

The Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law to provide employees and former employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.  In certain states, the Debtors are qualifiedly self-insured pursuant to the laws and regulations of such states, whereas in other states the Debtors insure their workers' compensation liabilities through high deductible, jurisdiction-specific workers' compensation insurance policies (the "Workers' Compensation Programs").  The Debtors have generally posted letters of credit with state authorities and insurance companies to guarantee the Debtors' workers' compensation obligations.

The Debtors' outstanding obligations relating to workers' compensation arise from incurred but not yet paid claims and incurred but not reported claims.  The Debtors estimate their incurred but not reported claims through an actuarial process that is common in the insurance industry.  As of February 28, 2009, a total of approximately 150 Workers' Compensation Claims were pending against the Debtors arising out of employees' alleged on-the-job injuries.  The Debtors estimate that the aggregate

amount payable on account of incurred but not yet paid claims and incurred but not reported claims arising prior to February 28, 2009, and retrospectively-rated premium rate adjustments, is approximately $10.5 million in undiscounted net reserves. The Debtors expect that the cash payments related to Workers' Compensation Claims for the twelve months after the Effective Date will be approximately $2.5 million.

Upon confirmation and substantial consummation of the Plan, the Reorganized Debtors will continue the Workers' Compensation Programs in accordance with applicable state laws. Nothing in the Plan shall be deemed to discharge, release, or relieve the Debtors or the Reorganized Debtors from any current or future liability with respect to any of the Workers' Compensation Programs. The Reorganized Debtors will be responsible for all valid claims for benefits and liabilities under the Workers' Compensation Programs regardless of when the applicable injuries were incurred. Any and all obligations under the Workers' Compensation Programs will be paid in accordance with the terms and conditions of Workers' Compensation Programs and in accordance with all applicable laws.

## H. Treatment of PBGC Plan

The Company participates in or sponsors one defined benefit pension plan (the "Pension Plan"), which is covered by Title IV of Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1301-1461 (2000 and Supp. V. 2005). As of February 28, 2009, the Pension Plan had assets of approximately $326 million and approximately $327 million of actuarially-calculated liabilities.

If the Pension Plan is terminated, the Company could incur liability to the Pension Benefit Guaranty Corporation (the "PBGC") under Title IV of ERISA with respect to such termination. In the event the Pension Plan is not terminated, the Reorganized Debtors' liability to the PBGC, if any, would remain contingent unless and until the Pension Plan is terminated and would not be affected by any provision of the Plan or by confirmation of the Plan or cancellation of the Old Common Stock of Mark IV.

The Debtors anticipate that the Pension Plan will be unaffected by the Chapter 11 Cases.

## I. Litigation

The Debtors are party to various legal proceedings incidental to the normal course of the Debtors' businesses. Based upon the Debtors' current assessment of the underlying merits of the actions, as well as their historical experience in litigating such actions and the availability of applicable insurance reserves and coverage, management believes that the final resolution of these matters, to the extent not already subject to an approved settlement, will not have a significant effect on the Debtors' financial position, liquidity, cash flows or results of operations except as indicated below. Certain litigation matters are further discussed below.

### 1. *Property Damage Litigation Claims*

A number of homeowners' insurance companies have pursued recovery of payments from the Company on a substantial number of subrogated claims associated with property damages allegedly caused by faulty washing machine hose produced by the Company's previously-divested fluid management business unit. Since fiscal 2006, the Company has reached settlements with substantially all of the claimants with respect to these matters. As of February 28, 2009, there were over 400 alleged claims outstanding in the aggregate face amount of approximately $4.2 million. The Company expects to be able to settle these claims at rates consistent with past settlements.

2.  *Product Liability Issues*

The Company has been named as a defendant in a number of litigation actions related to damages allegedly arising from the failure of certain product manufactured by the Company which were incorporated within retail gasoline fuel delivery systems. The aggregated initial demands were in excess of $2 billion. During fiscal 2009, the Company reached settlement agreements on certain of these actions, and expects to be able to settle the remaining claims. The Company estimates that there were approximately $20 million in face amount of asserted claims with respect to these matters outstanding as of February 28, 2009, only a fraction of which would be apportioned to the Company. The Company cannot guarantee that additional claims with respect to these matters will not be asserted in the future. The Company believes there is insurance coverage for these matters. However, the insurance carriers have interpreted the terms of the insurance coverage in a manner which is in contrast to the Company's interpretation. As a result, the Company has initiated legal action against the insurance providers.

3.  *Other Legal Proceedings*

Prior to fiscal 2008, the Company settled a number of claims from former employees for occupational diseases allegedly resulting from, or expected to result in the future from, past exposure to asbestos at a facility which had been closed in the late 1990's. The Company's decision to settle was based upon its assessment of the future litigation costs to pursue its position, litigation risk associated with its arguments, and the interaction of possible reimbursement considerations relative to the Company's insurance carriers and other third parties. Approximately 100 additional claims have been made in fiscal 2008 and 2009 related to this same facility in the aggregate face amount of less than $6 million.

A former subsidiary of the Company ("Vapor"), is alleged to have exposed its employees and users of products manufactured at Vapor to asbestos used by Vapor in its manufacturing processes in periods prior to the Company's acquisition of Vapor in 1990. As part of the Company's agreement to acquire Vapor, the related Share Purchase Agreement required Brunswick Corporation ("Brunswick"), the seller of Vapor, to indemnify the Company against all claims related to asbestos exposure, including those that might arise subsequent thereto. During the period in which the Company owned Vapor, it received a number of claims alleging occupational diseases resulting from, or expected to result from, past exposure to asbestos. All such claims have been forwarded to Brunswick, who has accepted such claims and assumed responsibility for their defense. The Company sold Vapor in fiscal 1997, and provided certain indemnification protections to the buyer of Vapor against similar claims that might be received by the buyer thereafter. All such claims forwarded to the Company by the buyer have been forwarded in turn to Brunswick, who has accepted such claims and assumed responsibility for their defense as provided for under the original indemnification agreements with the Company. As of February 29, 2008 the Company has forwarded over 8,000 asbestos-related claims to Brunswick under its indemnification agreement. The Company has no available information to enable it to quantify the range of exposure related to these claims. However, the Company has no reason to believe Brunswick will not be able to meet its indemnification responsibilities to the Company. As a result, the Company does not believe it has any financial exposure related to the ultimate resolution of these claims.

**J.   Environmental Matters**

The Company is subject to numerous federal, state, local and other statutory environmental laws and regulations governing its operations, including the handling, transportation and disposal of its products, and its non-hazardous and hazardous substances and wastes, as well as emissions and discharges into the environment, including discharges to air, surface water and groundwater. Failure to comply with such laws and regulations could result in costs for corrective action, penalties or the

imposition of other liabilities. Changes in laws or the interpretation thereof or the development of new facts could also cause the Company to incur additional capital and operating expenditures to maintain compliance with environmental laws and regulations. The Company is also subject to laws and regulations that impose liability and cleanup responsibility for releases of hazardous substances into the environment without regard to fault or knowledge about the condition or action causing the liability. Under certain of these laws and regulations, such liabilities can be imposed for cleanup of previously owned or operated properties, or properties to which substances or wastes were sent by current or former operations of the Company. The presence of contamination from such substances or wastes could also adversely affect the Company's ability to sell or lease its properties, or to use them as collateral for financing. From time to time, the Company has incurred and is incurring costs and obligations for correcting environmental noncompliance matters and for remediation at or relating to certain of its properties. The Company believes it has complied with, or is currently complying with its environmental obligations to date and that such liabilities will not have a material adverse effect on its business or financial performance, except as discussed in the following paragraph.

A former subsidiary of the Company has been named within a group of defendants who are alleged to have caused contamination and pollution of the water shed basin in Orange County, California. Damages in excess of $140 million are being sought to recover compensatory and other damages, including all necessary funds to investigate, monitor, remediate, abate, or contain contamination of groundwater within the district. This action was commenced during fiscal 2006 and has been actively defended throughout the duration. The Company believes it has valid defenses in its favor to refute the allegations.

One of the Company's manufacturing facilities currently uses low-level radioactive source materials in its manufacturing processes to produce products such as electrostatic control devices and smoke-detector ionization elements. The production, storage and transportation of these radioactive materials are subject to federal, state and local laws and regulations. Federal and state regulations also limit the amount of exposure the Company's employees may have to radiation and radioactive materials. The Company has obtained the necessary licenses and approvals required for the business and believes it is in compliance with all applicable regulations concerning radioactive materials and employee safety. The Company has radioactive materials that are a by-product of its current and past manufacturing activities at this site, since there are no readily available disposal sites in the United States for such low-level radioactive waste materials. The Company is currently working with the federal government for the transfer of the waste to a federally-operated site; however, by its nature, the process for completing such arrangements is lengthy and there can be no assurance as to when the government will approve and schedule such a transfer. The Company estimates the cost to dispose of such materials to an approved site will be in the range of $600,000. If the Company were to discontinue the activities at this facility, such an action would require the Company to decontaminate and decommission the facility.

Certain federal and state environmental superfund statutes generally impose joint and several liabilities on present and former owners and operators, transporters and generators for remediation of contaminated properties, regardless of fault. The Company has been designated as a potentially responsible party under these statutes at a number of sites. Based on the facts currently known to management, the Company expects that the costs of remedial actions at the sites where it has been named a potentially responsible party will not have a material adverse effect on its financial position, results of operations or cash flows.

The Company's facilities are also subject to many other federal, state, local and statutory requirements relating to the protection of the environment, and the Company has made, and will continue to make, expenditures to comply with these provisions. The Company believes that its facilities are in material compliance with these laws and regulations, and that future compliance with these laws and

regulations will not have a material adverse affect on its financial position, results of operations or cash flows.

The Company estimates that future remediation and other required environmental expenditures will be approximately $6 million.

**K.  Accomplishments During Chapter 11; Go-Forward Strategy**

The Company's need to file for chapter 11 bankruptcy arose due to the combination of a number of factors including, among other things, cumbersome obligations under an unworkable capital structure, the recent unprecedented global financial crisis, increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets, pressures from the Company's customers and suppliers, and progressively unsustainable domestic retiree legacy liabilities.  In light of these factors, the Company concluded that commencement of the Chapter 11 Cases would afford the Company the best opportunity for restructuring its affairs and for developing and implementing a long-term, go-forward strategy.  To this end, the Company has successfully implemented certain key initiatives during the time that the Company has been in chapter 11.  The Company believes that it has accomplished or will accomplish prior to emergence from chapter 11 nearly all of the actions which it required chapter 11 to address, including, among other things, the restructuring of its balance sheet.

1.  *Strategic Initiatives*

During these Chapter 11 Cases, the Company has implemented certain cost saving initiatives and other strategic action items.  These initiatives include consolidating a Canadian manufacturing and distribution operation into three existing facilities in the U.S. and reducing corporate overhead in Europe and the U.S.  In addition, the Company has consolidated two of its technical centers into one facility.  The Company estimates that these initial consolidations will result in annual savings of approximately $22 million.

2.  *Reasons for Emergence at This Time*

Although the Company has accomplished many important goals through the tools afforded by chapter 11, the Company believes that the prospects for further operational improvement will be best achieved outside of chapter 11, and that chapter 11, in fact, is neither necessary nor conducive to moving forward with the operational turnaround of the business.

The Company's key remaining operational challenges, in the Company's judgment, do not require chapter 11 and, in fact, are better addressed outside of chapter 11.  In this respect, there are continued costs to remaining in chapter 11 that warrant emergence at this time, including the concern of employees over job security, the continued administrative costs of the chapter 11 process, the continued diversion of management time to the chapter 11 process, and the negative impact on the Company's ability to attract new business, among others.  Upon emergence from chapter 11, management will be free to focus their energies on system-wide implementation of strategic initiatives.

3.  *The Company's Future Strategy*

(a)  Power Transmission

Power Transmission is a leader in technical innovation and is currently working towards the development of key new products which include timing belts in oil, spring dampers, switchable waterpumps, and self tensioning systems.  In addition, Power Transmission continues to monitor and

react to its OEM customers' evolving expectations and preferences, including their desire for suppliers of systems rather than individual components and for improvements in fuel economy and emissions through optimized power transmission systems.  In addition, Power Transmission is working towards optimizing its footprint by allocating production to Asia and emerging markets and adjusting its global capacity to match its global requirements.

(b)     Air Intake & Cooling

Air Intake & Cooling is a leader in plastic intake system design and manufacturing technology as a result of its competitive strength in research & development.  Air Intake & Cooling has begun supplying OEMs with sub-assembly modules which include intake, cooling, and exhaust gas recirculation components to meet critical emissions and consumption requirements being implemented around the world.

OEM customers require suppliers to be focused on improving emissions and fuel economy through leading edge systems, and/or are looking for a one stop shop for integrated intake, cooling, and emissions recovery systems.  Air Intake & Cooling is actively implementing initiatives in response to its OEM customers' preferences in  order to ensure new business.  In addition, Air Intake & Cooling is working on developing products for both diesel and gasoline engines, and expanding into Asian markets.

(c)     IVHS

IVHS is a leader in design and manufacturing of radio frequency based electronic toll collection equipment and is currently developing a next generation of products with greater flexibility and performance versus the competition.  IVHS plans to gain new business through expanded retail sales, new transportation authority contracts, rental car company contracts, and the renewal of existing government agency contracts.  IVHS's manufacturing operations currently match their capacity requirements and geographic needs.

(d)     IDS

IDS designs information display systems and lighting for buses, trains, and airplanes.  IDS's differentiation is based on integrating technology to improve display systems and lighting for its customers.  IDS's strategy to acquire new customers is focused on the aerospace and transportation lighting industries, and IDS is successfully executing this strategy by delivering world class products on existing contracts as well as nurturing relationships with OEMs.  In addition, IDS is seeking acquisitions which will enable it to expand geographically and develop relationships with potential customers.  IDS is currently implementing a footprint optimization program.

## VII.     SUMMARY OF THE PLAN

THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND

PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES-IN-INTEREST.

## A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the order confirming the plan, the order confirming the plan discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria. The Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that (1) Class 5 Subsidiary Interests shall not apply to the plan proposed by Mark IV and (2) Class 9 Old Equity Interests shall be deemed to apply only to the plan proposed by Mark IV.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims; (b) the Claims in certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims; and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. The Plan provides that Holders of First Lien Lender Secured Claims will receive a distribution consisting of such Claimholders' Pro Rata participation in the Restructured Debt Term Loan Agreement and Pro Rata Share of 92% of the new common stock of Reorganized Mark IV (the "New Common Stock") (prior to dilution from the Management Equity Incentive Program), and Holders of Allowed General Unsecured Claims will receive such Claimholders' Pro Rata Share of 8% of the New Common Stock (prior to dilution from the Management Equity Incentive Program), with the number of shares New Common Stock available to be distributed to Holders

of Allowed General Unsecured Claims of each Debtor as set forth on Exhibit A to the Plan. Holders of General Unsecured Convenience Claims will receive a distribution consisting of Cash in an amount equal to the lesser of (a) [●]% of such Allowed General Unsecured Convenience Claim, or (b) such Claimholders' Pro Rata share of $[●]. Furthermore, the Existing Securities of the Debtors will be cancelled on the Effective Date of the Plan and Holders of the Existing Securities will not receive distributions under the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

**B.    Reorganized Capital Structure Created by Plan**

The Plan contemplates Mark IV's emergence from chapter 11 as a privately-held company. The Plan sets forth the capital structure for the Reorganized Debtors upon their emergence from chapter 11, which is summarized as follows:

1.    *Equity*

On the Effective Date, [●] shares of New Common Stock will be issued as follows: (a) 92% of the New Common Stock will be issued to the First Lien Lenders on a Pro Rata basis on account of their respective Allowed First Lien Lender Secured Claims and (b) 8% of the New Common Stock will be issued to holders of General Unsecured Claims on a Pro Rata basis on account of their respective General Unsecured Claims. The New Common Stock issued to the First Lien Lenders and the General Unsecured Claimholders on the Effective Date will be subject to dilution from the exercise of stock options and/or the grant of restricted stock units and/or other forms of equity-based awards issued to certain members of the Company's senior management and other employees pursuant to the Management Equity Incentive Plan. The equity issued pursuant to the Management Equity Incentive Plan may equal up to [●]% of the New Common Stock on a fully-diluted basis.

As of the Effective Date, Reorganized Mark IV will enter into a stockholders agreement (the "Stockholders Agreement"), the form of which shall be filed as Exhibit G to the Plan, with the holders of New Common Stock. Pursuant to the Plan, any party receiving New Common Stock shall be automatically deemed a party to the Stockholders Agreement. The Stockholders Agreement may provide for, among other things, the election of the board of directors of Reorganized Mark IV, transfer restrictions with respect to the New Common Stock, tag-along rights, drag-along rights, participation rights and information rights.

As of the Effective Date, Reorganized Mark IV will enter into a registration rights agreement (the "Registration Rights Agreement"), the form of which shall be filed as Exhibit E to the Plan, with the holders of New Common Stock. Pursuant to the Plan, any party receiving New Common Stock shall be automatically deemed a party to the Registration Rights Agreement. The Registration Rights Agreement will provide for, among other things, customary demand registration rights with respect to the shares of New Common Stock.

2.    *Exit Facility*

On the Effective Date, the Reorganized Debtors will enter into a credit facility providing financing to the Reorganized Debtors as of the Effective Date having substantially the terms set forth on Exhibit B to the Plan (the "Exit Facility").

3. *Restructured Debt Term Loan Agreement*

On the Effective Date, the Reorganized Debtors will enter into a term loan agreement in the aggregate principal amount equal to $225 million governing the Restructured Debt Term Loans, among Reorganized Dayco Products, LLC as borrower, the other Reorganized Debtors as loan parties, JPMorgan Chase Bank, N.A., as administrative agent, the DIP Lenders (if applicable) with respect to the Deferred Commitment Fee and the First Lien Lenders receiving Restructured Debt Term Loans.

4. *Subsidiary Level Debt*

The Debtors anticipate that the obligations of certain of the Debtors' foreign subsidiaries and affiliates under the various Working Capital Facilities, the Bond Debt and the Chieti Mortgage, as further described in Articles V.D, E and F above, will be unaffected by the Chapter 11 Cases, and thus will be obligations of the Reorganized Company upon emergence from bankruptcy.

## C. Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In view of the

deemed rejection by Class 9 with respect to Mark IV, however, as set forth below, Mark IV will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. See Article X.F of this Disclosure Statement. Although the Debtors believe that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1. <em>Treatment of Unclassified Claims Under the Plan</em>

(a) Administrative Claims

Administrative Claims consist primarily of the costs and expenses of administration of the Chapter 11 Cases incurred by the Debtors. Such costs may include, but are not limited to, the cost of operating the Company's businesses since the Petition Date, the outstanding unpaid fees and expenses of the professionals retained by the Debtors and the Creditors' Committee as approved by the Bankruptcy Court, and the payments necessary to cure prepetition defaults on unexpired leases and executory contracts that are being assumed under the Plan (the "Cure"). All payments to professionals in connection with the Chapter 11 Cases for compensation and reimbursement of expenses, and all payments to reimburse expenses of members of the Creditors' Committee, will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and are subject to approval of the Bankruptcy Court as being reasonable. The Debtors believe that they will have sufficient Cash to pay any professional fees which remain unpaid as of the Effective Date. The Debtors further believe that the aggregate amount of Administrative Claims will not exceed the Reorganized Debtors' ability to pay such Claims when they are allowed and/or otherwise become due. The procedures governing allowance and payment of Administrative Claims are described in Article VII.G of this Disclosure Statement.

Subject to the provisions of Article IX of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date an Administrative Claim becomes an Allowed Administrative Claim or (ii) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the Holder of such Administrative Claim, an Allowed Administrative Claimholder in these Chapter 11 Cases shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which such Debtor (or such Reorganized Debtor) and such Claimholder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided further, however, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

The Debtors have estimated that the amount of Allowed Administrative Claims expected to have been accrued up to the Effective Date will be approximately $[●], consisting primarily of [●] and excluding Professional Fee Claims and Administrative Claims that will be paid in the ordinary course subsequent to the Effective Date. As to Cure costs attributable to the Debtors' assumption of executory contracts and non-residential real property leases that are to be assumed pursuant to the Plan, the Debtors

believe that the aggregate amount of all Cure costs will not be material. The Debtors believe that there will be sufficient funds available to satisfy the ultimate determination of Cure claims.

The Plan provides that all requests for payment of an Administrative Claim (other than Professional Claims and Claims for making a substantial contribution in the Chapter 11 Cases, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (i) which is paid or payable by any Debtor in the ordinary course of business or (ii) the payment of which has been approved by the Bankruptcy Court.

(b)     Priority Tax Claims

Priority Tax Claims are Claims of governmental units for taxes that are entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

Under the Plan, each holder of an Allowed Priority Tax Claim will be entitled to receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (i) equal Cash payments made in accordance with section 1129(a)(9)(C) of the Bankruptcy Code on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (i) above, or (iii) payment in full in Cash on the Effective Date.

The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $[●].

2.      *Treatment of Classified Claims Against, and Interest in, the Debtors Under the Plan*

(a)     Class 1, Secured Tax Claims

The Plan defines a Secured Tax Claim as a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (ii) the date a Secured Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above. The Debtors' failure to object to a Secured Tax Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend

against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Secured Tax Claim.

Secured Tax Claims are Unimpaired. The Debtors estimate that the aggregate amount of Secured Tax Claims payable under the Plan will be approximately $[●].

(b) Class 2, Other Secured Claims

The Plan defines an Other Secured Claim as a Claim (other than a DIP Claim, a Deferred Commitment Fee Claim, an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, a General Unsecured Claim, and a General Unsecured Convenience Claim) that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the Holder of such Claim.

The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Secured Claim becomes an Allowed Other Secured Claim or (ii) the date an Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Other Secured Claim, the Debtors (or Reorganized Debtors) shall, at the option of the Debtors, in full satisfaction, settlement, release, and discharge of and in exchange for such Other Secured Claim, (x) pay Cash equal to the amount of such Allowed Other Secured Claim, (y) return the collateral to the secured creditor with respect to such Other Secured Claim, or (z) reinstate such Other Secured Claim in accordance with the provisions of subsection 1124 of the Bankruptcy Code. The Debtors' failure to object to an Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Secured Claim.

Other Secured Claims are Unimpaired. The Debtors have estimated that the aggregate amount of Secured Claims payable under the Plan will be approximately $[●].

(c) Class 3, Other Priority Claims

The Plan defines an Other Priority Claim as a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (ii) the date an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Other Priority Claim, each Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (x) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing, provided that such

treatment is not more favorable than the treatment in clause (x) above. The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Priority Claim.

Other Priority Claims are Unimpaired. The Debtors estimate that the aggregate amount of Other Priority Claims payable under the Plan will be approximately $[●].

(d)     Class 4, Intercompany Claims

The Plan defines an Intercompany Claim as (i) a Claim by any Debtor against a Debtor; (ii) a Claim by any Debtor against a Mark IV Non-Debtor; or (iii) a Claim by any Mark IV Non-Debtor against a Debtor.

The Plan provides that Intercompany Claims will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (i) released, waived and discharged as of the Effective Date, (ii) contributed to the capital of the obligor corporation, (iii) dividended, or (iv) remain unimpaired.

Intercompany Claims are Unimpaired.

(e)     Class 5, Subsidiary Interests

Class 5 Subsidiary Interests applies to the Plan with respect to all of the Debtors except for Mark IV.

The Plan defines Subsidiary Interests as, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other instruments evidencing an ownership interest in the applicable Subsidiary Debtor as of the Effective Date, and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the applicable Subsidiary Debtor, as of the Effective Date.

Subsidiary Interests are Unimpaired. Subsidiary Interests shall be unaffected by the Plan, except to the extent required by the Restructuring Transactions.

(f)     Class 6, First Lien Lender Secured Claims

The Plan defines a First Lien Lender Secured Claim as a First Lien Lender Claim equal to secured portion under section 506 of the Bankruptcy Code of the First Lien Lender Claims as fixed pursuant to, and for all purposes of, the Plan.

Notwithstanding any provision to the contrary in the Plan, upon entry of the Confirmation Order, all First Lien Lender Secured Claims shall be allowed in full in the aggregate amount of $350 million and shall constitute Allowed Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

First Lien lender Secured Claims are Impaired. The Plan provides that, on the Effective Date, each Holder of an Allowed First Lien Lender Secured Claim shall receive in full satisfaction,

settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of each component of the First Lien Lenders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by the First Lien Agent as a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed First Lien Lender Secured Claim, and the denominator of which is equal to the aggregate amount of all Allowed First Lien Lender Secured Claims. Any adequate protection claims of the First Lien Lenders pursuant to the DIP Facility Order shall be deemed satisfied by the treatment of Class 6 Claims.

        (g)        Class 7, General Unsecured Claims

The Plan defines a General Unsecured Claim as a Claim that is not an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Secured Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, and a General Unsecured Convenience Claim, provided that, General Unsecured Claims shall include Deficiency Claims, provided further that, General Unsecured Claims shall not include a Claim that is disallowed or released, whether by operation of law or pursuant to a Final Order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

Notwithstanding any provision to the contrary in the Plan, upon entry of the Confirmation Order, all (i) First Lien Lender Deficiency Claims shall be allowed in full in the aggregate amount of $485 million and (ii) Second Lien Lender Claims shall be allowed in full in the aggregate amount of $[●] million. All First Lien Lender Deficiency Claims and Second Lien Lender Claims shall constitute Allowed General Unsecured Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

General Unsecured Claims are Impaired. The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (ii) the date a General Unsecured Claim becomes payable pursuant to an agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata share of the General Unsecured Claimholders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Claim, and the denominator of which is equal to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, the New Common Stock distributions on account of the First Lien Lender Deficiency Claims and the Second Lien Lender Claims shall be made on the Effective Date.

        (h)        Class 8, General Unsecured Convenience Claims

The Plan defines a General Unsecured Convenience Claim as a Claim against the Debtors that otherwise would be included in the General Unsecured Claim Class that is in an amount (i) of $[●] or less, or (ii) greater than $[●] and the Holder of such Claim has made the Convenience Class Election on the Ballot provided for voting on the Plan within the time fixed by the Bankruptcy Court for completing and returning such Ballot to accept Cash in an amount equal to the lesser of (x) [●]% of such Allowed General Unsecured Convenience Claim, or (y) such Claimholders' Pro Rata share of $[●], all in full satisfaction, discharge and release of such Claim.

General Unsecured Convenience Claims are Impaired. The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Convenience Claim becomes an Allowed General Unsecured Convenience Claim or (ii) the date a General Unsecured Convenience Claim becomes payable pursuant to any agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Convenience Claim, each Holder of an Allowed General Unsecured Convenience Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Convenience Claim, Cash in an amount equal to the lesser of (a) [●]% of such Allowed General Unsecured Convenience Claim or (b) such Claimholders' Pro Rata share of $[●], with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Claim, and the denominator of which is equal to the aggregate amount of all Allowed General Unsecured Claims.

(i)        Class 9, Old Equity Interests

Class 9 Old Equity Interests applies to the Plan with respect to Mark IV only.

The Plan defines Old Equity Interests as Interests in respect of the Old Common Stock issued and outstanding prior to the Effective Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of such common stock of Mark IV or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

Old Equity Interests are Impaired. The Plan provides that Old Equity Interests shall be cancelled, released, and extinguished, and Holders of such Interests shall neither receive nor retain any property on account of such Interests.

3.        *Reservation of Rights Regarding Claims*

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims.

**D.        Means for Implementation of the Plan**

1.        *Continued Corporate Existence*

Subject to any Restructuring Transactions contemplated by the Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Effective Date, except to the extent such Organizational Documents are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

2.      *Corporate Action*

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

3.      *Certificate of Incorporation and Bylaws*

The Certificate of Incorporation for Reorganized Mark IV is attached to the Plan as Exhibit H and the bylaws for Reorganized Mark IV is attached to the Plan as Exhibit I. The Organizational Documents of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (x) a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, until two (2) years after the Effective Date.

4.      *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under the Plan, shall be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under the Plan, as the case may be, shall be released and discharged.

5.      *Authorization and Issuance of New Common Stock*

(a)      The Certificate of Incorporation for Reorganized Mark IV shall authorize [●] shares of New Common Stock. On the Effective Date, Reorganized Mark IV shall (i) issue [●] shares of New Common Stock Pro Rata to the Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) and (ii) issue [●] shares of New Common Stock Pro Rata to Holders of General Unsecured Claims (or in the case of a First Lien Lender Deficiency Claim or Second Lien Lender Claim, such First Lien Lender's or Second Lien Lender's Permitted Nominees). A summary description of the New Common Stock is set forth as Exhibit D attached to the Plan.

(b)      The New Common Stock issued under the Plan shall be subject to economic and legal dilution based upon (i) the issuance of New Common Stock pursuant to, or upon the exercise of New Common Stock equivalents issued pursuant to, the Management Equity Incentive Plan as set forth in Section 6.8 of the Plan, and (ii) any other shares of New Common Stock issued after the Effective Date.

(c)      The issuance of the New Common Stock, including the shares of the New Common Stock reserved by Reorganized Mark IV in connection with the Management Equity Incentive Plan to be entered into in connection with the Restructuring Transactions is authorized without

the need for any further corporate action or action by any other party.

(d)     All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.

(e)     The New Common Stock issued under the Plan shall be subject to the terms of the Stockholders' Agreement and a Registration Rights Agreement, and the holders thereof shall automatically be deemed a party thereto as of the Effective Date.

6.     *Directors and Officers*

(a)     The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the terms of the Organizational Documents and any applicable employment agreements.

(b)     On the Effective Date, the term of the current members of the board of directors of Mark IV shall expire.  The initial board of directors of Reorganized Mark IV shall consist of five (5) directors.  The First Lien Lenders shall designate four (4) directors (including the Chairman).  Subject to the consent of the First Lien Lenders (such consent not to be unreasonably withheld), the remaining director shall be a senior executive officer of Mark IV in place immediately prior to the Effective Date.  Thereafter, the board of directors of Reorganized Mark IV will be elected in accordance with the Stockholders' Agreement and the Organizational Documents of Reorganized Mark IV.

(c)     The Debtors shall file on or before the Exhibit Filing Date a notice of the identities of the members of the board of directors of Reorganized Mark IV to serve as of the Effective Date.  The existing directors of each Subsidiary Debtor shall remain in their current capacities as directors of the applicable Reorganized Subsidiary Debtor until replaced or removed in accordance with the Organizational Documents of the applicable Reorganized Subsidiary Debtor.

(d)     Other provisions governing the service, term and continuance in office of the members of the board shall be as set forth in the Organizational Documents of the Reorganized Debtors.

7.     *Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs*

(a)     The proposed terms of employment agreements for certain key employees of the Reorganized Debtors, to be effective on the Effective Date, are summarized in Exhibit J attached to the Plan (the "Executive Employment Agreements").  The Executive Employment Agreements shall be in form and substance reasonably satisfactory to the First Lien Agent.

(b)     With the exception of those individuals (i) whose employment terms are summarized in Exhibit J to the Plan, and (ii) the terms of whose employment agreements are subject to a rejection motion as of the Confirmation Hearing, to the extent that any of the Debtors has in place as of the Effective Date employment, severance (change in control), retirement, indemnification and other agreements with their respective active directors, officers, managing members and employees who will continue in such capacities or a similar capacity after the Effective Date, or retirement income plans, welfare benefit plans and other plans for such Persons, such agreements, programs and plans will remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, programs and plans except to the extent provided in the Plan without prejudice to the Reorganized

Debtors' authority to modify or eliminate any such agreements, programs or plans as permitted under applicable non-bankruptcy law. Benefits provided under such agreements or plans may include benefits under qualified and non-qualified retirement plans; health and dental coverage; short and long-term disability benefits; death and supplemental accidental death benefits; vacation; leased car; financial consulting, tax preparation and estate planning as well as an annual physical examination, each paid or provided commensurate with an employee's position in accordance with the applicable Reorganized Debtor's policies then in effect. Such agreements and plans also may include equity, bonus and other incentive plans in which officers, managing members and other employees of the Reorganized Debtors may be eligible to participate; provided, however, such equity, bonus and other incentive plans shall not provide for the issuance of New Common Stock and to the extent that such equity, bonus and other incentive plan provides for the issuance of Existing Securities, such provision shall be deemed null and void and the officers, managing members and other employees shall waive any right to enforce such provisions; provided, further, however, that pursuant to the Management Equity Incentive Plan, there shall be reserved for certain members of management, directors, and other employees of the Reorganized Debtors a certain number of shares of New Common Stock and other securities all as more fully described in the Plan.

(c)     Notwithstanding anything to the contrary in the Plan, following the Effective Date of the Plan, with respect to the payment of "retiree benefits" (as such term is defined in section 1114 of the Bankruptcy Code) related to medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation the Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify.

(d)     Notwithstanding anything to the contrary in the Plan, the terms of the KEIP shall not be modified, altered, or amended. Those certain incentive payments provided for in the KEIP shall be paid in the amounts and at such times as contemplated by the KEIP.

8.     *Implementation of the Management Equity Incentive Program*

A summary of the Management Equity Incentive Plan is attached to the Plan as Exhibit C. On the Effective Date, the Reorganized Debtors shall implement the Management Equity Incentive Plan in order to promote the operations of the Reorganized Debtors by offering incentives to key employees who are primarily responsible for the growth and prosperity of the Reorganized Debtors, and to attract and retain qualified employees and thereby benefit the shareholders of the Reorganized Debtors based on the performance of the Reorganized Debtors. Pursuant to the Management Equity Incentive Plan, the Reorganized Debtors shall deliver certain stock options to certain members of management and other employees as of and after the Effective Date, in such amounts and pursuant to such terms as set forth in the Management Equity Incentive Plan. Payments to eligible employees under the Management Equity Incentive Program shall include all earned and due incentive payments, including, without limitation, payments due under the KEIP.

The Management Equity Incentive Plan will be administered by Reorganized Mark IV's board of directors. In applying and interpreting the provisions of the Management Equity Incentive Plan, the decisions of Reorganized Mark IV's board of directors shall be final.

9.     *Issuance of the New Common Stock*

On the Effective Date, Reorganized Mark IV shall issue the New Common Stock in accordance with the terms of the Plan. The issuance of the New Common Stock and the distribution

thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

10. *The Exit Facility*

On the Effective Date, the Reorganized Debtors shall (a) enter into the Exit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Exit Facility reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "Exit Facility Documents"), all of which such Exit Facility Documents shall be in form and substance satisfactory to the Exit Facility Lenders, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date. In the Confirmation Order, the Bankruptcy Court shall approve the Exit Facility in substantially the form filed with the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the Exit Facility Lenders may reasonably require in order to effectuate the treatment afforded to such parties under the Exit Facility.

11. *The Restructured Debt Term Loan Agreement*

On the Effective Date, the Reorganized Debtors shall (a) enter into the Restructured Debt Term Loan Agreement together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Restructured Debt Term Loan Agreement reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "Restructured Debt Term Loan Agreement Documents"), all of which such Restructured Debt Term Loan Agreement Documents shall be in form and substance satisfactory to the First Lien Agent, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date. In the Confirmation Order, the Bankruptcy Court shall approve the Restructured Debt Term Loan Agreement in substantially the form filed with the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the First Lien Agent may reasonably require in order to effectuate the treatment afforded to such parties under the Restructured Debt Term Loan Agreement. Further, on the Effective Date, the Restructured Debt Term Loan Agreement shall become effective and govern the original amount of $225 million of term loans deemed made by the DIP Lenders, in the case of the Deferred Commitment Fee Claims, and by the First Lien Lenders, in the case of the First Lien Lender Secured Claim. The Restructured Debt Term Loan shall be comprised of the following: (a) to the extent not paid with proceeds of the Exit Facility, the DIP Lenders shall be deemed to have made term loans in an aggregate amount equal to the Deferred Commitment Fee Claims, secured by a second lien on all assets granted to secure the Exit Facility; (b) up to $200 million of term loans to be allocated between the U.S. and Europe deemed made by the First Lien Lenders, with such $200 million to be reduced dollar for dollar by the amount of any term loans deemed made in satisfaction of the Deferred Commitment Fee Claims, and such term loans to be secured by a third lien on all assets granted to secure the Exit Facility; and (c) $25 million of pay-in-kind term loans deemed made by the First Lien Lenders, to be secured by a third lien on all assets granted to secure the Exit Facility, in each case as set forth in Exhibits B and K to the Plan. On the Effective Date, each First Lien Lender shall automatically be deemed a party to the Restructured Debt Term Loan Agreement.

12. *Restructuring Transactions and Alternative Structures*

The Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations under the Plan of each Reorganized Debtor party to such merger. In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Reorganized Debtor under the Plan.

13. *Preservation of Causes of Action*

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached to the Plan as Exhibit L. The Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided in the Plan, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit L to the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of the Plan.

14. *Exclusivity Period*

Subject to Section 13.2 of the Plan, the Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date; provided that, the First Lien Agent consents to any material amendment or modification of the Plan, such consent not to be unreasonably withheld.

15. *Effectuating Documents; Further Transactions*

The Chief Financial Officer, or any other executive officer or managing member of the Debtors, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary or Assistant Secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

16. *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan (including, without limitation, pursuant to any grant of collateral under the Reorganized Debtors' Credit Facilities), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## E. Unexpired Leases and Executory Contracts

### 1. *Assumed Contracts and Leases*

On the Effective Date, all executory contracts or unexpired leases of the Debtors (except those executory contracts and unexpired leases to which the Debtors are a party that are specifically listed on the schedule of rejected contracts and leases annexed to the Plan as Exhibit M) will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to Article VII of the Plan shall be Reinstated and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, without amendment or modification.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan.

### 2. *Rejected Contracts and Leases*

Except with respect to executory contracts and unexpired leases that have previously been assumed or are the subject of a motion to assume, or a notice of assumption served pursuant to an order of the Bankruptcy Court, on or before the Confirmation Date, all executory contracts and unexpired leases listed on Exhibit M to the Plan shall be deemed automatically rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

3.      *Exhibits Not Admissions*

Neither the inclusion by the Debtors of a contract or lease on Exhibit M to the Plan nor anything contained in the Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.

4.      *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

The provisions (if any) of each executory contract or unexpired lease to be assumed under the Plan which are or may be in default shall be satisfied solely by Cure. Any person claiming that a monetary cure amount is due in connection with the assumption of any executory contract or unexpired lease as contemplated by section 365(b) of the Bankruptcy Code must file a monetary cure claim with the Bankruptcy Court asserting all alleged amounts accrued through the Effective Date, if any (the "Cure Claim"), no later than thirty (30) days after the Effective Date (the "Cure Claim Submission Deadline"). Any party failing to submit a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting, or seeking to collect any amounts relating thereto against the Debtors or Reorganized Debtors. In the case of a Cure Claim related to an unexpired lease of non-residential real property, such Cure Claim must include a breakdown by category of all amounts claimed, including, but not limited to, amounts for real estate taxes, common area maintenance, and rent. The Debtors shall have thirty (30) days from the Cure Claims Submission Deadline or the date a Cure Claim is actually filed, whichever is later, to file an objection to the Cure Claim. Any disputed Cure Claims shall be resolved either consensually by the parties or by the Bankruptcy Court. Disputed Cure Claims shall be set for status at subsequent hearings following the Cure Claim Submission Deadline with separate evidentiary hearings to be set by the Bankruptcy Court as needed. If the Debtors do not dispute a Cure Claim, then the Debtors shall pay the Cure Claim, if any, to the claimant within twenty (20) days of the Cure Claim Submission Deadline. Disputed Cure Claims that are resolved by agreement or Final Order of the Bankruptcy Court shall be paid by the Debtors within twenty (20) days of such agreement or Final Order of the Bankruptcy Court.

5.      *Rejection Damages Bar Date*

If rejection of an executory contract or unexpired lease rejected pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected. Any Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as a General Unsecured Claim.

## F.      **Provisions Governing Distributions**

1.      *Time of Distributions*

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, distributions under the Plan shall be made on a Periodic Distribution Date.

2.      *No Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after

the Petition Date on any Claim, right, or Interest. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

3.     *Disbursing Agent*

The Disbursing Agent shall make all distributions required under the Plan.

4.     *Claims Administration Responsibility*

The Reorganized Debtors will have sole and absolute discretion in administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims Administration"). The Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the Claims Administration.

5.     *Delivery of Distributions*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or the last known addresses of such Holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change in address. Distributions under the Plan to Holders of DIP Facility Claims shall be made to or at the direction of the DIP Agent and shall be distributed by the DIP Agent in accordance with the DIP Facility. Distributions under the Plan to Holders of First Lien Lender Claims shall be made to or at the direction of the First Lien Agent and shall be distributed in accordance with the First Lien Credit Agreement and the Plan. Distributions under the Plan to Holders of Allowed Second Lien Lender Claims shall be made to or at the direction of the Second Lien Agent and shall be distributed by the Second Lien Agent in accordance with the Second Lien Credit Agreement. Distributions under the Plan to all other Allowed Claimholders shall be made by the Disbursing Agent. If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Disbursing Agent is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property shall revert to the Reorganized Debtors. Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

6.     *Procedures for Treating and Resolving Disputed and Contingent Claims*

(a)     No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)     Distributions After Allowance

Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern distributions to such Claimholders. Subject to Section 8.2 of the Plan, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

## G. Allowance of Certain Claims

### 1. *DIP Facility Claims*

On the Effective Date, the DIP Facility Claims shall be paid in full in Cash, except that Deferred Commitment Fee Claims shall be satisfied pursuant to Section 9.2 of the Plan.

### 2. *Deferred Commitment Fee Claims*

On the Effective Date, all Deferred Commitment Fee Claims shall either (a) be paid in full in Cash or (b) satisfied by the deemed making of Restructured Debt Term Loans under the Restructured Debt Term Loan Agreement.

### 3. *Professional Claims*

(a) Final Fee Applications. All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b) Payment of Interim Amounts. Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date. In order to receive payment on the Effective Date for unbilled fees and expenses incurred through such date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors. Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

(c) On the Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals. The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Reorganized Debtors. The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)     Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate.

4.      *Substantial Contribution Compensation and Expenses Bar Date*

Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the date which is forty-five (45) days after the Effective Date, or be forever barred from seeking such compensation or expense reimbursement.

5.      *Other Administrative Claims*

All other requests for payment of an Administrative Claim (other than as set forth in Sections 9.3 and 9.4 of the Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (a) which is paid or payable by any Debtor in the ordinary course of business or (b) the payment of which has been approved by the Bankruptcy Court.

## H.      **Effect of the Plan on Claims and Interests**

1.      *Revesting of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, Liens and Interests of creditors and equity security Holders (other than as expressly provided in the Plan).  As of the Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

2.      *Discharge of the Debtors*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, confirmation of the Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), the Debtors, the Reorganized Debtors and the Estates (a) from all Claims and Causes of Action, whether known or unknown, and (b) from liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, in each case regardless of whether any property has been distributed or retained pursuant to the Plan on account of such Claims, Causes of Action, rights, liabilities, liens, obligations and Interests, and in each case including, but not limited to, demands and (x) Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests that arose before the Confirmation Date, (y) any Claims, Causes of Actions, rights, liabilities (including withdrawal

liabilities), liens, obligations and Interests to the extent such Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and (z) all Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is filed or deemed filed under section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is allowed under section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim, Cause of Action, right, liability, lien, obligation or Interest accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Effective Date occurring.

As of the Confirmation Date, except as provided in the Plan or in the Confirmation Order or under the terms of the documents evidencing and orders approving the Reorganized Debtors' Credit Facilities, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in Mark IV, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

3.      *Compromises and Settlements*

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims (a) against them and (b) that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 10.1 of the Plan, without any need for Bankruptcy Court approval.

4.      *Release of Certain Parties*

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan or the Reorganized Debtors with respect to each of the Released Parties. Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan shall be deemed to release any of the Debtors or any of their Affiliates from their obligations under the Plan, the Reorganized Debtors' Credit Facilities, and the transactions contemplated hereby and thereby.

5.    *Releases by Holders of Claims*

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim that affirmatively votes in favor of the Plan forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan or the Reorganized Debtors.**

6.    *Setoffs*

Except with respect to Claims specifically Allowed under the Plan, including the First Lien Lender Secured Claims, the First Lien Lender Deficiency Claims and the Second Lien Lender Claims, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

7.    *Exculpation and Limitation of Liability*

Except as otherwise specifically provided in the Plan, the Released Parties shall not have or incur, and are thereby released from, any claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (a) the filing and prosecution of the Chapter 11 Cases, (b) the Reorganized Debtors' Credit Facilities and the documents related thereto, (c) the negotiation and filing of the Plan, (d) the pursuit of confirmation of the Plan, (e) the negotiation and pursuit of approval of the Disclosure Statement, (f) the consummation of the Plan, and (g) the administration of the Plan or the property to be distributed under the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Notwithstanding anything to the contrary contained in the Plan, Section 10.7 of the Plan shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed in bad faith, gross negligence or willful misconduct.

8.    *Indemnification Obligations*

Except as specifically provided in Sections 6.4 and 6.7 of the Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights except those held by Persons included in either the definition of "Insured Persons" or the "Insureds" in any of the policies providing the D&O Insurance shall be released and discharged on and as of the Effective Date; <u>provided that</u> the Indemnification Rights excepted from the release and discharge shall remain in full force and effect on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases; (b) the Debtors or Reorganized Debtors, as the case may be,

covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage for those Persons described in subsection (a)(i) of Section 10.8 of the Plan whose Indemnification Rights are not being released and discharged on and as of the Effective Date, for a period of five years after the Effective Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors or the Reorganized Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"); and (c) the Debtors or the Reorganized Debtors, as the case may be, indemnify such Persons referred to in subclause (b) above to the extent of, and agree to pay for, any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

9. *Injunction*

The satisfaction, release, and discharge pursuant to Article X of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

## VIII. CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference in the Plan) before deciding whether to vote to accept or to reject the Plan:

### A. General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all. The recapitalization of the Debtors realizes the going concern value of the Debtors for their Claimholders. Moreover, reorganization of the Debtors' businesses and operations under the Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of the Debtors' customers, trade vendors, suppliers of goods and services, lessors and other parties-in-interest in these Chapter 11 Cases.

### B. Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Article X of this Disclosure Statement. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders. The Debtors' future results are dependent upon the successful confirmation and implementation of a plan

of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results since the Debtors' ability to obtain financing to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

## C.     Claims Estimations

The Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan. There can be no assurance that the estimated Claim amounts set forth herein are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

## D.     Business Factors And Competitive Conditions Which May Affect the Company's Businesses

1.     *The Continuing Global Economic Crisis May Adversely Affect The Company's Operating Performance*

The current global economic crisis and turbulent financial markets could adversely affect the Company's businesses, results of operations, and financial condition. Lower consumer spending worldwide could lead to a decline in demand for the Company's products and services. If the global credit markets do not improve, the Company could have difficulty in the future refinancing of debt and raising capital for operations.

2.     *The Cyclical Nature Of Automotive Sales And Production May Adversely Affect The Company's Operating Performance*

A significant portion of the Company's businesses are directly related to automotive sales and automotive vehicle production by its customers. Automotive sales and production are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences as well as changes in interest rate levels, consumer confidence, and fuel costs. In addition, automotive sales and production can be affected by labor relations issues, regulatory requirements, trade agreements, and other factors. The Company has historically experienced sales declines during its customers' scheduled shut-downs or shut-downs resulting from unforeseen events. Any significant economic decline that results in a reduction in automotive sales and production by the Company's customers may have a material adverse effect on the Company's businesses, results of operations, and financial condition.

3.     *Customer Financial Difficulty May Adversely Affect The Company's Operating Performance*

The increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets has adversely affected the Company's suppliers as well as its customers. The Company currently experiences accounts receivable concentration risk with respect to some of its largest customers, especially in Europe. If the Company's customers have financial difficulties resulting in the

uncollectibility of certain of the Company's accounts receivable, the Company's financial condition may be adversely affected.

4.    *Competition May Adversely Affect The Company's Operating Performance*

The Company's businesses compete on a variety of factors such as price, product quality, performance or specifications, continuity of supply, customer service, and breadth of product line. Certain of the Company's competitors are larger or have greater financial resources.  Changes in a competitor's business behavior may adversely affect the Company's financial performance.

In addition, many of the Company's end markets are highly competitive.  There can be no assurance that the Company's products will be able to compete successfully with the products of its competitors.  Furthermore, the rapidly-evolving nature of the markets in which the Company competes may attract new entrants, particularly in low cost countries.  As a result, the Company's sales levels and margins could be adversely affected by pricing pressures caused by such new entrants.  These factors have led to selective resourcing of future business to non-U.S. competitors in the past and may continue to do so in the future.  In addition, any of the Company's competitors may foresee the course of market development more accurately than the Company, develop products that are superior to the Company's products, have the ability to produce similar products at a lower cost than the Company, or adapt more quickly than the Company to new technologies or evolving customer requirements.  As a result, the Company's products may not be able to compete successfully with the products of the Company's competitors.

5.    *Reduced Sales Volume May Adversely Affect The Company's Operating Performance*

Sales volume is an important factor in determining the Company's operating results.  The Company's sales volume is influenced by competition and customer demand as further discussed above. A material change in demand, supply, or general economic conditions and uncertainties regarding the Company's future economic viability or ownership could have a material adverse effect on the Company's sales volume and negatively impact operating results.

6.    *Increases in Costs May Adversely Affect the Company's Operating Performance*

The Company may have difficulty in generating cost savings and operational improvements in the future and in adapting its cost structure adequately to adjust for significant changes in production rates, and to offset reductions in the prices paid by its customers and increases in the costs of various manufacturing components and raw materials used in the Company's manufacturing processes. The principal components and raw materials purchased by the Company include polymers, steel, circuit boards, electronic components and light emitting diodes.  The prices of certain of these components and commodities, as well as energy costs including natural gas, electricity, and fuel oil, have markedly increased.  If prices continue to increase, they could result in a negative impact to the Company's operating results.  In addition, the Company's cost structure may be adversely affected by changes in the laws, regulations, policies, or other activities of governments, agencies, and similar organizations where such actions may affect the production, licensing, distribution, or sale of the Company's products, the cost thereof, or applicable tax rates, or affect the cost of legal and regulatory compliance or the cost of financing.

7. *Certain Disruptions In Supply Of And Changes In The Competitive Environment For Materials Integral To The Company's Products May Adversely Affect The Company's Operating Performance*

The Company uses a broad range of materials and supplies, including metals, castings, chemicals, and electronic components in its products. A significant disruption in the supply of these materials could decrease production and shipping levels, materially increase the Company's operating costs, and materially adversely affect the Company's profit margins. Shortages of materials or interruptions in transportation systems, labor strikes, work stoppages, or other interruptions to or difficulties in the employment of labor or transportation in the markets where the Company purchases material, components, and supplies for the production of its products or where its products are produced, distributed, or sold, whether as a result of labor strife, war, acts of terrorism, or otherwise, in each case may adversely affect the Company's profitability. Significant changes in the competitive environment in the markets where the Company purchases material, components, and supplies for the production of the Company's products or where the Company's products are produced, distributed, or sold also may adversely affect the Company's profitability. In addition, the Company's profitability may be adversely affected by changes in economic conditions or political stability in the markets where the Company procures material, components, and supplies for the production of the Company's principal products or where the Company's products are produced, distributed, or sold.

8. *The Company May Suffer Future Asset Impairment And Other Restructuring Charges, Including Write Downs Of Goodwill Or Intangible Assets*

From time to time in the past, the Company has recorded asset impairment losses and closure, severance, and restructuring losses relating to specific plants and operations. Generally, the Company records asset impairment losses when it determines that its estimates of the future undiscounted cash flows from an operation will not be sufficient to recover the carrying value of that facility's building, fixed assets, and production tooling. In light of the shifting nature of the competitive environment in which the Company operates, it is possible that the Company will incur similar losses and charges in the future, and those losses and charges may be significant.

9. *The Company May Lose Or Fail To Attract And Retain Key Salaried Employees And Management Personnel*

The Company's success is largely dependent on the skills, experience, and efforts of its people. While the Company believes that it has excellent depth throughout all levels of management and in all key skill levels of its employees, the loss of the services of one or more members of the Company's senior management or of numerous employees with critical skills could have a negative effect on the Company's business, financial condition and results of operations. If the Company is not able to attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect the Company's ability to fully implement its business objectives.

10. *The Company May Incur Material Losses And Costs As A Result Of Warranty Claims And Product Liability Actions*

The Company faces an inherent business risk of exposure to warranty and product liability claims in the event that its products fail to perform as expected and, in the case of product liability, such failure of its products results, or is alleged to result, in bodily injury and/or property damage. If any of the Company's products are or are alleged to be defective, the Company may be required to participate in a recall involving such products. A recall claim brought against the Company, or a product liability claim brought against the Company in excess of the Company's available insurance,

may have a material adverse effect on the Company's businesses. The Company currently maintains product liability insurance which it believes is both reasonable and comparable to that maintained by other companies of similar size serving similar markets. However, the Company cannot assure you that product liability claims in connection with the Company's current and future products will not exceed such insurance coverage limits or that such insurance will continue to be available on commercially reasonable terms, or at all. Insurance is expensive and in the future may not be available on acceptable terms, if at all. A successful product liability claim or series of claims brought against the Company in excess of its insurance coverage, or a recall of the Company's products, could result in a material adverse effect to the Company's businesses, results of operations and financial condition.

In addition, although the Company cannot assure that the future costs of warranty claims by its customers will not be material, the Company believes its established reserves are adequate to cover potential warranty settlements. The Company's warranty reserves are based on its best estimates of amounts necessary to settle future and existing claims. The Company regularly evaluates the level of these reserves and adjusts them when appropriate. However, the final amounts determined to be due related to these matters could differ materially from the Company's recorded estimates.

11. *The Company Is Subject To Other Litigation*

The Company is a defendant in numerous lawsuits that arise out of, and are incidental to, the current and past conduct of its businesses. These suits concern issues such as asbestos, environmental matters, contract disputes, labor related matters, intellectual property, property damage and personal injury. While it is not feasible to predict the outcome of all pending suits and claims, the ultimate resolution of these matters could have a material adverse effect upon the Company's businesses, results of operations and financial condition, and the resolution of any matters during a specific period could have a material adverse effect on the Company's quarterly or annual operating results for that period.

12. *The Company's Intellectual Property May Be Misappropriated Or Subject To Claims Of Infringement*

The Company attempts to protect intellectual property rights through a combination of patent, trademark, copyright and trade secret laws, as well as licensing agreements and third-party nondisclosure and assignment agreements. The Company's failure to obtain or maintain adequate protection of its intellectual property rights for any reason could have a material adverse effect on its businesses, results of operations and financial condition.

The patents the Company owns could be challenged, invalidated or circumvented by others and may not be of sufficient scope or strength to provide the Company with any meaningful protection or commercial advantage. Patent applications in the United States are maintained in secrecy until patents are issued, and since publication of discoveries in the scientific or patent literature tends to lag behind actual discoveries by several months, the Company cannot be certain that it will be the first creator of inventions covered by any patent application it makes or the first to file patent applications on such inventions. Further, the Company cannot assure you that it will have adequate resources to enforce its patents.

The Company's competitors domestically and internationally, many of which have substantially greater resources and have made substantial investments in competing technologies, may have applied for or obtained, or may in the future apply for and obtain, patents that will prevent, limit or otherwise interfere with the Company's ability to make and sell its products. The Company has not conducted an independent review of patents issued to third parties. The Company cannot assure you that competitors will not infringe on any of its patents.

Significant litigation regarding intellectual property rights exists in certain of the industries in which the Company operates. It is possible that third parties will make claims of infringement against the Company or against its licensees or manufacturers in connection with their use of the Company's technology. Any claims, even those without merit, could:

- be expensive and time consuming to defend;

- cause the Company to cease making, licensing or using products that incorporate the challenged intellectual property;

- require the Company to reengineer its products, if feasible;

- divert management's attention and resources; or

- require the Company to enter into royalty or licensing agreements in order to obtain the right to use a necessary product or component.

Any royalty or licensing agreements, if required, may not be available to the Company on acceptable terms or at all. A successful claim of infringement against the Company or one of its licensees in connection with its use of the Company's technology could materially adversely affect the Company's businesses, results of operations and financial condition.

The Company also relies on unpatented proprietary technology. It is possible that others will independently develop the same or similar technology or otherwise obtain access to the Company's unpatented technology. To protect the Company's trade secrets and other proprietary information, the Company requires employees, consultants, advisors and collaborators to enter into confidentiality agreements. The Company cannot assure you that these agreements will provide meaningful protection for its trade secrets, know-how or other proprietary information in the event of any unauthorized use, misappropriation or disclosure of such trade secrets, know-how or other proprietary information. If the Company is unable to maintain the proprietary nature of its technologies, its businesses, results of operations and financial condition could be materially adversely affected.

Moreover, with respect to both existing and proposed international and domestic operations, the Company cannot assure you that changes in current or future laws or regulations or future judicial intervention would not have a material adverse effect on the Company. The Company is unable to predict the effect that any future international or domestic legislation or regulation may have on its existing or future business.

13.     *IVHS May Not Be Successful in Procuring New Contracts With The IAG*

A substantial portion of IVHS's revenue is generated from products and services provided to the IAG, which represents a consortium of over 20 different toll agencies across 14 different states. The Company's contracts with various members of the IAG do not extend beyond 2010. The Company is currently in the process of bidding to furnish and provide electronic toll collection technology and associated subsystem components and services for the operation of the E-ZPass® system to the IAG beyond 2010. If the Company is not selected to provide these components and services, IVHS may experience a significant reduction in its operating performance.

IVHS is currently involved in an intellectual property dispute with TransCore – a unit of Ropert Industries. The Company believes that TransCore is infringing on certain of the Company's patents with respect to IVHS's radio frequency identification electronic toll applications. If the dispute is

not resolved, the Company intends to file a lawsuit seeking to enforce its patent rights. If the Company is unsuccessful in defending its patents rights, its chances of being selected by the IAG in the bidding process described above may be significantly reduced.

14.    *The Company Is Subject To Significant Environmental Regulation And Environmental Compliance Expenditures And Liabilities*

The Company's businesses are subject to many environmental laws and regulations. Compliance with these laws and regulations is a significant factor in the Company's businesses. The Company has incurred and expects to continue to incur significant expenditures to comply with applicable environmental laws and regulations. Moreover, some or all of the environmental laws and regulations to which the Company is subject could become more stringent or more stringently enforced in the future. The Company's failure to comply with applicable environmental laws and regulations and permit requirements could result in civil or criminal fines or penalties or enforcement actions, including regulatory or judicial orders enjoining or curtailing operations or requiring corrective measures, installation of pollution control equipment or remedial actions.

Some environmental laws and regulations impose liability and responsibility on present and former owners, operators or users of facilities and sites for contamination at such facilities and sites without regard to causation or knowledge of contamination. In addition, the Company occasionally evaluates various alternatives with respect to its facilities, including possible dispositions or closures. Investigations undertaken in connection with these activities may lead to discoveries of contamination that must be remediated, and closures of facilities may trigger compliance requirements that are not applicable to operating facilities. Consequently, the Company cannot assure you that existing or future circumstances or developments with respect to contamination will not require significant expenditures by the Company

One of the Company's manufacturing facilities currently uses low-level radioactive source materials in its manufacturing processes to produce products such as electrostatic control devices and smoke-detector ionization elements. The production, storage and transportation of these radioactive materials are subject to federal, state and local laws and regulations. Federal and state regulations also limit the amount of exposure the Company's employees may have to radiation and radioactive materials. The Company has obtained the necessary licenses and approvals required for the business and it believes that it is in compliance with all applicable regulations concerning radioactive materials and employee safety. The Company has radioactive materials that are a by-product of its current and past manufacturing activities at this site, since there are no readily available disposal sites in the United States for such low-level radioactive waste materials. The Company is currently working with the federal government for the transfer of the waste to a federally operated site; however, by its nature, the process for completing such arrangements is lengthy and there can be no assurance as to when the government will approve and schedule such a transfer. The Company estimates the cost to dispose of such materials to an approved site will be in the range of $600,000, and such amount has been recognized as a liability on the Company's consolidated balance sheet. Although no plans presently exist for the Company to discontinue the activities at this facility, if and when such an action would take place, the Company would be required to decontaminate and decommission the facility.

15.    *Actual Costs For Environmental Matters May Vary From The Estimates*

Actual costs and future estimated costs for identified environmental situations may change. Given the inherent uncertainties in evaluating environmental exposures due to unknown conditions, changing government regulations and legal standards regarding liability and evolving related

technologies, the Company could have higher future environmental expenditures than the Company has estimated.

16.     *The Company Is An International Company Subject To Uncertainties Which Could Affect Its Operating Results*

Approximately 71% of the Company's sales in fiscal 2009 were derived from sales outside of the United States, and the Company believes that revenue from sales outside of the United States will continue to account for a material portion of its total sales for the foreseeable future.  As a result, the Company's businesses may be subject to a number of risks, including:

•       fluctuations in currency exchange rates;

•       international customers may have longer payment cycles than customers in the United States;

•       tax rates in some international countries may exceed those of the United States and international earnings may be subject to withholding requirements or the imposition of tariffs, exchange controls or other restrictions;

•       general economic and political conditions in the countries where the Company operates may have an adverse effect on the Company's operations in those countries or not be favorable to the Company's growth strategy;

•       governments may adopt regulations or take other actions that would have a direct or indirect adverse impact on the Company's business and market opportunities;

•       the difficulties associated with managing a large organization spread throughout various countries; and

•       the potential difficulty in enforcing intellectual property rights in some international countries.

The Company's success depends, in large part, on its ability to anticipate and effectively manage these and other risks associated with its international operations.  However, any of these factors could adversely affect the Company's international operations and, consequently, its operating results.

Although the Company's non-U.S. subsidiaries have attempted, and will continue to attempt, to match costs and revenues and borrowings and repayments in terms of their respective local currencies, payment for the Company's products has been, and may continue to be, required to be made in currencies, including dollars, other than local currencies.  In addition, the value of the Company's investment in its operations is partially a function of the currency exchange rate between the dollar and the applicable local currency.  Accordingly, the Company may experience economic loss and a negative impact on earnings with respect to its holdings abroad solely as a result of foreign currency exchange rate fluctuations, which could include foreign currency devaluations against the dollar.  Most of the countries in which the Company's subsidiaries now conduct business generally do not restrict the removal or conversion of local or foreign currency; however, the Company cannot assure you that situation will continue.  The Company does business in locations with restrictions such as Argentina, Brazil, India and others.

Additionally, because the Company's consolidated financial results are reported in dollars, if the Company generates sales or earnings in other currencies the translation of those results into dollars could result in a significant increase or decrease in the amount of those sales or earnings. In addition, the Company's debt service requirements are primarily in U.S. dollars, even though a significant percentage of the Company's cash flow is generated in international currencies. Significant changes in the value of these international currencies relative to the U.S. dollar could have a material adverse effect on the Company's financial condition and its ability to meet interest and principal payments on its U.S. dollar denominated debt. In addition to currency translation risks, the Company incurs currency transaction risk whenever it or one of its subsidiaries enter into either a purchase or a sales transaction using a currency other than the local currency of the transacting entity. Given the volatility of exchange rates, the Company cannot assure you that it will be able to effectively manage its currency transaction and/or translation risks. It is possible that volatility in currency exchange rates will have a material adverse effect on the Company's businesses, results of operations or financial condition.

During the past several years, certain of the countries in which the Company operates or plans to operate have been characterized by varying degrees of inflation, uneven growth rates and political uncertainty. The Company currently does not have political risk insurance in the countries in which its conducts business. While the Company carefully consider these risks when evaluating investment opportunities, it cannot assure you that it will not be materially adversely affected should these any of these risks materialize.

The Company's strategy includes expanding the Company's European market share and expanding the Company's manufacturing footprint in lower-cost regions. As a result, the Company's exposure to the risks described above may be greater in the future. The likelihood of such occurrences and their potential impact on the Company vary from country to country and are unpredictable.

17. *There Could Be Significant Tax Risks For The Company In Connection With Its International Operations*

Distributions of earnings and other payments, including interest, received from Mark IV's affiliates may be subject to withholding taxes imposed by the jurisdictions in which these entities are formed or operating, which will reduce the amount of after-tax cash Mark IV can receive from its affiliates. In general, a U.S. corporation may claim a foreign tax credit against its federal income tax expense for such foreign withholding taxes and for foreign income taxes paid directly by foreign corporate entities in which it owns 10% or more of the voting stock. The ability to claim such foreign tax credits and to use net foreign losses is, however, subject to a number of limitations, and Mark IV may incur incremental tax costs as a result of these limitations or because Mark IV is not in a tax-paying position in the United States. Mark IV may also be required to include in its income for U.S. federal income tax purposes its proportionate share of certain earnings of its international corporate subsidiaries that are classified as "controlled foreign corporations" without regard to whether distributions have been actually received from such subsidiaries.

18. *As A U.S. Corporation, Mark IV Is Subject To The Foreign Corrupt Practices Act And A Determination That It Violated This Act May Affect Mark IV's Businesses And Operations Adversely*

As a U.S. corporation, Mark IV is subject to the regulations imposed by the Foreign Corrupt Practices Act, or FCPA, which generally prohibits U.S. companies and their intermediaries from making improper payments to international officials for the purpose of obtaining or keeping business. Any determination that the Company has violated the FCPA could have a material adverse effect on the Company.

19. *Changes In Interest Rates May Negatively Affect The Company*

Changes in interest rates and foreign exchange rates may affect the fair market value of the Company's assets. Specifically, decreases in interest rates will positively impact the value of the Company's assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

In addition, some portion of the Reorganized Debtors' indebtedness may contain floating rate interest provisions, which the Reorganized Debtors would pay on a current basis. However, interest on such obligations could rise to levels in excess of the cash available to the Reorganized Debtors. If the Reorganized Debtors are unable to satisfy their obligations under their floating rate debt, it could result in a default under the Reorganized Debtors' credit facilities.

20. *Adverse Publicity May Negatively Affect The Company's Businesses*

Adverse publicity or news coverage relating to the Reorganized Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

**E.  Conditions Precedent to Consummation; Timing**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

**F.  Inherent Uncertainty of Financial Projections**

The Projections set forth in <u>Appendix D</u> annexed hereto cover the operations of the Reorganized Company on a consolidated basis through fiscal year 2014. These Projections are based on numerous assumptions including the timing, confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Company, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Company and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Company's operations.

Critical assumptions underlie the Projections. Events that may have a significant impact on the Reorganized Company's ability to achieve the Projections, and that correspondingly have a material impact on the value of the Company, include, but are not limited to:

- capital markets risk – availability and cost of funds (debt/equity);

- customer volumes significantly below projections;

- increases in availability under accounts receivable factoring facilities in amounts less than those contemplated in the Projections;

- customer/supplier disruptions (e.g., labor strife, financial difficulties);

- unknown significant product (warranty), environmental, or legal liability risk;

- material commodity costs above projections;

- inability to achieve material cost reduction initiatives;

- significant failure to execute restructuring initiatives on a timely basis or at estimated costs;

- significant and unanticipated customer pricing reductions through marketplace pressures;

- change in tax environment;

- health care inflation significantly beyond estimated employee benefit costs and salaried retirement health care;

- pension asset returns below assumed rates of return resulting in additional future cash contributions to the Company's pension plans;

- cash flow constraints from working capital if unsuccessful in returning to pre-bankruptcy payment terms; and

- working capital liquidity pressures if customers are not timely in payments for accounts receivable.

The foregoing variations and assumptions may be material and may adversely affect the ability of the Reorganized Company to make payments with respect to post-Effective Date indebtedness and to achieve the Projections. Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Company intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

## G.    Access to Financing and Trade Terms

The Company's operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support. The Debtors' postpetition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, the Reorganized Debtors' Credit Facilities, and trade terms supplied by vendors. Moreover, if the Debtors or the Reorganized Debtors require working capital and trade financing greater than that provided by projected

operating cash flow, the Reorganized Debtors' Credit Facilities, and trade financing, they may be required either to (1) obtain other sources of financing or (2) curtail their operations. The Debtors believe that the recapitalization to be accomplished through the Plan will facilitate the ability to obtain additional or replacement working capital financing.

No assurance can be given, however, that any additional replacement financing will be available or, if available, accessible on terms that are favorable or acceptable to the Debtors or the Reorganized Debtors. The Company believes that it is important that the Company's performance meets projected results in order to ensure continued support from vendors. There are risks to the Company in the event such support erodes after emergence from chapter 11 that could be alleviated by remaining in chapter 11. Chapter 11 affords a debtor the opportunity to close facilities and liquidate assets relatively expeditiously – tools that will not be available to the Company upon emergence. However, the Debtors believe that the benefits of emergence from chapter 11 at this time outweigh the potential costs of remaining in chapter 11, and that emergence at this time is in the long-term operational best interests of the Company.

## H.    Leverage

The Debtors believe that they will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced. The amount of debt, however, will be significant and circumstances may arise which might cause the Reorganized Debtors to conclude that they are overleveraged, which could have significant negative consequences, including:

- it may become more difficult for the Reorganized Debtors to satisfy all of their obligations;

- the Reorganized Debtors may be vulnerable to a downturn in the markets in which they operate or a downturn in the economy in general;

- the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

- the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industries in which they operate or entry of new competitors into their markets;

- the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

- the Reorganized Debtors may be limited in borrowing additional funds.

The covenants in the Reorganized Debtors' Credit Facilities may also restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness. Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on the Reorganized Debtors' ability to sustain sales conditions in the markets in which the Reorganized

Debtors operate, the economy generally, and other factors that are beyond their control and that are further discussed above. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs. Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity. The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

## I.    Certain Risk Factors Relating to Securities to be Issued Under the Plan

Certain risk factors relating to the securities to be issued under the Plan are described below.

### 1.    *A Liquid Trading Market for the New Common Stock is Unlikely to Develop*

A liquid trading market for the New Common Stock is unlikely to develop. As of the Effective Date, the New Common Stock will not be listed for trading on any stock exchange or trading system and Reorganized Mark IV will not file any reports with the SEC. Consequently, the trading liquidity of the New Common Stock will be limited. The future liquidity of the trading market for the New Common stock will depend, among other things, upon the number of holders of New Common Stock, whether the stock is listed for trading on an exchange, and whether Reorganized Mark IV becomes a public reporting company at some later date.

### 2.    *Potential Dilution of New Common Stock*

The ownership percentage represented by New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from (i) the issuance of New Common Stock pursuant to, or upon exercise of New Common Stock equivalents issued pursuant to, the Management Equity Incentive Plan and (ii) any additional shares of New Common Stock issued after the Effective Date. In the future, similar to all companies, additional equity financings or other share issuances by Reorganized Mark IV could adversely affect the market price of the New Common Stock. Sales by existing holders of a large number of shares of the New Common Stock, or the perception that additional sales could occur, could cause the market price of the New Common Stock to decline.

### 3.    *Dividends*

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Reorganized Mark IV will be a party, including the Reorganized Debtors' Credit Facilities, may limit the ability of Reorganized Mark IV to pay dividends.

### 4.    *Change of Control*

The Organizational Documents for the Reorganized Debtors may contain, and the general corporate law under the jurisdictions of organization for the Reorganized Debtors may contain, provisions that may have the effect of delaying, deterring, or preventing a change in control of Reorganized Mark IV.

## IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only the principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan.  Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Plan.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of Claims or Interests.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., [banks and certain other financial institutions], insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the United States dollar, persons or groups that may be entitled to receive or acquire 5% or more of the stock of any of the Reorganized Debtors, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction).  Furthermore, the following discussion does not address United States federal taxes other than income taxes, and does not address the United States federal income tax consequences of the Plan to holders that own Claims or Interests in more than one Class.

Each holder of a Claim or Interest is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Plan.

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims or Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the IRC, (B) any discussion of federal tax issues contained or referred to in this Disclosure Statement is written in connection with the promotion or marketing of the transactions**

or matters discussed herein, and (C) holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax advisor.

**A.    Certain U.S. Federal Income Tax Consequences to the Debtors**

                1.      *Cancellation of Indebtedness Income*

[TO COME]

                2.      *Net Operating Losses*

[TO COME]

**B.    Certain U.S. Federal Income Tax Consequences to Claimholders**

                1.      *First Lien Lenders*

[TO COME]

                2.      *Holders of General Unsecured Claims*

[TO COME]

**C.    Information Reporting and Backup Withholding**

[TO COME]

**D.    Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH CLAIMHOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN OR CONTEMPLATED BY THE PLAN.

**X.    FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST**

**A.    Feasibility of the Plan**

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors.  This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement.  The Debtors believe that they will be able to timely perform all obligations described in the Plan, and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared financial Projections for fiscal 2010 through 2014, as set forth in <u>Appendix D</u> attached to this Disclosure Statement.  The Projections indicate that the Reorganized Company should have sufficient cash flow to pay and

service the Company's debt obligations and to fund its operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. As noted in the Projections, however, the Debtors caution that no representations can be made as to the accuracy of the Projections or as to the Reorganized Company's ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Reorganized Company's financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse. See <u>Article VIII</u> of this Disclosure Statement for a discussion of certain risk factors that may affect the financial feasibility of the Plan.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

## B.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the Plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

## C.    Best Interests Test

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (1) all members of an impaired class of claims or interests have accepted the plan or (2) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also could prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

**D.      Estimated Valuation of the Reorganized Company**

A copy of the analysis of the total enterprise value of the Reorganized Company is attached to this Disclosure Statement as <u>Appendix E</u> (the "<u>Valuation Analysis</u>").

**E.      Application of the Best Interests Test to the Liquidation Analysis and the Valuation of the Reorganized Company**

A liquidation analysis prepared with respect to the Debtors is attached to this Disclosure Statement as <u>Appendix F</u> (the "<u>Liquidation Analysis</u>"). The Debtors believe that any liquidation analysis is speculative. For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. In preparing the Liquidation Analysis, the Debtors have projected the amount of Allowed Claims based upon a review of their books and records and their scheduled and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected a range for the amount of Allowed Claims with the low end of the range the lowest reasonable amount of the Claims and the high end of the range the highest reasonable amount of the Claims, thus allowing assessment of the most likely range of chapter 7 liquidation dividends to the holders of the Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. In addition, as noted above, the Valuation Analysis of the Reorganized Company also contains numerous estimates and assumptions. For example, the value of the New Common Stock cannot be determined with precision due to the absence of a public market for the New Common Stock.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the Liquidation Analysis and the Valuation Analysis of the Reorganized Company, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each Impaired Class will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. These factors lead to the conclusion that recoveries pursuant the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

The Debtors believe the methodology used to prepare the Liquidation Analysis is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

## F.     Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as it has been accepted by at least one impaired class of claims. The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by Impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Class 9 Old Equity Interests are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims or Interests. Class 9 Old Equity Interests is therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, Mark IV is seeking confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to Class 9 Old Equity Interests, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.

## G. Conditions Precedent

1. *Conditions to Confirmation*

The following are conditions precedent to confirmation of the Plan that must be satisfied unless waived in accordance with Section 11.3 of the Plan:

(a) The Bankruptcy Court shall have approved a disclosure statement with respect to the Plan in form and substance reasonably satisfactory to the Debtors and the First Lien Agent.

(b) The Confirmation Order, the Plan, and all exhibits and annexes to each of the Confirmation Order and the Plan shall be in form and substance reasonably satisfactory to the Debtors and the First Lien Agent.

(c) The First Lien Agent shall be satisfied that the restructuring of Mark IV Industries Corp. and Dayco Europe S.r.l. shall be completed on terms satisfactory to the First Lien Agent on or before the Effective Date.

2. *Conditions to Consummation*

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied unless waived in accordance with Section 11.3 of the Plan:

(a) The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the rejection of unexpired leases and executory contracts by the Debtors as contemplated by Section 7.2 of the Plan.

(b) The Debtors shall have entered into the Reorganized Debtors' Credit Facilities and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c) The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably satisfactory to the Debtors and the First Lien Lenders, shall have been entered by the Bankruptcy Court on or before [●], 2009, and shall be a Final Order.

(d) All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtors and the First Lien Lenders and shall have been effected or executed as applicable.

(e) The Debtors shall have reduced their post-Effective Date obligations in respect of the Legacy Liabilities to an amount reasonably satisfactory to the First Lien Lenders.

**H.     Waiver of Conditions to Confirmation and Consummation of the Plan**

        The conditions set forth in Sections 11.1 (other than 11.1(a)) and 11.2 (other than 11.2(b) and (c)) of the Plan may be waived by the Debtors subject to such waiver being reasonably satisfactory to the First Lien Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

**XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

        The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (A) continuation of the pending Chapter 11 Cases; (B) an alternative plan or plans of reorganization; or (C) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

**A.     Continuation of the Bankruptcy Case**

        If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases.  In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors-in-possession and gaining access to sufficient liquidity to allow them to continue their operations as a going concern.    And as further discussed in Article VI.K herein, the Debtors believe that they have accomplished the goals that chapter 11 has allowed them to achieve, and that the Company's key remaining challenges are operational and therefore do not require that the Company remain in chapter 11.

**B.     Alternative Plans of Reorganization**

        If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases could propose a different plan or plans.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

**C.     Liquidation Under Chapter 7 or Chapter 11**

        If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

        However, the Debtors believe that creditors would lose substantially higher going concern value if the Debtors were forced to liquidate.  In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to the Claimholders and Interestholders under a chapter 11 liquidation plan probably would be delayed substantially.

The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Plan.

## XII. VOTING REQUIREMENTS

On [●], 2009, the Bankruptcy Court entered the Solicitation Procedures Order which, among other things, approved this Disclosure Statement, set procedures for voting on the Plan, and scheduled the Confirmation Hearing. A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballots should be read in connection with this article.

If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please contact:

Epiq Bankruptcy Solutions, LLC
Attn: Mark IV Industries
757 Third Avenue, 3rd Floor
New York, New York 10017
Phone: 646-282-2400
Fax: 646-282-2501

Imaged copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all exhibits, schedules and appendices to the foregoing) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, http://www.nysb.uscourts.gov for a fee (a PACER account is required), or at the Company's restructuring website, http://chapter11.epiqsystems.com/markiv, free of charge. In addition, if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, you may contact Epiq at the address immediately above.

The Bankruptcy Court may confirm the Plan only if the Bankruptcy Court determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11

Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), the Bankruptcy Court may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (A) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the non-acceptance by one or more such Classes; (B) the Plan is "feasible," which means that there is a reasonable probability that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation; and (C) the Plan is in the "best interests" of all Claimholders and Interestholders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE PLAN IS FEASIBLE, AND THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

UNLESS THE BALLOT BEING FURNISHED WITH THIS DISCLOSURE STATEMENT IS TIMELY SUBMITTED TO THE VOTING AGENT SO THAT IT IS RECEIVED ON OR PRIOR TO [●], 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

## A. Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which generally means that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan. If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2)(a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated); (b) such Claimholder has timely filed a proof of claim as to which no objection has been

filed; or (c) such Claimholder has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtors have not opposed the motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Bankruptcy Court.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

## B.      Classes Unimpaired Under the Plan

The following Classes of Claims and Interests are Unimpaired under the Plan: Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims and Class 5 Subsidiary Interests. Under section 1126(f) of the Bankruptcy Code and the Solicitation Procedures Order, such Claimholders and Interestholders, as applicable, are conclusively presumed to have accepted the Plan. Their votes to accept or reject the Plan will not be solicited.

## C.      Classes Impaired Under the Plan

### 1.      *Impaired Classes of Claims Entitled to Vote*

The following Classes of Claims are Impaired under the Plan, and are entitled to vote to accept or reject the Plan: Class 6 First Lien Lender Secured Claims, Class 7 General Unsecured Claims and Class 8 General Unsecured Convenience Claims.

### 2.      *Impaired Classes of Claims and Interests Not Entitled to Vote.*

The following Classes of Claims and Interests are not entitled to receive any distribution under the Plan on account of their Claims and Interests: Class 9 Old Equity Interests. Pursuant to section 1126(g) of the Bankruptcy Code, Class 9 Old Equity Interests, which applies only to the Plan with respect to Mark IV, is conclusively presumed to have rejected the Plan, and the votes of Interestholders in such Class therefore will not be solicited.

## XIII.   CONCLUSION

## A.      Hearing on and Objections to Confirmation

### 1.      *Confirmation Hearing*

The Confirmation Hearing has been scheduled for [●], 2009 at [●] (prevailing Eastern time). Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 2.      *Date Set for Filing Objections to Confirmation of the Plan*

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for

[●], 2009 at [●] p.m. (prevailing Eastern time).  A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

**B.**     **Recommendation**

As stated above, the Plan provides for an equitable and early distribution to creditors of the Debtors, preserves the value of the Debtors' businesses as a going concern, and preserves the jobs of employees.  The Debtors, the First Lien Agent and the Steering Committee believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation and costs, the loss of jobs by the Debtors' employees, and/or impaired recoveries.  Moreover, the Debtors, the First Lien Agent and the Steering Committee believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan.  FOR THESE REASONS, THE DEBTORS, THE FIRST LIEN AGENT AND THE STEERING COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Dated:   June 17, 2009

Respectfully submitted,

Mark IV Industries, Inc., et al.

By:   /s/ Mark G. Barberio
      Mark G. Barberio
      Vice President and Chief Financial Officer of
      Mark IV Industries, Inc.

J. Eric Ivester
Matthew M. Murphy
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

Jay M. Goffman
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
Four Times Square
New York, New York  10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for the Debtors and Debtors-in-Possession

**Appendix A**

**Joint Plan of Reorganization of**
**Mark IV Industries, Inc. and Its Affiliated Debtors and Debtors-in-Possession**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

     In re                   :   Chapter 11

                                 :

MARK IV INDUSTRIES, INC., <u>et al.</u>, :   Case No. 09-12795 (SMB)

                                 :

                                 :   (Jointly Administered)

               Debtors.   :
- - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT PLAN OF REORGANIZATION OF MARK IV INDUSTRIES, INC. <u>AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION</u>

J. Eric Ivester
Matthew M. Murphy
SKADDEN ARPS SLATE MEAGHER
   & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

Jay M. Goffman
SKADDEN ARPS SLATE MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Debtors and Debtors-in-Possession

Dated: June 17, 2009

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND
COMPUTATION OF TIME .................................................................3
A.    Scope of Definitions .............................................................................3
B.    Definitions .............................................................................................3
    1.1    "Administrative Claim" ...............................................3
    1.2    "Affiliates" ....................................................................3
    1.3    "Allowed Claim" ..........................................................3
    1.4    "Allowed Class __ Claim" .........................................4
    1.5    "Avoidance Claims" ....................................................4
    1.6    "Ballot" .........................................................................4
    1.7    "Bankruptcy Code" ......................................................4
    1.8    "Bankruptcy Court" .....................................................4
    1.9    "Bankruptcy Rules" .....................................................4
    1.10    "Business Day" ............................................................4
    1.11    "Cash" ...........................................................................4
    1.12    "Causes of Action" .......................................................5
    1.13    "Chapter 11 Case(s)" ...................................................5
    1.14    "Claim" .........................................................................5
    1.15    "Claimholder" ..............................................................5
    1.16    "Claims Administration" .............................................5
    1.17    "Claims Agent" ............................................................5
    1.18    "Claims Objection Deadline" ......................................5
    1.19    "Class" ..........................................................................5
    1.20    "Confirmation Date" ....................................................5
    1.21    "Confirmation Hearing" ...............................................5
    1.22    "Confirmation Order" ...................................................5
    1.23    "Convenience Class Election" .....................................6
    1.24    "Creditors' Committee" ...............................................6
    1.25    "Cure" ...........................................................................6
    1.26    "Debtors" ......................................................................6
    1.27    "Deferred Commitment Fee" .......................................6
    1.28    "Deferred Commitment Fee Claims" ...........................6
    1.29    "Deficiency Claims" ....................................................6
    1.30    "D&O Insurance" .........................................................6
    1.31    "DIP Agent" ..................................................................6
    1.32    "DIP Facility" ..............................................................6
    1.33    "DIP Facility Claims" ..................................................7
    1.34    "DIP Facility Order" .....................................................7
    1.35    "DIP Lenders" ..............................................................7
    1.36    "Disallowed Claim" .....................................................7
    1.37    "Disbursing Agent" ......................................................7

1.38 &ldquo;Disclosure Statement&rdquo; ................................................................7
1.39 &ldquo;Disputed Claim&rdquo; ......................................................................7
1.40 &ldquo;Distribution Date&rdquo; ...................................................................7
1.41 &ldquo;Effective Date&rdquo; .......................................................................8
1.42 &ldquo;Estates&rdquo; ..................................................................................8
1.43 &ldquo;Executive Employment Agreements&rdquo; ....................................8
1.44 &ldquo;Exhibit&rdquo; ..................................................................................8
1.45 &ldquo;Exhibit Filing Date&rdquo; ...............................................................8
1.46 &ldquo;Existing Securities&rdquo; ...............................................................8
1.47 &ldquo;Exit Facility&rdquo; ..........................................................................8
1.48 &ldquo;Exit Facility Documents&rdquo; ......................................................8
1.49 &ldquo;Exit Facility Lenders&rdquo; ............................................................8
1.50 &ldquo;Face Amount&rdquo; .......................................................................8
1.51 &ldquo;Final Order&rdquo; ...........................................................................9
1.52 &ldquo;First Lien Agent&rdquo; ....................................................................9
1.53 &ldquo;First Lien Credit Agreement&rdquo; ................................................9
1.54 &ldquo;First Lien Lenders&rdquo; .................................................................9
1.55 &ldquo;First Lien Lender Claims&rdquo; .......................................................9
1.56 &ldquo;First Lien Lender Deficiency Claim&rdquo; .....................................9
1.57 &ldquo;First Lien Lenders Plan Distribution Property&rdquo; ......................9
1.58 &ldquo;First Lien Lender Secured Claims&rdquo; ........................................9
1.59 &ldquo;General Unsecured Claim&rdquo; ...................................................10
1.60 &ldquo;General Unsecured Claimholders Plan Distribution
       Property&rdquo; ...............................................................................10
1.61 &ldquo;General Unsecured Convenience Claim&rdquo; ..............................10
1.62 &ldquo;Holdback Amount&rdquo; ...............................................................10
1.63 &ldquo;Holdback Escrow Account&rdquo; ..................................................10
1.64 &ldquo;Holder&rdquo; ................................................................................10
1.65 &ldquo;Impaired&rdquo; .............................................................................10
1.66 &ldquo;Indemnification Rights&rdquo; ......................................................10
1.67 &ldquo;Indemnitee&rdquo; ..........................................................................11
1.68 &ldquo;Insurance Coverage&rdquo; .............................................................11
1.69 &ldquo;Insured Claim&rdquo; .....................................................................11
1.70 &ldquo;Intercompany Claim&rdquo; ............................................................11
1.71 &ldquo;Interest&rdquo; ................................................................................11
1.72 &ldquo;Interestholder&rdquo; ......................................................................11
1.73 &ldquo;KEIP&rdquo; ...................................................................................11
1.74 &ldquo;Legacy Liabilities&rdquo; ...............................................................11
1.75 &ldquo;Lien&rdquo; .....................................................................................11
1.76 &ldquo;Management Equity Incentive Program&rdquo; ...............................11
1.77 &ldquo;Mark IV&rdquo; ..............................................................................12
1.78 &ldquo;Mark IV Non-Debtor&rdquo; ...........................................................12
1.79 &ldquo;New Common Stock&rdquo; ............................................................12
1.80 &ldquo;Old Common Stock&rdquo; ............................................................12

1.81 "Old Equity Interests"................................................12
1.82 "Organizational Documents"......................................12
1.83 "Other Deficiency Claim"..........................................12
1.84 "Other Priority Claim"...............................................12
1.85 "Other Secured Claim"..............................................12
1.86 "Periodic Distribution Date".......................................13
1.87 "Permitted Nominee"................................................13
1.88 "Person"................................................................13
1.89 "Petition Date".........................................................13
1.90 "Plan"....................................................................13
1.91 "Priority Claim"........................................................13
1.92 "Priority Tax Claim"..................................................13
1.93 "Pro Rata"..............................................................14
1.94 "Professional"..........................................................14
1.95 "Professional Claim"..................................................14
1.96 "Professional Fee Order"............................................14
1.97 "Registration Rights Agreement"..................................14
1.98 "Reinstated" or "Reinstatement" .................................14
1.99 "Released Parties"....................................................14
1.100 "Reorganized . . ."..................................................15
1.101 "Reorganized Debtors".............................................15
1.102 "Reorganized Debtors' Credit Facilities"........................15
1.103 "Restructured Debt Term Loans".................................15
1.104 "Restructured Debt Term Loan Agreement"....................15
1.105 "Restructured Debt Term Loan Agreement Documents".......15
1.106 "Restructuring Transaction(s)"....................................15
1.107 "Restructuring Transactions Notice"..............................15
1.108 "Retained Actions" ..................................................15
1.109 "Scheduled"...........................................................16
1.110 "Schedules"............................................................16
1.111 "Second Lien Agent".................................................16
1.112 "Second Lien Credit Agreement"..................................16
1.113 "Second Lien Lender Claims".......................................16
1.114 "Secured Tax Claim".................................................16
1.115 "Security"...............................................................16
1.116 "Stockholders' Agreement".........................................16
1.117 "Subsidiary Debtors".................................................16
1.118 "Subsidiary Interests"...............................................16
1.119 "Unimpaired"..........................................................17
1.120 "Voting Deadline" ...................................................17
C. Rules of Interpretation ...............................................17
D. Computation of Time .................................................17
E. Exhibits ...................................................................17

ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX
CLAIMS ........................................................................................18
    2.1    Administrative Claims ...........................................................18
    2.2    Priority Tax Claims................................................................18
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS ........................19
    3.1    Introduction............................................................................19
    3.2    Unimpaired Classes of Claims and Interests ..........................19
    3.3    Impaired Classes of Claims and Interests ...............................20
    3.4    Impaired Classes of Claims and Interests ...............................20
ARTICLE IV PROVISIONS FOR TREATMENT OF CLAIMS AND
INTERESTS ....................................................................................20
    4.1    Treatment of Claims Against and Interests In the
          Debtors....................................................................................20
    4.2    Reservation of Rights..............................................................24
ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE IMPAIRED CLASSES OF
CLAIMS OR INTERESTS................................................................24
    5.1    Impaired Classes of Claims Entitled to Vote...........................24
    5.2    Classes Deemed to Accept Plan..............................................24
    5.3    Acceptance by Impaired Classes .............................................24
    5.4    Classes Deemed to Reject Plan................................................24
    5.5    Confirmation Pursuant to Section 1129(b) of the
          Bankruptcy Code ....................................................................25
    5.6    Confirmability and Severability of a Plan ...............................25
ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN.........................25
    6.1    Continued Corporate Existence ...............................................25
    6.2    Corporate Action.....................................................................25
    6.3    Certificate of Incorporation and Bylaws..................................25
    6.4    Cancellation of Existing Securities and Agreements................26
    6.5    Authorization and Issuance of New Common Stock................26
    6.6    Directors and Officers.............................................................27
    6.7    Employment, Retirement, Indemnification and Other
          Agreements and Incentive Compensation Programs................27
    6.8    Implementation of the Management Equity Incentive
          Program...................................................................................29
    6.9    Issuance of the New Common Stock .......................................29
    6.10   The Exit Facility ....................................................................29
    6.11   The Restructured Debt Term Loan Agreement .......................29
    6.12   Restructuring Transactions and Alternative Structures ...........30
    6.13   Preservation of Causes of Action............................................31
    6.14   Exclusivity Period ..................................................................31
    6.15   Effectuating Documents; Further Transactions .......................31
    6.16   Exemption From Certain Transfer Taxes and Recording
          Fees ........................................................................................32

ARTICLE VII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ............32
    7.1     Assumed Contracts and Leases...................................................32
    7.2     Rejected Contracts and Leases...................................................33
    7.3     Exhibits Not Admissions ............................................................33
    7.4     Payments Related to Assumption of Executory
           Contracts and Unexpired Leases................................................33
    7.5     Rejection Damages Bar Date......................................................33
ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ............................34
    8.1     Time of Distributions..................................................................34
    8.2     No Interest on Claims.................................................................34
    8.3     Disbursing Agent ........................................................................34
    8.4     Claims Administration Responsibility.......................................34
    8.5     Delivery of Distributions ...........................................................34
    8.6     Procedures for Treating and Resolving Disputed and
           Contingent Claims .....................................................................35
ARTICLE IX ALLOWANCE AND PAYMENT OF CERTAIN
     ADMINISTRATIVE CLAIMS ......................................................36
    9.1     DIP Facility Claims....................................................................36
    9.2     Deferred Commitment Fee Claims ............................................36
    9.3     Professional Claims ....................................................................36
    9.4     Substantial Contribution Compensation and Expenses
           Bar Date .....................................................................................37
    9.5     Other Administrative Claims .....................................................37
ARTICLE X EFFECT OF THE PLAN ON CLAIMS AND INTERESTS .................37
    10.1    Revesting of Assets.....................................................................37
    10.2    Discharge of the Debtors ............................................................37
    10.3    Compromises and Settlements....................................................38
    10.4    Release of Certain Parties...........................................................39
    10.5    Releases by Holders of Claims ..................................................39
    10.6    Setoffs ........................................................................................39
    10.7    Exculpation and Limitation of Liability ...................................40
    10.8    Indemnification Obligations ......................................................40
    10.9    Injunction ...................................................................................41
ARTICLE XI CONDITIONS PRECEDENT ........................................................41
    11.1    Conditions to Confirmation .......................................................41
    11.2    Conditions to Consummation .....................................................41
    11.3    Waiver of Conditions to Confirmation or
           Consummation ...........................................................................42
ARTICLE XII RETENTION OF JURISDICTION ................................................42
ARTICLE XIII MISCELLANEOUS PROVISIONS ..............................................44
    13.1    Binding Effect............................................................................44
    13.2    Modification and Amendments...................................................44
    13.3    Withholding and Reporting Requirements .................................44

| | | |
|---|---|---|
| 13.4 | Allocation of Plan Distributions Between Principal and Interest | 45 |
| 13.5 | Creditors' Committee | 45 |
| 13.6 | Payment of Statutory Fees | 45 |
| 13.7 | Revocation, Withdrawal, or Non-Consummation | 45 |
| 13.8 | Notices | 45 |
| 13.9 | Term of Injunctions or Stays | 46 |
| 13.10 | Governing Law | 47 |
| 13.11 | Waiver and Estoppel | 47 |

# EXHIBITS

Exhibit A    Schedule of Shares of New Common Stock Available for Distribution to be Distributed to Holders of Allowed General Unsecured Claims of each Debtor

Exhibit B    Summary Description of the Terms of the Exit Facility

Exhibit C    Summary Description of the Terms of the Management Equity Incentive Plan

Exhibit D    Summary Description of the Terms of the New Common Stock

Exhibit E    Form of the Registration Rights Agreement

Exhibit F    Summary Description of the Terms of the Restructuring Transactions

Exhibit G    Form of Stockholders' Agreement

Exhibit H    Form of Certificate of Incorporation

Exhibit I    Form of Bylaws

Exhibit J    Summary Description of the Terms of Employment of Certain Key Executives

Exhibit K    Form of the Terms of the Restructured Debt Term Loan Agreement

Exhibit L    Nonexclusive List of Retained Actions and Avoidance Claims

Exhibit M    Schedule of Unexpired Leases and Executory Contracts to be Rejected Pursuant to the Plan

**INTRODUCTION**

Mark IV Industries, Inc. ("Mark IV") and seventeen of its direct and indirect subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-Debtor subsidiaries and affiliates (the "Company") in the above-captioned jointly-administered chapter 11 reorganization cases, hereby propose the following joint reorganization plan for the resolution of outstanding creditor claims against, and equity interests in, the Debtors. None of Mark IV's subsidiaries and affiliates located outside of the United States are chapter 11 Debtors. These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties, results of operations, projections for future operations, risk factors, and a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan. Each Debtor is a proponent of the plan contained herein within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used but not defined in this Introduction have the meanings ascribed to them in Article I of this Plan. The Debtors who are proponents of this Plan, their chapter 11 case numbers, and their jurisdictions of incorporation or formation are as follows:

| Debtors (state of formation or incorporation) | Bankruptcy Case No. |
| --- | --- |
| Luminator Service Inc. (New York) | Case No. 09-12793 (SMB) |
| Mark IV Industries, Inc. (Delaware) | Case No. 09-12795 (SMB) |
| Aerospace Sub, Inc. (Delaware) | Case No. 09-12798 (SMB) |
| Armtek International Holding Company, Inc. (Delaware) | Case No. 09-12800 (SMB) |
| Automatic Signal/Eagle Signal Corp. (Delaware) | Case No. 09-12802 (SMB) |
| Dayco Products, LLC (Delaware) | Case No. 09-12803 (SMB) |
| F-P Displays, Inc. (Massachusetts) | Case No. 09-12804 (SMB) |
| F-P Technologies Holding Corp. (Delaware) | Case No. 09-12805 (SMB) |
| Former Fuel Systems, Inc. (Delaware) | Case No. 09-12806 (SMB) |
| Luminator Holding L.P. (Delaware) | Case No. 09-12807 (SMB) |

| Mark IV Holdings, LLC (Delaware) | Case No. 09-12808 (SMB) |
| Mark IV Invesco, LLC (Delaware) | Case No. 09-12809 (SMB) |
| Mark IV IVHS Holding Corp. (Delaware) | Case No. 09-12811 (SMB) |
| Mark IV Pay Agent, Inc. (Delaware) | Case No. 09-12812 (SMB) |
| Mark IV Transportation Technologies Holding Corp. (Delaware) | Case No. 09-12813 (SMB) |
| NRD, LLC (Delaware) | Case No. 09-12814 (SMB) |
| Seebreeze Wireless Holdings, L.P. (Delaware) | Case No. 09-12815 (SMB) |
| Woods Liquidating Corporation (Delaware) | Case No. 09-12816 (SMB) |

This Plan contemplates the reorganization of each of the Debtors upon consummation of this Plan and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to sections 1123, 1129 and 1141 of the Bankruptcy Code. This Plan provides that Holders of First Lien Lender Secured Claims will receive a distribution consisting of such Claimholders' Pro Rata participation in the Restructured Debt Term Loan Agreement and Pro Rata Share of 92% of the New Common Stock (prior to dilution from the Management Equity Incentive Program), and Holders of Allowed General Unsecured Claims will receive such Claimholders' Pro Rata Share of 8% of the New Common Stock (prior to dilution from the Management Equity Incentive Program), with the number of shares New Common Stock available to be distributed to Holders of Allowed General Unsecured Claims of each Debtor as set forth on Exhibit A. Holders of General Unsecured Convenience Claims will receive a distribution consisting of Cash in an amount equal to the lesser of (a) [•]% of such Allowed General Unsecured Convenience Claim, or (b) such Claimholders' Pro Rata share of $[•]. Furthermore, the Existing Securities of the Debtors will be cancelled on the Effective Date of this Plan and Holders of the Existing Securities will not receive distributions under this Plan.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan may not be solicited from a Claimholder or Interestholder until the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Claimholders and Interestholders. ALL CLAIMHOLDERS WHO ARE ELIGIBLE TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article XIII of this Plan, the Debtors expressly reserve their right to alter, amend, modify, revoke or withdraw this Plan, one or more times, before this Plan's substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A. Scope of Definitions

For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. Whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter.

### B. Definitions

**1.1** **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, DIP Facility Claims, the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

**1.2** **"Affiliates"** shall have the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

**1.3** **"Allowed Claim"** means a Claim or any portion thereof, (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as a Reorganized Debtor and the Holder of such Claim agree may adjudicate such Claim and objections thereto), or (b) which (i) is not the subject of a proof of claim timely

filed with the Bankruptcy Court but (ii) is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent or (c) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or (d) that is expressly allowed in a liquidated amount in this Plan.

1.4 **"Allowed Class __ Claim"** means an Allowed Claim in the specified Class.

1.5 **"Avoidance Claims"** means Causes of Action of the Debtors and their Estates arising under any of sections 544, 545, 547, 548, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

1.6 **"Ballot"** means each ballot form distributed with the Disclosure Statement to Claimholders who are included in Classes that are Impaired under the Plan and entitled to vote under <u>Article V</u> herein to accept or reject this Plan.

1.7 **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

1.8 **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York.

1.9 **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

1.10 **"Business Day"** means any day, excluding Saturdays, Sundays and legal holidays, on which commercial banks are open for business in New York City.

1.11 **"Cash"** means legal tender of the United States or equivalents thereof.

**1.12** **"Causes of Action"** means any and all actions, claims, proceedings, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, and actions against any Person for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses.

**1.13** **"Chapter 11 Case(s)"** means the chapter 11 case(s) of the Debtor(s) pending in the Bankruptcy Court.

**1.14** **"Claim"** means a claim against the Debtors (all or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

**1.15** **"Claimholder"** means a Holder of a Claim.

**1.16** **"Claims Administration"** shall have the meaning ascribed to it in Section 8.4 hereof.

**1.17** **"Claims Agent"** means Epiq Bankruptcy Solutions, LLC.

**1.18** **"Claims Objection Deadline"** means that day which is one hundred eighty (180) days after the Effective Date, as the same may be from time to time extended by the Bankruptcy Court without further notice to parties-in-interest.

**1.19** **"Class"** means a category of Claimholders or Interestholders described in Article IV of this Plan.

**1.20** **"Confirmation Date"** means the date of entry of the Confirmation Order.

**1.21** **"Confirmation Hearing"** means the hearing before the Bankruptcy Court on confirmation of this Plan and related matters under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

**1.22** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming this Plan.

**1.23** **"Convenience Class Election"** means the election pursuant to which the Holder of a qualifying General Unsecured Claim against the Debtors timely elects to be treated as a General Unsecured Convenience Claim.

**1.24** **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.25** **"Cure"** means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.26** **"Debtors"** has the meaning ascribed to it in the Introduction hereof.

**1.27** **"Deferred Commitment Fee"** means, with respect to each DIP Lender, the deferred commitment fee earned by such DIP Lender as more fully described in the DIP Facility.

**1.28** **"Deferred Commitment Fee Claims"** means all Claims of the DIP Lenders on account of such DIP Lenders' Deferred Commitment Fees arising under or pursuant to the DIP Facility.

**1.29** **"Deficiency Claims"** mean the First Lien Lender Deficiency Claims, the Second Lien Claims and the Other Deficiency Claims.

**1.30** **"D&O Insurance"** means insurance maintained by the Debtors which covers, among others, the directors, officers and managing members of the Debtors or any of them.

**1.31** **"DIP Agent"** means JPMorgan Chase Bank, N.A., as administrative agent for the DIP Lenders under the DIP Facility.

**1.32** **"DIP Facility"** means the $90,000,000 Credit and Guarantee Agreement, dated as of May 4, 2009, among Mark IV, as Guarantor, Dayco Products, LLC, as U.S. Borrower, Dayco Europe S.r.l., as Italian Borrower, Mark IV Industries

Corp., as Canadian Borrower, the other U.S. Guarantors named therein, and the DIP Agent and the DIP Lenders, as the same may be amended, supplemented, or otherwise modified from time to time.

**1.33** **"DIP Facility Claims"** means all Administrative Claims of the DIP Agent and the DIP Lenders arising under or pursuant to or related to the DIP Facility.

**1.34** **"DIP Facility Order"** means, collectively, the Final Order that was entered by the Bankruptcy Court on May 27, 2009, authorizing and approving the DIP Facility and the agreements related thereto, and any further Final Orders entered by the Bankruptcy Court approving any amendment or extension of the DIP Facility.

**1.35** **"DIP Lenders"** means the lenders from time to time party to the DIP Facility.

**1.36** **"Disallowed Claim"** means a Claim or any portion thereof, that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) is Scheduled at zero or as contingent, disputed or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or (c) is not Scheduled and as to which a proof of claim bar date has been set but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court.

**1.37** **"Disbursing Agent"** means the Reorganized Debtors or any Person designated by the Reorganized Debtors (and who accepts such designation) to serve as a disbursing agent under Article VIII of this Plan.

**1.38** **"Disclosure Statement"** means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 on [•], 2009, as such disclosure statement may be amended, modified or supplemented from time to time.

**1.39** **"Disputed Claim"** means a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim and includes, without limitation, Claims that (a) (i) have not been Scheduled by the Debtors (or any of them) or have been Scheduled at zero or as unknown, contingent, unliquidated or disputed, and (ii) are not the subject of an objection filed in the Bankruptcy Court or as to which the time for filing an objection has not yet expired, (b) that are the subject of a proof of claim or interest that differs in nature, amount or priority from the Schedules, or (c) are the subject of an objection filed with the Bankruptcy Court, which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.40** **"Distribution Date"** means the date upon which the initial distributions will be made to Holders of Allowed Claims pursuant to Article VIII of

this Plan, which shall be not more than twenty (20) Business Days after the Effective Date.

**1.41** **"Effective Date"** means the Business Day on which all conditions to the consummation of this Plan set forth in Section 11.2 hereof have been either satisfied or waived as provided in Section 11.3 hereof, and such Business Day shall be the day upon which this Plan is substantially consummated.

**1.42** **"Estates"** means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.43** **"Executive Employment Agreements"** has the meaning ascribed to it in Section 6.7 hereof.

**1.44** **"Exhibit"** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.45** **"Exhibit Filing Date"** means the date on which Exhibits to this Plan or the Disclosure Statement shall be filed with the Bankruptcy Court, which date shall be at least seven (7) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court.

**1.46** **"Existing Securities"** means, collectively, the Old Common Stock, and all options, warrants, rights and other instruments evidencing an ownership interest in any Debtor (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire any of the foregoing; provided that, Existing Securities shall not include Subsidiary Interests.

**1.47** **"Exit Facility"** means the credit facility providing financing to the Reorganized Debtors as of the Effective Date having substantially the terms set forth on Exhibit B.

**1.48** **"Exit Facility Documents"** has the meaning ascribed to it in Section 6.10 hereof.

**1.49** **"Exit Facility Lenders"** shall mean the financial institutions that have committed to provide the Exit Facility as of the Effective Date.

**1.50** **"Face Amount"** means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise Allowed by any Final Order of the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.51** **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases, or the docket of any such other court, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or leave to appeal (other than under Rule 60(b) of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024) has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.52** **"First Lien Agent"** means JPMorgan Chase Bank, N.A., as administrative agent for the First Lien Lenders under the First Lien Credit Agreement.

**1.53** **"First Lien Credit Agreement"** means that certain Amended and Restated Credit Agreement, dated as of June 21, 2004, among Mark IV Industries, Inc., Dayco Products, LLC, as U.S. borrower, Dayco Europe S.r.l., as Italian borrower, the First Lien Agent, and the First Lien Lenders from time to time parties thereto.

**1.54** **"First Lien Lenders"** mean all lenders under the First Lien Credit Agreement, or any such lender or its Affiliates in their capacity as party to any hedge or swap agreement to which any Debtor is a party.

**1.55** **"First Lien Lender Claims"** mean all Claims of the First Lien Agent and the First Lien Lenders arising under or pursuant to the First Lien Credit Agreement, including any Claims of any First Lien Lender or any Affiliate thereof arising under any hedge or swap agreement to which any Debtor is a party.

**1.56** **"First Lien Lender Deficiency Claim"** means $485 million, being the aggregate amount of First Lien Lender Claims in excess of the First Lien Lender Secured Claims after giving effect to the waiver under this Plan by the First Lien Lenders of $25 million of such First Lien Lender Deficiency Claims.

**1.57** **"First Lien Lenders Plan Distribution Property"** means, with respect to the First Lien Lender Secured Claims, (a) the Restructured Debt Term Loans deemed made on the Effective Date by the First Lien Lenders under the Restructured Debt Term Loan Agreement and (b) [•] shares of New Common Stock representing 92% of the New Common Stock (prior to dilution from the Management Equity Incentive Program).

**1.58** **"First Lien Lender Secured Claims"** mean the aggregate of the First Lien Lender Claims equal to $350 million, being the secured portion under section 506 of the Bankruptcy Code of the First Lien Lender Claims as fixed pursuant to, and for all purposes of, this Plan.

**1.59** **"General Unsecured Claim"** means a Claim that is not an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Secured Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, and a General Unsecured Convenience Claim; provided that, General Unsecured Claims shall include Deficiency Claims; provided further that, General Unsecured Claims shall not include a Claim that is disallowed or released, whether by operation of law or pursuant to a Final Order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

**1.60** **"General Unsecured Claimholders Plan Distribution Property"** means [•] shares of New Common Stock representing 8% of the New Common Stock (prior to dilution from the Management Equity Incentive Program) to be apportioned between the Classes of General Unsecured Claims in each of the Debtors' Chapter 11 Cases as is more specifically set forth at Exhibit A.

**1.61** **"General Unsecured Convenience Claim"** means a Claim against the Debtors that otherwise would be included in the General Unsecured Claim Class that is in an amount (a) of $[•] or less, or (b) greater than $[•] and the Holder of such Claim has made the Convenience Class Election on the Ballot provided for voting on the Plan within the time fixed by the Bankruptcy Court for completing and returning such Ballot to accept Cash in an amount equal to the lesser of (x) [•]% of any Allowed General Unsecured Convenience Claim, or (b) such Claimholders' Pro Rata share of $[•], all in full satisfaction, discharge and release of such Claim.

**1.62** **"Holdback Amount"** means the amount equal to 20% of fees billed to the Debtors in a given month that was retained by the Debtors as a holdback on payment of Professional Claims pursuant to the Professional Fee Order.

**1.63** **"Holdback Escrow Account"** means the escrow account established by the Disbursing Agent into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**1.64** **"Holder"** means an entity holding a Claim or Interest.

**1.65** **"Impaired"** refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.66** **"Indemnification Rights"** means any obligations of the Debtors (or any of them) to indemnify, reimburse, advance or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to a Debtor's Organizational Documents, or pursuant to any applicable law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for or on behalf of the Debtors (or any of them).

**1.67** **"Indemnitee"** means all present and former directors, officers, employees, agents or representatives of the Debtors who provided services to the Debtors during the Chapter 11 Cases and who are entitled to assert Indemnification Rights.

**1.68** **"Insurance Coverage"** shall have the meaning ascribed to it in Section 10.8 hereof.

**1.69** **"Insured Claim"** means any Claim or portion of a Claim that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

**1.70** **"Intercompany Claim"** means (a) a Claim by any Debtor against a Debtor; (b) a Claim by any Debtor against a Mark IV Non-Debtor; or (c) a Claim by any Mark IV Non-Debtor against a Debtor.

**1.71** **"Interest"** means (a) the legal, equitable contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Person with respect to the Old Common Stock, or any other equity securities of the Debtors (or any of them) and (b) the legal, equitable, contractual and other rights, whether fixed or contingent, matured or unmatured, disputed or undisputed, of any Person to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.

**1.72** **"Interestholder"** means a Holder of an Interest.

**1.73** **"KEIP"** means that certain Key Employee Incentive Plan adopted by Mark IV's board of directors and approved by a Final Order of the Bankruptcy Court on [•], 2009, as amended.

**1.74** **"Legacy Liabilities"** mean all post-employment benefits provided by the Debtors to former employees, including obligations stemming from Civil Action No. 1:02CV243 in the District Court of the United States for the Western District of North Carolina, Asheville Division, captioned Jerry Trull et al. v. Dayco Products, LLC.

**1.75** **"Lien"** means a lien, security interest or charge against or interest in property of the Debtors to secure payment of a debt or performance of an obligation owed by the Debtors. For purposes of this Plan, the term shall not include (a) a lien resulting from the provisions of Chapter 5 of the Bankruptcy Code or (b) a lien that has been or may be avoided pursuant to Chapter 5 of the Bankruptcy Code.

**1.76** **"Management Equity Incentive Program"** means that certain incentive plan to be implemented on or after the Effective Date as is more specifically described at Exhibit C attached hereto, by which the Reorganized Debtors shall

deliver certain stock options or restricted stock grants in Reorganized Mark IV to certain Mark IV post-Effective Date senior management and other employees.

**1.77** **"Mark IV"** has the meaning ascribed to it in the Introduction hereof.

**1.78** **"Mark IV Non-Debtor"** means a subsidiary or affiliate of Mark IV that is not a Debtor in these Chapter 11 Cases.

**1.79** **"New Common Stock"** means shares of common stock, $0.01 par value per share, of Reorganized Mark IV to be authorized and issued on or after the Effective Date. A summary description of the New Common Stock is set forth at <u>Exhibit D</u>.

**1.80** **"Old Common Stock"** means the shares of Mark IV's common stock that were authorized, issued and outstanding prior to the Effective Date.

**1.81** **"Old Equity Interests"** means the Interests in respect of the Old Common Stock issued and outstanding prior to the Effective Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of such common stock of Mark IV or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

**1.82** **"Organizational Documents"** means the bylaws, articles of incorporation, corporate charters, certificates of formation, limited liability agreements, the Stockholders' Agreement or other documents or agreements that govern or affect the corporate formation and governance of the Debtors (or any of them) and the Reorganized Debtors (or any of the them), as the case may be.

**1.83** **"Other Deficiency Claim"** means, in the case of a Claimholder who asserts an Other Secured Claim against the Debtors, a Claim equal to the amount by which such Claim exceeds the secured portion thereof as determined pursuant to section 506 of the Bankruptcy Code.

**1.84** **"Other Priority Claim"** means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

**1.85** **"Other Secured Claim"** means a Claim (other than a DIP Claim, a Deferred Commitment Fee Claim, an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, a General Unsecured Claim, and a General Unsecured

Convenience Claim) that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the Holder of such Claim.

1.86    **"Periodic Distribution Date"** means (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring ninety (90) days after the Distribution Date, (ii) subsequently, the first Business Day occurring ninety (90) days after the immediately preceding Periodic Distribution Date, or (iii) such other Business Day as the Reorganized Debtors may designate.

1.87    **"Permitted Nominee"** means any nominee of a Prepetition Lender that such Prepetition Lender has confirmed in writing to the Debtors and the First Lien Agent (or the Second Lien Agent, as the case may be) that it is such Prepetition Lender's nominee for the purposes of distribution of some or all of such Prepetition Lender's Plan Distribution Property, provided that such nominee shall be an affiliate of such Prepetition Lender.

1.88    **"Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

1.89    **"Petition Date"** means the date on which each Debtor filed its voluntary petition commencing its Chapter 11 Case, that is April 30, 2009.

1.90    **"Plan"** means this joint plan of reorganization, which is jointly proposed by the Debtors for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as such plan may be further amended from time to time in accordance with the Bankruptcy Code, Bankruptcy Rules and Section 13.2, and the exhibits hereto.

1.91    **"Priority Claim"** means a Claim entitled to priority pursuant to section 507 of the Bankruptcy Code.

1.92    **"Priority Tax Claim"** means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.93** **"Pro Rata"** means, from time to time, unless this Plan specifically provides otherwise, with respect to Claims, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class.

**1.94** **"Professional"** means those Persons employed in the Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code, or otherwise.

**1.95** **"Professional Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

**1.96** **"Professional Fee Order"** means the order entered by the Bankruptcy Court on May 27, 2009, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**1.97** **"Registration Rights Agreement"** means the registration of rights agreement, a form of which is attached as <u>Exhibit E</u>, to which any party receiving New Common Stock shall automatically be deemed a party.

**1.98** **"Reinstated" or "Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claimholder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claimholder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claimholder for any damages incurred as a result of any reasonable reliance by such Claimholder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claimholder; <u>provided</u>, <u>however</u>, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

**1.99** **"Released Parties"** means, collectively, (a) the Debtors, its officers, directors, and shareholders who were either serving in such capacities as of the Effective Date, or who had served in such capacities during the Chapter 11 Cases, (b) the Reorganized Debtors, (c) the officers, directors, and shareholders of the Reorganized Debtors serving in such capacity after the Effective Date, (d) the DIP

Agent and DIP Lenders, (e) the First Lien Lenders and the Second Lien Lenders, (f) the First Lien Agent and the Second Lien Agent, (g) the Exit Facility Lenders, (h) the Creditors' Committee, and each of its members in their capacity as such, and (i) with respect to each of the Persons named in (a) – (h) above, such Person's Affiliates, principals, employees, agents, officers, directors, financial advisors, accountants, attorneys and other professionals, and any of their successors and assigns, when acting in any of such capacities.

**1.100 "Reorganized . . ."** means the applicable Debtor from and after the Effective Date.

**1.101 "Reorganized Debtors"** means, collectively, all Debtors from and after the Effective Date.

**1.102 "Reorganized Debtors' Credit Facilities"** means (a) the Exit Facility, and (b) the Restructured Debt Term Loan Agreement.

**1.103 "Restructured Debt Term Loans"** mean the aggregate principal amount equal to $225 million of term loans deemed made to the applicable borrower on the Effective Date pursuant to the Restructured Debt Term Loan Agreement by the DIP Lenders (in satisfaction of the Deferred Commitment Fee Claims) and the First Lien Lenders (in partial satisfaction of the First Lien Lender Secured Claims).

**1.104 "Restructured Debt Term Loan Agreement"** means the term loan agreement governing the Restructured Debt Term Loans, among Reorganized Dayco Products, LLC as borrower, Mark IV, JPMorgan Chase Bank, N.A., as administrative agent, the DIP Lenders (if applicable) with respect to the Deferred Commitment Fee and the First Lien Lenders receiving Restructured Debt Term Loans.

**1.105 "Restructured Debt Term Loan Agreement Documents"** has the meaning ascribed to it in Section 6.11 hereof.

**1.106 "Restructuring Transaction(s)"** means the transactions, if any, set forth in Section 6.12 of this Plan as to which the First Lien Agent consents, and as further described in the Restructuring Transactions Notice which is attached as <u>Exhibit F</u> to this Plan.

**1.107 "Restructuring Transactions Notice"** means the notice filed with the Bankruptcy Court on or before the Exhibit Filing Date as <u>Exhibit F</u> to this Plan listing the restructuring Debtors and briefly describing the relevant Restructuring Transactions.

**1.108 "Retained Actions"** means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person,

including, without limitation, Claims and Causes of Action brought prior to the Effective Date or identified in the Schedules, other than Claims explicitly released under this Plan or by a Final Order of the Bankruptcy Court.

**1.109 "Scheduled"** means, with respect to any Claim or Interest, the status, priority and amount, if any, of such Claim or Interest as set forth in the Schedules.

**1.110 "Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors, as such schedules or statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.111 "Second Lien Agent"** means Wilmington Trust FSB, or any successor to the administrative agent under the Second Lien Credit Agreement.

**1.112 "Second Lien Credit Agreement"** means that certain Second Lien Credit Agreement, dated as of June 19, 2006, among Dayco Products, LLC, as borrower, Wilmington Trust FSB, as administrative agent, and the several lenders from time to time parties thereto.

**1.113 "Second Lien Lender Claims"** mean all Claims of the Second Lien Agent and the Second Lien Lenders arising under or pursuant to the Second Lien Credit Agreement. Pursuant to section 506 of the Bankruptcy Code, all Second Lien Lender Claims are Deficiency Claims.

**1.114 "Secured Tax Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

**1.115 "Security"** shall have the meaning ascribed to it in section 101(49) of the Bankruptcy Code.

**1.116 "Stockholders' Agreement"** means the stockholders' agreement, a form of which is attached as <u>Exhibit G</u>, to which any party receiving New Common Stock shall automatically be deemed a party.

**1.117 "Subsidiary Debtors"** means, collectively, Luminator Service Inc., Aerospace Sub, Inc., Armtek International Holding Company, Inc., Automatic Signal/Eagle Signal Corp., Dayco Products, LLC, F-P Displays, Inc., F-P Technologies Holding Corp., Former Fuel Systems, Inc., Luminator Holding L.P., Mark IV Holdings, LLC, Mark IV Invesco, LLC, Mark IV IVHS Holding Corp., Mark IV Pay Agent, Inc., Mark IV Transportation Technologies Holding Corp., NRD, LLC, Seebreeze Wireless Holdings, L.P., and Woods Liquidating Corporation.

**1.118 "Subsidiary Interests"** means, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other

instruments evidencing an ownership interest in the applicable Subsidiary Debtor as of the Effective Date, and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the applicable Subsidiary Debtors, as of the Effective Date.

1.119 **"Unimpaired"** refers to any Claim which is not Impaired.

1.120 **"Voting Deadline"** means [•], 2009, at [•] p.m. (Eastern time).

## C.     Rules of Interpretation

For purposes of this Plan (a) any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be in such form or on such terms and conditions, (b) any reference in this Plan to an existing document or Exhibit filed or to be filed means such document or Exhibit as it may have been or may be amended, modified or supplemented, (c) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to this Plan, (d) the words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan, (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply, (g) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control, and (h) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control.

## D.     Computation of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## E.     Exhibits

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 (Attn: J. Eric Ivester, Esq. and Matthew M. Murphy, Esq.), counsel to the Debtors. In addition, imaged copies of the Exhibits will be available on the Bankruptcy Court's website, www.nysb.uscourts.gov, for a nominal charge (a PACER account is required and to obtain a PACER password, go to the PACER website, http://pacer.psc.uscourts.gov)

or at the Claims Agent's website address, http://chapter11.epiqsystems.com/markiv, free of charge. To the extent any Exhibit is inconsistent with the terms of the body of this Plan, unless otherwise ordered by the Bankruptcy Court, the terms of the relevant Exhibit shall control.

## ARTICLE II

## ADMINISTRATIVE EXPENSES
## AND PRIORITY TAX CLAIMS

**2.1    Administrative Claims**.  Subject to the provisions of <u>Article IX</u> of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date an Administrative Claim becomes an Allowed Administrative Claim or (b) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the Holder of such Administrative Claim, an Allowed Administrative Claimholder in these Chapter 11 Cases shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which such Debtor (or such Reorganized Debtor) and such Claimholder shall have agreed upon in writing; <u>provided</u>, <u>however</u>, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; <u>provided</u> <u>further</u>, <u>however</u>, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

**2.2    Priority Tax Claims**.  With respect to each Allowed Priority Tax Claim in any Debtor's Chapter 11 Case, at the sole option of the Debtors (or the Reorganized Debtors), the Allowed Priority Tax Claimholder shall be entitled to receive on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (a) equal Cash payments made in accordance with section 1129(a)(9)(C) of the Bankruptcy Code on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (b) such

other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (a) above, or (c) payment in full in Cash on the Effective Date.

## ARTICLE III

## <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>

### 3.1    **Introduction**.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in <u>Article II</u> herein.

This Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Therefore, the classifications set forth herein shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

### 3.2    **Unimpaired Classes of Claims and Interests** (deemed to have accepted this Plan and, therefore, not entitled to vote on this Plan).

(a)    Class 1 – Secured Tax Claims.  Class 1 consists of all Secured Tax Claims.

(b)    Class 2 – Other Secured Claims.  Class 2 consists of all Other Secured Claims.

(c)    Class 3 – Other Priority Claims.  Class 3 consists of all Other Priority Claims.

(d)    Class 4 – Intercompany Claims.   Class 4 consists of all Intercompany Claims.

(e)    Class 5 – Subsidiary Interests.   Class 5 consists of all Subsidiary Interests (Class 5 Subsidiary Interests applies to this Plan with respect to all of the Debtors except for Mark IV).

**3.3** **Impaired Classes of Claims and Interests** (entitled to vote on this Plan).

(a)    Class 6 – First Lien Lender Secured Claims.  Class 6 consists of the First Lien Lender Secured Claims.

(b)    Class 7 – General Unsecured Claims.  Class 7 consists of the General Unsecured Claims.

(c)    Class 8 – General Unsecured Convenience Claims.  Class 8 consists of all General Unsecured Convenience Claims.

**3.4** **Impaired Classes of Claims and Interests**  (deemed to have rejected this Plan and therefore not entitled to vote on this Plan).

(a)    Class 9 – Old Equity Interests.  Class 9 consists of all of the Old Equity Interests (Class 9 Old Equity Interests applies to this Plan with respect to Mark IV only).

## ARTICLE IV

## PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

**4.1** **Treatment of Claims Against and Interests In the Debtors**.

(a)    Class 1 (Secured Tax Claims).  Except as otherwise provided in and subject to Section 8.6 herein, on the first Periodic Distribution Date occurring after the later of (i) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (ii) the date a Secured Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Class 1 Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to a Secured Tax Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Secured Tax Claim.

(b)     Class 2 (Other Secured Claims).  Except as otherwise provided in and subject to Section 8.6 herein, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Secured Claim becomes an Allowed Other Secured Claim or (ii) the date an Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Other Secured Claim, the Debtors (or Reorganized Debtors) shall at the option of the Debtors, in full satisfaction, settlement, release, and discharge of and in exchange for such Other Secured Claim, (x) pay Cash equal to the amount of such Allowed Other Secured Claim, (y) return the collateral to the secured creditor with respect to such Other Secured Claim, or (z) reinstate such Other Secured Claim in accordance with the provisions of subsection 1124 of the Bankruptcy Code.  The Debtors' failure to object to an Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Secured Claim.

(c)     Class 3 (Other Priority Claims).  Except as otherwise provided in and subject to Section 8.6 herein, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (ii) the date an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Other Priority Claim, each Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (x) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Priority Claim.

(d)     Class 4 (Intercompany Claims).  Intercompany Claims will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (i) released, waived and discharged as of the Effective Date, (ii) contributed to the capital of the obligor corporation, (iii) dividended, or (iv) remain unimpaired.

(e)     Class 5 (Subsidiary Interests).  Class 5 Subsidiary Interests shall be unaffected by this Plan, except to the extent required by the Restructuring Transactions.

(f) Class 6 (First Lien Lender Secured Claims). Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all First Lien Lender Secured Claims shall be allowed in full in the aggregate amount of $350 million and shall constitute Allowed Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

On the Effective Date, each Holder of an Allowed First Lien Lender Secured Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of each component of the First Lien Lenders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by the First Lien Agent as a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed First Lien Lender Secured Claim, and the denominator of which is equal to the aggregate amount of all Allowed First Lien Lender Secured Claims. Any adequate protection claims of the First Lien Lenders pursuant to the DIP Facility Order shall be deemed satisfied by the treatment of Class 6 Claims.

(g)     Class 7 (General Unsecured Claims).  Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all (i) First Lien Lender Deficiency Claims shall be allowed in full in the aggregate amount of $485 million, and (ii) Second Lien Lender Claims shall be allowed in full in the aggregate amount of $[•] million.  All First Lien Lender Deficiency Claims and Second Lien Lender Claims shall constitute Allowed General Unsecured Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

Except as otherwise provided in and subject to Section 8.6 herein, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (ii) the date a General Unsecured Claim becomes payable pursuant to an agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata share of the General Unsecured Claimholders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Claim, and the denominator of which is equal to the aggregate amount of all Allowed General Unsecured Claims.  Notwithstanding the foregoing, the New Common Stock distributions on account of the First Lien Lender Deficiency Claims and the Second Lien Lender Claims shall be made on the Effective Date.

(h)     Class 8 (General Unsecured Convenience Claims).  Except as otherwise provided in and subject to Section 8.6 herein, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Convenience Claim becomes an Allowed General Unsecured Convenience Claim or (ii) the date a General Unsecured Convenience Claim becomes payable pursuant to any agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Convenience Claim, each Holder of an Allowed General Unsecured Convenience Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Convenience Claim, Cash in an amount equal to the lesser of (a) [•]%of such Allowed General Unsecured Convenience Claim or (b) such Claimholders' Pro Rata share of $[•], with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Claim, and the denominator of which is equal to the aggregate amount of all Allowed General Unsecured Claims.

(i)     Class 9 (Old Equity Interests).  Old Equity Interests shall be cancelled, released, and extinguished, and Holders of such Interests shall neither receive nor retain any property on account of such Interests.

**4.2     Reservation of Rights**.  Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims.

# ARTICLE V

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS

**5.1     Impaired Classes of Claims Entitled to Vote**.  Holders of Claims and Interests in each Impaired Class of Claims or Interests are entitled to vote as a Class to accept or reject this Plan, other than Classes that are deemed to reject this Plan as provided in Section 5.4 herein.  Accordingly, the votes of Holders of Claims in Class 6 First Lien Lender Secured Claims, Class 7 General Unsecured Claims, and Class 8 General Unsecured Convenience Claims shall be solicited with respect to this Plan.

**5.2     Classes Deemed to Accept Plan**.  Under section 1126(f) of the Bankruptcy Code, Holders of Claims and Interests in each Unimpaired Class of Claims or Interests are conclusively presumed to have accepted this Plan, and the votes of such Claimholders will not be solicited.  Accordingly, the votes of Holders of Claims in Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, and Class 4 Intercompany Claims, as well as votes of Holders of Class 5 Subsidiary Interests, shall not be solicited with respect to this Plan.

**5.3     Acceptance by Impaired Classes**.  Class 6 First Lien Lender Secured Claims, Class 7 General Unsecured Claims, and Class 8 General Unsecured Convenience Claims are Impaired under this Plan.  Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class has accepted this Plan if this Plan is accepted by the Holders of at least two-third (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

**5.4     Classes Deemed to Reject Plan**.  Because Holders of Interests in Class 9 Old Equity Interests are not receiving or retaining any property under this Plan on account of such Interests, they are conclusively presumed to have rejected this Plan, and the votes of such Holders will not be solicited.

**5.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class entitled to vote rejects this Plan or is deemed to have rejected it, the Debtors will request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**5.6    Confirmability and Severability of a Plan**.  Subject to Section 13.2, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan as it applies to the Debtors or any particular Debtor.  A determination by the Bankruptcy Court that this Plan, as it applies to the Debtors or any particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (a) the confirmability of this Plan as it applies to the other Debtor(s); or (b) the Debtors' ability to modify this Plan, as it applies to the Debtors or to any particular Debtor, to satisfy the requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    Continued Corporate Existence**.   Subject to any Restructuring Transactions contemplated by this Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Effective Date, except to the extent such Organizational Documents are amended by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

**6.2    Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

**6.3    Certificate of Incorporation and Bylaws**.   The Certificate of Incorporation for Reorganized Mark IV is attached hereto as <u>Exhibit H</u> and the bylaws for Reorganized Mark IV is attached hereto as <u>Exhibit I</u>.  The Organizational Documents of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (x) a provision prohibiting the issuance of non-voting equity securities, but only to the extent

required by section 1123(a)(6) of the Bankruptcy Code, until two (2) years after the Effective Date.

**6.4**     **Cancellation of Existing Securities and Agreements**. On the Effective Date, except as otherwise specifically provided for herein, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, shall be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, as the case may be, shall be released and discharged.

**6.5**     **Authorization and Issuance of New Common Stock**.

(a)     The Certificate of Incorporation for Reorganized Mark IV shall authorize [•] shares of New Common Stock. On the Effective Date, Reorganized Mark IV shall (i) issue [•] shares of New Common Stock Pro Rata to the Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) and (ii) issue [•] shares of New Common Stock Pro Rata to Holders of General Unsecured Claims (or in the case of a First Lien Lender Deficiency Claim or Second Lien Lender Claims, such First Lien Lender's or Second Lien Lender's Permitted Nominees). A summary description of the New Common Stock is set forth as Exhibit D.

(b)     The New Common Stock issued under this Plan shall be subject to economic and legal dilution based upon (i) the issuance of New Common Stock pursuant to, or upon the exercise of New Common Stock equivalents issued pursuant to, the Management Equity Incentive Plan as set forth in Section 6.8 of this Plan, and (ii) any other shares of New Common Stock issued after the Effective Date.

(c)     The issuance of the New Common Stock, including the shares of the New Common Stock reserved for issuance by Reorganized Mark IV in connection with the Management Equity Incentive Plan to be entered into in connection with the Restructuring Transaction is authorized without the need for any further corporate action or action by any other party.

(d)     All of the shares of New Common Stock issued pursuant to this Plan shall be duly authorized, validly issued, fully paid and non-assessable.

(e)     The New Common Stock issued hereunder shall be subject to the terms of the Stockholders' Agreement and a Registration Rights Agreement, and the holders thereof shall automatically be deemed a party thereto as of the Effective Date.

**6.6     Directors and Officers**.

(a)     The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the terms of the Organizational Documents and any applicable employment agreements.

(b)     On the Effective Date, the term of the current members of the board of directors of Mark IV shall expire.  The initial board of directors of Reorganized Mark IV shall consist of five (5) directors.  The First Lien Lenders shall designate four (4) directors (including the Chairman).  Subject to the consent of the First Lien Lenders (such consent not to be unreasonably withheld), the remaining director shall be a senior executive officer of Mark IV in place immediately prior to the Effective Date.  Thereafter, the board of directors of Reorganized Mark IV will be elected in accordance with the Stockholders' Agreement and the Organizational Documents of Reorganized Mark IV.

(c)     The Debtors shall file on or before the Exhibit Filing Date a notice of the identities of the members of the board of directors of Reorganized Mark IV to serve as of the Effective Date.  The existing directors of each Subsidiary Debtor shall remain in their current capacities as directors of the applicable Reorganized Subsidiary Debtor until replaced or removed in accordance with the Organizational Documents of the applicable Reorganized Subsidiary Debtor.

(d)     Other provisions governing the service, term and continuance in office of the members of the board shall be as set forth in the Organizational Documents of the Reorganized Debtors.

**6.7     Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs**.

(a)     The proposed terms of employment agreements for certain key employees of the Reorganized Debtors, to be effective on the Effective Date, are summarized in Exhibit J attached hereto (the "Executive Employment Agreements").  The Executive Employment Agreements shall be in form and substance reasonably satisfactory to the First Lien Agent.

(b)     With the exception of those individuals (i) whose employment terms are summarized in Exhibit J, and (ii) the terms of whose employment

agreements are subject to a rejection motion as of the Confirmation Hearing, to the extent that any of the Debtors has in place as of the Effective Date employment, severance (change in control), retirement, indemnification and other agreements with their respective active directors, officers, managing members and employees who will continue in such capacities or a similar capacity after the Effective Date, or retirement income plans, welfare benefit plans and other plans for such Persons, such agreements, programs and plans will remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, programs and plans except to the extent provided herein without prejudice to the Reorganized Debtors' authority to modify or eliminate any such agreements, programs or plans as permitted under applicable non-bankruptcy law. Benefits provided under such agreements or plans may include benefits under qualified and non-qualified retirement plans; health and dental coverage; short and long-term disability benefits; death and supplemental accidental death benefits; vacation; leased car; financial consulting, tax preparation and estate planning as well as an annual physical examination, each paid or provided commensurate with an employee's position in accordance with the applicable Reorganized Debtor's policies then in effect. Such agreements and plans also may include equity, bonus and other incentive plans in which officers, managing members and other employees of the Reorganized Debtors may be eligible to participate; provided, however, such equity, bonus and other incentive plans shall not provide for the issuance of New Common Stock and to the extent that such equity, bonus and other incentive plan provides for the issuance of Existing Securities, such provision shall be deemed null and void and the officers, managing members and other employees shall waive any right to enforce such provisions; provided, further, however, that pursuant to the Management Equity Incentive Plan, there shall be reserved for certain members of management, directors, and other employees of the Reorganized Debtors a certain number of shares of New Common Stock and other securities all as more fully described herein.

(c)  Notwithstanding anything to the contrary herein, following the Effective Date of the Plan, with respect to the payment of "retiree benefits" (as such term is defined in section 1114 of the Bankruptcy Code) related to medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation this Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify.

(d)  Notwithstanding anything contained herein to the contrary, the terms of the KEIP shall not be modified, altered, or amended. Those certain incentive payments provided for in the KEIP shall be paid in the amounts and at such times as contemplated by the KEIP.

**6.8     Implementation of the Management Equity Incentive Program**.  A summary of the Management Equity Incentive Plan is attached hereto as <u>Exhibit C</u>.  On the Effective Date, the Reorganized Debtors shall implement the Management Equity Incentive Plan in order to promote the operation of the Reorganized Debtors by offering incentives to key employees who are primarily responsible for the growth and prosperity of the Reorganized Debtors, and to attract and retain qualified employees and thereby benefit the shareholders of the Reorganized Debtors based on the performance of the Reorganized Debtors.   Pursuant to the Management Equity Incentive Plan, the Reorganized Debtors shall deliver certain stock options to certain members of management and other employees as of and after the Effective Date, in such amounts and pursuant to such terms as set forth in the Management Equity Incentive Plan.   Payments to eligible employees under the Management Equity Incentive Program shall include all earned and due incentive payments, including, without limitation, payments due under the KEIP.

The Management Equity Incentive Plan will be administered by Reorganized Mark IV's board of directors.   In applying and interpreting the provisions of the Management Equity Incentive Plan, the decisions of Reorganized Mark IV's board of directors shall be final.

**6.9     Issuance of the New Common Stock**.   On the Effective Date, Reorganized Mark IV shall issue the New Common Stock in accordance with the terms of the Plan.   The issuance of the New Common Stock and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

**6.10     The Exit Facility**.   On the Effective Date, the Reorganized Debtors shall (a) enter into the Exit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Exit Facility reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "<u>Exit Facility Documents</u>"), all of which such Exit Facility Documents shall be in form and substance satisfactory to the Exit Facility Lenders, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date.   In the Confirmation Order, the Bankruptcy Court shall approve the Exit Facility in substantially the form filed with the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the Exit Facility Lenders may reasonably require in order to effectuate the treatment afforded to such parties under the Exit Facility.

**6.11     The Restructured Debt Term Loan Agreement**.   On the Effective Date, the Reorganized Debtors shall (a) enter into the Restructured Debt Term Loan

Agreement together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Restructured Debt Term Loan Agreement reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "<u>Restructured Debt Term Loan Agreement Documents</u>"), all of which such Restructured Debt Term Loan Agreement Documents shall be in form and substance satisfactory to the First Lien Agent, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date. In the Confirmation Order, the Bankruptcy Court shall approve the Restructured Debt Term Loan Agreement in substantially the form filed with the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the First Lien Agent may reasonably require in order to effectuate the treatment afforded to such parties under the Restructured Debt Term Loan Agreement. Further, on the Effective Date, the Restructured Debt Term Loan Agreement shall become effective and govern the original amount of $225 million of term loans deemed made by the DIP Lenders, in the case of the Deferred Commitment Fee Claims, and by the First Lien Lenders, in the case of the First Lien Lender Secured Claim. The Restructured Debt Term Loan shall be comprised of the following: (a) to the extent not paid with proceeds of the Exit Facility, the DIP Lenders shall be deemed to have made term loans in an aggregate amount equal to the Deferred Commitment Fee Claims, secured by a second lien on all assets granted to secure the Exit Facility; (b) up to $200 million of term loans to be allocated between the U.S. and Europe deemed made by the First Lien Lenders, with such $200 million to be reduced dollar for dollar by the amount of any term loans deemed made in satisfaction of the Deferred Commitment Fee Claims, and such term loans to be secured by a third lien on all assets granted to secure the Exit Facility; and (c) $25 million of pay-in-kind term loans deemed made by the First Lien Lenders, to be secured by a third lien on all assets granted to secure the Exit Facility, in each case as set forth in <u>Exhibits B</u> and <u>K</u>. On the Effective Date, each First Lien Lender shall automatically be deemed a party to the Restructured Debt Term Loan Agreement.

**6.12    Restructuring Transactions and Alternative Structures**.    The Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtor or Reorganized Debtor determines are necessary

or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations under this Plan of each Reorganized Debtor party to such merger. In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Reorganized Debtor under this Plan.

**6.13 Preservation of Causes of Action**. In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached hereto as Exhibit L. The Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit L does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

**6.14 Exclusivity Period**. Subject to Section 13.2, the Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the Effective Date; provided that, the First Lien Agent consents to any material amendment or modification of this Plan, such consent not to be unreasonably withheld.

**6.15 Effectuating Documents; Further Transactions**. The Chief Financial Officer, or any other executive officer or managing member of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Secretary or Assistant Secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**6.16    Exemption From Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan (including, without limitation, pursuant to any grant of collateral under the Reorganized Debtors' Credit Facilities), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**7.1    Assumed Contracts and Leases**.  On the Effective Date, all executory contracts or unexpired leases of the Debtors (except those executory contracts and unexpired leases to which the Debtors are a party that are specifically listed on the schedule of rejected contracts and leases annexed hereto as <u>Exhibit M</u>) will deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Effective Date.  Each executory contract and unexpired lease assumed pursuant to this Article VII shall be Reinstated and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, without amendment or modification.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights <u>in rem</u> related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.

**7.2** **Rejected Contracts and Leases**. Except with respect to executory contracts and unexpired leases that have previously been assumed or are the subject of a motion to assume, or a notice of assumption served pursuant to an order of the Bankruptcy Court, on or before the Confirmation Date, all executory contracts and unexpired leases listed on Exhibit M to this Plan shall be deemed automatically rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

**7.3** **Exhibits Not Admissions**. Neither the inclusion by the Debtors of a contract or lease on Exhibit M nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.

**7.4** **Payments Related to Assumption of Executory Contracts and Unexpired Leases**. The provisions (if any) of each executory contract or unexpired lease to be assumed under this Plan which are or may be in default shall be satisfied solely by Cure. Any person claiming that a monetary cure amount is due in connection with the assumption of any executory contract or unexpired lease as contemplated by section 365(b) of the Bankruptcy Code must file a monetary cure claim with the Bankruptcy Court asserting all alleged amounts accrued through the Effective Date, if any (the "Cure Claim"), no later than thirty (30) days after the Effective Date (the "Cure Claim Submission Deadline"). Any party failing to submit a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting, or seeking to collect any amounts relating thereto against the Debtors or Reorganized Debtors. In the case of a Cure Claim related to an unexpired lease of non-residential real property, such Cure Claim must include a breakdown by category of all amounts claimed, including, but not limited to, amounts for real estate taxes, common area maintenance, and rent. The Debtors shall have thirty (30) days from the Cure Claims Submission Deadline or the date a Cure Claim is actually filed, whichever is later, to file an objection to the Cure Claim. Any disputed Cure Claims shall be resolved either consensually by the parties or by the Bankruptcy Court. Disputed Cure Claims shall be set for status at subsequent hearings following the Cure Claim Submission Deadline with separate evidentiary hearings to be set by the Bankruptcy Court as needed. If the Debtors do not dispute a Cure Claim, then the Debtors shall pay the Cure Claim, if any, to the claimant within twenty (20) days of the Cure Claim Submission Deadline. Disputed Cure Claims that are resolved by agreement or Final Order of the Bankruptcy Court shall be paid by the Debtors within twenty (20) days of such agreement or Final Order of the Bankruptcy Court.

**7.5** **Rejection Damages Bar Date**. If rejection of an executory contract or unexpired lease rejected pursuant to this Plan results in a Claim, then such Claim

shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected. Any Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as a General Unsecured Claim.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

**8.1    Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date.

**8.2    No Interest on Claims**.  Unless otherwise specifically provided for in this Plan, or the Confirmation Order, interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**8.3    Disbursing Agent**.  The Disbursing Agent shall make all distributions required under this Plan.

**8.4    Claims Administration Responsibility**.  The Reorganized Debtors will have sole and absolute discretion in administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims Administration").  The Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the Claims Administration.

**8.5    Delivery of Distributions**.  Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or the last known addresses of such Holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change in address.  Distributions under this Plan to Holders of DIP Facility Claims shall be made to or at the direction of the DIP Agent

and shall be distributed by the DIP Agent in accordance with the DIP Facility. Distributions under this Plan to Holders of First Lien Lender Claims shall be made to or at the direction of the First Lien Agent and shall be distributed in accordance with the First Lien Credit Agreement and this Plan. Distributions under this Plan to Holders of Allowed Second Lien Lender Claims shall be made to or at the direction of the Second Lien Agent and shall be distributed by the Second Lien Agent in accordance with the Second Lien Credit Agreement. Distributions under this Plan to all other Allowed Claimholders shall be made by the Disbursing Agent. If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Disbursing Agent is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property shall revert to the Reorganized Debtors. Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.6     Procedures for Treating and Resolving Disputed and Contingent Claims**.

(a)     *No Distributions Pending Allowance.* No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)     *Distributions After Allowance.* Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of this Plan that govern distributions to such Claimholders. Subject to Section 8.2 hereof, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

# ARTICLE IX

## ALLOWANCE AND PAYMENT OF
## CERTAIN ADMINISTRATIVE CLAIMS

**9.1     DIP Facility Claims**.  On the Effective Date, DIP Facility Claims shall be paid in full in Cash, except that Deferred Commitment Fee Claims shall be satisfied pursuant to section 9.2 hereof.

**9.2     Deferred Commitment Fee Claims**.  On the Effective Date, all Deferred Commitment Fee Claims shall either (a) be paid in full in Cash or (b) satisfied by the deemed making of Restructured Debt Term Loans under the Restructured Debt Term Loan Agreement.

**9.3     Professional Claims**.

(a)     *Final Fee Applications.*  All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b)     *Payment of Interim Amounts.*  Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through such date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

(c)     On the Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)     Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate.

**9.4     Substantial Contribution Compensation and Expenses Bar Date**. Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court, and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before a date which is forty-five (45) days after the Effective Date, or be forever barred from seeking such compensation or expense reimbursement.

**9.5     Other Administrative Claims**.  All other requests for payment of an Administrative Claim (other than as set forth in Sections 9.3 and 9.4 of this Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (a) which is paid or payable by any Debtor in the ordinary course of business or (b) the payment of which has been approved by the Bankruptcy Court.

## ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**10.1     Revesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, Liens and Interests of creditors and equity security Holders (other than as expressly provided herein).  As of the Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

**10.2     Discharge of the Debtors**. Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, except as otherwise

specifically provided in this Plan or in the Confirmation Order, confirmation of this Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), the Debtors, the Reorganized Debtors and the Estates (a) from all Claims and Causes of Action, whether known or unknown, and (b) from liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, in each case regardless of whether any property has been distributed or retained pursuant to this Plan on account of such Claims, Causes of Action, rights, liabilities, liens, obligations and Interests, and in each case including, but not limited to, demands and (x) Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests that arose before the Confirmation Date, (y) any Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests to the extent such Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and (z) all Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, Cause of Action, right, liability, lien, obligation or Interests accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Effective Date occurring.

As of the Confirmation Date, except as provided in this Plan or in the Confirmation Order or under the terms of the documents evidencing and orders approving the Reorganized Debtors' Credit Facilities all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date.  In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in Mark IV, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**10.3  Compromises and Settlements**.  Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims (a) against them and (b) that they have against other Persons.  The Debtors expressly reserve the right

(with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 10.1 of this Plan, without any need for Bankruptcy Court approval.

**10.4    Release of Certain Parties**.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan or the Reorganized Debtors with respect to each of the Released Parties. Notwithstanding anything to the contrary contained herein, nothing in this Plan shall be deemed to release any of the Debtors, or any of their Affiliates from their obligations under this Plan, the Reorganized Debtors' Credit Facilities, and the transactions contemplated hereby and thereby.

**10.5    Releases by Holders of Claims.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim that affirmatively votes in favor of this Plan hereby forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan (other than the rights under this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan or the Reorganized Debtors.**

**10.6    Setoffs**.  Except with respect to Claims specifically Allowed under the Plan, including the First Lien Lender Secured Claims, the First Lien Lender

Deficiency Claims and the Second Lien Lender Claims, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

**10.7    Exculpation and Limitation of Liability**.  Except as otherwise specifically provided in this Plan, the Released Parties shall not have or incur, and are hereby released from, any claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (a) the filing and prosecution of the Chapter 11 Cases, (b) the Reorganized Debtors' Credit Facilities and the documents related thereto, (c) the negotiation and filing of this Plan, (d) the pursuit of confirmation of this Plan, (e) the negotiation and pursuit of approval of the Disclosure Statement, (f) the consummation of this Plan, and (g) the administration of this Plan or the property to be distributed under this Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  Notwithstanding anything to the contrary contained herein, this Section 10.7 shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed in bad faith, gross negligence or willful misconduct.

**10.8    Indemnification Obligations**.  Except as specifically provided in Sections 6.4 and 6.7 of this Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights except those held by Persons included in either the definition of "Insured Persons" or the "Insureds" in any of the policies providing the D&O Insurance shall be released and discharged on and as of the Effective Date; provided that the Indemnification Rights excepted from the release and discharge shall remain in full force and effect on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases; (b) the Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage for those Persons described in subsection (a)(i) of this Section 10.8 whose Indemnification Rights are not being released and discharged on and as of the Effective Date, for a period of five years after the Effective Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors or the Reorganized Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"); and (c) the Debtors or the Reorganized Debtors, as the case may be,

hereby indemnify such Persons referred to in subclause (b) above to the extent of, and agree to pay for, any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

**10.9    Injunction.  The satisfaction, release, and discharge pursuant to this <u>Article X</u> of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

**ARTICLE XI**

**<u>CONDITIONS PRECEDENT</u>**

**11.1    Conditions to Confirmation**.  The following are conditions precedent to confirmation of this Plan that must be satisfied unless waived in accordance with Section 11.3 of this Plan:

(a)    The Bankruptcy Court shall have approved a disclosure statement with respect to this Plan in form and substance reasonably satisfactory to the Debtors and the First Lien Agent.

(b)    The Confirmation Order, this Plan, and all exhibits and annexes to each of this Plan and the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors and the First Lien Agent.

(c)    The First Lien Agent shall be satisfied that the restructuring of Mark IV Industries Corp. and Dayco Europe S.r.l. shall be completed on terms satisfactory to the First Lien Agent on or before the Effective Date.

**11.2    Conditions to Consummation**.   The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied unless waived in accordance with Section 11.3 of this Plan:

(a)    The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the rejection of unexpired leases and executory contracts by the Debtors as contemplated by Section 7.2 hereof.

(b)    The Debtors shall have entered into the Reorganized Debtors' Credit Facilities and all conditions precedent to the consummation thereof shall have

been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)     The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably satisfactory to the Debtors and the First Lien Lenders, shall have been entered by the Bankruptcy Court on or before [•], 2009, and shall be a Final Order.

(d)     All actions, documents and agreements necessary to implement this Plan shall be in form and substance reasonably satisfactory to the Debtors and the First Lien Lenders and shall have been effected or executed as applicable.

(e)     The Debtors shall have reduced their post Effective Date obligations in respect of the Legacy Liabilities to an amount reasonably satisfactory to the First Lien Lenders.

**11.3    Waiver of Conditions to Confirmation or Consummation**.  The conditions set forth in Sections 11.1 (other than 11.1(a)) and 11.2 (other than 11.2(b) and (c)) of this Plan may be waived by the Debtors subject to such waiver being reasonably satisfactory to the First Lien Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

## ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan (except in the case of the Restructured Debt Term Loans, the Exit Facility and the New Common Stock, and [•], which shall be subject to the jurisdiction indicated in the definitive documentation thereof), including, among others, the following matters:

(a)     to hear and determine pending motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b)     to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

(c)    to adjudicate any and all disputes arising from the distribution of the New Common Stock;

(d)    to ensure that distributions to Allowed Claimholders are accomplished as provided herein;

(e)    to hear and determine any and all objections to the allowance of Claims and the estimation of Claims, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Claim, in whole or in part;

(f)    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g)    to issue orders in aid of execution, implementation, or consummation of this Plan;

(h)    to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    to hear and determine all applications for compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)    to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(k)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with this Plan; provided, however, that any dispute arising under or in connection with the Reorganized Debtors' Credit Facilities, the Registration Rights Agreement and the Stockholders' Agreement shall be dealt with in accordance with the provisions thereof.

(l)    to hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of its Estates, wherever located;

(m)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)    to hear any other matter not inconsistent with the Bankruptcy Code;

(o)     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(p)     to hear and determine all disputes involving the releases and exculpations granted herein and the injunctions established herein;

(q)     to enter a final decree closing the Chapter 11 Cases; and

(r)     to enforce all orders previously entered by the Bankruptcy Court.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims, Interests, and the Retained Actions and any motions to compromise or settle such disputes.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1     Binding Effect**.  As of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Claimholders, all present and former Interestholders, other parties-in-interest and their respective heirs, successors, and assigns.

**13.2     Modification and Amendments**.  The Debtors may alter, amend, or modify this Plan or any Exhibits hereto under section 1127(a) of the Bankruptcy Code, in a form that is reasonably satisfactory to the First Lien Agent, at any time prior to the Confirmation Hearing.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**13.3     Withholding and Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**13.4    Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**13.5    Creditors' Committee**.    Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims.  The professionals retained by the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with (a) the implementation of the transactions contemplated to occur on the Effective Date hereunder and (b) applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 9.3 hereof.

**13.6    Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation hearing, shall be paid on the Effective Date.  The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code as required by that section.

**13.7    Revocation, Withdrawal, or Non-Consummation**.

(a)    *Right to Revoke or Withdraw.*  Each Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Effective Date.

(b)    *Effect of Withdrawal, Revocation, or Non-Consummation.*  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement, or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

**13.8    Notices**.  Any notice required or permitted to be provided to the Debtors, the Creditors' Committee, the First Lien Agent or the DIP Agent under this

Plan shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors:

MARK IV INDUSTRIES, INC.
One Towne Centre
501 John James Audubon Parkway
Amherst, New York 14226
Attn:   Chief Financial Officer

with copies to:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois  60606-1720
Attn:   J. Eric Ivester, Esq. and Matthew M. Murphy, Esq.

If to the Creditors' Committee:

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Attn:   Scott L. Hazan, Esq.

If to the First Lien Agent or DIP Agent:

JPMORGAN CHASE BANK, N.A.
277 Park Avenue, 8th Floor
New York, New York 10017
Attn:   Marina Flindell

with copies to:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue, 27th Floor
New York, New York 10017
Attn:   Steven M. Fuhrman, Esq.

**13.9**     **Term of Injunctions or Stays**.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**13.10  Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or in the relevant governing agreement, document or instrument, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan.

**13.11  Waiver and Estoppel**.  Each Claimholder or Interestholder shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other Person, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: New York, New York
June 17, 2009

MARK IV INDUSTRIES, INC. AND ITS
AFFILIATES AND SUBSIDIARIES THAT ARE ALSO
DEBTORS AND DEBTORS-IN-POSSESSION IN THE
CHAPTER 11 CASES

By: /s/ Mark G. Barberio
Mark G. Barberio
Vice President and Chief Financial Officer of
Mark IV Industries, Inc.

J. Eric Ivester

Matthew M. Murphy

SKADDEN ARPS SLATE MEAGHER
& FLOM LLP

155 N. Wacker Drive, Suite 2700

Chicago, Illinois  60606-1720

Telephone: (312) 407-0700

Facsimile: (312) 407-0411

Jay M. Goffman

SKADDEN ARPS SLATE MEAGHER
& FLOM LLP

Four Times Square

New York, New York 10036-6522

Telephone: (212) 735-3000

Facsimile: (212) 735-2000

ATTORNEYS FOR MARK IV INDUSTRIES, INC.
CORPORATION AND ITS SUBSIDIARIES AND
AFFILIATES THAT ARE ALSO DEBTORS AND
DEBTORS-IN-POSSESSION IN THE CHAPTER 11
CASES

**Appendix B**

**Estimated Percentage Recoveries By Class**

[To be broken out for each Debtor]

**Mark IV Industries, Inc.**

| <u>Class Description</u> | <u>Treatment Under Plan</u> |
|---|---|

| Class 1 – Secured Tax Claims | |
|---|---|
| | **Estimated Amount of Secured Tax Claims:**       **[●]** |
| | **Estimated Percentage Recovery:**       **100%** |

| Class 2 – Other Secured Claims | |
|---|---|
| | **Estimated Amount of Other Secured Claims:**       **[●]** |
| | **Estimated Percentage Recovery:**       **100%** |

| Class 3 – Other Priority Claims | |
|---|---|
| | **Estimated Amount of Other Priority Claims:**       **[●]** |
| | **Estimated Percentage Recovery:**       **100%** |

| Class 4 – Intercompany Claims | |
|---|---|
| | **Estimated Percentage Recovery:**       **100%** |

| Class 5 – Subsidiary Interests | |
|---|---|
| | **Estimated Percentage Recovery:**       **100%** |

| Class 6 – First Lien Lender Secured Claims | |
|---|---|
| | **Estimated Amount of First Lien Lender Secured Claims:**       **[●]** |
| | **Estimated Percentage Recovery:**       **92%** |

| Class 7 – General Unsecured Claims | |
|---|---|

| Class Description | Treatment Under Plan |
|---|---|
| | **Estimated Amount of General Unsecured Claims:** [●] |
| | **Estimated Percentage Recovery:** 8% |

| Class 8 – General Unsecured Convenience Claims | |
|---|---|
| | **Estimated Amount of**<br>**General Unsecured Convenience Claims:** [●] |
| | **Estimated Percentage Recovery:** [●]% |

| Class 9 – Old Equity Interests | |
|---|---|
| | **Estimated Percentage Recovery:** 0% |

**Appendix C**

**Historical Financial Results**

[TO COME]

**Appendix D**

**Financial Projections**

[TO COME]

**Appendix E**

**Valuation Analysis**

[TO COME]

**Appendix F**

**Liquidation Analysis**

[TO COME]