************************************************************************
**THIS DISCLOSURE STATEMENT IS SUBJECT TO THE APPROVAL OF THE
BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR
REJECTIONS OF THE PLAN.  ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT
BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.**
************************************************************************

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| MARK IV INDUSTRIES, INC., et al., | : | Case No. 09-12795 (SMB) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DISCLOSURE STATEMENT WITH RESPECT TO**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**MARK IV INDUSTRIES, INC. AND ITS AFFILIATED DEBTORS**
**AND DEBTORS-IN-POSSESSION**

J. Eric Ivester
Matthew M. Murphy
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois  60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

Jay M. Goffman
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
Four Times Square
New York, New York  10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for the Debtors and Debtors-in-Possession

Dated:  July 30, 2009

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF MARK IV INDUSTRIES, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH THEIR LEGAL AND/OR BUSINESS ADVISORS AS DEEMED APPROPRIATE BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND/OR APPENDICES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101, *ET SEQ.* AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF MARK IV INDUSTRIES, INC. OR ANY OF ITS AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES ISSUED PURSUANT TO THE PLAN, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, MARK IV INDUSTRIES, INC. OR ANY OF ITS AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

# EXECUTIVE SUMMARY

Mark IV Industries, Inc.("Mark IV"), together with its subsidiaries and affiliates (collectively, the "Company"), is a leading diversified manufacturer of highly-engineered systems and components for the worldwide automotive OEM market, automotive aftermarket and transportation markets. The Company operates in 16 countries around the world, generating 29% of its fiscal year 2009 sales in North America with the balance in Europe (63%) and other geographic regions (8%).

On April 30, 2009 (the "Petition Date"), Mark IV and seventeen of its U.S. subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtors' decision to commence chapter 11 reorganization cases was based on a combination of specific factors that placed significant stress on the Debtors' liquidity position in the several months leading up to the Petition Date and hindered the Company's ability to successfully compete in the markets in which it operated. These factors included, among other things, cumbersome obligations under an unworkable capital structure, the recent unprecedented global financial crisis, increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets, pressures from the Company's customers and suppliers, and progressively unsustainable domestic retiree legacy liabilities.

The Debtors' proposal for reorganization of their businesses is set forth in the First Amended Joint Plan of Reorganization of Mark IV Industries, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan"), a copy of which is attached hereto as Appendix A.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors, as filed on the date hereof with the United States Bankruptcy Court for the Southern District of New York. Certain provisions of the Plan, and thus the description and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties. Accordingly, the Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 3019, and Section 14.2 of the Plan.

The Plan provides for an equitable distribution to creditors of the Debtors, preserves the value of the Debtors' businesses as a going concern, and preserves the jobs of employees. The Debtors, the First Lien Agent, the steering committee for the First Lien Lenders (the "Steering Committee") and the official committee of unsecured creditors appointed in these cases (the "Creditors' Committee") believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation and costs, the loss of jobs by the Debtors' employees, and/or impaired recoveries. Moreover, the Debtors, the First Lien Agent, the Steering Committee and the Creditors' Committee believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. **FOR THESE REASONS, THE DEBTORS, THE FIRST LIEN AGENT, THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.**

## Plan Overview and Summary of Distributions

The following summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement with respect to the Plan.

### A.     General Basis for the Plan

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  The Plan, though proposed jointly, constitutes a separate plan of reorganization proposed by each Debtor.  Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that (1) Class 5 Subsidiary Interests shall not apply to the plan proposed by Mark IV and (2) Class 9 Old Equity Interests shall be deemed to apply only to the plan proposed by Mark IV.  After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors will be maximized by the reorganization of the Debtors as contemplated by the Plan.

Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the implied valuation of the Reorganized Company prepared by the Debtors' investment banker and financial advisors, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), the liquidation analysis prepared by management with the assistance of the Debtors' restructuring advisors, Zolfo Cooper Management, LLC ("Zolfo Cooper"), and the other analyses prepared by the Debtors with the assistance of their advisors, the Debtors believe that the value of their Estates is significantly greater in the proposed reorganization than it would be in a liquidation.

Accordingly, the Debtors believe the Plan maximizes the value of the Debtors and represent the best alternative for the Debtors, their Estates and their constituencies.

### B.     Summary of Treatment of Claims and Interests under the Plan

The Plan, though proposed jointly, constitutes a separate plan of reorganization proposed by each Debtor.  Each Plan contains separate classes for holders of Claims against and Interests in the applicable Debtor.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.

The treatment of Claims under the Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

If the Company determines to pursue the Alternative Corporate Structure described in Section 6.6 of the Plan, then, with the consent of the First Lien Agent, the Debtors will pursue such Alternative Corporate Structure and, instead of receiving the New Common Stock, the Holders of Allowed First Lien Lender Claims, the Holders of Allowed General Unsecured Claims and those Holders of Allowed General Unsecured Convenience Class Claims not receiving Cash pursuant to the Plan shall receive the New LLC Membership Interests.

The tables below summarize the classification and treatment of Claims and Interests under the Plan.  These summaries are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VII below.  The tables

below also set forth the estimated percentage recovery for holders of Claims and Interests in each Class, and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors and as modified by the Bankruptcy Court through certain hearings, and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims. Each Debtor's Plan contemplates distributions to Claimholders in the amount of the estimated percentage recoveries set forth below. Thus, the aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

| **Class Description** | **Treatment Under Plan** |
|---|---|
| Class 1 – Secured Tax Claims | A Secured Tax Claim means any Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit. Under the Plan, each Holder of an Allowed Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.<br><br>**Estimated Amount of Allowed Secured Tax Claims (all Debtors): $400,000**<br><br>**Estimated Percentage Recovery:          100%** |
| Class 2 – Other Secured Claims | An Other Secured Claim means a Claim (other than a DIP Facility Claim, Deferred Commitment Fee Claim, Secured Tax Claim or First Lien Lender Secured Claim) that is secured by a lien, which is not subject to avoidance or subordination under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the Holder of such Claim. Under the Plan, the Debtors (or Reorganized Debtors) shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, (x) reinstate such Other Secured Claim in accordance with the provisions of subsection 1124 of the Bankruptcy Code or (y) provide such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing.<br><br>**Estimated Amount of Allowed Other Secured Claims (all Debtors):  $300,000**<br><br>**Estimated Percentage Recovery:          100%** |

| Class Description | Treatment Under Plan |
|---|---|
| Class 3 – Other Priority Claims | An Other Priority Claim means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim. Under the Plan, unless a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of its Claim, each Other Priority Claimholder shall be treated in accordance with section 1129(a)(9) of the Bankruptcy Code.<br><br>**Estimated Amount of**<br>**Allowed Other Priority Claims (all Debtors):  $500,000**<br><br>**Estimated Percentage Recovery:                    100%** |

| Class 4 – Intercompany Claims | An Intercompany Claim means (i) a Claim by any Debtor against a Debtor; (ii) a Claim by any Debtor against a Mark IV Non-Debtor; or (iii) a Claim by any Mark IV Non-Debtor against a Debtor. Under the Plan, Intercompany Claims will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired. |

| Class 5 – Subsidiary Interests | Subsidiary Interests means, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other instruments evidencing an ownership interest in the applicable Subsidiary Debtor as of the Effective Date, and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the applicable Subsidiary Debtor, as of the Effective Date. Subsidiary Interests shall be unaffected by the Plan, except to the extent required by the Restructuring Transactions. |

| Class Description | Treatment Under Plan |
|---|---|
| Class 6 – First Lien Lender Secured Claims | First Lien Lender Secured Claims means the secured portion under section 506 of the Bankruptcy Code of the First Lien Lender Claims which shall be allowed in full in the aggregate amount of $350 million pursuant to the Plan. Under the Plan, each Holder of an Allowed First Lien Lender Secured Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, (a) such Claimholder's Pro Rata participation in the Restructured Debt Term Loan Agreement and (b) such Claimholder's Pro Rata share of 88% of the New Equity Interests (prior to dilution from the Management Equity Incentive Program and prior to dilution from any New Equity Interests issued to the Exit Facility Lenders).<br><br>**Amount of Allowed**<br>**First Lien Lender Secured Claims (all Debtors):**  **$350,000,000**<br><br>**Estimated Percentage Recovery:**  **95%**[1] |
| Class 7 – General Unsecured Claims | A General Unsecured Claim means a Claim that is not an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Secured Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, or a General Unsecured Convenience Claim; provided that, General Unsecured Claims shall include Deficiency Claims. General Unsecured Claims generally are comprised of, among other things, trade Claims, lease and contract rejection Claims, and personal injury and other litigation Claims. Under the Plan, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, its Pro Rata Share of (a) 12% of the New Equity Interests (prior to dilution from the Management Equity Incentive Program) and (b) the net proceeds from the Trust Assets.<br><br>**Estimated Amount of Allowed**<br>**General Unsecured Claims (all Debtors):**  **$500,000,000**[2]<br><br>**Estimated Percentage Recovery:**  **3.5%** |

---

[1]  The estimated recovery for the First Lien Lender Secured Claims is comprised of the sum of (a) 88% of the New Equity Interests (88% of $147 million, or $129.36 million) and (b) the face amount of the Restructured Debt Term Loans less the Deferred Commitment Fee Claims ($225 million less an estimated $22.5 million, or $202.5 million). The Restructured Debt Term Loans may not trade at par.

[2]  The Plan provides that, upon entry of the Confirmation Order, all (a) First Lien Lender Deficiency Claims shall be allowed in an amount equal to $485,000,000 and (b) Second Lien Lender Claims shall be allowed as Deficiency Claims in full in the aggregate amount of $153,140,228. For distribution and estimated recovery purposes, the First Lien Lender Deficiency Claims are limited to no more than 50% of the estimated total Allowed General Unsecured Claims.

| Class Description | Treatment Under Plan |
|---|---|
| Class 8 – General Unsecured Convenience Claims | A General Unsecured Convenience Claim means a Claim, other than a First Lien Lender Deficiency Claim or Second Lien Lender Claim, against the Debtors that otherwise would be included in the General Unsecured Claim Class that is in an amount (i) of $100,000 or less, or (ii) greater than $100,000 and the Holder of such Claim has made the Convenience Class Election on the Ballot provided for voting on the Plan within the time fixed by the Bankruptcy Court for completing and returning such Ballot. Under the Plan, Holders of Allowed General Unsecured Convenience Class Claims will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, distributions as follows:<br><br>♦ A Holder of an Allowed General Unsecured Convenience Claim in an amount less than or equal to $25,000 shall receive, in exchange for such Claim, Cash in an amount equal to the lesser of (i) 25% of such Allowed General Unsecured Convenience Claim and (ii) such Claimholder's Pro Rata share of the Convenience Class Cap Amount.<br><br>♦ A Holder of an Allowed General Unsecured Convenience Claim in an amount exceeding $25,000 and less than or equal to $100,000 shall receive a distribution consisting of (i) Cash in an amount equal to the lesser of (a) 25% of such Allowed General Unsecured Convenience Claim and (b) such Claimholder's Pro Rata share of the Convenience Class Cap Amount, or (ii) if affirmatively elected on the applicable Ballot, such Claimholder's Pro Rata share of the General Unsecured Claimholders Plan Distribution Property.<br><br>♦ A Holder of an Allowed General Unsecured Claim in excess of $100,000 that makes an irrevocable written election to opt into the classification of Class 8 on a validly executed and timely delivered Ballot shall, by such election reduce such Claim to $100,000 and become a Holder of a Class 8 General Unsecured Convenience Claim for all purposes (including voting and distribution), and shall receive, in exchange for such Claim in the amount of $100,000, Cash in an amount equal to the lesser of (a) $25,000 and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount.<br><br>**THERE CAN BE NO ASSURANCE THAT ANY GENERAL UNSECURED CLAIMHOLDER RECEIVING (OR ELECTING TO RECEIVE) CASH WILL RECEIVE 25% OF ITS CLAIM.[3]**<br><br>**Estimated Amount of Allowed**<br>**General Unsecured Convenience Claims (all Debtors): $5,000,000**<br><br>**Estimated Percentage Recovery:          Between 3.5% and 25%** |

---

[3] There can be no assurance that any General Unsecured Claimholder receiving (or electing to receive) Cash will receive distributions equal to 25% of such Claimholder's Claim. Indeed, to the extent General Unsecured Claimholders holding Claims exceeding $5,200,000 in the aggregate (i.e., the Convenience Class Cap Amount multiplied by four (4)) elect to receive Cash, the percentage recovery to each Class 8 General Unsecured Convenience Claimholder will be proportionately reduced. For example, if the aggregate amount of Claims of Claimholders who receive (including those who elect to receive) Cash exceeds approximately $37,000,000, the recoveries to those receiving Cash will be less than the 3.5% distribution the Debtors estimate would be available to holders of General Unsecured Claims assuming no Cash elections were made and they receive distributions of the General Unsecured Claims Plan Distribution Property.

| Class Description | Treatment Under Plan |
|---|---|
| Class 9 – Old Equity Interests | Old Equity Interests means the Interests in respect of the old common stock of Mark IV issued and outstanding prior to the Effective Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of such common stock of Mark IV or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims. Under the Plan, Old Equity Interests shall be cancelled, released, and extinguished, and Holders of such Interests shall neither receive nor retain any property on account of such Interests. |
| | **Estimated Percentage Recovery:        0%** |

THE DEBTORS, THE FIRST LIEN AGENT, THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS. THE DEBTORS, THE FIRST LIEN AGENT, THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE EACH STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

**A VOTE TO ACCEPT THE PLAN CONSTITUTES YOUR CONSENT TO THE RELEASE OF THE PARTIES SPECIFIED IN ARTICLE XI OF THE PLAN.**

**TABLE OF CONTENTS**

**ARTICLE**                                                          **PAGE**

I.      INTRODUCTION .................................................................................................... 1

II.     PLAN VOTING INSTRUCTIONS AND PROCEDURES ........................................ 2
        A.     Notice to Holders of Claims and Interests ................................................ 2
        B.     Solicitation Package .................................................................................. 3
        C.     General Voting Procedures, Ballots, and Voting Deadline ........................ 3
        D.     Confirmation Hearing and Deadline for Objections to Confirmation ......... 4

III.    OVERVIEW OF THE COMPANY'S BUSINESSES ............................................ 5
        A.     Mark IV's Business Units ......................................................................... 5
              1.     Power Transmission ...................................................................... 5
              2.     Air Intake & Cooling .................................................................... 6
              3.     Intelligent Vehicle Highway Systems ........................................... 6
              4.     Information Display Systems ......................................................... 6
              5.     Additional Businesses ................................................................... 7
         B.     Recent Financial Results .......................................................................... 7

IV.    CORPORATE STRUCTURE AND MANAGEMENT OF THE COMPANY ............ 7
        A.     Current Corporate Structure ...................................................................... 7
        B.     Board of Directors .................................................................................... 7
        C.     Executive Officers ................................................................................... 8

V.     PREPETITION CAPITAL STRUCTURE OF THE COMPANY ............................ 9
        A.     Equity ...................................................................................................... 9
        B.     First Lien Credit Agreement ..................................................................... 9
        C.     Second Lien Credit Agreement ............................................................... 10
        D.     Unsecured Bond Debt ............................................................................. 11
        E.     Foreign Overdraft Lines, Working Capital Facilities and Factoring Facilities ................ 11
        F.     Chieti Mortgage ..................................................................................... 11

VI.    THE CHAPTER 11 CASES ............................................................................... 11
        A.     Events Leading to Commencement of the Chapter 11 Cases ................... 11
              1.     Prepetition Obligations ................................................................ 12
              2.     Customer Pressures ..................................................................... 12
              3.     Supplier Pressures ....................................................................... 12
              4.     Retiree Legacy Liabilities and Operational Restrictions ................. 12
         B.     Commencement of the Chapter 11 Cases ................................................ 13
              1.     Continuation of Business ............................................................. 13
              2.     Stay of Ltigation ......................................................................... 13
         C.     Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases ................. 13
              1.     First Day Orders .......................................................................... 13
              2.     Appointment of Statutory Committees .......................................... 14
         D.     Post-Petition Financing ........................................................................... 14
        E.     Other Significant Events During the Chapter 11 Cases ............................ 15
              1.     Labor and Employee Matters ....................................................... 15

2. Rejection of Real Property Leases ..................................................... 16
F. Summary of Claims Process and Bar Date ...................................................... 16
    1. Claims Process ............................................................................. 16
    2. Schedules and Statements of Financial Affairs ......................... 17
    3. Claims Bar Date .......................................................................... 17
G. Workers' Compensation .................................................................................. 17
H. Treatment of PBGC Plan ................................................................................. 18
I. Litigation .......................................................................................................... 18
    1. Property Damage Litigation Claims ........................................... 18
    2. Product Liability Issues .............................................................. 19
    3. Other Legal Proceedings ............................................................ 19
J. Environmental Matters ..................................................................................... 19
K. Accomplishments During Chapter 11; Go-Forward Strategy ......................... 21
    1. Strategic Initiatives .................................................................... 21
    2. Reasons for Emergence at This Time ......................................... 21
    3. The Company's Future Strategy ................................................. 22

VII. SUMMARY OF THE PLAN ...................................................................................... 23
A. Overall Structure of the Plan ........................................................................... 23
B. Reorganized Capital Structure Created by Plan .............................................. 25
    1. Equity .......................................................................................... 25
    2. Exit Facility ................................................................................ 25
    3. Restructured Debt Term Loan Agreement .................................. 26
    4. Subsidiary Level Debt ................................................................ 26
C. Classification and Treatment of Claims and Interests ..................................... 26
    1. Treatment of Unclassified Claims Under the Plan ..................... 27
    2. Treatment of Classified Claims Against, and Interest in, the Debtors
       Under the Plan ............................................................................. 28
    3. Reservation of Rights Regarding Claims ................................... 33
D. Means for Implementation of the Plan ............................................................. 33
    1. Continued Corporate Existence .................................................. 33
    2. Corporate Action ........................................................................ 33
    3. Organizational Documents .......................................................... 33
    4. Cancellation of Existing Securities and Agreements .................. 34
    5. Authorization and Issuance of New Common Stock ................... 34
    6. Alternative Corporate Structure .................................................. 35
    7. Authorization and Issuance of New LLC Membership Interests ......... 35
    8. Directors and Officers or Managing Members ........................... 35
    9. Employment, Retirement, Indemnification and Other Agreements and
       Incentive Compensation Programs .............................................. 36
    10. Implementation of the Management Equity Incentive Program ......... 37
    11. Issuance of the New Equity Interests .......................................... 37
    12. The Exit Facility ......................................................................... 38
    13. The Restructured Debt Term Loan Agreement .......................... 38
    14. Restructuring Transactions ......................................................... 39
    15. Retained Causes of Action .......................................................... 39
    16. Exclusivity Period ...................................................................... 39
    17. Effectuating Documents; Further Transactions .......................... 40
    18. Exemption from Certain Transfer Taxes and Recording Fees ......... 40
E. Unexpired Leases and Executory Contracts .................................................... 40
    1. Assumed Contracts and Leases ................................................... 40

| | 2. | Rejected Contracts and Leases | 41 |
|---|---|---|---|
| | 3. | Exhibits Not Admissions | 41 |
| | 4. | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 41 |
| | 5. | Rejection Damages Bar Date | 42 |
| F. | | Provisions Governing Distributions | 42 |
| | 1. | Time of Distributions | 42 |
| | 2. | No Interest on Claims | 42 |
| | 3. | Disbursing Agent | 42 |
| | 4. | Claims Administration Responsibility | 42 |
| | 5. | Delivery of Distributions | 43 |
| | 6. | Procedures for Treating and Resolving Disputed and Contingent Claims | 44 |
| G. | | Allowance of Certain Claims | 45 |
| | 1. | DIP Facility Claims | 45 |
| | 2. | Deferred Commitment Fee Claims | 46 |
| | 3. | Professional Claims | 46 |
| | 4. | Substantial Contribution Compensation and Expenses Bar Date | 46 |
| | 5. | Other Administrative Claims | 47 |
| H. | | Creditors' Trust | 47 |
| | 1. | Appointment of Trustee | 47 |
| | 2. | Assignment of Trust Assets to the Creditors' Trust | 47 |
| | 3. | The Creditors' Trust | 47 |
| | 4. | The Trust Advisory Board | 48 |
| I. | | Effect of the Plan on Claims and Interests | 49 |
| | 1. | Revesting of Assets | 49 |
| | 2. | Discharge of the Debtors | 50 |
| | 3. | Compromises and Settlements | 50 |
| | 4. | Release of Certain Parties | 51 |
| | 5. | Releases by Holders of Claims | 51 |
| | 6. | Setoffs | 51 |
| | 7. | Exculpation and Limitation of Liability | 52 |
| | 8. | Indemnification Obligations | 52 |
| | 9. | Injunction | 52 |
| VIII. | | CERTAIN FACTORS TO BE CONSIDERED | 53 |
| A. | | General Considerations | 53 |
| B. | | Certain Bankruptcy Considerations | 53 |
| C. | | Claims Estimations | 53 |
| D. | | Business Factors And Competitive Conditions Which May Affect the Company's Businesses | 54 |
| | 1. | The Continuing Global Economic Crisis May Adversely Affect The Company's Operating Performance | 54 |
| | 2. | The Cyclical Nature Of Automotive Sales And Production May Adversely Affect The Company's Operating Performance | 54 |
| | 3. | Customer Financial Difficulty May Adversely Affect The Company's Operating Performance | 54 |
| | 4. | Competition May Adversely Affect The Company's Operating Performance | 54 |
| | 5. | Reduced Sales Volume May Adversely Affect The Company's Operating Performance | 55 |

| | 6. | Increases in Costs May Adversely Affect the Company's Operating Performance | 55 |
|---|---|---|---|
| | 7. | Certain Disruptions In Supply Of And Changes In The Competitive Environment For Materials Integral To The Company's Products May Adversely Affect The Company's Operating Performance | 55 |
| | 8. | The Company May Suffer Future Asset Impairment And Other Restructuring Charges, Including Write Downs Of Goodwill Or Intangible Assets | 56 |
| | 9. | The Company May Lose Or Fail To Attract And Retain Key Salaried Employees And Management Personnel | 56 |
| | 10. | The Company May Incur Material Losses And Costs As A Result Of Warranty Claims And Product Liability Actions | 56 |
| | 11. | The Company Is Subject To Other Litigation | 57 |
| | 12. | The Company's Intellectual Property May Be Misappropriated Or Subject To Claims Of Infringement | 57 |
| | 13. | IVHS May Not Be Successful in Procuring New Contracts With The IAG | 58 |
| | 14. | The Company Is Subject To Significant Environmental Regulation And Environmental Compliance Expenditures And Liabilities | 58 |
| | 15. | Actual Costs For Environmental Matters May Vary From The Estimates | 59 |
| | 16. | The Company Is An International Company Subject To Uncertainties Which Could Affect Its Operating Results | 59 |
| | 17. | There Could Be Significant Tax Risks For The Company In Connection With Its International Operations | 61 |
| | 18. | As A U.S. Corporation, Mark IV Is Subject To The Foreign Corrupt Practices Act And A Determination That It Violated This Act May Affect Mark IV's Businesses And Operations Adversely | 61 |
| | 19. | Changes In Interest Rates May Negatively Affect The Company | 61 |
| | 20. | Adverse Publicity May Negatively Affect The Company's Businesses | 62 |
| E. | | Conditions Precedent to Consummation; Timing | 62 |
| F. | | Inherent Uncertainty of Financial Projections | 62 |
| G. | | Access to Financing and Trade Terms | 63 |
| H. | | Leverage | 64 |
| I. | | Certain Risk Factors Relating to Securities to be Issued Under the Plan | 65 |
| | 1. | A Liquid Trading Market for the New Equity Interests is Unlikely to Develop | 65 |
| | 2. | Potential Dilution of the New Equity Interests | 65 |
| | 3. | Dividends | 65 |
| | 4. | Change of Control | 65 |
| | 5. | Restrictions on Transfer | 65 |
| J. | | Additional Factors to Be Considered | 66 |
| | 1. | The Debtors Have No Duty to Update | 66 |
| | 2. | No Representations Outside This Disclosure Statement Are Authorized | 66 |
| | 3. | Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary | 66 |
| | 4. | Claims Could Be More Than Projected | 66 |
| | 5. | No Legal or Tax Advice Is Provided to You By This Disclosure Statement | 66 |
| | 6. | No Admission Made | 67 |

IX.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
      PLAN ..................................................................................................................... 67
      A.    Certain U.S. Federal Income Tax Consequences to the Debtors ....................... 68
            1.    Cancellation of Indebtedness and Reduction of Tax Attributes .......... 68
            2.    Net Operating Losses — IRC section 382 ........................................... 69
            3.    Alternative Minimum Tax ................................................................... 70
      B.    Certain U.S. Federal Income Tax Consequences to Claimholders and Interest
            Holders ............................................................................................................ 70
            1.    U.S. Holders ....................................................................................... 70
            2.    Non-U.S. Holders ............................................................................... 74
      C.    Information Reporting and Backup Withholding .............................................. 75
      D.    Importance of Obtaining Professional Tax Assistance ..................................... 75

X.    FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST ....................... 75
      A.    Feasibility of the Plan ..................................................................................... 75
      B.    Acceptance of the Plan .................................................................................... 76
      C.    Best Interests Test ........................................................................................... 76
      D.    Estimated Valuation of the Reorganized Company .......................................... 77
      E.    Application of the Best Interests Test to the Liquidation Analysis and the
            Valuation of the Reorganized Company ........................................................... 77
      F.    Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown'
            Alternative ...................................................................................................... 78
      G.    Conditions Precedent ...................................................................................... 79
            1.    Conditions to Confirmation ................................................................ 79
            2.    Conditions to Consummation .............................................................. 79
      H.    Waiver of Conditions to Confirmation and Consummation of the Plan ............ 80

XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. 80
      A.    Continuation of the Bankruptcy Case .............................................................. 80
      B.    Alternative Plans of Reorganization ................................................................ 81
      C.    Liquidation Under Chapter 7 or Chapter 11 .................................................... 81

XII.  VOTING REQUIREMENTS ...................................................................................... 81
      A.    Parties-in-Interest Entitled to Vote ................................................................. 83
      B.    Classes Unimpaired Under the Plan ................................................................. 83
      C.    Classes Impaired Under the Plan ..................................................................... 84
            1.    Impaired Classes of Claims Entitled to Vote ...................................... 84
            2.    Impaired Classes of Claims and Interests Not Entitled to Vote .......... 84

XIII. CONCLUSION ......................................................................................................... 84
      A.    Hearing on and Objections to Confirmation .................................................... 84
            1.    Confirmation Hearing ........................................................................ 84
            2.    Date Set for Filing Objections to Confirmation of the Plan ............... 84
      B.    Recommendation ............................................................................................. 84

**APPENDICES**

Appendix A     —     First Amended Joint Plan of Reorganization of Mark IV Industries, Inc. and Its Affiliated Debtors and Debtors-in-Possession

Appendix B     —     Historical Financial Results

Appendix C     —     Financial Projections

Appendix D     —     Valuation Analysis

Appendix E     —     Liquidation Analysis

## I.      INTRODUCTION

Mark IV Industries, Inc. ("Mark IV") and seventeen of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors," and the Debtors, together with their non-Debtor subsidiaries and affiliates, shall be referred to herein as the "Company") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 30, 2009 (the "Petition Date").  The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors' cases are pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and are being jointly administered under Case No. 09-12795.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.

The Debtors' proposal for reorganization of their businesses is set forth in the First Amended Joint Plan of Reorganization of Mark IV Industries, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan"), a copy of which is attached hereto as Appendix A.  Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

Prior to soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

This Disclosure Statement sets forth certain information regarding the Debtors' operations and financial history.  Historical financial results for the Company on a consolidated basis are set forth in Appendix B annexed hereto.  This Disclosure Statement also describes the Debtors' need to seek chapter 11 protection, significant events that have occurred during the Debtors' chapter 11 cases (the "Chapter 11 Cases"), and the anticipated operations of the Company after the Effective Date (the "Reorganized Company").  In addition, this Disclosure Statement describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  Furthermore, this Disclosure Statement discusses the confirmation process and the voting procedures that Claimholders in Impaired Classes entitled to vote must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND THE VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTEREST IN THE DEBTORS, PLEASE SEE ARTICLES VII AND VIII HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION.  TO THE EXTENT ANY PORTION OF THIS DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED HEREIN ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS OR STATUTORY PROVISIONS THEY ARE SUMMARIZING. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE

SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II. PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims and Interests

The Debtors are causing this Disclosure Statement to be transmitted to certain Claimholders for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the Claimholder to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

On or around the date of this Disclosure Statement, the Bankruptcy Court entered an order (the "Solicitation Procedures Order") (1) approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan, (2) setting procedures for voting on the Plan, and (3) scheduling the hearing on confirmation of the Plan (the "Confirmation Hearing"). THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIMHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY AND CONSULT WITH THEIR LEGAL AND/OR BUSINESS ADVISORS AS DEEMED APPROPRIATE BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the projections set forth in Appendix C attached hereto (the "Projections"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Company intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**B.      Solicitation Package**

Accompanying this Disclosure Statement are copies of (1) the Plan (<u>Appendix A</u> hereto); (2) the notice of, among other things, (a) the time for submitting ballot forms (the "<u>Ballots</u>") that are distributed to Claimholders who are included in Classes that are entitled to vote to accept or reject the Plan; (b) the date, time and place of the Confirmation Hearing and related matters; and (c) the time for filing objections to the confirmation of the Plan (such notice, the "<u>Confirmation Hearing Notice</u>"); (3) as applicable, either (x) a Ballot for the Class in which you are entitled to vote, to be used by you in voting to accept or reject the Plan, or (y) in lieu of a Ballot, a notice explaining why you are not entitled to vote; (4) the Solicitation Procedures Order; and, (5) if applicable, a Plan solicitation letter from the Creditors' Committee urging Holders of General Unsecured Claims to vote to accept the Plan.

**C.      General Voting Procedures, Ballots, and Voting Deadline**

If you are a Claimholder entitled to vote on the Plan and a Ballot is included herewith, after carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND ACTUALLY RECEIVED NO LATER THAN September 1, 2009 AT 5:00 P.M. (EASTERN TIME) (THE "<u>VOTING DEADLINE</u>") BY EPIQ BANKRUPTCY SOLUTIONS, LLC ("<u>EPIQ</u>," OR THE "<u>VOTING AGENT</u>"), AT MARK IV INDUSTRIES BALLOTING CENTER, C/O EPIQ BANKRUPTCY SOLUTIONS, LLC, P.O. BOX 5014, FDR STATION, NEW YORK, NEW YORK 10150-5014. If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please contact:

Epiq Bankruptcy Solutions, LLC
Attn: Mark IV Industries
757 Third Avenue, 3rd Floor
New York, New York 10017
Phone: 646-282-2400
Fax: 646-282-2501

Imaged copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all exhibits, schedules and appendices to the foregoing) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, http://www.nysb.uscourts.gov for a fee (a PACER account is required), or at the Company's restructuring website, http://chapter11.epiqsystems.com/markiv, free of charge. In addition, if you wish to obtain, at

your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, you may contact Epiq at the address immediately above.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE <u>ARTICLE XII</u> HEREIN.

### D. Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to begin on September 22, 2009 at 2:00 p.m. (Eastern time) before the Honorable Stuart M. Bernstein, Chief Judge for the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, Courtroom 723.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are <u>ACTUALLY RECEIVED</u> on or before September 15, 2009 at 5:00 p.m. (Eastern time) by:

<u>Counsel for the Debtors</u>

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois  60606-1720
Attn: J. Eric Ivester, Esq.
Attn: Matthew M. Murphy, Esq.

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York  10036
Attn: Jay M. Goffman, Esq.

<u>U.S. Trustee</u>

Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn: Paul K. Schwartzberg, Esq.

<u>Counsel for the First Lien Agent and the DIP Agent</u>

Simpson Thacher & Bartlett LLP
425 Lexington Ave.
New York, New York  10017
Attn: Steven M. Fuhrman, Esq.

Counsel for the Creditors' Committee

Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169
Attn: Scott L. Hazan, Esq.
Attn: Jenette A. Barrow-Bosshart, Esq.

## III.    OVERVIEW OF THE COMPANY'S BUSINESSES

### A.    Mark IV's Business Units

First founded in 1970, Mark IV is a leading manufacturer of highly-engineered systems and components for transportation infrastructure, vehicles and equipment.  The Company's systems and components are generally designed and targeted for two segments of the transportation world – (1) automotive and industrial ("<u>Automotive and Industrial</u>") and (2) transportation technologies ("<u>Transportation Technologies</u>") – and include radio frequency identification technology, information display, power transmission, air admission and cooling, and other technologies.  The Automotive and Industrial products are used to power small, industrial and commercial vehicles, as well as equipment and automobiles.  The Transportation Technologies products help state and other local authorities improve traffic flow on their highways and expressways, and are also used in lighting and information display systems for rail, bus and aircraft.  The Debtors believe that the Company is a market leader in most markets that it serves.  The Company operates in 16 countries around the world, generating 29% of its fiscal year 2009 sales in North America with the balance in Europe (63%) and other geographic regions (8%).

Mark IV manages and reports its Automotive and Industrial and Transportation Technologies operations in four strategic business units, which include: (1) Power Transmission, (2) Air Intake & Cooling, (3) Intelligent Vehicle Highway Systems, and (4) Information Display Systems (collectively, the "<u>Business Units</u>").  The Company's Business Units each offer distinct product technology and serve separate customer market channels.

1.    *Power Transmission*

The Power Transmission Business Unit ("<u>Power Transmission</u>"), headquartered in Troy, Michigan, designs, manufactures and sells high quality engine-related products using mechanical power transmission technology.  Power Transmission is a leading Tier 1 supplier, selling directly to automotive and heavy duty original equipment manufacturers ("<u>OEMs</u>") across North America, Europe and South America.  It is also a market share leader in the aftermarket industry – a segment of the automotive industry concerned with the manufacturing, re-manufacturing, distribution, retailing, and installation of all vehicle parts, chemicals, tools, equipment and accessories for light and heavy duty vehicles after the sale of the vehicle by the OEM to the consumer.  Power Transmission products include light duty systems and components used to facilitate the transfer of power mechanically from an engine to a drive unit, including camshaft drive and accessory drive systems.  Components include timing and poly-rib belts, automatic tensioning devices, pulleys, idlers, brackets and dampers.  The Power Transmission parts, mostly sold under the well-known "Dayco" brand name, allow engines to operate at peak efficiency, thus maximizing fuel economy while reducing emissions, vibration and noise.  Sales of Mark IV's Power Transmission products account for 71% of total annual sales of all such products across Europe and the rest of the non-North American markets.  Mark IV's Power Transmission products are either number 1, 2, or 3 in each of its major OEM and aftermarket customer segments.

2. *Air Intake & Cooling*

The Air Intake & Cooling Business Unit ("<u>Air Intake & Cooling</u>"), headquartered in Orbey, France, designs, manufactures and sells high quality plastic-based products for air intake and engine cooling applications. Mark IV uses a proprietary injection-molded composite plastic material that is significantly lighter and costs substantially less than traditional metal air intake manifolds and other resin-based technologies, making Mark IV a recognized leader in these technology areas. Additional products include air/water ducts and pipes, thermostat housings, water pumps, surge tanks and integrated air intake and cooling systems. These systems and components supply and manage the airflow to the engine necessary for combustion. Air Intake & Cooling is a leading Tier 1 supplier and sells directly to OEMs in North America and Europe.

The Company's operating subsidiaries with respect to Air Intake & Cooling are not Debtors in these Chapter 11 Cases or in any reorganization or other similar proceeding in any jurisdiction.

3. *Intelligent Vehicle Highway Systems*

The Intelligent Vehicle Highway Systems Business Unit ("<u>IVHS</u>") is headquartered in Mississauga, Ontario, Canada (with customer service offices in New Jersey and Maryland) and designs, produces and markets systems and components for a broad range of applications utilizing advanced radio frequency and electronics technologies. In particular, IVHS is a leading designer and manufacturer of radio frequency-based transponders, readers and antennas for electronic toll collection and intelligent vehicle highway systems. IVHS produces electronic vehicle identification products, such as the E-ZPass® system, for the electronic toll and traffic management markets. With over 18 million toll transponders in service, Mark IV is the leading supplier of electronic toll collection equipment to the majority of toll authorities in the midwestern and northeastern part of the United States. A substantial portion of IVHS's revenue is generated from products provided to the E-ZPass® Interagency Group (the "<u>IAG</u>"), which represents a consortium of over 20 different toll agencies across 14 different states.

In addition to the E-ZPass® technology and products, IVHS is also known for its other innovative vehicle identification products as evidenced by the use of IVHS's technology on Canada's Highway 407, the world's first non-stop all-electronic toll road, as well as by toll collection-related border crossing projects in which IVHS's products facilitate the clearing of heavy commercial vehicles through customs smoothly, efficiently and cost effectively. IVHS also developed the "Smart Fusion" smart card transponder system and the T3 Tag, which combines three electronic toll protocols in one transponder to give the commercial vehicle market the opportunity for interoperability on electronic toll roads stretching from the East to the West coast. Furthermore, Mark IV is one of the organizations leading the development of 5.9 GHz technology, which is part of a United States Department of Transportation initiative to decrease accidents and congestion by enabling vehicle-to-vehicle and vehicle-to-roadside communication. Mark IV IVHS Inc., the Company's U.S. operating subsidiary for IVHS, is not a debtor in these chapter 11 cases.

The Company's operating subsidiaries with respect to IVHS are not Debtors in these Chapter 11 Cases or in any reorganization or other similar proceeding in any jurisdiction.

4. *Information Display Systems*

The Information Display Systems Business Unit ("<u>IDS</u>"), headquartered in Plano, Texas, designs, produces and markets, among other things, (a) electronic destination signs and information displays for buses and railcars; (b) variable message signs and display components for highways, gasoline pumps and status indicators; and (c) vehicle lighting and passenger information display systems for the

bus, rail transit and aircraft industries. While many of IDS's products are sold directly to OEMs worldwide for installation in mass transit vehicles, the Company is also the leader in the market for replacement parts. The rail and aircraft lighting systems and components business primarily consists of lighting in railcars, indirect fluorescent light fixtures for commuter and inter-city railcars, reading lights for both railcars and aircraft, air diffusers for railcars, landing and recognition lights for aircraft, sidewall fluorescents, information signs, night vision, search lighting and emergency systems for aircraft and other self-illuminating products. Mark IV ranks number 1 in North America for interior lighting systems for railcars and destination signs for buses.

5.     <em>Additional Businesses</em>

In addition to the four Business Units described above, NRD, LLC, a subsidiary of Mark IV, manufacturers ionization sources for smoke detectors and manufactures and distributes electrostatic control products.

## B.     Recent Financial Results

Set forth in <u>Appendix B</u> annexed hereto are certain consolidated historical financial data for the Company derived from the Company's audited consolidated financial statements for each of the previous three fiscal years. The Company's most recent fiscal year ended on February 28, 2009.

## IV.     CORPORATE STRUCTURE AND MANAGEMENT OF THE COMPANY

### A.     Current Corporate Structure

Mark IV is incorporated in Delaware. It is the parent corporation of the 17 Subsidiary Debtors in these jointly-administered Chapter 11 Cases, as well as 34 additional non-Debtor subsidiaries and affiliates, 33 of which are located outside the United States. None of Mark IV's affiliates located outside the United States sought reorganization relief either in the United States or in its domicile.

### B.     Board of Directors

The following persons comprise the Board of Directors of Mark IV:

| Name | Position |
|------|----------|
| Douglas C. Werking | Director |
| James C. Orchard | Director |
| Michael Diament | Director |
| William E. Redmond, Jr. | Director, Chairman of the Board |

*Douglas C. Werking*. Mr. Werking has served as a director of Mark IV since December 2007. Mr. Werking is a vice president at Sun Capital Partners, Inc. (together with its affiliates, "<u>Sun Capital</u>") with over 17 years experience in finance, restructurings, turnarounds, and general management. Prior to joining Sun Capital in 2006, he was a Managing Director with an international turnaround and restructuring consulting firm, during which time he served in several interim management positions including Chief Financial Officer with Peregrine, Inc., a Detroit-based automotive parts manufacturer, Chief Restructuring Officer with Mirant Corporation, a large merchant energy company, and Treasurer with Air Transport International, a Little Rock-based air cargo company. Mr. Werking has worked with companies in the automotive, manufacturing, textile, technology, agricultural, and healthcare industries. Mr. Werking received his Bachelor of Science and Commerce degree from Santa Clara University and MBA from the University of Chicago.

*James C. Orchard*.  Mr. Orchard has served as a director of Mark IV since August 2008. Mr. Orchard joined the Company in August 2008 as a director of Mark IV and as Chief Executive Officer of the Company's Power Transmission business.  In addition, he was elected as Interim Chief Executive Officer of Mark IV, effective May 12, 2009.  Mr. Orchard has 40 years of automotive experience.  Prior to joining the Company, Mr. Orchard was the Chief Operating Officer of Noble International, Chief Executive Officer and a member of the board of directors for Faurecia's North American Operations, Executive Vice President and President of North American Operations and Asia-Pacific for Visteon, Chief Executive Officer of North American Operations and Member of Management Board of ZF Friedrichshafen AG, and numerous executive positions in his 20 years with Dana Corporation.  He is a past Chairman and current Director of the Original Equipment Supplier Association (OESA) and a Director of the Motor & Equipment Manufacturers Association (MEMA).  He holds a Bachelor of Science Degrees in Marketing and Business Administration from Indiana University.  Mr. Orchard is based in Detroit, Michigan.

*Michael Diament*.  Mr. Diament has served as a director of Mark IV since March 2009. Mr. Diament formerly served as Portfolio Manager and Director of Bankruptcies and Restructurings from January 2001 to February 2006 for Q Investments, an investment management firm.  From February 2000 until January 2001, Mr. Diament was a Senior Research Analyst for Sandell Asset Management, an investment management firm, and served as Vice President of Havens Advisors, an investment management firm, from July 1998 to January 2000.  Mr. Diament previously worked at Price Waterhouse LLP, as a Senior Consultant in the Corporate Finance, Recovery & Disputes Consulting practice, primarily involved in litigation consulting related to both antitrust issues and alleged securities violations. He has been, or currently is, a member of the board of directors of various other companies including Magellan Health Services Inc., J.L. French Automotive Castings, Inc., i2 Technologies, Inc. and WilTel Communications Group, Inc.  Mr. Diament graduated, Beta Gamma Sigma, from Columbia Business School, with a Masters in Business Administration.  Mr. Diament graduated, Magna Cum Laude, from Washington University, with a Bachelor of Arts in Economics, with honors in Psychology.

*William E. Redmond, Jr.*  Mr. Redmond has served as a director of Mark IV since March 2009, and was recently appointed chairman of the board of directors for Mark IV, effective May 12, 2009. Since May 24, 2005, Mr. Redmond has been the President and Chief Executive Officer of Gentek Inc. Immediately prior to his employment with Gentek Inc., Mr. Redmond served as President, Chief Executive Officer and Chairman of the Board of Gardenway, Inc., a manufacturer of outdoor garden and power equipment that filed for bankruptcy protection in July 2001 in order to facilitate a sale of substantially all of its assets in August 2001.  Prior to his employment with Gardenway, Inc., Mr. Redmond held various positions at Quaker Oats Company and Pepsi-Cola Company.  Mr. Redmond also serves on the board of directors of Eddie Bauer Holdings, Inc.  Previously, Mr. Redmond has been a member of the board of directors of various other companies including Maxim Crane Works, National Energy and Gas Transmission Company, USA Mobility Inc., Malden Mills Inc., Work Kitchen Inc., Tokehim Corp. and Arch Wireless Inc.

## C.    Executive Officers

The following persons comprise the executive officers of the Debtors:

*Mark G. Barberio* – Vice President and Chief Financial Officer of Mark IV.  Mr. Barberio joined Mark IV in 1985 and has over 23 years of industry experience.  Mr. Barberio was appointed Chief Financial Officer in 2004.  Previously, he was Vice President of Finance and Secretary from 2000 to 2004 in addition to the position of Treasurer, which he held from 1997 to 2008.  Mr. Barberio has also served in various accounting and finance roles including Senior Accountant, Assistant Treasurer and Director – Global Treasury.  He holds a Bachelor of Science Degree in business/accounting

from the Rochester Institute of Technology and an M.B.A. with a concentration in Finance from the State University of New York at Buffalo. Mr. Barberio is based in Amherst, New York.

*Steven K. Kerns* – Vice President, Human Resources of Dayco Products, LLC. Mr. Kerns joined the Company in 1988. Prior to joining the Company, Mr. Kerns was Vice President of Human Resources for the Dayco Division at Armtek Corporation, which was acquired by Mark IV in 1988. Mr. Kerns formally assumed the role of Vice President of Human Resources in 2000. Mr. Kerns holds bachelor and master degrees in business from the University of Virginia and has over 30 years of industry experience. Mr. Kerns is based in Detroit, Michigan.

*James C. Orchard* – Interim Chief Executive Officer of Mark IV. Mr. Orchard's biographical information can be found in Article IV.B above.

*David Orlofsky* – Chief Restructuring Officer of Mark IV. Mr. Orlofsky, a managing director at Zolfo Cooper, was named Mark IV's Chief Restructuring Officer as of February 13, 2009. Mr. Orlofsky has been with Zolfo Cooper since 1998. Before joining Zolfo Cooper, Mr. Orlofsky was an audit manager at Arthur Anderson. Mr. Orlofsky holds a B.S. degree in business administration from Montclair State University. Mr. Orlofsky is also a certified insolvency and restructuring advisor.

*Edward R. Steele* – Vice President-Finance, Secretary, Treasurer and Chief Tax Officer of Mark IV. Mr. Steele joined Mark IV in 1994 and was appointed to his present position in 2008. Prior to joining Mark IV, he was a Senior Tax Manager with the accounting firm of Coopers & Lybrand, LLP. In addition, Mr. Steele was Assistant Director of Taxes for Corning Incorporated for the period 1999-2002. Mr. Steele holds a B.S. degree in Accounting from Elmira College, a Masters degree in Business from The Johns Hopkins University and he has a Master of Science in Taxation Degree from the Golden Gate University School of Law and Taxation. Mr. Steele is a Certified Public Accountant, licensed in the State of New York. Mr. Steele is based in Amherst, New York.

*Avi Zisman* – President of Luminator Service, Inc. and Luminator Holding L.P. Mr. Zisman joined the Company in 2000 as Senior Vice President of Engineering for the Transportation Group before becoming President in 2001 of IDS. In 2008 he was named chief executive officer of IDS. Mr. Zisman has over 27 years of industry experience. Prior to joining the Company, Mr. Zisman worked for Litton Industries and Honeywell in a variety of positions including director of System Development and Vice President of Engineering. Mr. Zisman holds a Bachelor's degree in Electrical Engineering and Computer Science from the University of New Mexico. Mr. Zisman is based in Dallas, Texas.

## V. PREPETITION CAPITAL STRUCTURE OF THE COMPANY

### A. Equity

Mark IV, the parent company of each other Debtor, is a privately-held corporation and is 100% owned by Mark IV Global Holding Corp. Also privately held, Mark IV Global Holding Corp. is owned by certain affiliates of Sun Capital, a private investment firm specializing in leverage buyouts and investments in market-leading companies, which acquired Mark IV in December 2007 from funds advised by London-based BC Partners Ltd. and other financial investors.

### B. First Lien Credit Agreement

Mark IV entered into an $865 million Amended and Restated Credit Agreement dated as of June 21, 2004 (as amended, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"), among Mark IV, Dayco Products, LLC (the "U.S. First Lien Borrower"), Dayco

Europe S.r.l. (the "Italian First Lien Borrower"), JPMorgan Chase Bank, N.A., as Administrative Agent (in such capacity, the "First Lien Agent"), and the several lenders from time to time parties thereto (such lenders, or any such lender or its Affiliates in their capacity as party to any hedge or swap agreement to which any Debtor is a party, and the First Lien Agent collectively referred to herein as the "First Lien Lenders"). The First Lien Credit Agreement consists of the following: (1) a first lien U.S. revolving loan in the original approximate principal amount of up to $100 million (the "First Lien U.S. Revolving Loan"); (2) a first lien Euro revolving loan in the original approximate principal amount of $50 million (the "First Lien Euro Revolving Loan"); (3) a first lien Tranche A Euro term loan in the approximate principal amount of €82,515,059 (the "First Lien Tranche A Euro Term Loan"); and (4) a first lien Tranche B term loan in the approximate principal amount of approximately $615 million (the "First Lien Tranche B Term Loan" and together with the First Lien U.S. Revolving Loan, the First Lien Euro Revolving Loan, and the First Lien Tranche A Term Loan, the "First Lien Loans," and the obligations in connection therewith, and together with related secured hedging and cash management obligations, the "First Lien Obligations").

Under the First Lien Credit Agreement, Mark IV and each of its U.S. subsidiaries are guarantors of amounts borrowed by the U.S. First Lien Borrower under the First Lien US Revolving Loan, the First Lien Euro Revolving Loan and the First Lien Tranche B Term Loan and the other First Lien Obligations of the U.S. First Lien Borrower. Additionally, Mark IV and each of its U.S. subsidiaries and certain of its non-U.S. subsidiaries are guarantors of amounts borrowed by the Italian First Lien Borrower under the First Lien Euro Revolving Loan and the First Lien Tranche A Euro Term Loan and the other First Lien Obligations of the Italian First Lien Borrower.

As of the Petition Date, the Company had an aggregate principal amount outstanding under the First Lien Credit Agreement of approximately $858 million.

**C. Second Lien Credit Agreement**

Mark IV also entered into a $150 million Second Lien Credit Agreement dated as of June 19, 2006 (as amended, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement," and together with the First Lien Credit Agreement, the "Prepetition Credit Facilities"), among Mark IV, Dayco Products, LLC, as the Borrower (the "Second Lien Borrower"), Wilmington Trust FSB, as successor to JP Morgan Chase Bank, N.A., as successor to Bear Stearns Corporate Lending Inc., as Administrative Agent (in such capacity, the "Second Lien Agent"), and the several lenders from time to time parties thereto (such lenders and the Second Lien Agent collectively referred to herein as the "Second Lien Lenders," and together with the First Lien Lenders, the "Prepetition Secured Lenders"), pursuant to which the Second Lien Lenders have made available to the Second Lien Borrower a term loan (the "Second Lien Loan," and the obligations thereunder, the "Second Lien Obligations," which, together with the First Lien Obligations shall be referred to herein as the "Prepetition Obligations") in the original principal amount of approximately $150 million and maturing on December 31, 2011.

Under the Second Lien Credit Agreement, Mark IV and each of its U.S. subsidiaries are guarantors of amounts borrowed by the Second Lien Borrower under the Second Lien Loan and the other Second Lien Obligations of the Second Lien Borrower.

As of the Petition Date, the Company had an aggregate principal amount outstanding under the Second Lien Credit Agreement of approximately $148 million.

### D. Unsecured Bond Debt

In addition to the indebtedness under the Prepetition Credit Facilities, certain of the Debtors' foreign non-Debtor subsidiaries and affiliates, as applicable, are obligors of unsecured bond debt pursuant to a certain Underwriting Agreement, dated July 25, 2008, by and among Mark IV Systems Moteurs SAS, as Issuer ("Systemes Moteurs"), Mark IV Air Intake Systems Corp., as Guarantor ("Air Intake Systems"), and Sabèrasu Japan Investments II B.V., as Subscriber ("Sabèrasu") relating to the issue of bonds (the "Cerberus Bonds," and such debt under the Cerberus Bonds shall be referred to herein as the "Bond Debt") in the amount of €29.5 million and with an approximate amount outstanding of $32.4 million as of the fiscal year ended February 28, 2009. Systemes Moteurs, a non-Debtor, is organized under the laws of France. Air Intake Systems, also a non-Debtor, is organized under the laws of Nova Scotia. Sabèrasu, an affiliate of Cerberus Capital Management, L.P., is organized under the laws of the Netherlands.

### E. Foreign Overdraft Lines, Working Capital Facilities and Factoring Facilities

In addition to the indebtedness under the Prepetition Credit Facilities and the Bond Debt, certain of the Debtors' foreign non-Debtor subsidiaries and affiliates, as applicable, are obligors under various overdraft lines, working capital facilities and accounts receivable factoring facilities (collectively, the "Working Capital Facilities"). The Working Capital Facilities provide the foreign non-Debtor subsidiaries and affiliates additional liquidity with which to operate their businesses. As of April 24, 2009, the foreign non-Debtor subsidiaries and affiliates had $94.6 million in outstanding amounts under the Working Capital Facilities.

### F. Chieti Mortgage

On or about June 25, 2008, Dayco Europe S.r.l., a non-Debtor Italian affiliate of Mark IV, entered into a certain Loan Agreement No. 2428707, which had an approximate amount outstanding as of the Petition Date of approximately $26 million (the "Chieti Mortgage"). The Chieti Mortgage is secured by certain real property located in the Italian municipalities of Chieti, Manoppello, and Colonnella.

## VI. THE CHAPTER 11 CASES

### A. Events Leading to Commencement of the Chapter 11 Cases

The Debtors' decision to commence chapter 11 reorganization cases was based on a combination of specific factors that placed significant stress on the Debtors' liquidity position in the several months leading up to the Petition Date and hindered the Company's ability to successfully compete in the markets in which it operated. These factors included, among other things, cumbersome obligations under an unworkable capital structure, the recent unprecedented global financial crisis, increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets, pressures from the Company's customers and suppliers, and progressively unsustainable domestic retiree legacy liabilities.

In response to these challenges, Mark IV developed a restructuring plan pursuant to which the Company instituted various cost-cutting initiatives, including reducing corporate overhead and consolidating various technical centers and plants into existing operations. In addition, the Company, with the assistance of its advisors, began to search for sources of additional financing or an equity investment. Despite these efforts, neither the Company nor its advisors were successful in attaining a secured loan that afforded the Company sufficient liquidity yet was also subordinated to the liens of the First Lien Lenders. In addition, the Company was unable to obtain financing on an unsecured basis or

obtain an equity investment from any potential strategic partner. In the end, the overburdensome capital structure, the world-wide economic downturn and the challenges with respect to liquidity forced the Debtors to file for chapter 11 relief. Certain of these factors, and others, are described below.

### 1. *Prepetition Obligations*

In the early part of 2009, in an effort to increase liquidity, the Company determined that it could not make certain payments with respect to its Prepetition Obligations. As a result, the Company did not make certain payments of interests and fees owed to the First Lien Lenders and the Second Lien Lenders, which resulted in defaults under both the First Lien Credit Agreement and the Second Lien Credit Agreement. In response, the Company and the First Lien Lenders entered into a forbearance agreement whereby the First Lien Lenders agreed, under certain conditions and for a limited time, to forbear from exercising certain remedies available to them under the First Lien Credit Agreement as a result of the Company's defaults. Because documents governing certain of the Company's other prepetition indebtedness contained cross-default provisions that would be triggered by a default under the First Lien Credit Agreement, the Company also entered into forbearance agreements with certain of its other prepetition lenders.

### 2. *Customer Pressures*

The market share and overall production of some of the Company's customers, including the OEMs, has declined in recent years in connection with a severe downturn across the automotive industry. Although the Company's businesses are significantly less reliant on the "Big Three" automakers than other similarly-situated part suppliers, the Company typically supplies its customers, some of which are connected to the "Big Three," on an as-needed basis. Accordingly, when the Company's customers and the OEMs decrease production, the volume of the Company's business likewise decreases. In addition, in response to market pressures, some of the Company's customers, particularly in Europe, have asked suppliers, including the Company, to lower prices and/or stretch out their payments.

### 3. *Supplier Pressures*

As a result of the downturn in the automotive industry, many of the Company's suppliers, both domestic and foreign, have unilaterally requested tighter payment terms from the Company on the parts they supply. This problem has been exacerbated by the commencement of the Chapter 11 Cases, which has caused certain trade credit insurers to refuse to insure accounts receivables owed by the Company. In response, certain of the Company's suppliers have demanded tighter payment terms. In addition, many of the Company's suppliers are working through their own restructuring issues. Because these suppliers are often sole-source or limited-source providers of parts to the Company, their financial situations necessarily influence and dictate the Company's businesses.

### 4. *Retiree Legacy Liabilities and Operational Restrictions*

Although Mark IV has been able to enjoy a great deal of success, transformation and expansion since its inception, this expansion has not been without an increase in its annual liabilities. Specifically, the Company currently faces a significant number of legacy obligations in connection with its domestic defined benefit pension plan as well as the retiree health and life benefit programs ("Retiree Legacy Liabilities") taken on by Mark IV in connection with its various business acquisitions over the years.

As of February 28, 2009, the Company had obligations related to retiree healthcare and life insurance in the approximate amount of $82 million. During the fiscal year ending February 2010, the Debtors' estimated cash outflow associated with its Retiree Legacy Liabilities will be approximately $10 million. This situation was placing financial burdens on the Company that were no longer supportable.

**B.  Commencement of the Chapter 11 Cases**

1.  *Continuation of Business*

On April 30, 2009, Mark IV and seventeen of its wholly-owned U.S. subsidiaries filed voluntary petitions in the Bankruptcy Court for reorganization relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses in the ordinary course of business, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

2.  *Stay of Litigation*

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing room" necessary to assess and reorganize their businesses. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

**C.  Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases**

1.  *First Day Orders*

On the Petition Date, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

The first day orders in the Chapter 11 Cases, which were entered on or soon after the Petition Date, authorized, among other things:

- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

- the payment of employees' accrued prepetition wages and employee benefit claims;

- the payment of certain prepetition obligations to customers and the continuation of certain customer programs and practices;

- the payment of certain prepetition shipping and delivery charges;

- the payment of prepetition amounts due under the Debtors' insurance programs;

- the payment of certain prepetition claims of critical vendors;

- the payment of certain prepetition claims of foreign vendors;

- procedures for the resolution and payment of valid reclamation claims;

- procedures for interim compensation and reimbursement of professional expenses during the Chapter 11 Cases;

- the continuation of utility services during the pendency of the Chapter 11 Cases;

- the payment of certain prepetition tax claims;

- the payment of certain prepetition amounts owed to contractors;

- the grant of administrative expense status to obligations arising from postpetition delivery of goods and services;

- the joint administration of each of the Debtors' bankruptcy cases;

- the retention of the following professionals to serve on behalf of the Debtors: Skadden, Arps, Slate, Meagher & Flom LLP as restructuring counsel; Houlihan Lokey as investment banker and financial advisor; Zolfo Cooper as restructuring advisors; and Epiq as claims, noticing and balloting agent; and

- the continued retention of professionals regularly employed by the Debtors in the ordinary course of their businesses.

2.    *Appointment of Statutory Committees*

On May 8, 2009, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed, pursuant to section 1102 of the Bankruptcy Code, the Creditors' Committee. The following creditors comprise the Creditors' Committee as of the date of this Disclosure Statement: (a) Carlisle Power Transmission Producers, Inc. (b) Kurt Manufacturing Co, Inc.; (c) Regal Research & Mfg, Co., LLC; (d) Norvell Electronics, Inc.; (e) Dongil Rubber Belt America, Inc.; (f) Preferred Rubber Compounding; and (g) GMB North America, Inc.

The Creditors' Committee's legal counsel is Otterbourg, Steindler, Houston & Rosen, and its financial advisor is FTI Consulting, Inc.

**D.    Post-Petition Financing**

On April 30, 2009, the Debtors obtained interim approval from the Bankruptcy Court to (1) enter into a $90 million Credit and Guarantee Agreement (the "DIP Agreement"), pursuant to which the Debtors and certain of their non-Debtor foreign subsidiaries and affiliates have obtained postpetition loans and other financial accommodations (the "DIP Financing") from JPMorgan Chase Bank, N.A., as the administrative agent (in such capacity, the "DIP Agent") for itself and other financial institutions from time to time party to the DIP Agreement as lenders (collectively, the "DIP Lenders") and (2) use the cash collateral of the First Lien Lenders for working capital and general corporate purposes in accordance with

the terms and conditions of the dip order. More specifically, the DIP Financing permits (a) Dayco Products, LLC to borrow up to an aggregate principal amount not to exceed $35 million, (b) Mark IV Industries Corp. (a Canadian affiliate of Mark IV) to borrow up to an aggregate principal amount of $25 million and (c) Dayco Europe S.r.l. (an Italian affiliate of Mark IV) to borrow up to an aggregate principal amount of $30 million. Mark IV Global Holding Corp. and each of the Debtors are guarantors of the payment and performance of all obligations under the DIP Financing of Dayco Products, LLC, Mark IV Industries Corp. and Dayco Europe S.r.l., secured by liens on substantially all assets of Mark IV Global Holding Corp. and each of the Debtors. A final order with respect to the DIP Financing was approved by the Bankruptcy Court on May 27, 2009.

The Debtors sought approval of the DIP Financing to ensure necessary liquidity during the Chapter 11 Cases. The funds available under the DIP Agreement permitted the Debtors to obtain goods and services on the same terms as prior to filing the Chapter 11 Cases. Specifically, the DIP Agreement provided the necessary security to the Debtors' vendors so that they would continue to do business with the Debtors, thereby minimizing the harm to the Debtors' businesses as they pursued their reorganization efforts.

As of July 27, 2009, the Company had borrowings of $90 million outstanding under the DIP Agreement, and had liquidity in the approximate amount of $75 million.

### E. Other Significant Events During the Chapter 11 Cases

#### 1. *Labor and Employee Matters*

##### (a) Appointment of Chief Restructuring Officer

At the outset of the bankruptcy, the Debtors appointed David Orlofsky as Chief Restructuring Officer of the Company. Mr. Orlofsky, as an employee of Zolfo, was designated as an officer pursuant to a Services Agreement that was approved by the Bankruptcy Court on May 27, 2009. Under the terms of the Services Agreement, if a plan of reorganization is confirmed on or within 120 days of the Petition Date, Zolfo Cooper is entitled to a confirmation fee of $1,250,000, with the confirmation fee payable to Zolfo Cooper decreasing if confirmation of a plan of reorganization takes place thereafter. In addition, under the terms of the Services Agreement, Zolfo Cooper is entitled to a performance fee of $500,000 if the Company meets certain operating objectives during its fiscal year 2010.

##### (b) Key Employee Incentive Plan

On June 11, 2009, the Debtors filed a motion seeking approval of their proposed Key Employee Incentive Plan (the "KEIP"), which is designed to incentivize ten employees (the "Key Employees") who were identified as mission-critical management employees with the knowledge, experience and skills necessary to manage the Company's businesses and shepard the Debtors through the chapter 11 process. Payouts under the KEIP will be based on the incremental enterprise value achieved by the Company over and above a minimum threshold value, as measured on the date the Debtors emerge from bankruptcy or sell substantially all of their assets. In the event that none of the prepetition employment agreements entered into between the Debtors and the Key Employees are assumed by the Debtors, the maximum aggregate amount of payouts under the KEIP is $2.565 million. In the event that all such employment agreements are assumed, the maximum aggregate amount of payouts under the KEIP is $1.85 million. The Bankruptcy Court has not yet ruled on the motion seeking approval of the KEIP.

(c)     Fiscal Year 2010 Annual Incentive Compensation Plan

Prior to the Petition Date, the Debtors, in the ordinary course of their businesses, regularly implemented annual incentive compensation programs for their salaried employees designed to provide incentives to motivate the participants under such programs to meet certain corporate and other objectives.  On June 11, 2009, the Debtors filed a motion seeking approval of the continuation of their proposed fiscal year 2010 annual incentive compensation plan (the "AICP").  The AICP covers the period from March 1, 2009, through February 28, 2010, which coincides with the Company's fiscal year 2010.  The participants in the AICP will be designated by Mark IV's Chief Financial Officer and Board of Directors.  Payouts under the AICP will depend on the category of the participant and the achievement of certain corporate, functional and/or regional objectives as determined by the AICP Administrators.  For officers of the Company, payouts under the AICP will be based on the final consolidated EBITDA of the Company for fiscal year 2010 as compared to the budgeted EBITDA contemplated by the Business Plan.  For participants other than officers, 80% of any payouts under the AICP will be based on the final consolidated EBITDA of the Company for fiscal year 2010 compared to budget, and 20% of payouts will be based on up to 3 specific quantifiable goals for functional areas of responsibility as designated by the administrators of the AICP.  The Bankruptcy Court has not yet ruled on the motion seeking approval of the AICP.

2.     *Rejection of Real Property Leases*

The Debtors devoted effort during the Chapter 11 Cases to analyzing and making final decisions with regard to the approximately 22 real property leases to which the Debtors were party on the Petition Date.  The Debtors determined that certain of such leases no longer served any benefit to the Estates.  In an effort to reduce postpetition administrative costs and in the exercise of the Debtors' sound business judgment, the Debtors determined to seek authority to reject such leases (the "Rejected Leases").  In some cases, leases were rejected because the Debtors had terminated or planned to terminate operations at certain locations as part of the Debtors' ordinary business operations prior to the Petition Date.  Before rejecting such leases, the Debtors considered such factors as the annual rent, the remaining term of the lease (including any renewal options), the condition of the premises, comparable market rents and any previous efforts of the Debtors as to the disposition of the leases.  The Debtors also considered their options with respect to the Rejected Leases, such as evaluating the possibility of one or more assignments and/or subleases of such leases.  As a result of these analyses, the Debtors determined that the Rejected Leases did not have any marketable value beneficial to the Debtors' estates.

Through the date hereof, the Debtors have filed motions seeking authority to reject two nonresidential real property leases and related agreements.  If the motions are granted, the resultant savings from the rejection of such leases and related agreements will favorably affect the Debtors' cash flow and assist the Debtors in managing their future operations.

F.     **Summary of Claims Process and Bar Date**

1.     *Claims Process*

In chapter 11 cases, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form.  Once established, the claims are either allowed or disallowed.  If allowed, the claim will be recognized and treated pursuant to a plan of reorganization.  If disallowed, the creditor will have no right to obtain any recovery on, or to otherwise enforce, the claim against the debtor.

2.      *Schedules and Statements of Financial Affairs*

On June 16, 2009, the Debtors filed with the Bankruptcy Court their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"). Separate Schedules and Statements were filed for each of the eighteen Debtors. However, because the Debtors use a consolidated cash management system through which the Debtors pay substantially all liabilities and expenses, certain assets and liabilities were not allocated among the Debtors and, therefore, certain assets and liabilities were presented on a consolidated basis in the Schedules and Statements for the Debtors.

3.      *Claims Bar Date*

On July 2, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") establishing the general deadline for filing proofs of claim against the Debtors. The general deadline for Claims established by the Bankruptcy Court was August 21, 2009 at 5:00 p.m. (Eastern time) (the "Bar Date"). However, certain Claims are not subject to the Bar Date, including, among others, (a) the Claims of governmental units, as to which the bar date is October 28, 2009 at 5:00 pm. (Eastern time), (b) Claims based on the rejection of executory contracts and unexpired leases, as to which the bar date is the later of (i) the Bar Date, (ii) the first Business Day that is at least thirty (30) calendar days after entry of the order authorizing the rejection of the respective executory contract or unexpired lease or (iii) such date as the Bankruptcy Court may fix in the applicable order authorizing such rejection, (c) certain Claims affected by the amendment, if any, of the Debtors' Schedules, as to which the bar date is the later of (x) the first Business Day that is at least thirty (30) calendar days after mailing of the notice of such amendment and (y) such other time as may be established by order of the Bankruptcy Court in connection with a motion to amend the Schedules, and (d) requests for payment of Administrative Claims (other than Claims allowable under section 503(b)(9) of the Bankruptcy Code and except as otherwise provided in the Plan), as to which the bar date is thirty (30) days after the Effective Date pursuant to Section 9.5 of the Plan. Epiq provided notice of the Bar Date by mailing to each person listed in the Schedules a notice of the Bar Date and a proof of claim form. In addition, the Debtors published notice of the Bar Date in (1) The Wall Street Journal (National Edition), (2) The Financial Times (Worldwide Edition), (3) the Chicago Tribune, (4) The Niles Journal and Topics, and (5) the Asheville Citizen-Times (Asheville, North Carolina) on or before July 8, 2009.

**G.      Workers' Compensation**

The Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law to provide employees and former employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. In certain states, the Debtors are qualifiedly self-insured pursuant to the laws and regulations of such states, whereas in other states the Debtors insure their workers' compensation liabilities through high deductible, jurisdiction-specific workers' compensation insurance policies (the "Workers' Compensation Programs"). The Debtors have generally posted letters of credit with state authorities and insurance companies to guarantee the Debtors' workers' compensation obligations.

The Debtors' outstanding obligations relating to workers' compensation arise from incurred but not yet paid claims and incurred but not reported claims. The Debtors estimate their incurred but not reported claims through an actuarial process that is common in the insurance industry. As of February 28, 2009, a total of approximately 150 Workers' Compensation Claims were pending against the Debtors arising out of employees' alleged on-the-job injuries. The Debtors estimate that the aggregate amount payable on account of incurred but not yet paid claims and incurred but not reported claims arising prior to February 28, 2009, and retrospectively-rated premium rate adjustments, is approximately $10.5 million in undiscounted net reserves. The Debtors expect that the cash payments related to

Workers' Compensation Claims for the twelve months after the Effective Date will be approximately $2.5 million.

Upon confirmation and substantial consummation of the Plan, the Reorganized Debtors will continue the Workers' Compensation Programs in accordance with applicable state laws. Nothing in the Plan shall be deemed to discharge, release, or relieve the Debtors or the Reorganized Debtors from any current or future liability with respect to any of the Workers' Compensation Programs. The Reorganized Debtors will be responsible for all valid claims for benefits and liabilities under the Workers' Compensation Programs regardless of when the applicable injuries were incurred. Any and all obligations under the Workers' Compensation Programs will be paid in accordance with the terms and conditions of Workers' Compensation Programs and in accordance with all applicable laws.

## H.    Treatment of PBGC Plan

The Company participates in or sponsors one defined benefit pension plan (the "<u>Pension Plan</u>"), which is covered by Title IV of Employee Retirement Income Security Act ("<u>ERISA</u>"), 29 U.S.C. §§ 1301-1461 (2000 and Supp. V. 2005). As of February 28, 2009, the Pension Plan had assets of approximately $326 million and approximately $327 million of actuarially-calculated liabilities.

If the Pension Plan is terminated, the Company could incur liability to the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") under Title IV of ERISA with respect to such termination. In the event the Pension Plan is not terminated, the Reorganized Debtors' liability to the PBGC, if any, would remain contingent unless and until the Pension Plan is terminated and would not be affected by any provision of the Plan or by confirmation of the Plan or cancellation of the Old Common Stock of Mark IV.

The Debtors anticipate that the Pension Plan will be unaffected by the Chapter 11 Cases.

## I.    Litigation

The Debtors are party to various legal proceedings incidental to the normal course of the Debtors' businesses. Based upon the Debtors' current assessment of the underlying merits of the actions, as well as their historical experience in litigating such actions, the availability of applicable insurance reserves and coverage and the prepetition nature of many of these actions, management believes that the final resolution of these matters, to the extent not already subject to an approved settlement, will not have a significant effect on the Debtors' financial position, liquidity, cash flows or results of operations except as indicated below.

Certain litigation matters are further discussed below. For more discussion on these matters, including discussion of the financial reserves established by the Company with respect to these matters, please see the notes to the historical financial results for the Company set forth in <u>Appendix B</u> to this Disclosure Statement.

### 1.    *Property Damage Litigation Claims*

A number of homeowners' insurance companies have pursued recovery of payments from the Company on a substantial number of subrogated claims associated with property damages allegedly caused by faulty washing machine hose produced by the Company's previously-divested fluid management business unit. Since fiscal 2006, the Company has reached settlements with substantially all of the claimants with respect to these matters. As of February 28, 2009, there were over 400 alleged claims outstanding in the aggregate face amount of approximately $4.2 million. The Company expects to

be able to settle these claims at rates consistent with past settlements. The Company does not currently believe that such matters will be covered by insurance.

2. *Product Liability Issues*

The Company has been named as a defendant in a number of litigation actions related to damages allegedly arising from the failure of certain product manufactured by the Company which were incorporated within retail gasoline fuel delivery systems. The aggregated initial demands were in excess of $2 billion. During fiscal 2009, the Company reached settlement agreements on certain of these actions, and expects to be able to settle the remaining claims. The Company estimates that there were approximately $20 million in face amount of asserted claims with respect to these matters outstanding as of February 28, 2009, only a fraction of which would be apportioned to the Company. The Company cannot guarantee that additional claims with respect to these matters will not be asserted in the future. The Company believes there is insurance coverage for these matters. However, the insurance carriers have interpreted the terms of the insurance coverage in a manner which is in contrast to the Company's interpretation. As a result, the Company has initiated legal action against the insurance providers.

3. *Other Legal Proceedings*

Prior to fiscal 2008, the Company settled a number of claims from former employees for occupational diseases allegedly resulting from, or expected to result in the future from, past exposure to asbestos at a facility which had been closed in the late 1990's. The Company's decision to settle was based upon its assessment of the future litigation costs to pursue its position, litigation risk associated with its arguments, and the interaction of possible reimbursement considerations relative to the Company's insurance carriers and other third parties. Approximately 100 additional claims have been made in fiscal 2008 and 2009 related to this same facility in the aggregate face amount of less than $6 million.

A former subsidiary of the Company ("Vapor"), is alleged to have exposed its employees and users of products manufactured at Vapor to asbestos used by Vapor in its manufacturing processes in periods prior to the Company's acquisition of Vapor in 1990. As part of the Company's agreement to acquire Vapor, the related Share Purchase Agreement required Brunswick Corporation ("Brunswick"), the seller of Vapor, to indemnify the Company against all claims related to asbestos exposure, including those that might arise subsequent thereto. During the period in which the Company owned Vapor, it received a number of claims alleging occupational diseases resulting from, or expected to result from, past exposure to asbestos. All such claims have been forwarded to Brunswick, who has accepted such claims and assumed responsibility for their defense. The Company sold Vapor in fiscal 1997, and provided certain indemnification protections to the buyer of Vapor against similar claims that might be received by the buyer thereafter. All such claims forwarded to the Company by the buyer have been forwarded in turn to Brunswick, who has accepted such claims and assumed responsibility for their defense as provided for under the original indemnification agreements with the Company. As of February 29, 2008 the Company has forwarded over 8,000 asbestos-related claims to Brunswick under its indemnification agreement. The Company has no available information to enable it to quantify the range of exposure related to these claims. However, the Company has no reason to believe Brunswick will not be able to meet its indemnification responsibilities to the Company. As a result, the Company does not believe it has any financial exposure related to the ultimate resolution of these claims.

**J.  Environmental Matters**

The Company is subject to numerous federal, state, local and other statutory environmental laws and regulations governing its operations, including the handling, transportation and

disposal of its products, and its non-hazardous and hazardous substances and wastes, as well as emissions and discharges into the environment, including discharges to air, surface water and groundwater. Failure to comply with such laws and regulations could result in costs for corrective action, penalties or the imposition of other liabilities. Changes in laws or the interpretation thereof or the development of new facts could also cause the Company to incur additional capital and operating expenditures to maintain compliance with environmental laws and regulations. The Company is also subject to laws and regulations that impose liability and cleanup responsibility for releases of hazardous substances into the environment without regard to fault or knowledge about the condition or action causing the liability. Under certain of these laws and regulations, such liabilities can be imposed for cleanup of previously owned or operated properties, or properties to which substances or wastes were sent by current or former operations of the Company. The presence of contamination from such substances or wastes could also adversely affect the Company's ability to sell or lease its properties, or to use them as collateral for financing. From time to time, the Company has incurred and is incurring costs and obligations for correcting environmental noncompliance matters and for remediation at or relating to certain of its properties. The Company believes it has complied with, or is currently complying with its environmental obligations to date and that such liabilities will not have a material adverse effect on its business or financial performance, except as discussed in the following paragraph.

A former subsidiary of the Company has been named within a group of defendants who are alleged to have caused contamination and pollution of the water shed basin in Orange County, California. Damages in excess of an aggregate amount of $140 million are being sought from a large number of defendants to recover compensatory and other damages, including all necessary funds to investigate, monitor, remediate, abate, or contain contamination of groundwater within the district. This action was commenced during fiscal 2006 and has been actively defended throughout the duration. The Company believes it has valid defenses in its favor to refute the allegations. The Company believes that its exposure, if any, with respect to this matter would be limited to only a very small fraction of the total damages, if any, that could ultimately be recovered by the plaintiffs. Insurance applicable to any exposure of the Debtors with respect to these matters has been exhausted and/or is no longer applicable.

The Debtors are parties to a lawsuit styled: DMJ Associates, LLC v. Carl A. Campasso, et al Exxon Mobil Corporation and Quanta Resources Corporation, Defendants/Third-Party Plaintiffs v. Ace Waste Oil, Inc., et al Third-Party Defendants, Case Number 1:97-cv-07285-DLI-RML, pending in the United States District Court for the Eastern District of New York. Quanta Resources Corporation ("Quanta") and Exxon Mobil Corporation ("Exxon") have asserted third party contribution claims against one of the Debtors' predecessors alleging that such entity disposed of waste at a contaminated site and, thus, is at least partially responsible for the clean-up costs. Quanta and Exxon contend that the Debtors' liability could be as high as $30 million. The Debtors dispute these allegations and deny any liability. Insurance applicable to any exposure of the Debtors has been exhausted and/or is no longer applicable.

One of the Company's manufacturing facilities currently uses low-level radioactive source materials in its manufacturing processes to produce products such as electrostatic control devices and smoke-detector ionization elements. The production, storage and transportation of these radioactive materials are subject to federal, state and local laws and regulations. Federal and state regulations also limit the amount of exposure the Company's employees may have to radiation and radioactive materials. The Company has obtained the necessary licenses and approvals required for the business and believes it is in compliance with all applicable regulations concerning radioactive materials and employee safety. The Company has radioactive materials that are a by-product of its current and past manufacturing activities at this site, since there are no readily available disposal sites in the United States for such low-level radioactive waste materials. The Company is currently working with the federal government for the transfer of the waste to a federally-operated site; however, by its nature, the process for completing such arrangements is lengthy and there can be no assurance as to when the government will approve and

schedule such a transfer.  The Company estimates the cost to dispose of such materials to an approved site will be in the range of $600,000.  If the Company were to discontinue the activities at this facility, such an action would require the Company to decontaminate and decommission the facility.

Certain federal and state environmental superfund statutes generally impose joint and several liabilities on present and former owners and operators, transporters and generators for remediation of contaminated properties, regardless of fault.  The Company has been designated as a potentially responsible party under these statutes at a number of sites.  Based on the facts currently known to management, the Company expects that the costs of remedial actions at the sites where it has been named a potentially responsible party will not have a material adverse effect on its financial position, results of operations or cash flows.

The Company's facilities are also subject to many other federal, state, local and statutory requirements relating to the protection of the environment, and the Company has made, and will continue to make, expenditures to comply with these provisions.  The Company believes that its facilities are in material compliance with these laws and regulations, and that future compliance with these laws and regulations will not have a material adverse affect on its financial position, results of operations or cash flows.

The Company estimates that future remediation and other required environmental expenditures will be approximately $6 million.

**K.**     **Accomplishments During Chapter 11; Go-Forward Strategy**

The Company's need to file for chapter 11 bankruptcy arose due to the combination of a number of factors including, among other things, cumbersome obligations under an unworkable capital structure, the recent unprecedented global financial crisis, increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets, pressures from the Company's customers and suppliers, and progressively unsustainable domestic retiree legacy liabilities.  In light of these factors, the Company concluded that commencement of the Chapter 11 Cases would afford the Company the best opportunity for restructuring its affairs and for developing and implementing a long-term, go-forward strategy.  To this end, the Company has successfully implemented certain key initiatives during the time that the Company has been in chapter 11.  The Company believes that it has accomplished or will accomplish prior to emergence from chapter 11 nearly all of the actions which it required chapter 11 to address, including, among other things, the restructuring of its balance sheet.

1.     *Strategic Initiatives*

During these Chapter 11 Cases, the Company has implemented certain cost saving initiatives and other strategic action items.  These initiatives include consolidating a Canadian manufacturing and distribution operation into three existing facilities in the U.S. and reducing corporate overhead in Europe and the U.S.  In addition, the Company has consolidated two of its technical centers into one facility.  The Company estimates that these initial consolidations will result in annual savings of approximately $22 million.

2.     *Reasons for Emergence at This Time*

Although the Company has accomplished many important goals through the tools afforded by chapter 11, the Company believes that the prospects for further operational improvement will be best achieved outside of chapter 11, and that chapter 11, in fact, is neither necessary nor conducive to moving forward with the operational turnaround of the business.

The Company's key remaining operational challenges, in the Company's judgment, do not require chapter 11 and, in fact, are better addressed outside of chapter 11. In this respect, there are continued costs to remaining in chapter 11 that warrant emergence at this time, including the concern of employees over job security, the continued administrative costs of the chapter 11 process, the continued diversion of management time to the chapter 11 process, and the negative impact on the Company's ability to attract new business, among others. Upon emergence from chapter 11, management will be free to focus their energies on system-wide implementation of strategic initiatives.

3.     *The Company's Future Strategy*

(a)     Power Transmission

Power Transmission is a leader in technical innovation and is currently working towards the development of key new products which include timing belts in oil, spring dampers, switchable waterpumps, and self tensioning systems. In addition, Power Transmission continues to monitor and react to its OEM customers' evolving expectations and preferences, including their desire for suppliers of systems rather than individual components and for improvements in fuel economy and emissions through optimized power transmission systems. In addition, Power Transmission is working towards optimizing its footprint by allocating production to Asia and emerging markets and adjusting its global capacity to match its global requirements.

(b)     Air Intake & Cooling

Air Intake & Cooling is a leader in plastic intake system design and manufacturing technology as a result of its competitive strength in research & development. Air Intake & Cooling has begun supplying OEMs with sub-assembly modules which include intake, cooling, and exhaust gas recirculation components to meet critical emissions and consumption requirements being implemented around the world.

OEM customers require suppliers to be focused on improving emissions and fuel economy through leading edge systems, and/or are looking for a one stop shop for integrated intake, cooling, and emissions recovery systems. Air Intake & Cooling is actively implementing initiatives in response to its OEM customers' preferences in order to ensure new business. In addition, Air Intake & Cooling is working on developing products for both diesel and gasoline engines, and expanding into Asian markets.

(c)     IVHS

IVHS is a leader in design and manufacturing of radio frequency based electronic toll collection equipment and is currently developing a next generation of products with greater flexibility and performance versus the competition. IVHS plans to gain new business through expanded retail sales, new transportation authority contracts, rental car company contracts, and the renewal of existing government agency contracts. IVHS's manufacturing operations currently match their capacity requirements and geographic needs.

(d)     IDS

IDS designs information display systems and lighting for buses, trains, and airplanes. IDS's differentiation is based on integrating technology to improve display systems and lighting for its customers. IDS's strategy to acquire new customers is focused on the aerospace and transportation lighting industries, and IDS is successfully executing this strategy by delivering world class products on

existing contracts as well as nurturing relationships with OEMs. In addition, IDS is seeking acquisitions which will enable it to expand geographically and develop relationships with potential customers.

## VII.    SUMMARY OF THE PLAN

THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES-IN-INTEREST.

### A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the order confirming the plan, the order confirming the plan discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria. The Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that (1) Class 5 Subsidiary Interests

shall not apply to the plan proposed by Mark IV and (2) Class 9 Old Equity Interests shall be deemed to apply only to the plan proposed by Mark IV.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims; (b) the Claims in certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims; and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.

The Plan provides that, upon entry of the Confirmation Order, (a) all First Lien Lender Secured Claims shall be allowed in full in the aggregate amount of $350,000,000, (b) all First Lien Lender Deficiency Claims shall be allowed in an amount equal to $485,000,000, and (c) all Second Lien Lender Claims shall be allowed as Deficiency Claims in the aggregate amount of $153,140,228.

The Plan provides that Holders of First Lien Lender Secured Claims will receive a distribution consisting of (a) such Claimholders' Pro Rata participation in the Restructured Debt Term Loan Agreement and (b) such Claimholders' Pro Rata Share of 88% of (i) the new common stock of Reorganized Mark IV (the "New Common Stock") (prior to dilution from the Management Equity Incentive Program and prior to dilution from any shares or interests issued to the Exit Facility Lenders) or, if the Debtors pursue the Alternative Corporate Structure, (ii) the membership interests (the "New LLC Membership Interests") (prior to dilution from the Management Equity Incentive Program and prior to dilution from any shares or interests issued to the Exit Facility Lenders) of the limited liability company (the "New LLC") formed as part of the Alternative Corporate Structure and the ultimate parent of Reorganized Mark IV (collectively, the "First Lien Lenders Plan Distribution Property"). For the purposes of this Disclosure Statement, "New Equity Interests" shall mean either (x) the New Common Stock, or, if the Debtors pursue the Alternative Corporate Structure, (y) the New LLC Membership Interests.

The Plan further provides that Holders of Allowed General Unsecured Claims will receive such Claimholders' Pro Rata Share of (a) 12% of the New Equity Interests (prior to dilution from the Management Equity Incentive Program) and (b) the net proceeds from the Trust Assets (collectively, the "General Unsecured Claimholders Plan Distribution Property"). Holders of General Unsecured Convenience Claims in an amount less than or equal to $25,000 will receive a distribution consisting of Cash in an amount equal to the lesser of (a) 25% of such Allowed General Unsecured Convenience Claims and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount. Holders of Allowed General Unsecured Convenience Claims in an amount exceeding $25,000 and less than or equal to $100,000 shall receive a distribution consisting of (i) Cash in an amount equal to the lesser of (a) 25% of such Allowed General Unsecured Convenience Claims and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount, or (ii) if affirmatively elected on the applicable Ballot, such Claimholders' Pro Rata share of the General Unsecured Claimholders Plan Distribution Property. Holders of Allowed General Unsecured Convenience Claims in excess of $100,000 that opt into Class 8 pursuant to the conditions set forth in Article IV of the Plan shall have their Claims reduced to $100,000 and will receive a distribution consisting of Cash in an amount equal to the lesser of (a) $25,000 and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount.

Furthermore, the Plan provides Existing Securities of the Debtors will be cancelled on the Effective Date of the Plan and Holders of the Existing Securities will not receive distributions under the Plan.

The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

**B.      Reorganized Capital Structure Created by Plan**

The Plan contemplates Mark IV's emergence from chapter 11 as a privately-held company.  The Plan sets forth the capital structure for the Reorganized Debtors upon their emergence from chapter 11, which is summarized as follows:

1.      *Equity*

On the Effective Date, the Reorganized Company will issue shares of the New Equity Interests as follows: (a) 88% of the New Equity Interests will be issued to the First Lien Lenders on a Pro Rata basis on account of their respective Allowed First Lien Lender Secured Claims and (b) 12% of the New Equity Interests will be issued to holders of General Unsecured Claims on a Pro Rata basis on account of their respective General Unsecured Claims.  The New Equity Interests issued to the First Lien Lenders and the General Unsecured Claimholders on the Effective Date will be subject to dilution from the exercise of stock options and/or the grant of restricted stock units and/or other forms of equity-based awards issued to certain members of the Company's senior management and other employees pursuant to the Management Equity Incentive Plan.  In addition, up to 5% of the New Equity Interests (prior to dilution from the Management Equity Incentive Plan) may be issued to the Exit Facility Lenders from the 88% of the New Equity Interests reserved for the First Lien Lenders.  Additional shares of New Equity Interests may be issued in accordance with Section 4.1(g) of the Plan, the issuance of which shall not require any additional corporate authority or action of any other party.

As of the Effective Date, Reorganized Mark IV will enter into either (a) a stockholders agreement (the "Stockholders Agreement"), the form of which shall be filed as Exhibit G to the Plan, with the holders of New Common Stock, or, if the Debtors pursue the Alternative Corporate Structure (b) an Operating Agreement filed as Exhibit G to the Plan.  Pursuant to the Plan, any party receiving New Common Stock shall be automatically deemed a party to the Stockholders Agreement.  The Stockholders Agreement may provide for, among other things, the election of the board of directors of Reorganized Mark IV, transfer restrictions with respect to the New Common Stock, tag-along rights, drag-along rights, participation rights and information rights.

As of the Effective Date, Reorganized Mark IV will enter into a registration rights agreement (the "Registration Rights Agreement"), the form of which shall be filed as Exhibit E to the Plan, with the holders of the New Equity Interests.  Pursuant to the Plan, any party receiving New Common Stock (or New LLC Membership Interests, as the case may be) shall be automatically deemed a party to the Registration Rights Agreement.  The Registration Rights Agreement may provide for, among other things, customary demand registration rights with respect to the New Equity Interests.

2.      *Exit Facility*

On the Effective Date, the Reorganized Debtors will enter into a credit facility in the approximate amount of $100 million providing financing to the Reorganized Debtors as of the Effective Date and having substantially the terms set forth on Exhibit A to the Plan (the "Exit Facility").

3. *Restructured Debt Term Loan Agreement*

On the Effective Date, the Reorganized Debtors will enter into a term loan agreement, governing the aggregate principal amount of $225 million of term loans deemed made to the applicable borrower on the Effective Date by the DIP Lenders (if applicable, in satisfaction of the Deferred Commitment Fee Claims) and/or the First Lien Lenders (in partial satisfaction of the First Lien Lender Secured Claims), as more fully set forth in Section 6.12 of the Plan, among Reorganized Dayco Products, LLC as borrower, the other Reorganized Debtors as loan parties, JPMorgan Chase Bank, N.A., as administrative agent, the DIP Lenders (if applicable) with respect to the Deferred Commitment Fee and the First Lien Lenders receiving Restructured Debt Term Loans.

4. *Subsidiary Level Debt*

The Debtors anticipate that the obligations of certain of the Debtors' foreign subsidiaries and affiliates under the various Working Capital Facilities, the Bond Debt and the Chieti Mortgage, as further described in Articles V.D, E and F above, will be unaffected by the Chapter 11 Cases, and thus will be obligations of the Reorganized Company upon emergence from bankruptcy.

**C.    Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the

Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In view of the deemed rejection by Class 9 with respect to Mark IV, however, as set forth below, Mark IV will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. See Article X.F of this Disclosure Statement. Although the Debtors believe that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1. *Treatment of Unclassified Claims Under the Plan*

(a) Administrative Claims

Administrative Claims consist primarily of the costs and expenses of administration of the Chapter 11 Cases incurred by the Debtors. Such costs may include, but are not limited to, the cost of operating the Company's businesses since the "Petition Date, the outstanding unpaid fees and expenses of the professionals retained by the Debtors and the Creditors' Committee as approved by the Bankruptcy Court, and the payments necessary to cure prepetition defaults on unexpired leases and executory contracts that are being assumed under the Plan (the "Cure"). All payments to professionals in connection with the Chapter 11 Cases for compensation and reimbursement of expenses, and all payments to reimburse expenses of members of the Creditors' Committee, will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and are subject to approval of the Bankruptcy Court as being reasonable. The Debtors believe that they will have sufficient Cash to pay any professional fees which remain unpaid as of the Effective Date. The Debtors further believe that the aggregate amount of Administrative Claims will not exceed the Reorganized Debtors' ability to pay such Claims when they are allowed and/or otherwise become due. The procedures governing allowance and payment of Administrative Claims are described in Article VII.G of this Disclosure Statement.

Subject to the provisions of Article IX of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date an Administrative Claim becomes an Allowed Administrative Claim or (ii) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the Holder of such Administrative Claim, an Allowed Administrative Claimholder in these Chapter 11 Cases shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which such Debtor (or such Reorganized Debtor) and such Claimholder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims as of the Effective Date shall be paid on the Effective Date; provided further, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided further, however, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

The Debtors have estimated that the amount of Allowed Administrative Claims expected to have been accrued up to the Effective Date will be approximately $123 million, consisting primarily of

DIP Facility Claims and the Deferred Commitment Fee Claims and excluding Professional Fee Claims, Intercompany Claims and Administrative Claims that will be paid in the ordinary course subsequent to the Effective Date. As to Cure costs attributable to the Debtors' assumption of executory contracts and non-residential real property leases that are to be assumed pursuant to the Plan, the Debtors believe that the aggregate amount of all Cure costs will not affect the feasibility of the Plan as further discussed in Article X of this Disclosure Statement. The Debtors believe that there will be sufficient funds available to satisfy the ultimate determination of Cure claims.

The Plan provides that all requests for payment of an Administrative Claim (other than Professional Claims and Claims for making a substantial contribution in the Chapter 11 Cases, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (i) which is paid or payable by any Debtor in the ordinary course of business or (ii) the payment of which has been approved by the Bankruptcy Court.

      (b)      Priority Tax Claims

Priority Tax Claims are Claims of governmental units for taxes that are entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

Under the Plan, each holder of an Allowed Priority Tax Claim will be entitled to receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (i) equal Cash payments made in accordance with section 1129(a)(9)(C) of the Bankruptcy Code on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five years after the Petition Date, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate required under applicable non-bankruptcy law, and in a manner not less favorable than the most favored non-priority unsecured claim provided for by the Plan (other than cash payments made to a Class of creditors under section 1122(b)), (ii) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided that, such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (i) above, or (iii) payment in full in Cash on the Effective Date.

The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $200,000.

      2.      *Treatment of Classified Claims Against, and Interest in, the Debtors Under the Plan*

      (a)      Class 1, Secured Tax Claims

The Plan defines a Secured Tax Claim as a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (ii) the date a Secured Tax Claim becomes payable pursuant

to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above. The Debtors' failure to object to a Secured Tax Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Secured Tax Claim.

Secured Tax Claims are Unimpaired. The Debtors estimate that the aggregate amount of Secured Tax Claims payable under the Plan will be approximately $400,000.

(b)     Class 2, Other Secured Claims

The Plan defines an Other Secured Claim as a Claim (other than a DIP Claim, a Deferred Commitment Fee Claim, an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, a General Unsecured Claim, and a General Unsecured Convenience Claim) that is secured by a Lien which is not subject to avoidance or subordination under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the Holder of such Claim.

The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Secured Claim becomes an Allowed Other Secured Claim or (ii) the date an Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Other Secured Claim, the Debtors (or Reorganized Debtors) shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Other Secured Claim, (x) reinstate such Other Secured Claim in accordance with the provisions of subsection 1124 of the Bankruptcy Code or (y) provide such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing. The Debtors' failure to object to an Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Secured Claim.

Other Secured Claims are Unimpaired. The Debtors have estimated that the aggregate amount of Other Secured Claims payable under the Plan will be approximately $300,000.

(c)     Class 3, Other Priority Claims

The Plan defines an Other Priority Claim as a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge

of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Tax Claim shall be treated in accordance with section 1129(a)(9) of the Bankruptcy Code. The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Priority Claim.

Other Priority Claims are Unimpaired. The Debtors estimate that the aggregate amount of Other Priority Claims payable under the Plan will be approximately $500,000.

(d) Class 4, Intercompany Claims

The Plan defines an Intercompany Claim as (i) a Claim by any Debtor against a Debtor; (ii) a Claim by any Debtor against a Mark IV Non-Debtor; or (iii) a Claim by any Mark IV Non-Debtor against a Debtor.

The Plan provides that Intercompany Claims will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (i) released, waived and discharged as of the Effective Date, (ii) contributed to the capital of the obligor corporation, (iii) dividended, or (iv) remain unimpaired.

Intercompany Claims are Unimpaired.

(e) Class 5, Subsidiary Interests

Class 5 Subsidiary Interests applies to the Plan with respect to all of the Debtors except for Mark IV.

The Plan defines Subsidiary Interests as, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other instruments evidencing an ownership interest in the applicable Subsidiary Debtor as of the Effective Date, and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the applicable Subsidiary Debtor, as of the Effective Date.

Subsidiary Interests are Unimpaired. Subsidiary Interests shall be unaffected by the Plan, except to the extent required by the Restructuring Transactions.

(f) Class 6, First Lien Lender Secured Claims

The Plan defines a First Lien Lender Secured Claim as a First Lien Lender Claim equal to secured portion under section 506 of the Bankruptcy Code of the First Lien Lender Claims as fixed pursuant to, and for all purposes of, the Plan.

Notwithstanding any provision to the contrary in the Plan, upon entry of the Confirmation Order, all First Lien Lender Secured Claims shall be allowed in full in the aggregate amount of $350 million and shall constitute Allowed Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

First Lien lender Secured Claims are Impaired. The Plan provides that, on the Effective Date, each Holder of an Allowed First Lien Lender Secured Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of each component of the First Lien Lenders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by the First Lien Agent as a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed First Lien Lender Secured Claim, and the denominator of which is equal to the aggregate amount of all Allowed First Lien Lender Secured Claims. Any adequate protection claims of the First Lien Lenders pursuant to the DIP Facility Order shall be deemed satisfied by the treatment of Class 6 Claims.

(g)     Class 7, General Unsecured Claims

The Plan defines a General Unsecured Claim as a Claim that is not an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Secured Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, and a General Unsecured Convenience Claim, provided that, General Unsecured Claims shall include Deficiency Claims, provided further that, General Unsecured Claims shall not include a Claim that is disallowed or released, whether by operation of law or pursuant to a Final Order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

Notwithstanding any provision to the contrary in the Plan, upon entry of the Confirmation Order, all (i) First Lien Lender Deficiency Claims shall be allowed in an amount equal to $485,000,000, and (ii) Second Lien Lender Claims shall be allowed in full in the aggregate amount of $153,140,228. All First Lien Lender Deficiency Claims and Second Lien Lender Claims shall constitute Allowed General Unsecured Claims for all purposes, including distribution, in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party-in-interest.

General Unsecured Claims are Impaired. The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (ii) the date a General Unsecured Claim becomes payable pursuant to an agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata share of the General Unsecured Claimholders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Claim, and the denominator of which is equal to the aggregate amount of all Allowed General Unsecured Claims (subject to the limitation on the First Lien Lenders' Deficiency Claim distribution). Notwithstanding the foregoing, the New Equity Interests distributions on account of the First Lien Lender Deficiency Claims and the Second Lien Lender Claims shall be made on the Effective Date.

In accordance with Section 4.1(g) of the Plan, if, after the process of reconciliation and allowance or disallowance of all General Unsecured Claims, the aggregate amount of Allowed General Unsecured Claims exceeds $485 million (without taking into account the First Lien Lender Deficiency Claims), either (i) the Reorganized Debtors shall cause to be issued a sufficient number of New Equity Interests other than to the Holders of First Lien Lender Deficiency Claims or (ii) the Holders of the First Lien Lender Deficiency Claims shall return a sufficient number of New Equity Interests to the Debtors for distribution to Holders of Allowed General Unsecured Claims (other than on account of First Lien Lender Deficiency Claims), in either case to cause the aggregate amount of New Equity Interests issued to the

Holders of First Lien Lender Deficiency Claims not to exceed 50% of the total amount of the New Equity Interests issued to all Holders of Allowed General Unsecured Claims.

(h)     Class 8, General Unsecured Convenience Claims

The Plan defines a General Unsecured Convenience Claim as a Claim, other than a First Lien Lender Deficiency Claim or Second Lien Lender Claim, against the Debtors that otherwise would be included in the General Unsecured Claim Class that is in an amount (i) of $100,000 or less, or (ii) greater than $100,000 and the Holder of such Claim has made the Convenience Class Election on the applicable Ballot provided for voting on the Plan to reduce such Claim to $100,000 and to accept Cash in an amount equal to the lesser of (x) $25,000 and (y) such Claimholder's Pro Rata share of $1.3 million plus any Cash that constitutes unclaimed property distributed in accordance with Section 8.5 of the Plan to holders of Class 8 General Unsecured Convenience Claim Claims (the "Convenience Class Cap Amount").

General Unsecured Convenience Claims are Impaired. The Plan provides that, except as otherwise provided in and subject to Section 8.6 of the Plan, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Convenience Claim becomes an Allowed General Unsecured Convenience Claim or (ii) the date a General Unsecured Convenience Claim becomes payable pursuant to any agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Convenience Claim, each Holder of an Allowed General Unsecured Convenience Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Convenience Claim, the distributions set forth immediately below. The First Lien Lenders are consenting to the use of their cash collateral to fund the Cash payments to Holders of Allowed General Unsecured Convenience Claims in accordance with the terms of the Plan.

A Holder of an Allowed General Unsecured Convenience Claim in an amount less than or equal to $25,000 shall receive, in exchange for such Claim, Cash in an amount equal to the lesser of (i) 25% of such Allowed General Unsecured Convenience Claim and (ii) such Claimholder's Pro Rata share of the Convenience Class Cap Amount.

A Holder of an Allowed General Unsecured Convenience Claim in an amount exceeding $25,000 and less than or equal to $100,000 shall receive, in exchange for such Claim, (i) Cash in an amount equal to the lesser of (a) 25% of such Allowed General Unsecured Convenience Claim and (b) such Claimholder's Pro Rata share of the Convenience Class Cap Amount, or (ii) if affirmatively elected on the applicable Ballot, such Claimholder's Pro Rata share of the General Unsecured Claimholders Plan Distribution Property.

A Holder of an Allowed General Unsecured Claim in excess of $100,000 that makes an irrevocable written election to opt into the classification of Class 8 on a validly executed and timely delivered Ballot shall, by such election reduce such Claim to $100,000 and become a Holder of a Class 8 General Unsecured Convenience Claim for all purposes (including voting and distribution), and shall receive, in exchange for such Claim in the amount of $100,000, Cash in an amount equal to the lesser of (a) $25,000 and (b) such Claimholder's Pro Rata share of the Convenience Class Cap Amount.

For purposes of this section, the amount of each Allowed General Unsecured Convenience Claimholder's Pro Rata share is to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Convenience Claim, and the denominator of which is equal to the aggregate amount of, (a) if such Claimholder is receiving Cash, all Allowed General Unsecured Convenience Claims receiving Cash, or (b) if such Claimholder is receiving General Unsecured Claimholders Plan Distribution Property, the Allowed amount of all Claims (subject

to the limitation on the First Lien Lenders' Deficiency Claim distribution) with respect to which Claimholders will receive General Unsecured Claimholders Plan Distribution Property.

(i)     Class 9, Old Equity Interests

Class 9 Old Equity Interests applies to the Plan with respect to Mark IV only.

The Plan defines Old Equity Interests as Interests in respect of the Old Common Stock issued and outstanding prior to the Effective Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of such common stock of Mark IV or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

Old Equity Interests are Impaired.  The Plan provides that Old Equity Interests shall be cancelled, released, and extinguished, and Holders of such Interests shall neither receive nor retain any property on account of such Interests.

3.     *Reservation of Rights Regarding Claims*

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims.

**D.     Means for Implementation of the Plan**

1.     *Continued Corporate Existence*

Subject to any Restructuring Transactions contemplated by the Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Effective Date, except to the extent such Organizational Documents are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

2.     *Corporate Action*

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

3.     *Organizational Documents*

The Certificate of Incorporation for Reorganized Mark IV is attached to the Plan as Exhibit J and the bylaws for Reorganized Mark IV is attached to the Plan as Exhibit K.   The

Organizational Documents of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (x) a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, until two (2) years after the Effective Date. To the extent the Alternative Corporate Structure is pursued, the Debtors shall file, on or before the Exhibit Filing Date, the Operating Agreement of New LLC as Exhibit D to the Plan in lieu of the Stockholders' Agreement.

4.      *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under the Plan, shall be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under the Plan, as the case may be, shall be released and discharged.

5.      *Authorization and Issuance of New Common Stock*

(a)      The Certificate of Incorporation for Reorganized Mark IV shall authorize a number of shares of New Common Stock to be reflected on Exhibit C to the Plan. On the Effective Date, Reorganized Mark IV shall (i) issue shares of New Common Stock Pro Rata to the Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) and (ii) issue shares of New Common Stock Pro Rata to Holders of Allowed General Unsecured Claims (or in the case of a First Lien Lender Deficiency Claim or Second Lien Lender Claim, such First Lien Lender's or Second Lien Lender's Permitted Nominees). A summary description of the New Common Stock is set forth as Exhibit C attached to the Plan.

(b)      The New Common Stock issued under the Plan shall be subject to economic and legal dilution based upon (i) the issuance of New Common Stock pursuant to, or upon the exercise of New Common Stock equivalents issued pursuant to, the Management Equity Incentive Plan as set forth in Section 6.10 of the Plan, and (ii) any other shares of New Common Stock issued after the Effective Date. The New Common Stock issued to Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) shall be subject to dilution from any shares of New Common Stock issued to the Exit Facility Lenders pursuant to Section 6.12 of the Plan.

(c)      The issuance of the New Common Stock, including the shares of the New Common Stock reserved by Reorganized Mark IV in connection with the Management Equity Incentive Plan is authorized without the need for any further corporate action or action by any other party.

(d)      All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.

(e)      The New Common Stock issued under the Plan shall be subject to the terms of the Stockholders' Agreement and a Registration Rights Agreement, and the holders thereof shall automatically be deemed a party thereto as of the Effective Date.

(f)     Additional New Common Stock may be issued in accordance with Section 4.1(g) of the Plan, which issuance shall not require any additional corporate authority or action of any other party.

6.     *Alternative Corporate Structure*

The Debtors or the Reorganized Debtors, as the case may be, may take such actions as may be necessary to implement an Alternative Corporate Structure. The Alternative Corporate Structure shall have New LLC as the direct parent of the operating companies. The reorganization of the Debtors will be consummated pursuant to the Alternative Corporate Structure described in this paragraph and the Restructuring Transactions only if, after further analysis, the Debtors believe that it will improve the corporate or operational structure or otherwise provide efficiencies to the Estates or the Reorganized Debtors, and only if the Debtors have received the prior written consent of the First Lien Agent.

7.     *Authorization and Issuance of New LLC Membership Interests*

If the Alternative Corporate Structure is pursued, the following shall take place in lieu of the authorization and issuance of New Common Stock as set forth in Section 6.5 of the Plan:

(a)     The Operating Agreement for New LLC shall authorize the issuance of shares of New LLC Membership Interests and New LLC shall issue New LLC Membership Interests to the Holders of Allowed First Lien Lender Secured Claims and Holders of General Unsecured Claims.

(b)     The New LLC Membership Interests issued under this Plan shall be subject to economic and legal dilution based upon (i) the issuance of New LLC Membership Interests pursuant to, or upon the exercise of New LLC Membership Interest equivalents issued pursuant to, the Management Equity Incentive Plan as set forth in Section 6.10 of this Plan, and (ii) any other New LLC Membership Interests issued after the Effective Date. The New LLC Membership Interests issued to Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) shall be subject to dilution for any New LLC Membership Interests issued to the Exit Facility Lenders pursuant to Section 6.12 of the Plan.

(c)     The issuance of the New LLC Membership Interests, including the New LLC Membership Interests reserved for issuance by New LLC in connection with the Management Equity Incentive Plan is authorized without the need for any further corporate action or action by any other party.

(d)     All of the New LLC Membership Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid and non-assessable.

(e)     Additional New LLC Membership Interests may be issued in accordance with Section 4.1(g) of the Plan, which issuance shall not require any additional corporate authority or action of any other party.

8.     *Directors and Officers or Managing Members*

(a)     The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the terms of the Organizational Documents and any applicable employment agreements.

(b)     On the Effective Date, the term of the current members of the board of directors of Mark IV shall expire.  The initial board of directors or members of the managing committee, as applicable, of Reorganized Mark IV shall consist of five (5) directors or members of the managing committee, as applicable.  The First Lien Lenders shall designate four (4) directors (including the Chairman) or members of the managing committee, as applicable.  Subject to the consent of the First Lien Lenders (such consent not to be unreasonably withheld), the remaining director or member of the managing committee, as applicable, shall be a senior executive officer of Mark IV in place immediately prior to the Effective Date.  Thereafter, (i) the board of directors of Reorganized Mark IV will be elected in accordance with the Stockholders' Agreement and the Organizational Documents of Reorganized Mark IV, or (ii) the members of the managing committee of New LLC will be elected in accordance with the Operating Agreement.

(c)     The Debtors shall file on or before the Exhibit Filing Date a notice of the identities of the members of the board of directors of Reorganized Mark IV or the members of the managing committee to serve as of the Effective Date.  The existing directors of each Subsidiary Debtor shall remain in their current capacities as directors of the applicable Reorganized Subsidiary Debtor until replaced or removed in accordance with the Organizational Documents of the applicable Reorganized Subsidiary Debtor.

(d)     Other provisions governing the service, term and continuance in office of the members of the board shall be as set forth in the Organizational Documents of the Reorganized Debtors or New LLC.

9.      *Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs*

(a)     The proposed terms of employment agreements for certain key employees of the Reorganized Debtors, to be effective on the Effective Date, are summarized in Exhibit L attached to the Plan (the "Executive Employment Agreements").  The Executive Employment Agreements shall be in form and substance reasonably satisfactory to the First Lien Agent.

(b)     With the exception of those individuals (i) whose employment terms are summarized in Exhibit L to the Plan, and (ii) the terms of whose employment agreements are subject to a rejection motion as of the Confirmation Hearing, to the extent that any of the Debtors has in place as of the Effective Date employment, severance (change in control), retirement, indemnification and other agreements with their respective active directors, officers, managing members and employees who will continue in such capacities or a similar capacity after the Effective Date, or retirement income plans, welfare benefit plans and other plans for such Persons, such agreements, programs and plans will remain in place after the Effective Date (subject to the consent of the First Lien Agent to be given prior to the Confirmation Date, which consent shall not be unreasonably withheld), and the Reorganized Debtors will continue to honor such agreements, programs and plans except to the extent provided in the Plan without prejudice to the Reorganized Debtors' authority to modify or eliminate any such agreements, programs or plans as permitted under applicable non-bankruptcy law.  Benefits provided under such agreements or plans may include benefits under qualified and non-qualified retirement plans; health and dental coverage; short and long-term disability benefits; death and supplemental accidental death benefits; vacation; leased car; financial consulting, tax preparation and estate planning as well as an annual physical examination, each paid or provided commensurate with an employee's position in accordance with the applicable Reorganized Debtor's policies then in effect.  Such agreements and plans also may include equity, bonus and other incentive plans in which officers, managing members and other employees of the Reorganized Debtors may be eligible to participate; provided, however, such equity, bonus and other incentive plans shall not provide for the issuance of New Equity Interests and to the extent that such equity, bonus and

other incentive plan provides for the issuance of Existing Securities, such provision shall be deemed null and void and the officers, managing members and other employees shall waive any right to enforce such provisions; provided, further, however, that pursuant to the Management Equity Incentive Plan, there shall be reserved for certain members of management, directors, and other employees of the Reorganized Debtors a certain number of shares of New Equity Interests and other securities all as more fully described in the Plan.

(c)     Notwithstanding anything to the contrary in the Plan, following the Effective Date of the Plan, with respect to the payment of "retiree benefits" (as such term is defined in section 1114 of the Bankruptcy Code) related to medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation the Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify.

(d)     Notwithstanding anything contained in the Plan to the contrary, if the KEIP has been approved by the Bankruptcy Court, the terms of the KEIP shall not be modified, altered, or amended by the Plan.  If approved by the Bankruptcy Court, those certain incentive payments provided for in the KEIP shall be paid in the amounts and at such times as contemplated by the KEIP.

10.     *Implementation of the Management Equity Incentive Program*

A summary of the Management Equity Incentive Plan is attached to the Plan as Exhibit B. On the Effective Date, the Reorganized Debtors shall implement the Management Equity Incentive Plan in order to promote the operations of the Reorganized Debtors by offering incentives to key employees who are primarily responsible for the growth and prosperity of the Reorganized Debtors, and to attract and retain qualified employees and thereby benefit the shareholders of the Reorganized Debtors based on the performance of the Reorganized Debtors.  Pursuant to the Management Equity Incentive Plan, the Reorganized Debtors shall deliver certain stock options and/or restricted stock grants (or membership interests, as applicable) to certain members of management and other employees as of and after the Effective Date, in such amounts and pursuant to such terms as set forth in the Management Equity Incentive Plan.  Payments to eligible employees under the Management Equity Incentive Program shall include all earned and due incentive payments, including, without limitation, any payments due under the KEIP.  Not less than 5% and not more than 10% of the New Equity Interests shall be reserved for the Management Equity Incentive Plan.

The Management Equity Incentive Plan will be administered by Reorganized Mark IV's board of directors or managing committee, as applicable.  In applying and interpreting the provisions of the Management Equity Incentive Plan, the decisions of Reorganized Mark IV's board of directors or managing committee, as applicable, shall be final.

11.     *Issuance of the New Equity Interests*

On and after the Effective Date, the Reorganized Company shall issue the New Equity Interests in accordance with the terms of the Plan.  The issuance of the New Equity Interests and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

12. *The Exit Facility*

On the Effective Date, the Reorganized Debtors shall (a) enter into the Exit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Exit Facility reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "Exit Facility Documents"), all of which such Exit Facility Documents shall be in form and substance satisfactory to the Exit Facility Lenders, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date. Any letters of credit that remain outstanding under the First Lien Credit Agreement as of the Effective Date shall be deemed issued and outstanding under the Exit Facility. Up to 5% of the New Equity Interests from the First Lien Lenders Plan Distribution Property (prior to dilution for the Management Equity Incentive Plan) shall be reserved for potential issuance to the First Lien Lenders and/or the DIP Lenders (or any third party acceptable to the First Lien Agent) to the extent such lenders are Exit Facility Lenders. In the Confirmation Order, the Bankruptcy Court shall approve the Exit Facility on substantially the terms and conditions set forth in Exhibit A to the Plan and authorize the Reorganized Debtors to execute the same together with such other documents as the Exit Facility Lenders may reasonably require in order to effectuate the treatment afforded to such parties under the Exit Facility.

13. *The Restructured Debt Term Loan Agreement*

On the Effective Date, the Reorganized Debtors shall (a) enter into the Restructured Debt Term Loan Agreement together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Restructured Debt Term Loan Agreement reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "Restructured Debt Term Loan Agreement Documents"), all of which such Restructured Debt Term Loan Agreement Documents shall be in form and substance satisfactory to the First Lien Agent, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date. In the Confirmation Order, the Bankruptcy Court shall approve the Restructured Debt Term Loan Agreement in substantially the form filed with the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the First Lien Agent may reasonably require in order to effectuate the treatment afforded to such parties under the Restructured Debt Term Loan Agreement. Further, on the Effective Date, the Restructured Debt Term Loan Agreement shall become effective and govern the original amount of $225 million of term loans deemed made by the DIP Lenders (if applicable), in the case of the Deferred Commitment Fee Claims, and/or by the First Lien Lenders, in the case of the First Lien Lender Secured Claim. The Restructured Debt Term Loan shall be comprised of the following: (a) to the extent not paid with proceeds of the Exit Facility, the DIP Lenders shall be deemed to have made term loans in an aggregate amount equal to the Deferred Commitment Fee Claims, secured by a second lien on all assets granted to secure the Exit Facility, maturing thirty six (36) months after the Effective Date, and accruing interest at a rate equal to the Eurocurrency Rate (to be defined substantially as set forth in the DIP Facility) plus 7%; (b) up to $200 million of term loans to be allocated between the U.S. and Europe deemed made by the First Lien Lenders, with such $200 million to be reduced dollar for dollar by the amount of any term loans deemed made in satisfaction of the Deferred Commitment Fee Claims, secured by a third lien on all assets granted to secure the Exit Facility, maturing fifty four (54) months after the Effective Date and accruing interest and fees at a rate equal to the Eurocurrency Rate plus 7%; and (c) $25 million of pay-in-kind term loans deemed made by the First Lien Lenders, secured by a third lien on all assets granted to secure the Exit Facility, maturing sixty (60) months after the Effective Date and accruing interest at a rate equal to the Eurocurrency Rate plus 9%; in each case as set

forth in Exhibits A and M to the Plan. On the Effective Date, each First Lien Lender shall automatically be deemed a party to the Restructured Debt Term Loan Agreement. The Restructured Debt Term Loan Agreement, the Stockholders' Agreement or the Operating Agreement (as applicable) will each provide that during the period from the Effective Date until the earlier of (i) one year after the Effective Date and (ii) achievement of a financial performance threshold to be set forth therein, any assignment by a First Lien Lender of its Restructured Debt Term Loans or New Equity Interests shall be accompanied by a Pro Rata assignment by such First Lien Lender of its New Equity Interests (in the case of an assignment of Restructured Debt Term Loans) or Restructured Debt Term Loans (in the case of an assignment of New Equity Interests).

14. *Restructuring Transactions*

The Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions, which may include the Alternative Corporate Structure. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations under the Plan of each Reorganized Debtor party to such merger. In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Reorganized Debtor under the Plan.

15. *Retained Causes of Action*

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached to the Plan as Exhibit N. The Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided in the Plan, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit N to the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of the Plan.

16. *Exclusivity Period*

Subject to Section 14.2 of the Plan, and absent further order of the Bankruptcy Court, the Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any

amendments to or modifications of the Plan, through and until the Effective Date; provided that, the First Lien Agent consents to any material amendment or modification of the Plan, such consent not to be unreasonably withheld.

17. *Effectuating Documents; Further Transactions*

The Chief Financial Officer, or any other executive officer or managing member of the Debtors, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary or Assistant Secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

18. *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers pursuant to the Plan (including, without limitation, pursuant to any grant of collateral under the Reorganized Debtors' Credit Facilities), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, or the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer pursuant to the Plan, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

E. **Unexpired Leases and Executory Contracts**

1. *Assumed Contracts and Leases*

On the Confirmation Date (but subject to the occurrence of the Effective Date and the Debtors' right to reject as set forth in Section 7.4 of the Plan), all executory contracts or unexpired leases of the Debtors (except those executory contracts and unexpired leases to which the Debtors are a party that are specifically listed on the schedule of rejected contracts and leases annexed to the Plan as Exhibit O) will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Confirmation Date (but subject to the occurrence of the Effective Date and the Debtors' right to reject as set forth in Section 7.4 of the Plan). Each executory contract and unexpired lease assumed pursuant to Article VII of the Plan shall be Reinstated and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, without amendment or modification.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan.

2.      *Rejected Contracts and Leases*

All executory contracts and unexpired leases listed on Exhibit O to the Plan shall be deemed automatically rejected as of the Confirmation Date (but subject to the occurrence of the Effective Date). The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

3.      *Exhibits Not Admissions*

Neither the inclusion by the Debtors of a contract or lease on Exhibit O to the Plan nor anything contained in the Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.

4.      *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

(a)      The provisions (if any) of each executory contract or unexpired lease to be assumed under the Plan which are or may be in default shall be satisfied solely by Cure.

(b)      Objections to assumption or rejection including, without limitation, to Cure related to non-monetary defaults (a "<u>Non-Monetary Objection</u>"), must be raised in an objection to be filed no later than the date by which objections are required to be filed with respect to confirmation of the Plan. Any such Non-Monetary Objection will be litigated at the Confirmation Hearing or at such other time as the Bankruptcy Court may schedule. Any party failing to file a Non-Monetary Objection shall be deemed to have consented to the assumption of such executory contract or unexpired lease and shall be forever barred from asserting an objection with respect to such assumption.

(c)      Any Person claiming that a monetary cure amount is due in connection with the assumption of any executory contract or unexpired lease as contemplated by section 365(b) of the Bankruptcy Code must file such monetary cure claim with the Bankruptcy Court asserting all alleged amounts accrued through the Confirmation Date, if any (the "<u>Cure Claim</u>"), no later than thirty (30) days after the Confirmation Date (the "<u>Cure Claim Submission Deadline</u>"). Any party failing to submit a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting, or seeking to collect any amounts relating thereto against the Debtors or Reorganized Debtors. In the case of a Cure Claim related to an unexpired lease of non-residential real property, such Cure Claim must include a breakdown by category of all amounts claimed, including, but not limited to, amounts for real estate taxes, common area maintenance, and rent. The Debtors shall have thirty (30) days from the Cure Claim Submission Deadline or the date a Cure Claim is actually filed, whichever is later, to file an objection to the Cure Claim. Any disputed Cure Claims shall be resolved either consensually by the parties or by the Bankruptcy Court. Disputed Cure Claims shall be set for status at subsequent hearings following the Cure Claim Submission Deadline with separate evidentiary hearings to be set by the Bankruptcy Court as needed. If the Debtors do not dispute a Cure Claim, then the Debtors shall pay the Cure Claim, if any, to the claimant within twenty (20) days of the Cure Claim Submission Deadline. Disputed Cure Claims that are resolved by agreement or Final Order of the Bankruptcy Court shall be paid by the Debtors within twenty (20) days of such agreement or Final Order of the Bankruptcy Court; provided, that, the Debtors shall have the right to reject the executory contract or unexpired lease, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) for a period of five (5) days after entry of a Final Order establishing an amount with respect to a Cure Claim in excess of that provided by the Debtors.

5.      *Rejection Damages Bar Date*

Except as otherwise provided in the Plan, if rejection of an executory contract or unexpired lease rejected pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected; provided, however, that, any Claim resulting from the rejection of an executory contract or unexpired lease within five (5) days after entry of a Final Order establishing an amount with respect to a Cure Claim in excess of that asserted by the Debtors, shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after receiving written notice of rejection. Any Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as a General Unsecured Claim.

**F.      Provisions Governing Distributions**

1.      *Time of Distributions*

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, distributions under the Plan shall be made on a Periodic Distribution Date.

2.      *No Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

3.      *Disbursing Agent*

The Disbursing Agent shall make all distributions required under the Plan.

4.      *Claims Administration Responsibility*

(a)      *Reorganized Debtors*.      The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims Administration"). Except as otherwise provided in Section 8.6 of the Plan, the Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the Claims Administration.

(b)      *Claims Oversight Committee*.      On the Effective Date, there shall be formed a Claims Oversight Committee. Notwithstanding anything to the contrary set forth in the Plan or in the Confirmation Order, the Claims Oversight Committee shall monitor the Claims Administration conducted by the Reorganized Debtors, and address the Bankruptcy Court if the Claims Oversight Committee disagrees with the Reorganized Debtors' determinations with respect to Claims resolution; and monitor any stock adjustment process described in Section 4.1(g) of the Plan and address the Bankruptcy Court with respect to such matters. The Claims Oversight Committee shall be comprised of three (3) members selected by the Creditors' Committee. For so long as the Claims Administration shall

continue, the Reorganized Debtors shall make monthly reports to the Claims Oversight Committee and the administrative agent under the Restructured Debt Term Loan Agreement. The Claims Oversight Committee may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in the Chapter 11 Cases and/or retained by the Trustee or the Trust Advisory Board, and the Reorganized Debtors shall pay the reasonable costs and expenses of the Claims Oversight Committee and its members, including reasonable professional fees (provided, that except as otherwise agreed to by the Reorganized Debtors or ordered by the Bankruptcy Court, such aggregate fees shall not exceed $100,000 plus any unused Creditors' Trust Initial Funding as provided for in Section 10.3(d) of the Plan) in the ordinary course without further order of the Bankruptcy Court.

(c) *Claims Bar Date*. Any Claim (whether a newly-filed Claim or an amendment to a previously-filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Section 7.5 of the Plan for the filing of such Claims, or (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to Article IX of the Plan, shall not be recognized by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such filing is expressly authorized by a Final Order of the Bankruptcy Court. Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, and the Debtors', Reorganized Debtors', the Claims Oversight Committee's and other parties-in-interest's rights to object to such Claims on the grounds that they are time-barred or otherwise subject to disallowance or modification.

(d) *Filing of Objections*. Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or Reorganized Debtors effect service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address); or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

(e) *Determination of Claims*. Any Claim determined and liquidated pursuant to (i) a Final Order of the Bankruptcy Court, or (ii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan. Nothing contained in Section 8.4 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors or the Claims Oversight Committee may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

5. *Delivery of Distributions*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or the last known addresses of such Holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any

written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change in address. Distributions under the Plan to Holders of DIP Facility Claims shall be made to or at the direction of the DIP Agent and shall be distributed by the DIP Agent in accordance with the DIP Facility. Distributions under the Plan to Holders of First Lien Lender Claims shall be made to or at the direction of the First Lien Agent and shall be distributed in accordance with the First Lien Credit Agreement and the Plan. Distributions under the Plan to Holders of Allowed Second Lien Lender Claims shall be made to or at the direction of the Second Lien Agent and shall be distributed by the Second Lien Agent in accordance with the Second Lien Credit Agreement. Distributions under the Plan to all other Allowed Claimholders shall be made by the Disbursing Agent. If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Disbursing Agent is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property on account of General Unsecured Claims shall revert to the Holders of General Unsecured Claims (excluding any Allowed First Lien Deficiency Claim) and shall be distributed to such Holders pursuant to the Plan. Any unclaimed Cash to be distributed to Holders of Class 8 Claims pursuant to the Plan shall result in a dollar for dollar increase in the Convenience Class Cap Amount. Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

6.       *Procedures for Treating and Resolving Disputed and Contingent Claims*

(a)       *No Distributions Pending Allowance.* No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)       *Distribution Reserve.* The Debtors shall establish one or more Distribution Reserves of New Equity Interests and Cash for the purpose of effectuating distributions to Holders of Disputed Claims pending the allowance or disallowance of such Claims or Interests in accordance with the Plan. The Debtors or the Disbursing Agent shall establish a reserve to hold the New Equity Interests and Cash that would otherwise be distributed to Holders of Disputed Claims based on the amounts of such Claims or Interests estimated by agreement between the Debtors and the Claims Oversight Committee (or Final Order of the Bankruptcy Court upon a motion by the Debtors).

(c)       *Estimation of Claims for Distribution Reserve.* The Debtors or the Disbursing Agent shall establish a reserve to hold the New Equity Interests and Cash that would otherwise be distributed to Holders of Disputed Claims based on the amount of such Claims or Interests estimated by agreement between the Debtors and the Claims Oversight Committee (or Final Order of the Bankruptcy Court upon a motion by the Debtors). Without limiting the foregoing, the Debtors, the Reorganized Debtors or the Claims Oversight Committee may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or the Reorganized Debtors' rejection of an executory contract, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may,

as determined by the Bankruptcy Court, constitute either (i) the Allowed amount of such Disputed Claim, (ii) a maximum limitation on such Disputed Claim, or (iii) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated; provided, however, that if the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(d) *No Recourse to the Debtors or Reorganized Debtors*. Any Disputed Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserve established on account of such Disputed Claim. In no event shall any Holder of a Disputed Claim have any recourse with respect to distributions made, or to be made, under the Plan to Holders of such Disputed Claims to any Debtor or Reorganized Debtor on account of such Disputed Claims, regardless of whether such Disputed Claim shall ultimately become an Allowed Claim or regardless of whether sufficient Cash or New Equity Interests or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

(e) *Distributions After Allowance*. Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern distributions to such Claimholders. Subject to Section 8.2 of the Plan, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

(f) *Fractional Equity Interests; Fractional Dollars*. Payments of fractions of shares of New Equity Interests shall not be made. Fractional shares of New Equity Interests that would otherwise be distributed under the Plan shall be rounded (up or down) to the nearest whole number of shares of New Equity Interests with fractions equal to or less than ½ being rounded down. Any other provision of the Plan notwithstanding, neither the Reorganized Debtors nor the Disbursing Agent shall be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

## G. Allowance of Certain Claims

1. *DIP Facility Claims*

On the Effective Date, the DIP Facility Claims shall be paid in full in Cash, except that Deferred Commitment Fee Claims shall be satisfied pursuant to Section 9.2 of the Plan. To the extent that any DIP Facility Claim, by the terms of the DIP Facility, survives the termination thereof, remains contingent and has not been paid in full in Cash, then any such obligation shall survive the occurrence of the Effective Date.

2. *Deferred Commitment Fee Claims*

On the Effective Date, all Deferred Commitment Fee Claims shall either (a) be paid in full in Cash or (b) satisfied by the deemed making of Restructured Debt Term Loans under the Restructured Debt Term Loan Agreement.

3. *Professional Claims*

(a) *Final Fee Applications*. All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b) *Payment of Interim Amounts*. Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date. In order to receive payment on the Effective Date for unbilled fees and expenses incurred through such date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors. Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

(c) On the Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals. The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Reorganized Debtors. The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d) Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).

4. *Substantial Contribution Compensation and Expenses Bar Date*

Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the date which is forty-five (45) days after the Effective Date, or be forever barred from seeking such compensation or expense reimbursement.

5.    *Other Administrative Claims*

All other requests for payment of an Administrative Claim (other than as set forth in Sections 9.3 and 9.4 of the Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (a) which is paid or payable by any Debtor in the ordinary course of business or (b) the payment of which has been approved by the Bankruptcy Court.

**H.    Creditors' Trust**

1.    *Appointment of Trustee*

(a)    The Trustee for the Creditors' Trust shall be designated by the Creditors' Committee. Specifically, the Creditors' Committee shall file a notice on a date which is at least seven (7) days prior to the date the Bankruptcy Court establishes for the commencement of the Confirmation Hearing designating the Person who it has selected as the Trustee and seeking approval of such designation. The Person designated as the Trustee shall file an affidavit contemporaneously with the Creditors' Committee's motion demonstrating that such Person is disinterested. The Person so designated by the Creditors' Committee shall become the Trustee as of the Effective Date upon the Bankruptcy Court entering an order granting the motion after consideration of the same and any objections thereto at the Confirmation Hearing.

(b)    The Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Trust Agreement.

2.    *Assignment of Trust Assets to the Creditors' Trust*

On the Effective Date, the Trust Assets shall be transferred to the Creditors' Trust, for and on behalf of the Trust Beneficiaries. Only Cash proceeds of Trust Assets may be distributed to Trust Beneficiaries and "in-kind" distributions are not permitted.

3.    *The Creditors' Trust*

(a)    Without any further action of the directors, officers or shareholders of the Debtors or the Reorganized Debtors, on the Effective Date, the Trust Agreement, substantially in the form of Exhibit H to the Plan, shall become effective. The Trustee shall accept the Creditors' Trust and sign the Trust Agreement on that date and the Creditors' Trust will then be deemed created and effective.

(b)    The duration of the Creditors' Trust will be limited to an initial term of three (3) years, subject to further extension solely for the purpose of permitting the Creditors' Trust to liquidate the Trust Assets and distribute the proceeds thereof to the Trust Beneficiaries.

(c)    The Trustee shall have full authority to take any steps necessary to administer the Trust Agreement, including, without limitation, the duty and obligation to liquidate the Trust Assets (having first obtained such approvals from the Trust Advisory Board as may be necessary, if any), as applicable, and, if authorized by majority vote of those members of the Trust Advisory Board

authorized to vote, to prosecute and settle the Trust Avoidance Claims, in such a manner so as reasonably to maximize the value of the Trust Assets.

(d)     All reasonable fees, costs and expenses associated with the administration of the Creditors' Trust and distribution to Trust Beneficiaries shall be the responsibility of and be paid by the Creditors' Trust first from initial funding to be provided by the Reorganized Debtors in the amount of $250,000 (the "Initial Funding") and then to the extent that the Initial Funding is exhausted by the Creditors' Trust, from the Trust Assets, to the extent necessary.  The Initial Funding shall be repaid, to the extent of available net recoveries, to the Debtors or Reorganized Debtors dollar for dollar from the first net proceeds realized from the Trust Avoidance Claims recoveries.  To the extent that less than the entire amount of the Initial Funding is utilized by the Trustee for expenses of the Creditors' Trust, any amounts not so utilized shall be made available to fund the expenses of the Claims Oversight Committee.

(e)     The Trustee, in consultation with the Trust Advisory Board, may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary, including any professionals retained in the Chapter 11 Cases and/or retained by the Claims Oversight Committee or the Trust Advisory Board (collectively, the "Trustee Professionals"), in consultation with the Claims Oversight Committee, to aid in the performance of its responsibilities pursuant to the terms of the Plan including, without limitation, the liquidation of Trust Assets, as applicable.  The Trustee Professionals shall continue to prepare monthly statements in the same manner and in the same detail as required pursuant to the Professional Fee Order, and the Trustee Professionals shall serve such statements on each member of the Trust Advisory Board.  In the event two or more members of the Trust Advisory Board object to the reasonableness of such fees and expenses, the matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

(f)     For U.S. federal income tax purposes, it is intended that the Creditors' Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by the Trust Beneficiaries.

(g)     The Trustee shall be responsible for filing all U.S. federal, state and local tax returns for the Creditors' Trust.

(h)     To the extent that there is an inconsistency or conflict between the description of the Creditors' Trust provided in the Plan and the Trust Agreement, the Trust Agreement shall control.

4.     *The Trust Advisory Board*

(a)     The Trust Advisory Board shall be comprised of three (3) members as designated by the Creditors' Committee.  The Creditors' Committee shall give written notice of the identities of such members and file and serve such notice with the Bankruptcy Court, on a date that is not less than seven (7) days prior to the Confirmation Hearing; provided, however, that if and to the extent the Creditors' Committee fails to file and serve such notice, the Debtors shall designate the members of the Trust Advisory Board by announcing their identities at the Confirmation Hearing.  The Trust Advisory Board shall adopt such bylaws as it may deem appropriate.  The Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Creditors' Trust.  Members of the Trust Advisory Board shall not be entitled to compensation from the Creditors' Trust.  Members of the Trust Advisory Board shall be entitled to reimbursement of reasonable and necessary expenses.  Any reimbursement of reasonable and necessary expenses of the Trust Advisory Board incurred by it in carrying out the purpose of the Trust Advisory Board shall be payable solely by the Creditors' Trust

including, but not limited to, fees and expenses of such firms, experts, advisors, consultants, investigators, auctioneers, appraisers or other professionals as it may deem necessary, including any professionals retrained in the Chapter 11 Cases and/or retained by the Claims Oversight Committee or the Trustee.

(b)	In the case of an inability or unwillingness of any member of the Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Trust Advisory Board.  If any position on the Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Trustee without the requirement of a vote by the other members of the Trust Advisory Board.

(c)	Upon the certification by the Trustee that all Trust Assets transferred into the Creditors' Trust have been distributed, abandoned or otherwise disposed of, the members of the Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(d)	The Trust Advisory Board may, by majority vote, approve all settlements of Trust Avoidance Claims which the Trustee may propose; provided, however, that the Trustee may seek Bankruptcy Court approval of a settlement of a Trust Claim if the Trust Advisory Board fails to act on a proposed settlement of such Trust Claim within thirty (30) days of receiving notice of such proposed settlement by the Trustee.

(e)	The Trust Advisory Board may, by majority vote, authorize the Trustee to invest the corpus of the Creditors' Trust in prudent investments other than those described in section 345 of the Bankruptcy Code.

(f)	The Trustee may be removed by a two-thirds affirmative vote of the Trust Advisory Board or upon order of the Bankruptcy Court for good cause shown.  In the event of the resignation or removal of the Trustee, the Trust Advisory Board shall, by majority vote, designate a person to serve as successor Trustee.

(g)	The Trust Advisory Board shall govern its proceedings through the adoption of bylaws, which the Trust Advisory Board may adopt by majority vote.  No provision of such bylaws shall supersede any provision of the Plan.

(h)	In connection with the Trust Avoidance Claims that constitute the Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) (collectively, the "Privileges") transferred to the Creditors' Trust shall vest in the Trustee and the Trust Advisory Board and their representatives, and the Debtors, Reorganized Debtors, the Trustee and Trust Advisory Board are authorized to take all necessary actions to effectuate the transfer of such Privileges.

## I.	Effect of the Plan on Claims and Interests

1.	*Revesting of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, liens and Interests of creditors and equity security Holders (other than as expressly provided in the Plan).  As of the Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or

Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

2.    *Discharge of the Debtors*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, confirmation of the Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), the Debtors, the Reorganized Debtors and the Estates (a) from all Claims and Causes of Action, whether known or unknown, and (b) from liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, in each case regardless of whether any property has been distributed or retained pursuant to the Plan on account of such Claims, Causes of Action, rights, liabilities, liens, obligations and Interests, and in each case including, but not limited to, demands and (x) Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests that arose before the Confirmation Date, (y) any Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests to the extent such Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and (z) all Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is filed or deemed filed under section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is allowed under section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim, Cause of Action, right, liability, lien, obligation or Interest accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Effective Date occurring.

As of the Confirmation Date (but subject to the occurrence of the Effective Date), except as provided in the Plan or in the Confirmation Order or under the terms of the documents evidencing and orders approving the Reorganized Debtors' Credit Facilities, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in Mark IV, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

3.    *Compromises and Settlements*

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims (a) against them and (b) that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 11.1 of the Plan, without any need for Bankruptcy Court approval.

4.      *Release of Certain Parties*

(a)     Except with respect to the Trust Avoidance Claims, as of the Confirmation Date (but subject to the occurrence of the Effective Date), for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan or the Reorganized Debtors with respect to each of the Released Parties.

(b)     Except with respect to the Trust Avoidance Claims, as of the Confirmation Date (but subject to the occurrence of the Effective Date), for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge all claims and Causes of Action arising under section 547 of the Bankruptcy Code.

(c)     Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan shall be deemed to release any of the Debtors or any of their Affiliates from their obligations under the Plan, the Exit Facility or the Restructured Debt Term Loan Agreement, and the transactions contemplated hereby and thereby.

5.      *Releases by Holders of Claims*

**As of the Confirmation Date (but subject to the occurrence of the Effective Date), for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim that affirmatively votes in favor of the Plan forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan or the Reorganized Debtors.**

6.      *Setoffs*

Except with respect to Claims specifically Allowed under the Plan, including the First Lien Lender Secured Claims, the First Lien Lender Deficiency Claims and the Second Lien Lender Claims, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature

whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

### 7. *Exculpation and Limitation of Liability*

Except as otherwise specifically provided in the Plan, the Released Parties shall not have or incur, and are thereby released from, any claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, each of the foregoing in their capacity as such, for any act or omission in connection with, relating to, or arising out of (a) the filing and prosecution of the Chapter 11 Cases, (b) the Reorganized Debtors' Credit Facilities and the documents related thereto, (c) the negotiation and filing of the Plan, (d) the pursuit of confirmation of the Plan, (e) the negotiation and pursuit of approval of the Disclosure Statement, (f) the consummation of the Plan, and (g) the administration of the Plan or the property to be distributed under the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Notwithstanding anything to the contrary contained in the Plan, Section 11.7 of the Plan shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed in bad faith, gross negligence or willful misconduct.

### 8. *Indemnification Obligations*

Except as specifically provided in Sections 6.4 and 6.8 of the Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights except those held by Persons who are Released Parties and who are included in either the definition of "Insured Persons" or the "Insureds" in any of the policies providing the D&O Insurance shall be released and discharged on and as of the Confirmation Date; provided that the Indemnification Rights excepted from the release and discharge shall remain in full force and effect on and after the Confirmation Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases; (b) the Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage for those Persons described in clause (a) of this section whose Indemnification Rights are not being released and discharged on and as of the Confirmation Date, for a period of five years after the Confirmation Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors or the Reorganized Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"); and (c) the Debtors or the Reorganized Debtors, as the case may be, indemnify such Persons referred to in subclause (b) above to the extent of, and agree to pay for, any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

### 9. *Injunction*

The satisfaction, release, and discharge pursuant to Article XI of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

## VIII.   CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference in the Plan) before deciding whether to vote to accept or to reject the Plan:

### A.   General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all.  The recapitalization of the Debtors realizes the going concern value of the Debtors for their Claimholders.  Moreover, reorganization of the Debtors' businesses and operations under the Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of the Debtors' customers, trade vendors, suppliers of goods and services, lessors and other parties-in-interest in these Chapter 11 Cases.

### B.   Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" (discussed in more detail in Article X.F herein) are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  See Article X of this Disclosure Statement.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.  The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results since the Debtors' ability to obtain financing to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization.  Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

### C.   Claims Estimations

The Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan.  There can be no assurance that the estimated Claim amounts set forth herein are correct.  The actual Allowed amount of Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### D. Business Factors And Competitive Conditions Which May Affect the Company's Businesses

#### 1. *The Continuing Global Economic Crisis May Adversely Affect The Company's Operating Performance*

The current global economic crisis and turbulent financial markets could adversely affect the Company's businesses, results of operations, and financial condition. Lower consumer spending worldwide could lead to a decline in demand for the Company's products and services. If the global credit markets do not improve, the Company could have difficulty in the future refinancing of debt and raising capital for operations.

#### 2. *The Cyclical Nature Of Automotive Sales And Production May Adversely Affect The Company's Operating Performance*

A significant portion of the Company's businesses are directly related to automotive sales and automotive vehicle production by its customers. Automotive sales and production are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences as well as changes in interest rate levels, consumer confidence, and fuel costs. In addition, automotive sales and production can be affected by labor relations issues, regulatory requirements, trade agreements, and other factors. The Company has historically experienced sales declines during its customers' scheduled shut-downs or shut-downs resulting from unforeseen events. Any significant economic decline that results in a reduction in automotive sales and production by the Company's customers may have a material adverse effect on the Company's businesses, results of operations, and financial condition.

#### 3. *Customer Financial Difficulty May Adversely Affect The Company's Operating Performance*

The increasingly deteriorating conditions in the domestic and foreign automotive and heavy duty markets has adversely affected the Company's suppliers as well as its customers. The Company currently experiences accounts receivable concentration risk with respect to some of its largest customers, especially in Europe. If the Company's customers have financial difficulties resulting in the uncollectibility of certain of the Company's accounts receivable, the Company's financial condition may be adversely affected.

#### 4. *Competition May Adversely Affect The Company's Operating Performance*

The Company's businesses compete on a variety of factors such as price, product quality, performance or specifications, continuity of supply, customer service, and breadth of product line. Certain of the Company's competitors are larger or have greater financial resources. Changes in a competitor's business behavior may adversely affect the Company's financial performance.

In addition, many of the Company's end markets are highly competitive. There can be no assurance that the Company's products will be able to compete successfully with the products of its competitors. Furthermore, the rapidly-evolving nature of the markets in which the Company competes may attract new entrants, particularly in low cost countries. As a result, the Company's sales levels and margins could be adversely affected by pricing pressures caused by such new entrants. These factors have led to selective resourcing of future business to non-U.S. competitors in the past and may continue to do so in the future. In addition, any of the Company's competitors may foresee the course of market development more accurately than the Company, develop products that are superior to the Company's

products, have the ability to produce similar products at a lower cost than the Company, or adapt more quickly than the Company to new technologies or evolving customer requirements. As a result, the Company's products may not be able to compete successfully with the products of the Company's competitors.

5.    *Reduced Sales Volume May Adversely Affect The Company's Operating Performance*

Sales volume is an important factor in determining the Company's operating results. The Company's sales volume is influenced by competition and customer demand as further discussed above. A material change in demand, supply, or general economic conditions and uncertainties regarding the Company's future economic viability or ownership could have a material adverse effect on the Company's sales volume and negatively impact operating results.

6.    *Increases in Costs May Adversely Affect the Company's Operating Performance*

The Company may have difficulty in generating cost savings and operational improvements in the future and in adapting its cost structure adequately to adjust for significant changes in production rates, and to offset reductions in the prices paid by its customers and increases in the costs of various manufacturing components and raw materials used in the Company's manufacturing processes. The principal components and raw materials purchased by the Company include polymers, steel, circuit boards, electronic components and light emitting diodes. The prices of certain of these components and commodities, as well as energy costs including natural gas, electricity, and fuel oil, have markedly increased. If prices continue to increase, they could result in a negative impact to the Company's operating results. In addition, the Company's cost structure may be adversely affected by changes in the laws, regulations, policies, or other activities of governments, agencies, and similar organizations where such actions may affect the production, licensing, distribution, or sale of the Company's products, the cost thereof, or applicable tax rates, or affect the cost of legal and regulatory compliance or the cost of financing.

7.    *Certain Disruptions In Supply Of And Changes In The Competitive Environment For Materials Integral To The Company's Products May Adversely Affect The Company's Operating Performance*

The Company uses a broad range of materials and supplies, including metals, castings, chemicals, and electronic components in its products. A significant disruption in the supply of these materials could decrease production and shipping levels, materially increase the Company's operating costs, and materially adversely affect the Company's profit margins. Shortages of materials or interruptions in transportation systems, labor strikes, work stoppages, or other interruptions to or difficulties in the employment of labor or transportation in the markets where the Company purchases material, components, and supplies for the production of its products or where its products are produced, distributed, or sold, whether as a result of labor strife, war, acts of terrorism, or otherwise, in each case may adversely affect the Company's profitability. Significant changes in the competitive environment in the markets where the Company purchases material, components, and supplies for the production of the Company's products or where the Company's products are produced, distributed, or sold also may adversely affect the Company's profitability. In addition, the Company's profitability may be adversely affected by changes in economic conditions or political stability in the markets where the Company procures material, components, and supplies for the production of the Company's principal products or where the Company's products are produced, distributed, or sold.

8.      *The Company May Suffer Future Asset Impairment And Other Restructuring Charges, Including Write Downs Of Goodwill Or Intangible Assets*

From time to time in the past, the Company has recorded asset impairment losses and closure, severance, and restructuring losses relating to specific plants and operations. Generally, the Company records asset impairment losses when it determines that its estimates of the future undiscounted cash flows from an operation will not be sufficient to recover the carrying value of that facility's building, fixed assets, and production tooling. In light of the shifting nature of the competitive environment in which the Company operates, it is possible that the Company will incur similar losses and charges in the future, and those losses and charges may be significant.

9.      *The Company May Lose Or Fail To Attract And Retain Key Salaried Employees And Management Personnel*

The Company's success is largely dependent on the skills, experience, and efforts of its people. While the Company believes that it has excellent depth throughout all levels of management and in all key skill levels of its employees, the loss of the services of one or more members of the Company's senior management or of numerous employees with critical skills could have a negative effect on the Company's business, financial condition and results of operations. If the Company is not able to attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect the Company's ability to fully implement its business objectives.

10.     *The Company May Incur Material Losses And Costs As A Result Of Warranty Claims And Product Liability Actions*

The Company faces an inherent business risk of exposure to warranty and product liability claims in the event that its products fail to perform as expected and, in the case of product liability, such failure of its products results, or is alleged to result, in bodily injury and/or property damage. If any of the Company's products are or are alleged to be defective, the Company may be required to participate in a recall involving such products. A recall claim brought against the Company, or a product liability claim brought against the Company in excess of the Company's available insurance, may have a material adverse effect on the Company's businesses. The Company currently maintains product liability insurance which it believes is both reasonable and comparable to that maintained by other companies of similar size serving similar markets. However, the Company cannot assure you that product liability claims in connection with the Company's current and future products will not exceed such insurance coverage limits or that such insurance will continue to be available on commercially reasonable terms, or at all. Insurance is expensive and in the future may not be available on acceptable terms, if at all. A successful product liability claim or series of claims brought against the Company in excess of its insurance coverage, or a recall of the Company's products, could result in a material adverse effect to the Company's businesses, results of operations and financial condition.

In addition, although the Company cannot assure that the future costs of warranty claims by its customers will not be material, the Company believes its established reserves are adequate to cover potential warranty settlements. The Company's warranty reserves are based on its best estimates of amounts necessary to settle future and existing claims. The Company regularly evaluates the level of these reserves and adjusts them when appropriate. However, the final amounts determined to be due related to these matters could differ materially from the Company's recorded estimates.

11.      *The Company Is Subject To Other Litigation*

The Company is a defendant in numerous lawsuits that arise out of, and are incidental to, the current and past conduct of its businesses. These suits concern issues such as asbestos, environmental matters, contract disputes, labor related matters, intellectual property, property damage and personal injury. While it is not feasible to predict the outcome of all pending suits and claims, the ultimate resolution of these matters could have a material adverse effect upon the Company's businesses, results of operations and financial condition, and the resolution of any matters during a specific period could have a material adverse effect on the Company's quarterly or annual operating results for that period.

12.      *The Company's Intellectual Property May Be Misappropriated Or Subject To Claims Of Infringement*

The Company attempts to protect intellectual property rights through a combination of patent, trademark, copyright and trade secret laws, as well as licensing agreements and third-party nondisclosure and assignment agreements. The Company's failure to obtain or maintain adequate protection of its intellectual property rights for any reason could have a material adverse effect on its businesses, results of operations and financial condition.

The patents the Company owns could be challenged, invalidated or circumvented by others and may not be of sufficient scope or strength to provide the Company with any meaningful protection or commercial advantage. Patent applications in the United States are maintained in secrecy until patents are issued, and since publication of discoveries in the scientific or patent literature tends to lag behind actual discoveries by several months, the Company cannot be certain that it will be the first creator of inventions covered by any patent application it makes or the first to file patent applications on such inventions. Further, the Company cannot assure you that it will have adequate resources to enforce its patents.

The Company's competitors domestically and internationally, many of which have substantially greater resources and have made substantial investments in competing technologies, may have applied for or obtained, or may in the future apply for and obtain, patents that will prevent, limit or otherwise interfere with the Company's ability to make and sell its products. The Company has not conducted an independent review of patents issued to third parties. The Company cannot assure you that competitors will not infringe on any of its patents.

Significant litigation regarding intellectual property rights exists in certain of the industries in which the Company operates. It is possible that third parties will make claims of infringement against the Company or against its licensees or manufacturers in connection with their use of the Company's technology. Any claims, even those without merit, could:

-     be expensive and time consuming to defend;

-     cause the Company to cease making, licensing or using products that incorporate the challenged intellectual property;

-     require the Company to reengineer its products, if feasible;

-     divert management's attention and resources; or

-     require the Company to enter into royalty or licensing agreements in order to obtain the right to use a necessary product or component.

Any royalty or licensing agreements, if required, may not be available to the Company on acceptable terms or at all. A successful claim of infringement against the Company or one of its licensees in connection with its use of the Company's technology could materially adversely affect the Company's businesses, results of operations and financial condition.

The Company also relies on unpatented proprietary technology. It is possible that others will independently develop the same or similar technology or otherwise obtain access to the Company's unpatented technology. To protect the Company's trade secrets and other proprietary information, the Company requires employees, consultants, advisors and collaborators to enter into confidentiality agreements. The Company cannot assure you that these agreements will provide meaningful protection for its trade secrets, know-how or other proprietary information in the event of any unauthorized use, misappropriation or disclosure of such trade secrets, know-how or other proprietary information. If the Company is unable to maintain the proprietary nature of its technologies, its businesses, results of operations and financial condition could be materially adversely affected.

Moreover, with respect to both existing and proposed international and domestic operations, the Company cannot assure you that changes in current or future laws or regulations or future judicial intervention would not have a material adverse effect on the Company. The Company is unable to predict the effect that any future international or domestic legislation or regulation may have on its existing or future business.

13. *IVHS May Not Be Successful in Procuring New Contracts With The IAG*

A substantial portion of IVHS's revenue is generated from products and services provided to the IAG, which represents a consortium of over 20 different toll agencies across 14 different states. The Company's contracts with various members of the IAG do not extend beyond 2010. The Company is currently in the process of bidding to furnish and provide electronic toll collection technology and associated subsystem components and services for the operation of the E-ZPass® system to the IAG beyond 2010. If the Company is not selected to provide these components and services, IVHS may experience a significant reduction in its operating performance.

IVHS is currently involved in an intellectual property dispute with TransCore – a unit of Ropert Industries. The Company believes that TransCore is infringing on certain of the Company's patents with respect to IVHS's radio frequency identification electronic toll applications. If the dispute is not resolved, the Company intends to file a lawsuit seeking to enforce its patent rights. If the Company is unsuccessful in defending its patents rights, its chances of being selected by the IAG in the bidding process described above may be significantly reduced.

14. *The Company Is Subject To Significant Environmental Regulation And Environmental Compliance Expenditures And Liabilities*

The Company's businesses are subject to many environmental laws and regulations. Compliance with these laws and regulations is a significant factor in the Company's businesses. The Company has incurred and expects to continue to incur significant expenditures to comply with applicable environmental laws and regulations. Moreover, some or all of the environmental laws and regulations to which the Company is subject could become more stringent or more stringently enforced in the future. The Company's failure to comply with applicable environmental laws and regulations and permit requirements could result in civil or criminal fines or penalties or enforcement actions, including regulatory or judicial orders enjoining or curtailing operations or requiring corrective measures, installation of pollution control equipment or remedial actions.

Some environmental laws and regulations impose liability and responsibility on present and former owners, operators or users of facilities and sites for contamination at such facilities and sites without regard to causation or knowledge of contamination. In addition, the Company occasionally evaluates various alternatives with respect to its facilities, including possible dispositions or closures. Investigations undertaken in connection with these activities may lead to discoveries of contamination that must be remediated, and closures of facilities may trigger compliance requirements that are not applicable to operating facilities. Consequently, the Company cannot assure you that existing or future circumstances or developments with respect to contamination will not require significant expenditures by the Company.

One of the Company's manufacturing facilities currently uses low-level radioactive source materials in its manufacturing processes to produce products such as electrostatic control devices and smoke-detector ionization elements. The production, storage and transportation of these radioactive materials are subject to federal, state and local laws and regulations. Federal and state regulations also limit the amount of exposure the Company's employees may have to radiation and radioactive materials. The Company has obtained the necessary licenses and approvals required for the business and it believes that it is in compliance with all applicable regulations concerning radioactive materials and employee safety. The Company has radioactive materials that are a by-product of its current and past manufacturing activities at this site, since there are no readily available disposal sites in the United States for such low-level radioactive waste materials. The Company is currently working with the federal government for the transfer of the waste to a federally operated site; however, by its nature, the process for completing such arrangements is lengthy and there can be no assurance as to when the government will approve and schedule such a transfer. The Company estimates the cost to dispose of such materials to an approved site will be in the range of $600,000, and such amount has been recognized as a liability on the Company's consolidated balance sheet. Although no plans presently exist for the Company to discontinue the activities at this facility, if and when such an action would take place, the Company would be required to decontaminate and decommission the facility.

15.    *Actual Costs For Environmental Matters May Vary From The Estimates*

Actual costs and future estimated costs for identified environmental situations may change. Given the inherent uncertainties in evaluating environmental exposures due to unknown conditions, changing government regulations and legal standards regarding liability and evolving related technologies, the Company could have higher future environmental expenditures than the Company has estimated.

16.    *The Company Is An International Company Subject To Uncertainties Which Could Affect Its Operating Results*

Approximately 71% of the Company's sales in fiscal 2009 were derived from sales outside of the United States, and the Company believes that revenue from sales outside of the United States will continue to account for a material portion of its total sales for the foreseeable future. As a result, the Company's businesses may be subject to a number of risks, including:

- fluctuations in currency exchange rates;

- international customers may have longer payment cycles than customers in the United States;

- tax rates in some international countries may exceed those of the United States and international earnings may be subject to withholding requirements or the imposition of tariffs, exchange controls or other restrictions;

- general economic and political conditions in the countries where the Company operates may have an adverse effect on the Company's operations in those countries or not be favorable to the Company's growth strategy;

- governments may adopt regulations or take other actions that would have a direct or indirect adverse impact on the Company's business and market opportunities;

- the difficulties associated with managing a large organization spread throughout various countries; and

- the potential difficulty in enforcing intellectual property rights in some international countries.

The Company's success depends, in large part, on its ability to anticipate and effectively manage these and other risks associated with its international operations. However, any of these factors could adversely affect the Company's international operations and, consequently, its operating results.

Although the Company's non-U.S. subsidiaries have attempted, and will continue to attempt, to match costs and revenues and borrowings and repayments in terms of their respective local currencies, payment for the Company's products has been, and may continue to be, required to be made in currencies, including dollars, other than local currencies. In addition, the value of the Company's investment in its operations is partially a function of the currency exchange rate between the dollar and the applicable local currency. Accordingly, the Company may experience economic loss and a negative impact on earnings with respect to its holdings abroad solely as a result of foreign currency exchange rate fluctuations, which could include foreign currency devaluations against the dollar. Most of the countries in which the Company's subsidiaries now conduct business generally do not restrict the removal or conversion of local or foreign currency; however, the Company cannot assure you that situation will continue. The Company does business in locations with restrictions such as Argentina, Brazil, India and others.

Additionally, because the Company's consolidated financial results are reported in dollars, if the Company generates sales or earnings in other currencies the translation of those results into dollars could result in a significant increase or decrease in the amount of those sales or earnings. In addition, the Company's debt service requirements are primarily in U.S. dollars, even though a significant percentage of the Company's cash flow is generated in international currencies. Significant changes in the value of these international currencies relative to the U.S. dollar could have a material adverse effect on the Company's financial condition and its ability to meet interest and principal payments on its U.S. dollar denominated debt. In addition to currency translation risks, the Company incurs currency transaction risk whenever it or one of its subsidiaries enter into either a purchase or a sales transaction using a currency other than the local currency of the transacting entity. Given the volatility of exchange rates, the Company cannot assure you that it will be able to effectively manage its currency transaction and/or translation risks. It is possible that volatility in currency exchange rates will have a material adverse effect on the Company's businesses, results of operations or financial condition.

During the past several years, certain of the countries in which the Company operates or plans to operate have been characterized by varying degrees of inflation, uneven growth rates and political uncertainty. The Company currently does not have political risk insurance in the countries in

which its conducts business. While the Company carefully consider these risks when evaluating investment opportunities, it cannot assure you that it will not be materially adversely affected should these any of these risks materialize.

The Company's strategy includes expanding the Company's European market share and expanding the Company's manufacturing footprint in lower-cost regions. As a result, the Company's exposure to the risks described above may be greater in the future. The likelihood of such occurrences and their potential impact on the Company vary from country to country and are unpredictable.

17. *There Could Be Significant Tax Risks For The Company In Connection With Its International Operations*

Distributions of earnings and other payments, including interest, received from Mark IV's affiliates may be subject to withholding taxes imposed by the jurisdictions in which these entities are formed or operating, which will reduce the amount of after-tax cash Mark IV can receive from its affiliates. In general, a U.S. corporation may claim a foreign tax credit against its federal income tax expense for such foreign withholding taxes and for foreign income taxes paid directly by foreign corporate entities in which it owns 10% or more of the voting stock. The ability to claim such foreign tax credits and to use net foreign losses is, however, subject to a number of limitations, and Mark IV may incur incremental tax costs as a result of these limitations or because Mark IV is not in a tax-paying position in the United States. Mark IV may also be required to include in its income for U.S. federal income tax purposes its proportionate share of certain earnings of its international corporate subsidiaries that are classified as "controlled foreign corporations" without regard to whether distributions have been actually received from such subsidiaries.

18. *As A U.S. Corporation, Mark IV Is Subject To The Foreign Corrupt Practices Act And A Determination That It Violated This Act May Affect Mark IV's Businesses And Operations Adversely*

As a U.S. corporation, Mark IV is subject to the regulations imposed by the Foreign Corrupt Practices Act, or FCPA, which generally prohibits U.S. companies and their intermediaries from making improper payments to international officials for the purpose of obtaining or keeping business. Any determination that the Company has violated the FCPA could have a material adverse effect on the Company.

19. *Changes In Interest Rates May Negatively Affect The Company*

Changes in interest rates and foreign exchange rates may affect the fair market value of the Company's assets. Specifically, decreases in interest rates will positively impact the value of the Company's assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

In addition, some portion of the Reorganized Debtors' indebtedness may contain floating rate interest provisions, which the Reorganized Debtors would pay on a current basis. However, interest on such obligations could rise to levels in excess of the cash available to the Reorganized Debtors. If the Reorganized Debtors are unable to satisfy their obligations under their floating rate debt, it could result in a default under the Reorganized Debtors' credit facilities.

20.    *Adverse Publicity May Negatively Affect The Company's Businesses*

Adverse publicity or news coverage relating to the Reorganized Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

**E.    Conditions Precedent to Consummation; Timing**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

**F.    Inherent Uncertainty of Financial Projections**

The Projections set forth in <u>Appendix C</u> annexed hereto cover the operations of the Reorganized Company on a consolidated basis through fiscal year 2014.  These Projections are based on numerous assumptions including the timing, confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Company, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Company and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Company's operations.

Critical assumptions underlie the Projections.  Events that may have a significant impact on the Reorganized Company's ability to achieve the Projections, and that correspondingly have a material impact on the value of the Company, include, but are not limited to:

- capital markets risk – availability and cost of funds (debt/equity);

- customer volumes significantly below projections;

- increases in availability under accounts receivable factoring facilities in amounts less than those contemplated in the Projections;

- customer/supplier disruptions (e.g., labor strife, financial difficulties);

- unknown significant product (warranty), environmental, or legal liability risk;

- material commodity costs above projections;

- inability to achieve material cost reduction initiatives;

- significant failure to execute restructuring initiatives on a timely basis or at estimated costs;

- significant and unanticipated customer pricing reductions through marketplace pressures;

- change in tax environment;

- health care inflation significantly beyond estimated employee benefit costs and salaried retirement health care;

- pension asset returns below assumed rates of return resulting in additional future cash contributions to the Company's pension plans;

- cash flow constraints from working capital if unsuccessful in returning to pre-bankruptcy payment terms; and

- working capital liquidity pressures if customers are not timely in payments for accounts receivable.

The foregoing variations and assumptions may be material and may adversely affect the ability of the Reorganized Company to make payments with respect to post-Effective Date indebtedness and to achieve the Projections. Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Company intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

## G. Access to Financing and Trade Terms

The Company's operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support. The Debtors' postpetition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, the Reorganized Debtors' Credit Facilities, and trade terms supplied by vendors. Moreover, if the Debtors or the Reorganized Debtors require working capital and trade financing greater than that provided by projected operating cash flow, the Reorganized Debtors' Credit Facilities, and trade financing, they may be required either to (1) obtain other sources of financing or (2) curtail their operations. The Debtors believe that the recapitalization to be accomplished through the Plan will facilitate the ability to obtain additional or replacement working capital financing.

No assurance can be given, however, that any additional replacement financing will be available or, if available, accessible on terms that are favorable or acceptable to the Debtors or the Reorganized Debtors. The Company believes that it is important that the Company's performance meets projected results in order to ensure continued support from vendors. There are risks to the Company in the event such support erodes after emergence from chapter 11 that could be alleviated by remaining in chapter 11. Chapter 11 affords a debtor the opportunity to close facilities and liquidate assets relatively expeditiously – tools that will not be available to the Company upon emergence. However, the Debtors believe that the benefits of emergence from chapter 11 at this time outweigh the potential costs of

remaining in chapter 11, and that emergence at this time is in the long-term operational best interests of the Company.

### H. Leverage

The Debtors believe that they will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced. The amount of debt, however, will be significant and circumstances may arise which might cause the Reorganized Debtors to conclude that they are overleveraged, which could have significant negative consequences, including:

- it may become more difficult for the Reorganized Debtors to satisfy all of their obligations;

- the Reorganized Debtors may be vulnerable to a downturn in the markets in which they operate or a downturn in the economy in general;

- the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

- the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industries in which they operate or entry of new competitors into their markets;

- the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

- the Reorganized Debtors may be limited in borrowing additional funds.

The covenants in the Reorganized Debtors' Credit Facilities may also restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness. Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on the Reorganized Debtors' ability to sustain sales conditions in the markets in which the Reorganized Debtors operate, the economy generally, and other factors that are beyond their control and that are further discussed above. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs. Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity. The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

### I. Certain Risk Factors Relating to Securities to be Issued Under the Plan

Certain risk factors relating to the securities to be issued under the Plan are described below.

1. *A Liquid Trading Market for the New Equity Interests is Unlikely to Develop*

A liquid trading market for the New Equity Interests is unlikely to develop. As of the Effective Date, the New Equity Interests will not be listed for trading on any stock exchange or trading system and Reorganized Mark IV will not file any reports with the SEC. Consequently, the trading liquidity of the New Equity Interests will be limited. The future liquidity of the trading market for the New Equity Interests will depend, among other things, upon the number of holders of the New Equity Interests, whether the New Equity Interests are listed for trading on an exchange, and whether Reorganized Mark IV becomes a public reporting company at some later date.

2. *Potential Dilution of the New Equity Interests*

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan will be subject to dilution from (i) the issuance of New Equity Interests pursuant to, or upon exercise of New Equity Interests equivalents issued pursuant to, the Management Equity Incentive Plan and (ii) any additional shares of New Equity Interests issued after the Effective Date. In the future, similar to all companies, additional equity financings or other share issuances by Reorganized Mark IV could adversely affect the market price of the New Equity Interests. Sales by existing holders of a large number of shares of the New Equity Interests, or the perception that additional sales could occur, could cause the market price of the New Equity Interests to decline.

3. *Dividends*

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Equity Interests in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Reorganized Mark IV will be a party, including the Exit Facility and the Restructured Debt Term Loan Agreement, may limit the ability of Reorganized Mark IV to pay dividends.

4. *Change of Control*

The Organizational Documents for the Reorganized Debtors may contain, and the general corporate law under the jurisdictions of organization for the Reorganized Debtors may contain, provisions that may have the effect of delaying, deterring, or preventing a change in control of Reorganized Mark IV.

5. *Restrictions on Transfer*

The New Equity Interests will be distributed pursuant to the Plan without registration under the Securities Act of 1933 (the "Securities Act") and without qualification or registration under state securities laws, pursuant to exemptions from such registration and qualification contained in section 1145 of the Bankruptcy Code and section 4(2) of the Securities Act. With respect to certain persons who receive the New Equity Interests pursuant to the Plan, the Bankruptcy Code exemptions apply only to the distribution of such securities under the Plan and not to any subsequent sale, exchange, transfer or other disposition of such securities or any interest therein by such persons. Therefore, subsequent sales, exchanges, transfers, or other dispositions of such securities or any interest therein by "underwriters" or "issuers" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or state securities laws.

Holders of New Equity Interests who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable to transfer or to sell their securities freely except pursuant to (i) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (ii) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (iii) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements.

The organizational documents of Reorganized Mark IV will set forth other transfer restrictions applicable to the New Equity Interests.

**J.      Additional Factors to Be Considered.**

1.      *The Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.      *No Representations Outside This Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.      *Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary.*

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be Allowed.

4.      *Claims Could Be More Than Projected.*

The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions and/or recoveries to the affected Classes to be reduced substantially.  If the ultimate Allowed amount of Claims exceed projections, it may impair the value of the New Equity Interests and/or recoveries being distributed to the holders of Allowed Claims and Interests.

5.      *No Legal or Tax Advice Is Provided to You By This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each creditor or Interest holder should consult his, her, or its own legal counsel and

accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.      *No Admission Made.*

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

## IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan. This summary is for informational purposes only and is based on the Internal Revenue Code ("IRC" or the "Code"), Treasury Regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described herein. No opinion of counsel has been obtained as to any of the tax consequences of the Plan and, although the Debtors intend to seek a private letter ruling from the IRS with respect to a certain aspect of the Alternative Corporate Structure, the scope of the intended ruling is narrow and will not address the tax consequences of the Plan described herein. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Claimholder or Interest Holder and there can be no assurance that the Internal Revenue Service ("IRS") would not assert, or that a court would not sustain, positions different from those discussed herein.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, persons or groups that may be entitled to receive or acquire 5% or more of the stock of the Reorganized Company, foreign persons that own or would be treated as owning 10% or more of the Debtors' or Reorganized Debtors' stock, dealers in securities or foreign currency, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address U.S. federal taxes other than income taxes, and does not address the U.S. federal income tax consequences of the Plan to holders that own Claims or Interests in more than one Class.

Each Claimholder and Interest Holder is strongly urged to consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of the transactions described herein or otherwise contemplated by the Plan.

For purposes of the following discussion, a "U.S. Holder" is a holder of a Claim or an Interest that is (i) a citizen or individual resident of the U.S.; (ii) a corporation (or other entity classified as a corporation for U.S. federal tax purposes) created, organized, or domesticated under the laws of the U.S. or any political subdivision thereof; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust that (a) is subject to the primary supervision of a U.S. court and has one or more U.S. persons, within the meaning of IRC section 7701(a)(30), who have the authority

to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. For purposes of the following discussion, a "Non-U.S. Holder" is a holder of a Claim or an Interest that is an individual, corporation, estate or trust that is not a U.S. Holder.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE CODE, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A. Certain U.S. Federal Income Tax Consequences to the Debtors

1. *Cancellation of Indebtedness and Reduction of Tax Attributes*

Under general U.S. federal income tax principles, each Debtor will realize cancellation of indebtedness ("COD") income to the extent that its obligations to a Claimholder are discharged pursuant to the Plan in exchange for an amount of cash and/or other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt that is discharged. However, COD income is not taxable to a debtor if the debt discharge occurs in a title 11 bankruptcy case. Rather, under the Code, such COD income instead will reduce certain of the debtors' tax attributes, generally in the following order: (a) net operating losses and net operating loss carryforwards (collectively, "NOLs"); (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A debtor may alter the preceding order of attribute reduction by electing to reduce first the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries). The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income for the taxable year in which the discharge occurs, including, e.g., any gain recognized under the Alternative Corporate Structure). Any excess COD income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

A recently enacted amendment to the COD income rules provides that taxpayers, including debtors in a bankruptcy case, that recognize COD income in 2009 or 2010 may elect to forgo the COD income exclusion and attribute reduction rules described above and, instead, include such COD income as taxable income ratably over a five-year period beginning in 2014. The Debtors do not intend to elect to apply this new rule.

The Debtors expect to realize a substantial amount of COD income as a result of the discharge of obligations pursuant to the Plan, which, under the attribute reduction rules described above, is expected to result in the substantial reduction of the Debtors' NOLs, and of certain other U.S. federal income tax attributes of the Debtors, including basis in assets (the "Attribute Reduction"). Implementation of the Alternative Corporate Structure may result in a significant decrease in the amount of the Debtor's NOLs that are available for the Attribute Reduction, which could result in a greater

reduction in the Debtor's other federal income tax attributes, including basis in assets, than otherwise would have occurred.

2. *Net Operating Losses — IRC section 382*

In 2007, the Debtors experienced an "ownership change" (within the meaning of IRC section 382) (the "Ownership Change") as a result of which the Debtors' ability to use any pre-Ownership Change NOLs and certain other tax attributes is subject to significant annual limitation. The Debtors anticipate that they will experience a second ownership change on the Effective Date as a result of the issuance of New Common Stock or New LLC Interests to holders of Claims pursuant to the Plan. As a result, to the extent that NOLs and tax attributes survive the Attribute Reduction, the Debtors' ability to use pre-Effective Date NOLs and other tax attributes to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryforward is made generally (subject to various exceptions and adjustments, some of which are described below) will be subject to a second annual limitation. Under IRC Section 382, NOLs attributable to a period preceding an earlier ownership change are treated as pre-change losses with respect to later ownership changes with the result that such NOLs always will be subject to the smaller of the earlier annual limitation and any later annual limitations. Thus, the second ownership change may cause pre-Ownership Change NOLs which survive the Attribute Reduction, if any, to be more significantly limited than they currently are. IRC section 382 may also limit the Debtors' ability to use "net unrealized built-in losses" (i.e., losses and deductions that have economically accrued but are unrecognized as of the date of the ownership change) to offset future taxable income. Moreover, the Debtors' loss carryforwards will be subject to even further limitations if the Debtors experience additional future ownership changes or if they do not continue their business enterprise for at least two years following the Effective Date.

If the Debtors are subject to the special rules for corporations in bankruptcy provided in IRC section 382(l)(5), and do not elect out of that provision, then, to the extent that the Debtors have post-Ownership Change NOLs that survive the Attribute Reduction, the application of IRC section 382 will be materially different from that just described. In that case, the Debtors' ability to utilize post-Ownership Change NOLs generated prior to the Effective Date would not be limited as described in the preceding paragraph. However, several other limitations would apply to the Debtors under IRC section 382(l)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged pursuant to the Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' IRC section 382 limitation with respect to that ownership change will be zero. Even if IRC section 382(l)(5) is available, the Debtors could elect not to apply the special rules of IRC section 382(l)(5). The Debtors have not yet determined whether they would seek to have the IRC section 382(l)(5) rules apply to the ownership change arising from the consummation of the Plan (assuming IRC section 382(l)(5) would otherwise apply).

If the Debtors do not qualify for, or elect not to apply, the special rule under IRC section 382(l)(5) for corporations in bankruptcy described above, then, to the extent that the Debtors have post-Ownership Change NOLs that survive the Attribute Reduction, a different rule under IRC section 382 applicable to corporations under the jurisdiction of a bankruptcy court will apply in calculating the annual IRC section 382 limitation applicable to post-Ownership Change NOLs generated prior to the Effective Date. Under this rule, the limitation will be calculated by reference to the lesser of the value of the company's new stock (with certain adjustments) immediately after the ownership change or the value of such company's assets (determined without regard to liabilities) immediately before the ownership change. Although such calculation may substantially increase the annual IRC section 382 limitation, the

Debtors' use of NOLs or other tax attributes remaining after implementation of the Plan, if any, may still be substantially limited after an ownership change.

Because holders of First Lien Lender Secured Claims will hold a significant equity position in the Reorganized Company following the consummation of the Plan, disposition by such persons or entities of all or a significant amount of this position after the Effective Date, could cause the Reorganized Company to undergo a subsequent ownership change. This would generally further limit (or possibly eliminate) the Reorganized Company's ability to use NOLs and other tax attributes.

### 3. *Alternative Minimum Tax*

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other U.S. federal income tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Company may be liable for the alternative minimum tax.

### B. **Certain U.S. Federal Income Tax Consequences to Claimholders and Interest Holders**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Claimholders generally will be as described below. These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (2) the manner in which a Claimholder acquired a Claim; (2) the length of time the Claim has been held; (3) the Claimholder's method of tax accounting; (4) whether the Claimholder has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior taxable years; (5) whether the Claim was acquired at a discount; (6) whether the Claimholder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) whether the Claim is a hedge against or is hedged against currency risk or are part of a straddle, constructive sale, or conversion transaction (8) whether the Claim is an installment obligation for U.S. federal income tax purposes; (9) whether the Claim constitutes a "security" for U.S. federal income tax purposes; (10) whether the Claim constitutes a "U.S. real property interest" for U.S. federal income tax purposes; (11) whether and in what precise form the Alternative Corporate Structure is implemented. Therefore, each Claimholder is strongly urged to consult its own tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan.

### 1. *U.S. Holders*

(a) Holders of First Lien Lender Secured Claims and Allowed General Unsecured Claims

The U.S. federal income tax consequences of the Plan to holders of First Lien Lender Secured Claims and Allowed General Unsecured Claims will vary depending upon, among other things, the specific terms of the Restructuring Transactions (including whether, and in what precise form, the Alternative Corporate Structure is Implemented) and whether such Claims and the participations in the Restructured Debt Term Loan Agreement ("Participations") constitute "securities" for United States federal income tax purposes. The determination whether a debt instrument constitutes a security depends upon an evaluation of the overall nature of the debt instrument. Most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. Generally, corporate debt instruments with maturities at issuance of less than five years are not considered securities, and corporate debt instruments with maturities at issuance of ten years or more are considered securities. The Debtors believe that the

Participations are not likely to be securities for U.S. federal income tax purposes. Each holder is urged to consult its own tax advisor regarding the status of its Claim. Depending on the specific terms of the Restructuring Transactions, receipt of consideration by U.S. Holders of First Lien Lender Secured Claims and Allowed General Unsecured Claims pursuant to the Plan may be treated as a taxable transaction, in whole or in part, for U.S. federal income tax purposes.

Participations are not securities. If the Participations are not securities for U.S. federal income tax purposes the receipt of a Participation by a U.S. Holder of a First Lien Lender Secured Claim will be treated as a taxable transaction for U.S. federal income tax purposes. Depending on the mechanism of the exchange of Claims for New Equity Interests (whether under the Alternative Corporate Structure or Otherwise), the exchange of Claims for New Equity Interests may be taxable or tax-free.

In the case that a U.S. Holder's receipt of New Equity Interests is treated as a taxable for U.S. federal income tax purposes, then, except as described in the next sentence, such U.S. Holder generally should recognize capital gain or loss for U.S. federal income tax purposes upon the exchange of Claims for a Participation (if any) and New Equity Interests in an amount equal to the difference between (i) the sum of the "issue price" of any Participation received and the fair market value on the Effective Date of the New Equity Interests received and (ii) such U.S. Holder's adjusted tax basis in its Claim. However, as discussed below under "Accrued Interest" and "Market Discount," a U.S. Holder should recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Claim is more than one year on the Effective Date. The deductibility of capital losses is subject to limitations. A U.S. Holder's tax basis in any Participation received generally should be equal to the "issue price" of such Participation. The "issue price" of a Participation will be equal to its stated principal amount if neither the Participations nor any of the First Lien Lender Claims are considered "publicly traded" for U.S. federal income tax purposes. If a substantial amount of the First Lien Lender Claims or the Participations are considered "publicly traded" for U.S. federal income tax purposes, then the issue price of a Participation will be its fair market value on the Effective Date. A U.S. Holder's tax basis in any New Equity Interests received generally should be equal to the fair market value of such New Equity Interests on the Effective Date. A U.S. Holder's holding period in any Participation and any New Equity Interests received pursuant to the Plan will begin on the day following the Effective Date.

In the case that a U.S. Holder's receipt of New Equity Interests is treated as a tax-free transaction for U.S. federal income tax purposes, then, with respect to the New Equity Interests, a U.S. Holder should not recognize gain or loss on the transaction (subject to possible application of the market discount rules); provided that the exchange of Claims for New Equity Interests is treated independently of the exchange of Claims for Participations for U.S. federal income tax purposes. The treatment of any OID and accrued but unpaid interest should be determined in the manner described below under "Accrued Interest." The U.S. Holder's tax basis in the New Equity Interests will be equal to such U.S. Holder's adjusted basis in the Claim exchanged for the New Equity Interests. A U.S. Holder's holding period in any New Equity Interests received will be the same as such U.S. Holder's holding period in the Claims exchanged for such New Equity Interests. The tax consequences to U.S. Holders of First Lien Lender Secured Claims on receipt of a Participation would be as described above.

Participations are treated as securities. If the Participations are treated as securities for U.S. federal income tax purposes, whether a U.S. Holder's receipt of a Participation pursuant to the Plan will be taxable will depend on whether the U.S. Holder's Claim constitutes a security for U.S. federal income tax purposes. If a U.S. Holder's Claim is a security for U.S. federal income tax purposes, the

receipt of a Participation in exchange for such Claim should be treated as a reorganization for U.S. federal income tax purposes.

If the receipt of a Participation is treated as a reorganization for U.S. federal income tax purposes and the receipt of the New Equity Interests is treated as a tax-free transaction for U.S. federal income tax purposes, then, a U.S. Holder should not recognize gain or loss on the transaction (subject to possible application of the market discount rules), except to the extent of accrued interest. The treatment of any OID and accrued but unpaid interest should be determined in the manner described below under "Accrued Interest." The U.S. Holder's tax basis in any Participation received will be equal to such U.S. Holder's adjusted basis in the Claim exchanged for the Participation; provided that the tax basis of any Participation that is treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the U.S. Holder's tax basis in the New Equity Interests will be equal to such U.S. Holder's adjusted basis in the Claim exchanged for the New Equity Interests. A U.S. Holder's holding period in any Participation and New Equity Interests received will be the same as such U.S. Holder's holding period in the respective Claims exchanged for such Participations and New Equity Interests.

If the receipt of a Participation is treated as a reorganization for U.S. federal income tax purposes, but the receipt of the New Equity Interests is not treated as a tax-free transaction for U.S. federal income tax purposes based on the form of the transaction actually implemented, then, (i) with respect to the receipt of the Participations, the tax consequences would be as described in this subsection without regard to references to New Equity Interests, and (ii) with respect to the receipt of New Equity Interests, the tax consequences would be as described with respect to taxable transactions discussed under "Participations are not securities."

The receipt of a Participation and New Equity Interests may be treated as reorganization "with boot." In such a case, a U.S. Holder may be required to recognize (a) capital gain (subject to the market discount rules) to the extent of the lesser of (i) the amount of gain realized on the exchange and (ii) the fair market value on the Effective Date of the New Equity Interests and any other property received and (b) gain or loss with respect to accrued interest as described below under "Accrued Interest." The U.S. Holder's tax basis in the Participation would be the same as that of the surrendered Claim decreased by the fair market value of the New Equity Interests received and increased by the amount of gain recognized; provided that the tax basis of any Participation that is treated as received in satisfaction of accrued interest should equal the amount of such accrued interest. The U.S. Holder's tax basis in the New Equity Interests received generally should be equal to the fair market value of such New Equity Interests on the Effective Date. The U.S. Holder's holding period in its Participation should include such U.S. Holder's holding period for the surrendered Claim. The U.S. Holder's holding period in the New Equity Interests received will begin on the day following the Effective Date.

(b)     Classification of New LLC

In the event that the Alternative Corporate Structure is implemented, the U.S. federal income tax consequences to holders of First Lien Lender Secured Claims and Allowed General Unsecured Claims would be as described above and such U.S. Holders will become members of New LLC. It is intended that New LLC be treated as a partnership for U.S. federal income tax purposes. If New LLC were to be treated as a partnership for U.S. federal income tax purposes, the members of New LLC will receive allocations of income, gain, loss, deduction, credit, and items thereof and will be responsible for any tax liability associated with any such allocations. New LLC may not have sufficient cash to make distributions that would allow members to satisfy their tax liability with respect to such allocations.

In general, New LLC will be treated as a "publicly traded partnership" and taxed as a corporation for U.S. federal income tax purposes, if the LLC Interests or any other equity issued by New LLC is "publicly traded" within the meaning of IRC section 7704(b) and Treasury Regulations promulgated thereunder. The Treasury Regulations set forth certain safe harbors for partnerships that either (i) have no more than one hundred (100) partners and whose partnership interests have been issued in a transaction that is not required to be registered under the Securities Act or (ii) satisfy the "passive income" guidelines. It is intended that New LLC would qualify under the "passive income" safe harbor. There can be no assurance, however, that New LLC would not be treated as a "publicly traded partnership." If New LLC is treated as publicly traded partnership, income and deductions of New LLC would be reported on its tax return rather than being passed through to its members and New LLC would be required to pay income tax at corporate rates on its net income. The imposition of any such corporate tax would reduce the amount of cash available to be distributed to members of New LLC.

(c)        Holders of Allowed General Unsecured Claims that Receive Beneficial Interests in the Creditor Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation Section 301.7701-4(d) and related regulations, the Creditor Trust should be treated as a grantor trust set up for the benefit of the beneficiaries of such Trust. Depending on the specific terms for the U.S. Holders of Allowed General Unsecured Claims that receive a beneficial interest in the Creditor Trust (a "Trust Interest") will be treated for U.S. federal income tax purposes as receiving their Pro Rata Shares of the assets of the Creditor Trust from the Debtors in a taxable exchange and then depositing the assets in the Creditor Trust in exchange for Trust Interests. Such U.S. Holders generally should recognize gain or loss for U.S. federal income tax purposes upon the deemed exchange of Claims for assets in an amount equal to the difference between (i) the fair market value on the Effective Date of the assets deemed received and (ii) the portion of such U.S. Holder's adjusted tax basis in its Claim exchanged therefor. The character of such loss as capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the U.S. Holder and whether the U.S. Holder holds its Interest as a capital asset. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Claim is more than one year on the Effective Date. The deductibility of capital losses is subject to limitations. However, as discussed below under "Accrued Interest" and "Market Discount," a U.S. Holder should recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. U.S. Holders should recognize no gain or loss on the deemed exchange of assets for a Trust Interests. A U.S. Holder's basis in a Trust Interest generally should be equal to the fair market value of such Trust Interest on the Effective Date. U.S. Holders of Allowed General Unsecured Claims that receive a beneficial interest in the Creditor Trust will be required to report on their United States federal income tax returns their share of the Creditor Trust's items of income, gain, loss, deduction and credit in the year recognized by the Creditor Trust. This requirement may result in such Holders being subject to tax on their allocable share of the Creditor Trust's taxable income prior to receiving any cash distributions from the Creditor Trust. U.S. Holders of Allowed General Unsecured Claims that receive a beneficial interest in the Creditor Trust are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Creditor Trust.

(d)        Holders of General Unsecured Convenience Claims

The receipt of Cash by a U.S. Holder of a General Unsecured Convenience Claims pursuant to the Plan should be treated as a taxable transaction for U.S. federal income tax purposes. As a result, except as described in the next sentence, such U.S. Holder generally should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash

received and (ii) such U.S. Holder's adjusted tax basis in its Claim. However, as discussed below under "Accrued Interest" and "Market Discount," a U.S. Holder should recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. The character of such loss as capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the U.S. Holder and whether the U.S. Holder holds its Interest as a capital asset. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Claim is more than one year on the Effective Date. The deductibility of capital losses is subject to limitations. U.S. Holders of General Unsecured Convenience Claims who elect to receive their Pro Rata share of the General Unsecured Claimholders Plan Distribution Property will be taxed as described above under "Holders of First Lien Lender Secured Claims and Allowed General Unsecured Claims" with respect to the receipt of New Equity Interests pursuant to the Plan.

(e)  Holders of Other Interests

A U.S. Holder of any Interest that is deemed cancelled under the Plan will recognize a loss for U.S. federal income tax purposes in an amount equal to such U.S. Holder's adjusted tax basis in the Interest. The character of such loss as capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the U.S. Holder and whether the U.S. Holder holds its Interest as a capital asset.

(f)  Accrued Interest

If and to the extent a U.S. Holder receives consideration in satisfaction of accrued interest or original issue discount ("OID"), such amount generally will be taxable to the Holder as interest income (if not previously included in the U.S. Holder's gross income). While a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full, it is unclear whether a holder of a Claim could be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full. U.S. Holders should consult their tax advisors as to the tax consequences of the allocation of consideration between principal and interest.

(g)  Market Discount

A U.S. Holder that purchased its Claim from a prior holder at a discount to the then-adjusted issue price of such Claim may be subject to the market discount rules of the IRC. Under those rules, assuming the U.S. Holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such Claim (subject to a de minimis rule and exceptions for certain non-recognition transactions) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the Effective Date. U.S. Holders should consult their tax advisors as to the tax consequences of the market discount rules.

2.  *Non-U.S. Holders*

Except with respect to consideration received in respect of accrued but unpaid interest, a Non-U.S. Holder generally will not be subject to U.S. federal withholding tax with respect to gain, if any, realized on the receipt of consideration pursuant to the Plan. A Non-U.S. Holder generally also will not be subject to U.S. federal income tax with respect to such gain unless (i) the gain is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder and, if required by an applicable tax treaty, is attributable to a permanent establishment or fixed base within the U.S. or (ii) in the case of a Non-U.S. Holder that is a nonresident alien individual, such Non-U.S. Holder is present in

the U.S. for 183 or more days in the taxable year of the Effective Date and certain other conditions are satisfied. In the case described in clause (i) above, gain recognized generally will be subject to U.S. federal income tax in the same manner as if such gain were recognized by a U.S. person and, in the case of a Non-U.S. Holder that is a corporation, may also be subject to the branch profits tax (currently imposed at a rate of thirty percent (30%), or a lower applicable treaty rate).

A Non-U.S. Holder generally will also be exempt from withholding tax on consideration received in respect of accrued interest if such interest is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (or, if certain tax treaties apply, the Non-U.S. Holder maintains a U.S. permanent establishment to which the interest is attributable) and the Non-U.S. Holder furnishes an IRS Form W-8ECI. In such case, the Non-U.S. Holder will generally be subject to U.S. federal income tax on the interest on a net basis in the same manner as if such Non-U.S. Holder were a U.S. Holder. In addition, in such case, if the Non-U.S. Holder is a foreign corporation, the interest may be subject to a branch profits tax at a rate of 30% (or lower treaty rate, if applicable).

## C.     Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a U.S. Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless such U.S. Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the U.S. Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC.

## D.     Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## X.     FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

## A.     Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to

as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan, and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared financial Projections for fiscal 2010 through 2014, as set forth in Appendix C attached to this Disclosure Statement. The Projections indicate that the Reorganized Company should have sufficient cash flow to pay and service the Company's debt obligations and to fund its operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. As noted in the Projections, however, the Debtors caution that no representations can be made as to the accuracy of the Projections or as to the Reorganized Company's ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Reorganized Company's financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse. See Article VIII of this Disclosure Statement for a discussion of certain risk factors that may affect the financial feasibility of the Plan.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

B.      Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the Plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

C.      Best Interests Test

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of

claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (1) all members of an impaired class of claims or interests have accepted the plan or (2) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also could prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

D.      **Estimated Valuation of the Reorganized Company**

A copy of the analysis of the total enterprise value of the Reorganized Company is attached to this Disclosure Statement as <u>Appendix D</u> (the "<u>Valuation Analysis</u>").

E.      **Application of the Best Interests Test to the Liquidation Analysis and the Valuation of the Reorganized Company**

A liquidation analysis prepared with respect to the Debtors is attached to this Disclosure Statement as <u>Appendix E</u> (the "<u>Liquidation Analysis</u>"). The Debtors believe that any liquidation analysis is speculative. For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. In preparing the Liquidation Analysis, the Debtors have projected the amount of Allowed Claims based upon a review of their books and records and their scheduled and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected a range for the amount of Allowed Claims with the low end of the range the lowest reasonable amount of the Claims and the high end of the range the highest reasonable amount of the Claims, thus allowing

assessment of the most likely range of chapter 7 liquidation dividends to the holders of the Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. In addition, as noted above, the Valuation Analysis of the Reorganized Company also contains numerous estimates and assumptions. For example, the value of the New Equity Interests cannot be determined with precision due to the absence of a public market for the New Equity Interests.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the Liquidation Analysis and the Valuation Analysis of the Reorganized Company, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each Impaired Class will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. These factors lead to the conclusion that recoveries pursuant the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

The Debtors believe the methodology used to prepare the Liquidation Analysis is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

F.    **Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative**

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as it has been accepted by at least one impaired class of claims. The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by Impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of

such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Class 9 Old Equity Interests are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims or Interests. Class 9 Old Equity Interests is therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, Mark IV is seeking confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to Class 9 Old Equity Interests, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.

### G. Conditions Precedent

1.  *Conditions to Confirmation*

The following are conditions precedent to confirmation of the Plan that must be satisfied unless waived in accordance with Section 12.3 of the Plan:

(a) The Bankruptcy Court shall have approved a disclosure statement with respect to the Plan in form and substance reasonably satisfactory to the Debtors, the First Lien Agent and the Creditors' Committee.

(b) The Confirmation Order, the Plan, and all exhibits and annexes to each of the Plan and the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

(c) The First Lien Agent shall be satisfied that, on or before the Effective Date, the restructuring of the obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to Mark IV IVHS Inc., and the obligations under the First Lien Credit Agreement with respect to Dayco Europe S.r.l., shall be completed on terms satisfactory to the First Lien Agent and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

2.  *Conditions to Consummation*

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied unless waived in accordance with Section 12.3 of the Plan:

(a) The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the rejection of unexpired leases and executory contracts by the Debtors as contemplated by Section 7.2 of the Plan.

(b)     The Debtors shall have entered into the Reorganized Debtors' Credit Facilities and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)     The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably satisfactory to the Debtors, the First Lien Lenders and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8), shall have been entered by the Bankruptcy Court on or before October 27, 2009, and shall be a Final Order.

(d)     All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Lenders and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent such actions, documents and agreements directly affect Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8) and shall have been effected or executed as applicable.

(e)     The Debtors shall have reduced their post-Effective Date obligations in respect of the Legacy Liabilities to an amount reasonably satisfactory to the First Lien Lenders and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

(f)     The obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to Mark IV IVHS Inc., and the restructuring of the obligations under the First Lien Credit Agreement with respect to Dayco Europe S.r.l. shall have been completed on terms satisfactory to the First Lien Agent and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

## H.     Waiver of Conditions to Confirmation and Consummation of the Plan

The conditions set forth in Sections 12.1 (other than 12.1(a)) and 12.2 (other than 12.2(b) and (c)) of the Plan may be waived by the Debtors subject to such waiver being reasonably satisfactory to the First Lien Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

## XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include: (A) continuation of the pending Chapter 11 Cases; (B) an alternative plan or plans of reorganization; or (C) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

## A.     Continuation of the Bankruptcy Case

If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors-in-possession and gaining access to sufficient liquidity to allow them to continue their operations as a going

concern. And as further discussed in <u>Article VI.K</u> herein, the Debtors believe that they have accomplished the goals that chapter 11 has allowed them to achieve, and that the Company's key remaining challenges are operational and therefore do not require that the Company remain in chapter 11.

### B. Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases could propose a different plan or plans. Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### C. Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

However, the Debtors believe that creditors would lose substantially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to the Claimholders and Interestholders under a chapter 11 liquidation plan probably would be delayed substantially.

The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Plan.

## XII. VOTING REQUIREMENTS

On or around the date of this Disclosure Statement, the Bankruptcy Court entered the Solicitation Procedures Order which, among other things, approved this Disclosure Statement, set procedures for voting on the Plan, and scheduled the Confirmation Hearing. A copy of the Confirmation

Hearing Notice is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballots should be read in connection with this article.

If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please contact:

Epiq Bankruptcy Solutions, LLC
Attn: Mark IV Industries
757 Third Avenue, 3rd Floor
New York, New York 10017
Phone: 646-282-2400
Fax: 646-282-2501

Imaged copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all exhibits, schedules and appendices to the foregoing) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, http://www.nysb.uscourts.gov for a fee (a PACER account is required), or at the Company's restructuring website, http://chapter11.epiqsystems.com/markiv, free of charge. In addition, if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, you may contact Epiq at the address immediately above.

The Bankruptcy Court may confirm the Plan only if the Bankruptcy Court determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), the Bankruptcy Court may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (A) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the non-acceptance by one or more such Classes; (B) the Plan is "feasible," which means that there is a reasonable probability that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation; and (C) the Plan is in the "best interests" of all Claimholders and Interestholders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE PLAN IS FEASIBLE, AND THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

UNLESS THE BALLOT BEING FURNISHED WITH THIS DISCLOSURE STATEMENT IS TIMELY SUBMITTED TO THE VOTING AGENT SO THAT IT IS ACTUALLY RECEIVED ON OR PRIOR TO SEPTEMBER 1, 2009 AT 5:00 P.M. (EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

### A.  Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which generally means that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan.  If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan.  If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2)(a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated); (b) such Claimholder has timely filed a proof of claim as to which no objection has been filed; or (c) such Claimholder has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtors have not opposed the motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Bankruptcy Court.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

### B.  Classes Unimpaired Under the Plan

The following Classes of Claims and Interests are Unimpaired under the Plan: Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims and Class 5 Subsidiary Interests.  Under section 1126(f) of the Bankruptcy Code and the Solicitation Procedures Order, such Claimholders and Interestholders, as applicable, are conclusively presumed to have accepted the Plan.  Their votes to accept or reject the Plan will not be solicited.

C.      **Classes Impaired Under the Plan**

1.      *Impaired Classes of Claims Entitled to Vote*

The following Classes of Claims are Impaired under the Plan, and are entitled to vote to accept or reject the Plan: Class 6 First Lien Lender Secured Claims, Class 7 General Unsecured Claims and Class 8 General Unsecured Convenience Claims.

2.      *Impaired Classes of Claims and Interests Not Entitled to Vote.*

The following Classes of Claims and Interests are not entitled to receive any distribution under the Plan on account of their Claims and Interests: Class 9 Old Equity Interests. Pursuant to section 1126(g) of the Bankruptcy Code, Class 9 Old Equity Interests, which applies only to the Plan with respect to Mark IV, is conclusively presumed to have rejected the Plan, and the votes of Interestholders in such Class therefore will not be solicited.

## XIII.   CONCLUSION

A.      **Hearing on and Objections to Confirmation**

1.      *Confirmation Hearing*

The Confirmation Hearing has been scheduled for September 22, 2009 at 2:00 p.m. (Eastern time). Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

2.      *Date Set for Filing Objections to Confirmation of the Plan*

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for September 15, 2009 at 5:00 p.m. (Eastern time). A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

B.      **Recommendation**

As stated above, the Plan provides for an equitable distribution to creditors of the Debtors, preserves the value of the Debtors' businesses as a going concern, and preserves the jobs of employees. The Debtors, the First Lien Agent, the Steering Committee and the Creditors' Committee believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation and costs, the loss of jobs by the Debtors' employees, and/or impaired recoveries. Moreover, the Debtors, the First Lien Agent, the Steering Committee and the Creditors' Committee believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, THE DEBTORS, THE FIRST LIEN AGENT, THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Dated:   July 30, 2009

Respectfully submitted,

Mark IV Industries, Inc., et al.

By: _/s/ Mark G. Barberio_____
     Mark G. Barberio
     Vice President and Chief Financial Officer of
     Mark IV Industries, Inc.


J. Eric Ivester             Jay M. Goffman
Matthew M. Murphy        SKADDEN ARPS SLATE MEAGHER
SKADDEN ARPS SLATE MEAGHER   & FLOM LLP
& FLOM LLP               Four Times Square
155 N. Wacker Drive, Suite 2700   New York, New York  10036-6522
Chicago, Illinois 60606-1720     Telephone: (212) 735-3000
Telephone: (312) 407-0700      Facsimile: (212) 735-2000
Facsimile: (312) 407-0411

Attorneys for the Debtors and Debtors-in-Possession

**Appendix A**

**First Amended Joint Plan of Reorganization of
Mark IV Industries, Inc. and Its Affiliated Debtors and Debtors-in-Possession**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - x
                       :

In re                    :    Chapter 11

                    :

MARK IV INDUSTRIES, INC., <u>et al.</u>,  :    Case No. 09-12795 (SMB)

                    :

                    :    (Jointly Administered)

             Debtors.  :

- - - - - - - - - - - - - - - - - - - - - - - - - x

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**MARK IV INDUSTRIES, INC. AND ITS AFFILIATED**
**<u>DEBTORS AND DEBTORS-IN-POSSESSION</u>**

J. Eric Ivester
Matthew M. Murphy
SKADDEN ARPS SLATE MEAGHER
   & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

Jay M. Goffman
SKADDEN ARPS SLATE MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Debtors and Debtors-in-Possession

Dated: July 30, 2009

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND
COMPUTATION OF TIME ........................................................................4
    A.     Scope of Definitions ...........................................................................4
    B.     Definitions ..........................................................................................4
          1.1     "Administrative Claim" ...........................................................4
          1.2     "Affiliates" ..............................................................................4
          1.3     "Allowed Claim" .....................................................................4
          1.4     "Allowed Class __ Claim" ......................................................5
          1.5     "Alternative Corporate Structure" ..........................................5
          1.6     "Avoidance Claims" ...............................................................5
          1.7     "Ballot" ...................................................................................5
          1.8     "Bankruptcy Code" .................................................................5
          1.9     "Bankruptcy Court" ................................................................5
          1.10    "Bankruptcy Rules" ................................................................5
          1.11    "Bar Date" ...............................................................................5
          1.12    "Bar Date Order" .....................................................................5
          1.13    "Business Day" ........................................................................6
          1.14    "Cash" .....................................................................................6
          1.15    "Causes of Action" ..................................................................6
          1.16    "Chapter 11 Case(s)" ...............................................................6
          1.17    "Claim" ....................................................................................6
          1.18    "Claimholder" .........................................................................6
          1.19    "Claims Administration" ........................................................6
          1.20    "Claims Agent" ........................................................................6
          1.21    "Claims Objection Deadline" ..................................................6
          1.22    "Claims Oversight Committee" ...............................................6
          1.23    "Class" .....................................................................................7
          1.24    "Confirmation Date" ...............................................................7
          1.25    "Confirmation Hearing" ..........................................................7
          1.26    "Confirmation Order" ..............................................................7
          1.27    "Convenience Class Cap Amount" ..........................................7
          1.28    "Convenience Class Election" .................................................7
          1.29    "Creditors' Committee" ..........................................................7
          1.30    "Creditors' Trust" ....................................................................7
          1.31    "Cure" ......................................................................................7
          1.32    "Debtors" .................................................................................8
          1.33    "Deferred Commitment Fee" ...................................................8
          1.34    "Deferred Commitment Fee Claims" ......................................8
          1.35    "Deficiency Claims" ...............................................................8
          1.36    "D&O Insurance" .....................................................................8
          1.37    "DIP Agent" ............................................................................8

1.38 "DIP Facility" ...........................................................................8
1.39 "DIP Facility Claims" ...............................................................8
1.40 "DIP Facility Order" ................................................................8
1.41 "DIP Lenders" ..........................................................................8
1.42 "Disallowed Claim" .................................................................9
1.43 "Disbursing Agent" .................................................................9
1.44 "Disclosure Statement" ...........................................................9
1.45 "Disputed Claim" ....................................................................9
1.46 "Distribution Date" .................................................................9
1.47 "Distribution Reserve" ...........................................................9
1.48 "Effective Date" ......................................................................9
1.49 "Estates" ................................................................................10
1.50 "Executive Employment Agreements" ...................................10
1.51 "Exhibit" ...............................................................................10
1.52 "Exhibit Filing Date" ............................................................10
1.53 "Existing Securities" .............................................................10
1.54 "Exit Facility" .......................................................................10
1.55 "Exit Facility Documents" ....................................................10
1.56 "Exit Facility Lenders" .........................................................10
1.57 "Face Amount" ......................................................................10
1.58 "Final Order" .........................................................................10
1.59 "First Lien Agent" .................................................................11
1.60 "First Lien Credit Agreement" ..............................................11
1.61 "First Lien Lenders" ..............................................................11
1.62 "First Lien Lender Claims" ...................................................11
1.63 "First Lien Lender Deficiency Claim" ...................................11
1.64 "First Lien Lenders Plan Distribution Property" ...................11
1.65 "First Lien Lender Secured Claims" ......................................11
1.66 "General Unsecured Claim" ...................................................12
1.67 "General Unsecured Claimholders Plan Distribution
Property" ................................................................................12
1.68 "General Unsecured Convenience Claim" ..............................12
1.69 "Holdback Amount" ..............................................................12
1.70 "Holdback Escrow Account" .................................................12
1.71 "Holder" .................................................................................12
1.72 "Impaired" .............................................................................12
1.73 "Indemnification Rights" .......................................................12
1.74 "Indemnitee" ..........................................................................13
1.75 "Insurance Coverage" ............................................................13
1.76 "Insured Claim" .....................................................................13
1.77 "Intercompany Claim" ...........................................................13
1.78 "Interest" ................................................................................13
1.79 "Interestholder" .....................................................................13
1.80 "KEIP" ...................................................................................13

1.81    "Legacy Liabilities" ................................................................13
1.82    "Management Equity Incentive Program" ..............................13
1.83    "Mark IV" ..............................................................................13
1.84    "Mark IV Non-Debtor" ...........................................................13
1.85    "New Common Stock" .............................................................14
1.86    "New Equity Interests" ............................................................14
1.87    "New LLC" ..............................................................................14
1.88    "New LLC Membership Interests" ...........................................14
1.89    "Old Common Stock" ..............................................................14
1.90    "Old Equity Interests" .............................................................14
1.91    "Operating Agreement" ...........................................................14
1.92    "Organizational Documents" ...................................................14
1.93    "Other Deficiency Claim" ........................................................14
1.94    "Other Priority Claim" .............................................................15
1.95    "Other Secured Claim" ............................................................15
1.96    "Periodic Distribution Date" ...................................................15
1.97    "Permitted Nominee" ..............................................................15
1.98    "Person" ..................................................................................15
1.99    "Petition Date" ........................................................................15
1.100   "Plan" ......................................................................................15
1.101   "Priority Claim" .......................................................................16
1.102   "Priority Tax Claim" ................................................................16
1.103   "Pro Rata" ...............................................................................16
1.104   "Professional" .........................................................................16
1.105   "Professional Claim" ...............................................................16
1.106   "Professional Fee Order" .........................................................16
1.107   "Registration Rights Agreement" .............................................16
1.108   "Reinstated" or "Reinstatement" ..............................................16
1.109   "Released Parties" ...................................................................17
1.110   "Reorganized . . ." ..................................................................17
1.111   "Reorganized Debtors" ............................................................17
1.112   "Reorganized Debtors' Credit Facilities" .................................17
1.113   "Restructured Debt Term Loans" .............................................17
1.114   "Restructured Debt Term Loan Agreement" ............................17
1.115   "Restructured Debt Term Loan Agreement Documents" .........17
1.116   "Restructuring Transaction(s)" ................................................17
1.117   "Restructuring Transactions Notice" ........................................18
1.118   "Retained Actions" ..................................................................18
1.119   "Scheduled" .............................................................................18
1.120   "Schedules" .............................................................................18
1.121   "Second Lien Agent" ...............................................................18
1.122   "Second Lien Credit Agreement" .............................................18
1.123   "Second Lien Lenders" ............................................................18
1.124   "Second Lien Lender Claims" ..................................................19

1.125 "Secured Tax Claim" ................................................................ 19
1.126 "Security" ......................................................................................... 19
1.127 "Steering Committee" ................................................................... 19
1.128 "Stockholders' Agreement" ......................................................... 19
1.129 "Subsidiary Debtors" .................................................................... 19
1.130 "Subsidiary Interests" ................................................................... 19
1.131 "Trust Advisory Board" ................................................................ 19
1.132 "Trust Agreement" ....................................................................... 19
1.133 "Trust Assets" ................................................................................ 20
1.134 "Trust Avoidance Claims" ............................................................ 20
1.135 "Trust Beneficiary" ....................................................................... 20
1.136 "Trustee" ......................................................................................... 20
1.137 "Trust Professionals" .................................................................... 20
1.138 "Unimpaired" .................................................................................. 20
1.139 "Voting Deadline" .......................................................................... 20
C. Rules of Interpretation ......................................................................... 20
D. Computation of Time ............................................................................ 21
E. Exhibits .................................................................................................. 21
ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX
CLAIMS .......................................................................................................... 21
2.1 Administrative Claims .................................................................. 21
2.2 Priority Tax Claims ....................................................................... 22
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS ................ 22
3.1 Introduction .................................................................................... 22
3.2 Unimpaired Classes of Claims and Interests ............................ 23
3.3 Impaired Classes of Claims and Interests ................................. 23
3.4 Impaired Classes of Claims and Interests ................................. 23
ARTICLE IV PROVISIONS FOR TREATMENT OF CLAIMS AND
INTERESTS .................................................................................................... 24
4.1 Treatment of Claims Against and Interests In the
Debtors ........................................................................................... 24
4.2 Reservation of Rights .................................................................... 27
ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE IMPAIRED CLASSES OF
CLAIMS OR INTERESTS .............................................................................. 28
5.1 Impaired Classes of Claims Entitled to Vote .......................... 28
5.2 Classes Deemed to Accept Plan ................................................ 28
5.3 Acceptance by Impaired Classes ............................................... 28
5.4 Classes Deemed to Reject Plan ................................................. 28
5.5 Confirmation Pursuant to Section 1129(b) of the
Bankruptcy Code ......................................................................... 28
5.6 Confirmability and Severability of a Plan ................................ 28
ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ................ 29
6.1 Continued Corporate Existence ................................................ 29

| | | |
|---|---|---|
| 6.2 | Corporate Action | 29 |
| 6.3 | Organizational Documents | 29 |
| 6.4 | Cancellation of Existing Securities and Agreements | 29 |
| 6.5 | Authorization and Issuance of New Common Stock | 30 |
| 6.6 | Alternative Corporate Structure | 31 |
| 6.7 | Authorization and Issuance of New LLC Membership Interests | 31 |
| 6.8 | Directors and Officers or Managing Members | 32 |
| 6.9 | Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs | 32 |
| 6.10 | Implementation of the Management Equity Incentive Program | 34 |
| 6.11 | Issuance of the New Equity Interests | 34 |
| 6.12 | The Exit Facility | 34 |
| 6.13 | The Restructured Debt Term Loan Agreement | 35 |
| 6.14 | Restructuring Transactions | 36 |
| 6.15 | Retained Causes of Action | 36 |
| 6.16 | Exclusivity Period | 37 |
| 6.17 | Effectuating Documents; Further Transactions | 37 |
| 6.18 | Exemption From Certain Transfer Taxes and Recording Fees | 37 |

ARTICLE VII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ........... 38

| | | |
|---|---|---|
| 7.1 | Assumed Contracts and Leases | 38 |
| 7.2 | Rejected Contracts and Leases | 38 |
| 7.3 | Exhibits Not Admissions | 38 |
| 7.4 | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 39 |
| 7.5 | Rejection Damages Bar Date | 40 |

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ........... 40

| | | |
|---|---|---|
| 8.1 | Time of Distributions | 40 |
| 8.2 | No Interest on Claims | 40 |
| 8.3 | Disbursing Agent | 40 |
| 8.4 | Claims Administration Responsibility | 40 |
| 8.5 | Delivery of Distributions | 42 |
| 8.6 | Procedures for Treating and Resolving Disputed and Contingent Claims | 43 |

ARTICLE IX ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS ........... 45

| | | |
|---|---|---|
| 9.1 | DIP Facility Claims | 45 |
| 9.2 | Deferred Commitment Fee Claims | 45 |
| 9.3 | Professional Claims | 45 |
| 9.4 | Substantial Contribution Compensation and Expenses Bar Date | 46 |
| 9.5 | Other Administrative Claims | 46 |

ARTICLE X CREDITORS' TRUST................................................................47
    10.1    Appointment of Trustee ...........................................................47
    10.2    Assignment of Trust Assets to the Creditors' Trust.................47
    10.3    The Creditors' Trust................................................................47
    10.4    The Trust Advisory Board .......................................................49
ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ................50
    11.1    Revesting of Assets.................................................................50
    11.2    Discharge of the Debtors .........................................................50
    11.3    Compromises and Settlements .................................................51
    11.4    Release of Certain Parties ........................................................51
    11.5    Releases by Holders of Claims ................................................52
    11.6    Setoffs ....................................................................................53
    11.7    Exculpation and Limitation of Liability ..................................53
    11.8    Indemnification Obligations ....................................................53
    11.9    Injunction ...............................................................................54
ARTICLE XII CONDITIONS PRECEDENT......................................................54
    12.1    Conditions to Confirmation .....................................................54
    12.2    Conditions to Consummation ..................................................55
    12.3    Waiver of Conditions to Confirmation or
            Consummation ........................................................................56
ARTICLE XIII RETENTION OF JURISDICTION ..................................................56
ARTICLE XIV MISCELLANEOUS PROVISIONS .................................................58
    14.1    Binding Effect.........................................................................58
    14.2    Modification and Amendments.................................................58
    14.3    Withholding and Reporting Requirements ...............................58
    14.4    Allocation of Plan Distributions Between Principal and
            Interest....................................................................................58
    14.5    Creditors' Committee..............................................................58
    14.6    Payment of Statutory Fees .......................................................59
    14.7    Revocation, Withdrawal, or Non-Consummation ....................59
    14.8    Notices ...................................................................................59
    14.9    Term of Injunctions or Stays...................................................60
    14.10   Governing Law .......................................................................60
    14.11   Waiver and Estoppel ...............................................................60

## EXHIBITS

Exhibit A      Summary Description of the Terms of the Exit Facility

Exhibit B      Summary Description of the Terms of the Management Equity Incentive Plan

Exhibit C      Summary Description of the Terms of the New Common Stock

Exhibit D      Form of Operating Agreement

Exhibit E      Form of the Registration Rights Agreement

Exhibit F      Summary Description of the Terms of the Restructuring Transactions

Exhibit G      Form of Stockholders' Agreement

Exhibit H      Form of Creditors' Trust Agreement

Exhibit I      Exclusive List of Trust Avoidance Claims

Exhibit J      Form of Certificate of Incorporation

Exhibit K      Form of Bylaws

Exhibit L      Summary Description of the Terms of Employment of Certain Key Executives

Exhibit M      Form of the Restructured Debt Term Loan Agreement

Exhibit N      Nonexclusive List of Retained Actions and Avoidance Claims

Exhibit O      Schedule of Unexpired Leases and Executory Contracts to be Rejected Pursuant to the Plan

## INTRODUCTION

Mark IV Industries, Inc. ("Mark IV") and seventeen of its direct and indirect subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-Debtor subsidiaries and affiliates (the "Company") in the above-captioned jointly-administered chapter 11 reorganization cases, hereby propose the following joint reorganization plan for the resolution of outstanding creditor claims against, and equity interests in, the Debtors. None of Mark IV's subsidiaries and affiliates located outside of the United States are chapter 11 Debtors. These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties, results of operations, projections for future operations, risk factors, and a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan. Each Debtor is a proponent of the plan contained herein within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used but not defined in this Introduction have the meanings ascribed to them in Article I of this Plan. The Debtors who are proponents of this Plan, their chapter 11 case numbers, and their jurisdictions of incorporation or formation are as follows:

| Debtors (state of formation or incorporation) | Bankruptcy Case No. |
|---|---|
| Luminator Service Inc. (New York) | Case No. 09-12793 (SMB) |
| Mark IV Industries, Inc. (Delaware) | Case No. 09-12795 (SMB) |
| Aerospace Sub, Inc. (Delaware) | Case No. 09-12798 (SMB) |
| Armtek International Holding Company, Inc. (Delaware) | Case No. 09-12800 (SMB) |
| Automatic Signal/Eagle Signal Corp. (Delaware) | Case No. 09-12802 (SMB) |
| Dayco Products, LLC (Delaware) | Case No. 09-12803 (SMB) |
| F-P Displays, Inc. (Massachusetts) | Case No. 09-12804 (SMB) |
| F-P Technologies Holding Corp. (Delaware) | Case No. 09-12805 (SMB) |
| Former Fuel Systems, Inc. (Delaware) | Case No. 09-12806 (SMB) |
| Luminator Holding L.P. (Delaware) | Case No. 09-12807 (SMB) |

| Mark IV Holdings, LLC (Delaware) | Case No. 09-12808 (SMB) |
|---|---|
| Mark IV Invesco, LLC (Delaware) | Case No. 09-12809 (SMB) |
| Mark IV IVHS Holding Corp. (Delaware) | Case No. 09-12811 (SMB) |
| Mark IV Pay Agent, Inc. (Delaware) | Case No. 09-12812 (SMB) |
| Mark IV Transportation Technologies Holding Corp. (Delaware) | Case No. 09-12813 (SMB) |
| NRD, LLC (Delaware) | Case No. 09-12814 (SMB) |
| Seebreeze Wireless Holdings, L.P. (Delaware) | Case No. 09-12815 (SMB) |
| Woods Liquidating Corporation (Delaware) | Case No. 09-12816 (SMB) |

This Plan contemplates the reorganization of each of the Debtors upon consummation of this Plan and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to sections 1123, 1129 and 1141 of the Bankruptcy Code. This Plan provides that Holders of First Lien Lender Secured Claims will receive a distribution consisting of such Claimholders' Pro Rata participation in the Restructured Debt Term Loan Agreement and such Claimholders' Pro Rata share of 88% of the New Equity Interests (prior to dilution from the Management Equity Incentive Program and prior to dilution for any New Equity Interests issued to the Exit Facility Lenders pursuant to Section 6.12 of this Plan), and Holders of Allowed General Unsecured Claims will receive (a) such Claimholders' Pro Rata share of 12% of the New Equity Interests (prior to dilution from the Management Equity Incentive Program) and (b) the net proceeds from the Trust Assets.

Holders of General Unsecured Convenience Claims in an amount less than or equal to $25,000 will receive a distribution consisting of Cash in an amount equal to the lesser of (a) 25% of such Allowed General Unsecured Convenience Claim, and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount. Holders of Allowed General Unsecured Convenience Claims in an amount exceeding $25,000 and less than or equal to $100,000 will receive a distribution consisting of (i) Cash in an amount equal to the lesser of (A) 25% of such Allowed General Unsecured Convenience Claim and (B) such Claimholders' Pro Rata share of the Convenience Class Cap Amount, or (ii) if affirmatively elected on the Ballot, such Claimholder's Pro Rata share of the General Unsecured Claimholders Plan Distribution Property. Holders of Allowed General Unsecured Convenience Claims in excess of $100,000 that opt into Class 8 pursuant to the conditions set forth in Article IV herein shall have such Claim reduced to $100,000 and will receive a distribution consisting of

Cash in an amount equal to the lesser of (a) $25,000 and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount.

If the Company determines to pursue the Alternative Corporate Structure described in Section 6.6 of the Plan, then, with the consent of the First Lien Agent, the Debtors will pursue such Alternative Corporate Structure and, instead of receiving the New Common Stock, the Holders of Allowed First Lien Lender Claims, the Holders of Allowed General Unsecured Claims and those Holders of Allowed General Unsecured Convenience Class Claims not receiving Cash pursuant to this Plan shall receive New LLC Membership Interests.

Furthermore, the Existing Securities of the Debtors will be cancelled on the Effective Date of this Plan and Holders of the Existing Securities will not receive distributions under this Plan.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan may not be solicited from a Claimholder or Interestholder until the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Claimholders and Interestholders. ALL CLAIMHOLDERS WHO ARE ELIGIBLE TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

The treatment of Claims under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

**AFTER CONSULTATION WITH THE DEBTORS, THE FIRST LIEN AGENT, THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS. ACCORDINGLY, THE DEBTORS, THE FIRST LIEN AGENT, THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE <u>STRONGLY</u> <u>RECOMMEND</u> THAT YOU RETURN YOUR BALLOT ACCEPTING THIS PLAN.**

**A VOTE TO ACCEPT THE PLAN CONSTITUTES YOUR CONSENT TO THE RELEASE OF THE PARTIES SPECIFIED IN ARTICLE XI OF THE PLAN.**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and <u>Article XIV</u> of this Plan, the Debtors expressly reserve their right to alter, amend, modify, revoke or withdraw this Plan, one or more times, before this Plan's substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION,
## AND COMPUTATION OF TIME

### A. Scope of Definitions

For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. Whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter.

### B. Definitions

**1.1** **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, DIP Facility Claims, the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(1)(A) of the Bankruptcy Code.

**1.2** **"Affiliates"** shall have the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

**1.3** **"Allowed Claim"** means, for distribution purposes, a Claim or any portion thereof, (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as a Reorganized Debtor and the Holder of such Claim agree may adjudicate such Claim and objections thereto), or (b) which (i) is not the subject of a proof of claim timely filed with the Bankruptcy Court but (ii) is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent or (c) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of

limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan.

1.4 **"Allowed Class __ Claim"** means an Allowed Claim in the specified Class.

1.5 **"Alternative Corporate Structure"** means the potential new corporate structure of the Reorganized Debtors contemplated by the Restructuring Transactions.

1.6 **"Avoidance Claims"** means Causes of Action against Persons arising under any of sections 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

1.7 **"Ballot"** means each ballot form distributed with the Disclosure Statement to Claimholders who are included in Classes that are Impaired under the Plan and entitled to vote under Article V herein to accept or reject this Plan.

1.8 **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

1.9 **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York.

1.10 **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

1.11 **"Bar Date"** means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in these Chapter 11 Cases.

1.12 **"Bar Date Order"** means the order entered by the Bankruptcy Court on July 2, 2009 that established (a) August 21, 2009 at 5:00 p.m. (Eastern time) as the Bar Date for filing proofs of claim for non-governmental entities, and (b) October 28,

2009 at 5:00 p.m. (Eastern time) as the Bar Date for filing proofs of claim for governmental entities, and any subsequent order supplementing such initial order or relating thereto.

**1.13** **"Business Day"** means any day, excluding Saturdays, Sundays and legal holidays, on which commercial banks are open for business in New York City.

**1.14** **"Cash"** means legal tender of the United States or equivalents thereof.

**1.15** **"Causes of Action"** means any and all actions, claims, proceedings, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, and actions against any Person for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses.

**1.16** **"Chapter 11 Case(s)"** means the chapter 11 case(s) of the Debtor(s) pending in the Bankruptcy Court.

**1.17** **"Claim"** means a claim against the Debtors (all or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

**1.18** **"Claimholder"** means a Holder of a Claim.

**1.19** **"Claims Administration"** shall have the meaning ascribed to it in Section 8.4(a) hereof.

**1.20** **"Claims Agent"** means Epiq Bankruptcy Solutions, LLC, or such other claims agent designated by the Debtors.

**1.21** **"Claims Objection Deadline"** means that day which is one hundred twenty (120) days after the Effective Date, as the same may be from time to time extended by the Bankruptcy Court without further notice to parties-in-interest; provided, however, that, notice shall be given to the Claims Oversight Committee.

**1.22** **"Claims Oversight Committee"** means the committee to be established pursuant to Section 8.4(b) hereof on the Effective Date or as soon as

thereafter as practicable to monitor Claims Administration, any stock adjustment process pursuant to Section 4.1(g) of this Plan and address the Bankruptcy Court with respect to such matters, as well as provide guidance to the Reorganized Debtors with respect to Claims Administration and resolution, and address the Bankruptcy Court if such committee disagrees with the Reorganized Debtors'determinations.

**1.23 "Class"** means a category of Claimholders or Interestholders described in <u>Article IV</u> of this Plan.

**1.24 "Confirmation Date"** means the date of entry of the Confirmation Order.

**1.25 "Confirmation Hearing"** means the hearing before the Bankruptcy Court on confirmation of this Plan and related matters under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

**1.26 "Confirmation Order"** means the order entered by the Bankruptcy Court confirming this Plan.

**1.27 "Convenience Class Cap Amount"** means the $1.3 million available for distribution to all Holders of Allowed General Unsecured Convenience Claims (on the terms and conditions more specifically described in <u>Article IV</u>), plus any Cash that constitutes unclaimed property distributed in accordance with Section 8.5 to Holders of Class 8 Claims.

**1.28 "Convenience Class Election"** means the election pursuant to which the Holder of a qualifying General Unsecured Claim against the Debtors timely elects to have such General Unsecured Claim be treated as a General Unsecured Convenience Claim.

**1.29 "Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.30 "Creditors' Trust"** means the trust which is created pursuant to this Plan to be administered by the Trustee with the advice and/or the direction of the Trust Advisory Board, all as more specifically set forth in Article X of this Plan.

**1.31 "Cure"** means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the

Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.32** **"Debtors"** has the meaning ascribed to it in the Introduction hereof.

**1.33** **"Deferred Commitment Fee"** means, with respect to each DIP Lender, the deferred commitment fee earned by such DIP Lender as more fully described in the DIP Facility.

**1.34** **"Deferred Commitment Fee Claims"** means all Claims of the DIP Lenders on account of such DIP Lenders' Deferred Commitment Fees arising under or pursuant to the DIP Facility.

**1.35** **"Deficiency Claims"** mean the First Lien Lender Deficiency Claims, the Second Lien Claims and the Other Deficiency Claims.

**1.36** **"D&O Insurance"** means insurance maintained by the Debtors which covers, among others, the directors, officers and managing members of the Debtors or any of them.

**1.37** **"DIP Agent"** means JPMorgan Chase Bank, N.A., as administrative agent for the DIP Lenders under the DIP Facility.

**1.38** **"DIP Facility"** means the $90,000,000 Credit and Guarantee Agreement, dated as of May 4, 2009, among Mark IV, as Guarantor, Dayco Products, LLC, as U.S. Borrower, Dayco Europe S.r.l., as Italian Borrower, Mark IV Industries Corp., as Canadian Borrower, the other U.S. Guarantors named therein, and the DIP Agent and the DIP Lenders, as the same may be amended, supplemented, or otherwise modified from time to time.

**1.39** **"DIP Facility Claims"** means all Administrative Claims of the DIP Agent and the DIP Lenders arising under or pursuant to or related to the DIP Facility.

**1.40** **"DIP Facility Order"** means, collectively, the Final Order that was entered by the Bankruptcy Court on May 27, 2009, authorizing and approving the DIP Facility and the agreements related thereto, and any further Final Orders entered by the Bankruptcy Court approving any amendment or extension of the DIP Facility.

**1.41** **"DIP Lenders"** means the lenders from time to time party to the DIP Facility.

**1.42** **"Disallowed Claim"** means, for distribution purposes, a Claim or any portion thereof, that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) is Scheduled at zero or as contingent, disputed or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or (c) is not Scheduled and as to which a proof of claim bar date has been set but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court.

**1.43** **"Disbursing Agent"** means the Reorganized Debtors or any Person designated by the Reorganized Debtors (and who accepts such designation) to serve as a disbursing agent under Article VIII of this Plan.

**1.44** **"Disclosure Statement"** means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 on or around the date of this Plan, as such disclosure statement may be amended, modified or supplemented from time to time.

**1.45** **"Disputed Claim"** means, for distribution purposes, a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim and includes, without limitation, Claims that (a) (i) have not been Scheduled by the Debtors (or any of them) or have been Scheduled at zero or as unknown, contingent, unliquidated or disputed, and (ii) are not the subject of an objection filed in the Bankruptcy Court or as to which the time for filing an objection has not yet expired, (b) that are the subject of a proof of claim or interest that differs in nature, amount or priority from the Schedules, or (c) are the subject of an objection filed with the Bankruptcy Court, which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.46** **"Distribution Date"** means the date upon which the initial distributions will be made to Holders of Allowed Claims pursuant to Article VIII of this Plan, which shall be not more than twenty (20) Business Days after the Effective Date; provided, however, that Allowed Administrative Claims as of the Effective Date shall be paid on the Effective Date.

**1.47** **"Distribution Reserve"** means, as applicable, one or more reserves of New Equity Interests and/or Cash for distribution to Holders of Allowed Claims in the Chapter 11 Cases to be reserved pending allowance of Disputed Claims in accordance with Articles IV and VIII.

**1.48** **"Effective Date"** means the Business Day determined by the Debtors on which all conditions to the consummation of this Plan set forth in Section 12.2 hereof have been either satisfied or waived as provided in Section 12.3 hereof, and

such Business Day shall be the day upon which this Plan is substantially consummated.

**1.49** **"Estates"** means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.50** **"Executive Employment Agreements"** has the meaning ascribed to it in Section 6.9(a) hereof.

**1.51** **"Exhibit"** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.52** **"Exhibit Filing Date"** means the date on which Exhibits to this Plan shall be filed with the Bankruptcy Court, which date shall be at least seven (7) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court; provided, however, that the Exhibit Filing Date with respect to Exhibit O setting forth the Schedule of Unexpired Leases and Executory Contracts to be Rejected Pursuant to the Plan shall be filed at least fourteen (14) days prior to the Voting Deadline.

**1.53** **"Existing Securities"** means, collectively, the Old Common Stock, and all options, warrants, rights and other instruments evidencing an ownership interest in any Debtor (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire any of the foregoing; provided that, Existing Securities shall not include Subsidiary Interests.

**1.54** **"Exit Facility"** means the approximately $100 million credit facility providing financing to the Reorganized Debtors as of the Effective Date having substantially the terms set forth on Exhibit A.

**1.55** **"Exit Facility Documents"** has the meaning ascribed to it in Section 6.11 hereof.

**1.56** **"Exit Facility Lenders"** shall mean the financial institutions that have committed to provide the Exit Facility as of the Effective Date.

**1.57** **"Face Amount"** means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise Allowed by any Final Order of the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.58** **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases, or the docket of any such other court, the operation or effect of which has not

been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or leave to appeal (other than under Rule 60(b) of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024) has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.59** **"First Lien Agent"** means JPMorgan Chase Bank, N.A., as administrative agent for the First Lien Lenders under the First Lien Credit Agreement.

**1.60** **"First Lien Credit Agreement"** means that certain Amended and Restated Credit Agreement, dated as of June 21, 2004, among Mark IV Industries, Inc., Dayco Products, LLC, as U.S. borrower, Dayco Europe S.r.l., as Italian borrower, the First Lien Agent, and the First Lien Lenders from time to time parties thereto.

**1.61** **"First Lien Lenders"** mean all lenders under the First Lien Credit Agreement, or any such lender or its Affiliates in their capacity as party to any hedge or swap agreement to which any Debtor is a party.

**1.62** **"First Lien Lender Claims"** mean all Claims of the First Lien Agent and the First Lien Lenders arising under or pursuant to the First Lien Credit Agreement, including any Claims of any First Lien Lender or any Affiliate thereof arising under any hedge or swap agreement to which any Debtor is a party, as well as any Claims for reimbursement in respect of drawings up to one day before the Effective Date made under letters of credit issued pursuant to the First Lien Credit Agreement.

**1.63** **"First Lien Lender Deficiency Claim"** means $485 million, being the aggregate amount of First Lien Lender Claims in excess of the First Lien Lender Secured Claims after giving effect to the waiver under this Plan by the First Lien Lenders of $25 million of such First Lien Lender Deficiency Claims.

**1.64** **"First Lien Lenders Plan Distribution Property"** means, with respect to the First Lien Lender Secured Claims, (a) the Restructured Debt Term Loans deemed made on the Effective Date by the First Lien Lenders under the Restructured Debt Term Loan Agreement and (b) the New Equity Interests (prior to dilution from the Management Equity Incentive Program and prior to dilution for any shares issued to the Exit Facility Lenders as described in Section 6.12).

**1.65** **"First Lien Lender Secured Claims"** mean the aggregate of the First Lien Lender Claims equal to $350 million, being the secured portion under section 506 of the Bankruptcy Code of the First Lien Lender Claims as fixed pursuant to, and for all purposes of, this Plan.

**1.66** **"General Unsecured Claim"** means a Claim that is not an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Secured Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, and a General Unsecured Convenience Claim; provided that, General Unsecured Claims shall include Deficiency Claims; provided further that, General Unsecured Claims shall not include a Claim that is disallowed or released, whether by operation of law or pursuant to a Final Order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

**1.67** **"General Unsecured Claimholders Plan Distribution Property"** means (a) the New Equity Interests representing 12% of the New Equity Interests (prior to dilution from the Management Equity Incentive Program) plus any additional New Equity Interests as may be required pursuant to Section 4.1(g) of this Plan, and (b) the net proceeds from the Trust Assets.

**1.68** **"General Unsecured Convenience Claim"** means a Claim, other than any First Lien Lender Deficiency Claim or Second Lien Lender Claim, against the Debtors that otherwise would be included in the General Unsecured Claim Class that is in an amount (a) of $100,000 or less, or (b) greater than $100,000 and the Holder of such Claim has made the Convenience Class Election on the Ballot to reduce such Claim to $100,000.

**1.69** **"Holdback Amount"** means the amount equal to 20% of fees billed to the Debtors in a given month that was retained by the Debtors as a holdback on payment of Professional Claims pursuant to the Professional Fee Order.

**1.70** **"Holdback Escrow Account"** means the escrow account established by the Disbursing Agent into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**1.71** **"Holder"** means an entity holding a Claim or Interest.

**1.72** **"Impaired"** refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.73** **"Indemnification Rights"** means any obligations of the Debtors (or any of them) to indemnify, reimburse, advance or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to a Debtor's Organizational Documents, or pursuant to any applicable law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for or on behalf of the Debtors (or any of them).

**1.74** **"Indemnitee"** means all present and former directors, officers, employees, agents or representatives of the Debtors who provided services to the Debtors during the Chapter 11 Cases and who are entitled to assert Indemnification Rights.

**1.75** **"Insurance Coverage"** shall have the meaning ascribed to it in Section 10.8 hereof.

**1.76** **"Insured Claim"** means any Claim or portion of a Claim that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

**1.77** **"Intercompany Claim"** means (a) a Claim by any Debtor against a Debtor; (b) a Claim by any Debtor against a Mark IV Non-Debtor; or (c) a Claim by any Mark IV Non-Debtor against a Debtor.

**1.78** **"Interest"** means (a) the legal, equitable contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Person with respect to the Old Common Stock, or any other equity securities of the Debtors (or any of them) and (b) the legal, equitable, contractual and other rights, whether fixed or contingent, matured or unmatured, disputed or undisputed, of any Person to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.

**1.79** **"Interestholder"** means a Holder of an Interest.

**1.80** **"KEIP"** means that certain Key Employee Incentive Plan adopted by Mark IV's board of directors.

**1.81** **"Legacy Liabilities"** mean all post-employment benefits provided by the Debtors to former employees, including obligations stemming from Civil Action No. 1:02CV243 in the District Court of the United States for the Western District of North Carolina, Asheville Division, captioned Jerry Trull et al. v. Dayco Products, LLC.

**1.82** **"Management Equity Incentive Program"** means that certain incentive plan to be implemented on or after the Effective Date as is more specifically described at <u>Exhibit B</u> attached hereto, by which the Reorganized Debtors shall deliver certain stock options and/or restricted stock grants in Reorganized Mark IV (or membership interests in New LLC, as applicable) to certain Mark IV post-Effective Date senior management and other employees.

**1.83** **"Mark IV"** has the meaning ascribed to it in the Introduction hereof.

**1.84** **"Mark IV Non-Debtor"** means a subsidiary or affiliate of Mark IV that is not a Debtor in these Chapter 11 Cases.

**1.85 "New Common Stock"** means shares of common stock, $0.01 par value per share, of Reorganized Mark IV to be authorized and issued on or after the Effective Date. A summary description of the New Common Stock is set forth at Exhibit C.

**1.86 "New Equity Interests"** mean either (a) the New Common Stock, or, if the Debtors pursue the Alternative Corporate Structure, (b) the New LLC Membership Interests.

**1.87 "New LLC"** means, if applicable, the limited liability company formed as part of the Alternative Corporate Structure and the ultimate parent of Reorganized Mark IV.

**1.88 "New LLC Membership Interests"** means, if applicable, the membership interests of New LLC to be authorized and issued on or after the Effective Date.

**1.89 "Old Common Stock"** means the shares of Mark IV's common stock that were authorized, issued and outstanding prior to the Effective Date.

**1.90 "Old Equity Interests"** means the Interests in respect of the Old Common Stock issued and outstanding prior to the Effective Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of such common stock of Mark IV or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

**1.91 "Operating Agreement"** means, if applicable, the operating agreement of New LLC, a form of which is attached hereto as Exhibit D.

**1.92 "Organizational Documents"** means the bylaws, articles of incorporation, corporate charters, certificates of formation, limited liability company agreements, operating agreements, the Stockholders' Agreement (or the Operating Agreement, if applicable) or other documents or agreements that govern or affect the corporate formation and governance of the Debtors (or any of them) and the Reorganized Debtors (or any of them), as the case may be.

**1.93 "Other Deficiency Claim"** means, in the case of a Claimholder who asserts an Other Secured Claim against the Debtors, a Claim equal to the amount by which such Claim exceeds the secured portion thereof as determined pursuant to section 506 of the Bankruptcy Code.

**1.94** **"Other Priority Claim"** means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

**1.95** **"Other Secured Claim"** means a Claim (other than a DIP Claim, a Deferred Commitment Fee Claim, an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, an Other Priority Claim, an Intercompany Claim, a First Lien Lender Secured Claim, a General Unsecured Claim, and a General Unsecured Convenience Claim) that is secured by a lien which is not subject to avoidance or subordination under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the Holder of such Claim.

**1.96** **"Periodic Distribution Date"** means (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring one hundred eighty (180) days after the Distribution Date, (ii) subsequently, the first Business Day occurring one hundred eighty (180) days after the immediately preceding Periodic Distribution Date, or (iii) such other Business Day as the Reorganized Debtors or the Claims Oversight Committee may designate.

**1.97** **"Permitted Nominee"** means any nominee of a First Lien Lender or a Second Lien Lender that such First Lien Lender or Second Lien Lender has confirmed in writing to the Debtors and the First Lien Agent (or the Second Lien Agent, as the case may be) that it is such First Lien Lender's or Second Lien Lender's nominee for the purposes of distribution pursuant to this Plan; provided, however, that such nominee shall be an affiliate of such First Lien Lender or Second Lien Lender, as applicable.

**1.98** **"Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

**1.99** **"Petition Date"** means the date on which each Debtor filed its voluntary petition commencing its Chapter 11 Case, that is April 30, 2009.

**1.100** **"Plan"** means this joint plan of reorganization, which is jointly proposed by the Debtors for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as such plan may be further amended from time to time in

accordance with the Bankruptcy Code, Bankruptcy Rules and Section 14.2, and the exhibits hereto.

**1.101 "Priority Claim"** means a Claim entitled to priority pursuant to section 507 of the Bankruptcy Code.

**1.102 "Priority Tax Claim"** means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.103 "Pro Rata"** means, from time to time, unless this Plan specifically provides otherwise, with respect to Claims, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class.

**1.104 "Professional"** means those Persons employed in the Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code, or otherwise.

**1.105 "Professional Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

**1.106 "Professional Fee Order"** means the order entered by the Bankruptcy Court on May 27, 2009, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**1.107 "Registration Rights Agreement"** means the registration of rights agreement, a form of which is attached as <u>Exhibit E</u>, to which any party receiving New Equity Interests shall automatically be deemed a party.

**1.108 "Reinstated" or "Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claimholder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claimholder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claimholder for any damages incurred as a result of any reasonable reliance by such Claimholder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claimholder; <u>provided</u>, <u>however</u>, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence

prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

**1.109 "Released Parties"** means, collectively, (a) except as set forth herein (including the Exhibits attached hereto), the Debtors and the Debtors' officers, directors, and shareholders as of the Effective Date or who had served in such capacities during the Chapter 11 Cases, (b) the DIP Agent and DIP Lenders, (c) the First Lien Lenders and the Second Lien Lenders, (d) the First Lien Agent and the Second Lien Agent, (e) the Exit Facility Lenders, (f) the Creditors' Committee, and each of its members, (g) with respect to each of the Persons named in (a) – (f) above, such Person's Affiliates, principals, employees, agents, officers, directors, financial advisors, accountants, attorneys and other professionals, and any of their successors and assigns, when acting in any of such capacities, and (h) with respect to each of the Persons named in (a) – (g) above, each only in their respective capacities set forth in such clause.

**1.110 "Reorganized . . ."** means the applicable Debtor from and after the Effective Date.

**1.111 "Reorganized Debtors"** means, collectively, all Debtors from and after the Effective Date.

**1.112 "Reorganized Debtors' Credit Facilities"** means (a) the Exit Facility, and (b) the Restructured Debt Term Loan Agreement.

**1.113 "Restructured Debt Term Loans"** mean the aggregate principal amount of $225 million of term loans deemed made to the applicable borrower on the Effective Date pursuant to the Restructured Debt Term Loan Agreement by the DIP Lenders (if applicable, in satisfaction of the Deferred Commitment Fee Claims) and/or the First Lien Lenders (in partial satisfaction of the First Lien Lender Secured Claims), as more fully set forth in Section 6.13 herein.

**1.114 "Restructured Debt Term Loan Agreement"** means the term loan agreement governing the Restructured Debt Term Loans, among Reorganized Dayco Products, LLC as borrower, Mark IV, JPMorgan Chase Bank, N.A., as administrative agent, the DIP Lenders (if applicable) with respect to the Deferred Commitment Fee and the First Lien Lenders receiving Restructured Debt Term Loans.

**1.115 "Restructured Debt Term Loan Agreement Documents"** has the meaning ascribed to it in Section 6.13 hereof.

**1.116 "Restructuring Transaction(s)"** means the transactions, if any, set forth in Section 6.14 of this Plan as to which the First Lien Agent consents, and as

further described in the Restructuring Transactions Notice which is attached as Exhibit F to this Plan.

**1.117 "Restructuring Transactions Notice"** means the notice filed with the Bankruptcy Court on or before the Exhibit Filing Date as Exhibit F to this Plan listing the restructuring Debtors and briefly describing the relevant Restructuring Transactions.

**1.118 "Retained Actions"** means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or equity, whether known or unknown, which any Debtor or any of the Debtors' Estates may hold against any Person, including, without limitation, (a) claims and Causes of Action brought prior to the Effective Date, (b) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (c) claims and Causes of Action relating to strict enforcement of any of the Debtors' or the Reorganized Debtors' intellectual property rights, including patents, copyrights and trademarks, (d) claims and Causes of Action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds and (e) the Avoidance Claims; provided, however, that Retained Actions shall not include (i) the Trust Avoidance Claims, and (ii) claims explicitly released under this Plan or by a Final Order of the Bankruptcy Court prior to the Confirmation Date.

**1.119 "Scheduled"** means, with respect to any Claim or Interest, the status, priority and amount, if any, of such Claim or Interest as set forth in the Schedules.

**1.120 "Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors, as such schedules or statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.121 "Second Lien Agent"** means Wilmington Trust FSB, or any successor to the administrative agent under the Second Lien Credit Agreement.

**1.122 "Second Lien Credit Agreement"** means that certain Second Lien Credit Agreement, dated as of June 19, 2006, among Dayco Products, LLC, as borrower, Wilmington Trust FSB, as administrative agent, and the several lenders from time to time parties thereto.

**1.123 "Second Lien Lenders"** mean all lenders under the Second Lien Credit Agreement.

**1.124 "Second Lien Lender Claims"** mean all Claims of the Second Lien Agent and the Second Lien Lenders arising under or pursuant to the Second Lien Credit Agreement. Pursuant to section 506 of the Bankruptcy Code, all Second Lien Lender Claims are Deficiency Claims.

**1.125 "Secured Tax Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

**1.126 "Security"** shall have the meaning ascribed to it in section 101(49) of the Bankruptcy Code.

**1.127 "Steering Committee"** means the steering committee for the First Lien Lenders.

**1.128 "Stockholders' Agreement"** means the stockholders' agreement, a form of which is attached as <u>Exhibit G</u>, to which any party receiving New Common Stock shall automatically be deemed a party.

**1.129 "Subsidiary Debtors"** means, collectively, Luminator Service Inc., Aerospace Sub, Inc., Armtek International Holding Company, Inc., Automatic Signal/Eagle Signal Corp., Dayco Products, LLC, F-P Displays, Inc., F-P Technologies Holding Corp., Former Fuel Systems, Inc., Luminator Holding L.P., Mark IV Holdings, LLC, Mark IV Invesco, LLC, Mark IV IVHS Holding Corp., Mark IV Pay Agent, Inc., Mark IV Transportation Technologies Holding Corp., NRD, LLC, Seebreeze Wireless Holdings, L.P., and Woods Liquidating Corporation.

**1.130 "Subsidiary Interests"** means, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other instruments evidencing an ownership interest in the applicable Subsidiary Debtor as of the Effective Date, and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the applicable Subsidiary Debtors, as of the Effective Date.

**1.131 "Trust Advisory Board"** means the board that is to be created pursuant to Section 10.4 of this Plan for the purpose of advising the Trustee with respect to decisions affecting the Creditors' Trust to the extent set forth in the Trust Agreement.

**1.132 "Trust Agreement"** means that certain Trust Agreement which is to govern the Creditors' Trust, substantially in the form attached as <u>Exhibit H</u> to this Plan, pursuant to which, among other things, the Trust Assets shall be liquidated and the net proceeds distributed to the Trust Beneficiaries on a pro rata basis.

**1.133 "Trust Assets"** means the Trust Avoidance Claims, and any and all proceeds thereof and interest or income accruing with respect thereto.

**1.134 "Trust Avoidance Claims"** mean the Avoidance Claims that are specifically listed on <u>Exhibit I</u> hereto, or as are otherwise agreed to by the Debtors, the First Lien Lenders and the Creditors' Committee, which claims are to be transferred to the Creditors' Trust on the Effective Date (as opposed to all other Avoidance Claims, which will be retained by the Reorganized Debtors).

**1.135 "Trust Beneficiary"** means a Holder of an Allowed General Unsecured Claim.

**1.136 "Trustee"** means the trustee of the Creditors' Trust as contemplated by the Trust Agreement and designated pursuant to Section 10.1 of this Plan.

**1.137 "Trust Professionals"** has the meaning ascribed to it in subsection 10.3(e) hereof.

**1.138 "Unimpaired"** refers to any Claim which is not Impaired.

**1.139 "Voting Deadline"** means September 1, 2009, at 5:00 p.m. (Eastern time).

## C. <u>Rules of Interpretation</u>

For purposes of this Plan (a) any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be in such form or on such terms and conditions, (b) any reference in this Plan to an existing document or Exhibit filed or to be filed means such document or Exhibit as it may have been or may be amended, modified or supplemented, (c) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to this Plan, (d) the words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan, (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply, (g) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control, and (h) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control.

**D.**     **Computation of Time**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.**     **Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date.  After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 2700, Chicago, Illinois 60606 (Attn: J. Eric Ivester, Esq. and Matthew M. Murphy, Esq.), counsel to the Debtors.  In addition, imaged copies of the Exhibits will be available on the Bankruptcy Court's website, www.nysb.uscourts.gov, for a nominal charge (a PACER account is required and to obtain a PACER password, go to the PACER website, http://pacer.psc.uscourts.gov) or at the Claims Agent's website address, http://chapter11.epiqsystems.com/markiv, free of charge.  To the extent any Exhibit is inconsistent with the terms of the body of this Plan, unless otherwise ordered by the Bankruptcy Court, the terms of the relevant Exhibit shall control.

ARTICLE II

ADMINISTRATIVE EXPENSES
AND PRIORITY TAX CLAIMS

**2.1**     **Administrative Claims**.  Subject to the provisions of <u>Article IX</u> of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date an Administrative Claim becomes an Allowed Administrative Claim or (b) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the Holder of such Administrative Claim, an Allowed Administrative Claimholder in these Chapter 11 Cases shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which such Debtor (or such Reorganized Debtor) and such Claimholder shall have agreed upon in writing; <u>provided</u>, <u>however</u>, that Allowed Administrative Claims as of the Effective Date shall be paid on the Effective Date; <u>provided</u> <u>further</u>, <u>however</u>, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; <u>provided</u> <u>further</u>, <u>however</u>, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints,

A-21

employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

**2.2     Priority Tax Claims**.  With respect to each Allowed Priority Tax Claim in any Debtor's Chapter 11 Case, at the sole option of the Debtors (or the Reorganized Debtors), the Allowed Priority Tax Claimholder shall be entitled to receive on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (a) equal Cash payments made in accordance with section 1129(a)(9)(C) of the Bankruptcy Code on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five years after the Petition Date, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate required under applicable non-bankruptcy law, and in a manner not less favorable than the most favored non-priority unsecured claim provided for by this Plan (other than cash payments made to a Class of creditors under section 1122(b)), (b) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided that, such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (a) above, or (c) payment in full in Cash on the Effective Date.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1     Introduction**.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article II herein.

This Plan, though proposed jointly and consolidated for purposes of making distributions to Holders of Claims or Interests under this Plan, constitutes a separate Plan proposed by each Debtor.  Therefore, the classifications set forth herein shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

**3.2** **Unimpaired Classes of Claims and Interests** (deemed to have accepted this Plan and, therefore, not entitled to vote on this Plan).

(a) Class 1 – Secured Tax Claims. Class 1 consists of all Secured Tax Claims.

(b) Class 2 – Other Secured Claims. Class 2 consists of all Other Secured Claims.

(c) Class 3 – Other Priority Claims. Class 3 consists of all Other Priority Claims.

(d) Class 4 – Intercompany Claims. Class 4 consists of all Intercompany Claims.

(e) Class 5 – Subsidiary Interests. Class 5 consists of all Subsidiary Interests (Class 5 Subsidiary Interests applies to this Plan with respect to all of the Debtors except for Mark IV).

**3.3** **Impaired Classes of Claims and Interests** (entitled to vote on this Plan).

(a) Class 6 – First Lien Lender Secured Claims. Class 6 consists of the First Lien Lender Secured Claims.

(b) Class 7 – General Unsecured Claims. Class 7 consists of the General Unsecured Claims.

(c) Class 8 – General Unsecured Convenience Claims. Class 8 consists of all General Unsecured Convenience Claims.

**3.4** **Impaired Classes of Claims and Interests** (deemed to have rejected this Plan and therefore not entitled to vote on this Plan).

(a) Class 9 – Old Equity Interests. Class 9 consists of all of the Old Equity Interests (Class 9 Old Equity Interests applies to this Plan with respect to Mark IV only).

## ARTICLE IV

## PROVISIONS FOR TREATMENT OF
## CLAIMS AND INTERESTS

**4.1    Treatment of Claims Against and Interests In the Debtors**.

(a)    Class 1 (Secured Tax Claims).  Except as otherwise provided in and subject to Section 8.6 herein, on the first Periodic Distribution Date occurring after the later of (i) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (ii) the date a Secured Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Class 1 Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to a Secured Tax Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Secured Tax Claim.

(b)    Class 2 (Other Secured Claims).  Except as otherwise provided in and subject to Section 8.6 herein, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Secured Claim becomes an Allowed Other Secured Claim or (ii) the date an Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Other Secured Claim, the Debtors (or Reorganized Debtors) shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Other Secured Claim, (x) reinstate such Other Secured Claim in accordance with the provisions of subsection 1124 of the Bankruptcy Code or (y) provide such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing.  The Debtors' failure to object to an Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Secured Claim.

(c)    Class 3 (Other Priority Claims).  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for

each Allowed Other Priority Claim, each Holder of such Allowed Other Priority Tax Claim shall be treated in accordance with section 1129(a)(9) of the Bankruptcy Code. The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the Holder of the Other Priority Claim.

(d)     Class 4 (Intercompany Claims).  Intercompany Claims will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (i) released, waived and discharged as of the Effective Date, (ii) contributed to the capital of the obligor corporation, (iii) dividended, or (iv) remain unimpaired.

(e)     Class 5 (Subsidiary Interests).  Class 5 Subsidiary Interests shall be unaffected by this Plan, except to the extent required by the Restructuring Transactions.

(f)     Class 6 (First Lien Lender Secured Claims).  Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all First Lien Lender Secured Claims shall be allowed in full in the aggregate amount of $350 million and shall constitute Allowed Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

On the Effective Date, each Holder of an Allowed First Lien Lender Secured Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of each component of the First Lien Lenders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by the First Lien Agent as a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed First Lien Lender Secured Claim, and the denominator of which is equal to the aggregate amount of all Allowed First Lien Lender Secured Claims.  Any adequate protection claims of the First Lien Lenders pursuant to the DIP Facility Order shall be deemed satisfied by the treatment of Class 6 Claims.

(g)     Class 7 (General Unsecured Claims).  Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order all (i) First Lien Lender Deficiency Claims shall be allowed in an amount equal to $485 million, and (ii) Second Lien Lender Claims shall be allowed in full in the aggregate amount of $153,140,228.  All First Lien Lender Deficiency Claims and Second Lien Lender Claims shall constitute Allowed General Unsecured Claims for all purposes, including distribution, in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

Except as otherwise provided in and subject to Section 8.6 herein, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (ii) the date a General Unsecured Claim becomes payable pursuant to an agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata share of the General Unsecured Claimholders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Claim, and the denominator of which is equal to the aggregate amount of all Allowed General Unsecured Claims (subject to the limitation on the First Lien Lenders' Deficiency Claim distribution). Notwithstanding the foregoing, the New Equity Interests distributions on account of the First Lien Lender Deficiency Claims and the Second Lien Lender Claims shall be made on the Effective Date.

If, after the process of reconciliation and allowance or disallowance of all General Unsecured Claims, the aggregate amount of Allowed General Unsecured Claims exceeds $485 million (without taking into account the First Lien Lender Deficiency Claims), either (i) the Reorganized Debtors shall cause to be issued a sufficient number of New Equity Interests other than to the Holders of First Lien Lender Deficiency Claims or (ii) the Holders of the First Lien Lender Deficiency Claims shall return a sufficient number of New Equity Interests to the Debtors for distribution to Holders of Allowed General Unsecured Claims (other than on account of First Lien Lender Deficiency Claims), in either case to cause the aggregate amount of New Equity Interests issued to the Holders of First Lien Lender Deficiency Claims not to exceed 50% of the total amount of the New Equity Interests issued to all Holders of Allowed General Unsecured Claims.

(h) Class 8 (General Unsecured Convenience Claims). Except as otherwise provided in and subject to Section 8.6 herein, on the First Periodic Distribution Date occurring after the later of (i) the date a General Unsecured Convenience Claim becomes an Allowed General Unsecured Convenience Claim or (ii) the date a General Unsecured Convenience Claim becomes payable pursuant to any agreement between the Debtors (or Reorganized Debtors) and the Holder of such General Unsecured Convenience Claim, each Holder of an Allowed General Unsecured Convenience Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Convenience Claim, the distributions set forth immediately below. The First Lien Lenders are consenting to the use of their cash collateral to fund the Cash payments to Allowed General Unsecured Convenience Claims in accordance with the terms hereof.

Holders of Allowed General Unsecured Convenience Claims in an amount less than or equal to $25,000 shall receive, in exchange for such Claim, Cash in an amount equal to the lesser of (A) 25% of such Allowed General Unsecured Convenience Claim and (B) such Claimholders' Pro Rata share of the Convenience Class Cap Amount.

A Holder of an Allowed General Unsecured Convenience Claim in an amount exceeding $25,000 and less than or equal to $100,000 shall receive, in exchange for such Claim, (i) Cash in an amount equal to the lesser of (A) 25% of such Allowed General Unsecured Convenience Claim and (B) such Claimholders' Pro Rata share of the Convenience Class Cap Amount, or (ii) if affirmatively elected on the Ballot, such Claimholder's Pro Rata share of the General Unsecured Claimholders Plan Distribution Property.

A Holder of an Allowed General Unsecured Claim in excess of $100,000 that makes an irrevocable written election to opt into the classification of Class 8 on a validly executed and timely delivered ballot shall, by such election reduce such Claim to $100,000 and become a Holder of a Class 8 General Unsecured Convenience Claim for all purposes (including voting and distribution), and shall receive, in exchange for such Claim in the amount of $100,000, Cash in an amount equal to the lesser of (a) $25,000 and (b) such Claimholders' Pro Rata share of the Convenience Class Cap Amount.

For purposes of this section, the amount of each Claimholder's Pro Rata share is to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed General Unsecured Convenience Claim, and the denominator of which is equal to the aggregate amount of, (a) if such Claimholder is receiving Cash, all Allowed General Unsecured Convenience Claims receiving Cash, or (b) if such Claimholder is receiving General Unsecured Claimholders Plan Distribution Property, the Allowed amount of all Claims (subject to the limitation on the First Lien Lenders' Deficiency Claim distribution) with respect to which Claimholders will receive General Unsecured Claimholders Plan Distribution Property.

(i) Class 9 (Old Equity Interests). Old Equity Interests shall be cancelled, released, and extinguished, and Holders of such Interests shall neither receive nor retain any property on account of such Interests.

**4.2 Reservation of Rights**. Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims.

# ARTICLE V

## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## <u>IMPAIRED CLASSES OF CLAIMS OR INTERESTS</u>

**5.1** **Impaired Classes of Claims Entitled to Vote**. Holders of Claims and Interests in each Impaired Class of Claims or Interests are entitled to vote as a Class to accept or reject this Plan, other than Classes that are deemed to reject this Plan as provided in Section 5.4 herein. Accordingly, the votes of Holders of Claims in Class 6 (First Lien Lender Secured Claims), Class 7 (General Unsecured Claims), and Class 8 (General Unsecured Convenience Claims) shall be solicited with respect to this Plan.

**5.2** **Classes Deemed to Accept Plan**. Under section 1126(f) of the Bankruptcy Code, Holders of Claims and Interests in each Unimpaired Class of Claims or Interests are conclusively presumed to have accepted this Plan, and the votes of such Claimholders will not be solicited. Accordingly, the votes of Holders of Claims in Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), Class 3 (Other Priority Claims), and Class 4 (Intercompany Claims), as well as votes of Holders of Class 5 (Subsidiary Interests), shall not be solicited with respect to this Plan.

**5.3** **Acceptance by Impaired Classes**. Class 6 (First Lien Lender Secured Claims), Class 7 (General Unsecured Claims), and Class 8 (General Unsecured Convenience Claims) are Impaired under this Plan. Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class has accepted this Plan if this Plan is accepted by the Holders of at least two-third (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

**5.4** **Classes Deemed to Reject Plan**. Because Holders of Interests in Class 9 (Old Equity Interests) are not receiving or retaining any property under this Plan on account of such Interests, they are conclusively presumed to have rejected this Plan, and the votes of such Holders will not be solicited.

**5.5** **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class entitled to vote rejects this Plan or is deemed to have rejected it, the Debtors will request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**5.6** **Confirmability and Severability of a Plan**. Subject to Section 14.2, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan as it applies to the Debtors or any particular Debtor. A determination by the Bankruptcy Court that this Plan, as it applies to the Debtors or any particular Debtor, is not

confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (a) the confirmability of this Plan as it applies to the other Debtor(s); or (b) the Debtors' ability to modify this Plan, as it applies to the Debtors or to any particular Debtor, to satisfy the requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1     Continued Corporate Existence**.   Subject to any Restructuring Transactions contemplated by this Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Effective Date, except to the extent such Organizational Documents are amended by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

**6.2     Corporate Action**.   Each of the matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

**6.3     Organizational Documents**.   The Certificate of Incorporation for Reorganized Mark IV is attached hereto as Exhibit J and the bylaws for Reorganized Mark IV is attached hereto as Exhibit K.   The Organizational Documents of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (x) a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, until two (2) years after the Effective Date.   To the extent the Alternative Corporate Structure is pursued, the Debtors shall file, on or before the Exhibit Filing Date, the Operating Agreement of New LLC as Exhibit D in lieu of the Stockholders' Agreement.

**6.4     Cancellation of Existing Securities and Agreements**.   On the Effective Date, except as otherwise specifically provided for herein, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, shall be

cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, as the case may be, shall be released and discharged.

### 6.5 Authorization and Issuance of New Common Stock.

(a)     The Certificate of Incorporation for Reorganized Mark IV shall authorize a number of shares of New Common Stock to be reflected on <u>Exhibit C</u>. On the Effective Date, Reorganized Mark IV shall (i) issue shares of New Common Stock Pro Rata to the Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) and (ii) issue shares of New Common Stock Pro Rata to Holders of Allowed General Unsecured Claims (or in the case of a First Lien Lender Deficiency Claim or Second Lien Lender Claims, such First Lien Lender's or Second Lien Lender's Permitted Nominees).  A summary description of the New Common Stock is set forth as <u>Exhibit C</u>.

(b)     The New Common Stock issued under this Plan shall be subject to economic and legal dilution based upon (i) the issuance of New Common Stock pursuant to, or upon the exercise of New Common Stock equivalents issued pursuant to, the Management Equity Incentive Plan as set forth in Section 6.10 of this Plan, and (ii) any other shares of New Common Stock issued after the Effective Date. The New Common Stock issued to Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) shall be subject to dilution for any shares issued to the Exit Facility Lenders pursuant to Section 6.12.

(c)     The issuance of the New Common Stock, including the shares of the New Common Stock reserved for issuance by Reorganized Mark IV in connection with the Management Equity Incentive Plan is authorized without the need for any further corporate action or action by any other party.

(d)     All of the shares of New Common Stock issued pursuant to this Plan shall be duly authorized, validly issued, fully paid and non-assessable.

(e)     The New Common Stock issued hereunder shall be subject to the terms of the Stockholders' Agreement and a Registration Rights Agreement, and the holders thereof shall automatically be deemed a party thereto as of the Effective Date.

(f)     In addition, additional New Common Stock may be issued in accordance with Section 4.1(g) of this Plan, which issuance shall not require any additional corporate authority or action of any other party.

**6.6     Alternative Corporate Structure**.  The Debtors or the Reorganized Debtors, as the case may be, may take such actions as may be necessary to implement an Alternative Corporate Structure.  The Alternative Corporate Structure shall have New LLC as the direct parent of the operating companies.  The reorganization of the Debtors will be consummated pursuant to the Alternative Corporate Structure described in this paragraph and the Restructuring Transactions only if, after further analysis, the Debtors believe that it will improve the corporate or operational structure or otherwise provide efficiencies to the Estates or the Reorganized Debtors, and only if the Debtors have received the prior written consent of the First Lien Agent.

**6.7     Authorization and Issuance of New LLC Membership Interests**.  If the Alternative Corporate Structure is pursued, the following shall take place in lieu of the authorization and issuance of New Common Stock as set forth in Section 6.5:

(a)     The Operating Agreement for New LLC shall authorize the issuance of shares of New LLC Membership Interests and New LLC shall issue New LLC Membership Interests to the Holders of Allowed First Lien Lender Secured Claims and Holders of General Unsecured Claims.

(b)     The New LLC Membership Interests issued under this Plan shall be subject to economic and legal dilution based upon (i) the issuance of New LLC Membership Interests pursuant to, or upon the exercise of New LLC Membership Interest equivalents issued pursuant to, the Management Equity Incentive Plan as set forth in Section 6.10 of this Plan, and (ii) any other New LLC Membership Interests issued after the Effective Date.  The New LLC Membership Interests issued to Holders of Allowed First Lien Lender Secured Claims (or their Permitted Nominees) shall be subject to dilution for any New LLC Membership Interests issued to the Exit Facility Lenders pursuant to Section 6.12.

(c)     The issuance of the New LLC Membership Interests, including the New LLC Membership Interests reserved for issuance by New LLC in connection with the Management Equity Incentive Plan is authorized without the need for any further corporate action or action by any other party.

(d)     All of the New LLC Membership Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid and non-assessable.

(e)     In addition, additional New LLC Membership Interests may be issued in accordance with Section 4.1(g) of this Plan, which issuance shall not require any additional corporate authority or action of any other party.

**6.8    Directors and Officers or Managing Members**.

(a)    The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the terms of the Organizational Documents and any applicable employment agreements.

(b)    On the Effective Date, the term of the current members of the board of directors of Mark IV shall expire.  The initial board of directors or members of the managing committee, as applicable, of Reorganized Mark IV shall consist of five (5) directors or members of the managing committee, as applicable.  The First Lien Lenders shall designate four (4) directors (including the Chairman) or members of the managing committee, as applicable.  Subject to the consent of the First Lien Lenders (such consent not to be unreasonably withheld), the remaining director or member of the managing committee, as applicable, shall be a senior executive officer of Mark IV in place immediately prior to the Effective Date.  Thereafter, (i) the board of directors of Reorganized Mark IV will be elected in accordance with the Stockholders' Agreement and the Organizational Documents of Reorganized Mark IV, or (ii) the members of the managing committee of New LLC will be elected in accordance with the Operating Agreement.

(c)    The Debtors shall file on or before the Exhibit Filing Date a notice of the identities of the members of the board of directors of Reorganized Mark IV or the members of the managing committee to serve as of the Effective Date.  The existing directors of each Subsidiary Debtor shall remain in their current capacities as directors of the applicable Reorganized Subsidiary Debtor until replaced or removed in accordance with the Organizational Documents of the applicable Reorganized Subsidiary Debtor.

(d)    Other provisions governing the service, term and continuance in office of the members of the board shall be as set forth in the Organizational Documents of the Reorganized Debtors or New LLC.

**6.9    Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs**.

(a)    The proposed terms of employment agreements for certain key employees of the Reorganized Debtors, to be effective on the Effective Date, are summarized in Exhibit L attached hereto (the "Executive Employment Agreements"). The Executive Employment Agreements shall be in form and substance reasonably satisfactory to the First Lien Agent.

(b)    With the exception of those individuals (i) whose employment terms are summarized in Exhibit L, and (ii) the terms of whose employment

agreements are subject to a rejection motion as of the Confirmation Hearing, to the extent that any of the Debtors has in place as of the Effective Date employment, severance (change in control), retirement, indemnification and other agreements with their respective active directors, officers, managing members and employees who will continue in such capacities or a similar capacity after the Effective Date, or retirement income plans, welfare benefit plans and other plans for such Persons, such agreements, programs and plans will remain in place after the Effective Date (subject to the consent of the First Lien Agent to be given prior to the Confirmation Date, which consent shall not be unreasonably withheld), and the Reorganized Debtors will continue to honor such agreements, programs and plans except to the extent provided herein without prejudice to the Reorganized Debtors' authority to modify or eliminate any such agreements, programs or plans as permitted under applicable non-bankruptcy law. Benefits provided under such agreements or plans may include benefits under qualified and non-qualified retirement plans; health and dental coverage; short and long-term disability benefits; death and supplemental accidental death benefits; vacation; leased car; financial consulting, tax preparation and estate planning as well as an annual physical examination, each paid or provided commensurate with an employee's position in accordance with the applicable Reorganized Debtor's policies then in effect. Such agreements and plans also may include equity, bonus and other incentive plans in which officers, managing members and other employees of the Reorganized Debtors may be eligible to participate; provided, however, such equity, bonus and other incentive plans shall not provide for the issuance of New Equity Interests and to the extent that such equity, bonus and other incentive plan provides for the issuance of Existing Securities, such provision shall be deemed null and void and the officers, managing members and other employees shall waive any right to enforce such provisions; provided, further, however, that pursuant to the Management Equity Incentive Plan, there shall be reserved for certain members of management, directors, and other employees of the Reorganized Debtors a certain number of shares of New Equity Interests and other securities all as more fully described herein.

(c)     Notwithstanding anything to the contrary herein, following the Effective Date of the Plan, with respect to the payment of "retiree benefits" (as such term is defined in section 1114 of the Bankruptcy Code) related to medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation this Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify.

(d)     Notwithstanding anything contained herein to the contrary, if the KEIP has been approved by the Bankruptcy Court, the terms of the KEIP shall not be modified, altered, or amended by this Plan. If approved by the Bankruptcy Court,

those certain incentive payments provided for in the KEIP shall be paid in the amounts and at such times as contemplated by the KEIP.

**6.10    Implementation of the Management Equity Incentive Program**.  A summary of the Management Equity Incentive Plan is attached hereto as <u>Exhibit B</u>.  On the Effective Date, the Reorganized Debtors shall implement the Management Equity Incentive Plan in order to promote the operation of the Reorganized Debtors by offering incentives to key employees who are primarily responsible for the growth and prosperity of the Reorganized Debtors, and to attract and retain qualified employees and thereby benefit the shareholders of the Reorganized Debtors based on the performance of the Reorganized Debtors.  Pursuant to the Management Equity Incentive Plan, the Reorganized Debtors shall deliver certain stock options and/or restricted stock grants (or membership interests, as applicable) to certain members of management and other employees as of and after the Effective Date, in such amounts and pursuant to such terms as set forth in the Management Equity Incentive Plan.  Payments to eligible employees under the Management Equity Incentive Program shall include all earned and due incentive payments, including, without limitation, any payments due under the KEIP.  Not less than 5% and not more than 10% of the New Equity Interests shall be reserved for the Management Equity Incentive Plan.

The Management Equity Incentive Plan will be administered by Reorganized Mark IV's board of directors or managing committee, as applicable.  In applying and interpreting the provisions of the Management Equity Incentive Plan, the decisions of Reorganized Mark IV's board of directors or managing committee, as applicable, shall be final.

**6.11    Issuance of the New Equity Interests**.  On the Effective Date, Reorganized Mark IV shall issue the New Equity Interests in accordance with the terms of the Plan.  The issuance of the New Equity Interests and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

**6.12    The Exit Facility**.  On the Effective Date, the Reorganized Debtors shall (a) enter into the Exit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Exit Facility reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "<u>Exit Facility Documents</u>"), all of which such Exit Facility Documents shall be in form and substance satisfactory to the Exit Facility Lenders, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date.  Any letters of credit that remain outstanding under the First Lien Credit Agreement as of the Effective Date shall be deemed issued and outstanding under the Exit Facility.  Up to 5% of the

New Equity Interests from the First Lien Lenders Plan Distribution Property (prior to dilution for the Management Equity Incentive Plan) shall be reserved for potential issuance to the First Lien Lenders and/or the DIP Lenders (or any third party acceptable to the First Lien Agent) to the extent such lenders are Exit Facility Lenders. In the Confirmation Order, the Bankruptcy Court shall approve the Exit Facility on substantially the terms and conditions set forth in Exhibit A and authorize the Reorganized Debtors to execute the same together with such other documents as the Exit Facility Lenders may reasonably require in order to effectuate the treatment afforded to such parties under the Exit Facility.

       **6.13    The Restructured Debt Term Loan Agreement**.  On the Effective Date, the Reorganized Debtors shall (a) enter into the Restructured Debt Term Loan Agreement together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute mortgages, certificates and other documentation and deliveries as the agent under the Restructured Debt Term Loan Agreement reasonably requests, and (c) deliver insurance and customary opinions (collectively, the documents in (a) – (c), the "Restructured Debt Term Loan Agreement Documents"), all of which such Restructured Debt Term Loan Agreement Documents shall be in form and substance satisfactory to the First Lien Agent, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date.  In the Confirmation Order, the Bankruptcy Court shall approve the Restructured Debt Term Loan Agreement in substantially the form filed with the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the First Lien Agent may reasonably require in order to effectuate the treatment afforded to such parties under the Restructured Debt Term Loan Agreement.  Further, on the Effective Date, the Restructured Debt Term Loan Agreement shall become effective and govern the original amount of $225 million of term loans deemed made by the DIP Lenders (if applicable), in the case of the Deferred Commitment Fee Claims, and/or by the First Lien Lenders, in the case of the First Lien Lender Secured Claim.  The Restructured Debt Term Loan shall be comprised of the following:  (a) to the extent not paid with proceeds of the Exit Facility, the DIP Lenders shall be deemed to have made term loans in an aggregate amount equal to the Deferred Commitment Fee Claims, secured by a second lien on all assets granted to secure the Exit Facility, maturing thirty six (36) months after the Effective Date, and accruing interest at a rate equal to the Eurocurrency Rate (to be defined substantially as set forth in the DIP Facility) plus 7%; (b) up to $200 million of term loans to be allocated between the U.S. and Europe deemed made by the First Lien Lenders, with such $200 million to be reduced dollar for dollar by the amount of any term loans deemed made in satisfaction of the Deferred Commitment Fee Claims, secured by a third lien on all assets granted to secure the Exit Facility, maturing fifty four (54) months after the Effective Date and accruing interest and fees at a rate equal to the Eurocurrency Rate plus 7%; and (c) $25 million of pay-in-kind term loans deemed made by the First Lien Lenders,

secured by a third lien on all assets granted to secure the Exit Facility, maturing sixty (60) months after the Effective Date and accruing interest at a rate equal to the Eurocurrency Rate plus 9%; in each case as set forth in Exhibits A and M. On the Effective Date, each First Lien Lender shall automatically be deemed a party to the Restructured Debt Term Loan Agreement. The Restructured Debt Term Loan Agreement, the Stockholders' Agreement or the Operating Agreement (as applicable) will each provide that during the period from the Effective Date until the earlier of (i) one year after the Effective Date and (ii) achievement of a financial performance threshold to be set forth therein, any assignment by a First Lien Lender of its Restructured Debt Term Loans or New Equity Interests shall be accompanied by a Pro Rata assignment by such First Lien Lender of its New Equity Interests (in the case of an assignment of Restructured Debt Term Loans) or Restructured Debt Term Loans (in the case of an assignment of New Equity Interests).

**6.14    Restructuring Transactions**.    The Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions, which may include the Alternative Corporate Structure as discussed in Section 6.6.    Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction.    In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations under this Plan of each Reorganized Debtor party to such merger.    In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Reorganized Debtor under this Plan.

**6.15    Retained Causes of Action**.  In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached hereto as Exhibit N.  The Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing).  The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the

Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit N does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

**6.16    Exclusivity Period**.  Subject to Section 14.2, and absent further order of the Bankruptcy Court, the Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the Effective Date; provided that, the First Lien Agent consents to any material amendment or modification of this Plan, such consent not to be unreasonably withheld.

**6.17    Effectuating Documents; Further Transactions**.  The Chief Financial Officer, or any other executive officer or managing member of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Secretary or Assistant Secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**6.18    Exemption From Certain Transfer Taxes and Recording Fees**.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers pursuant to this Plan (including, without limitation, pursuant to any grant of collateral under the Reorganized Debtors' Credit Facilities), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, or the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer pursuant to this Plan, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

# ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**7.1     Assumed Contracts and Leases**.  On the Confirmation Date (but subject to the occurrence of the Effective Date and the Debtors' right to reject as set forth in section 7.4), all executory contracts or unexpired leases of the Debtors (except those executory contracts and unexpired leases to which the Debtors are a party that are specifically listed on the schedule of rejected contracts and leases annexed hereto as <u>Exhibit O</u>) will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Confirmation Date (but subject to the occurrence of the Effective Date and the Debtors' right to reject as set forth in section 7.4).  Each executory contract and unexpired lease assumed pursuant to this Article VII shall be Reinstated and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, without amendment or modification.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights <u>in rem</u> related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.

**7.2     Rejected Contracts and Leases**.   All executory contracts and unexpired leases listed on <u>Exhibit O</u> to this Plan shall be deemed automatically rejected as of the Confirmation Date (but subject to the occurrence of the Effective Date).  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

**7.3     Exhibits Not Admissions**.  Neither the inclusion by the Debtors of a contract or lease on <u>Exhibit O</u> nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or

executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.

**7.4     Payments Related to Assumption of Executory Contracts and Unexpired Leases**.

(a)     The provisions (if any) of each executory contract or unexpired lease to be assumed under this Plan which are or may be in default shall be satisfied solely by Cure.

(b)     Objections to assumption or rejection including, without limitation, to Cure related to non-monetary defaults (a "Non-Monetary Objection"), must be raised in an objection to be filed no later than the date by which objections are required to be filed with respect to confirmation of the Plan.  Any such Non-Monetary Objection will be litigated at the Confirmation Hearing or at such other time as the Bankruptcy Court may schedule.  Any party failing to file a Non-Monetary Objection shall be deemed to have consented to the assumption of such executory contract or unexpired lease and shall be forever barred from asserting an objection with respect to such assumption.

(c)     Any Person claiming that a monetary cure amount is due in connection with the assumption of any executory contract or unexpired lease as contemplated by section 365(b) of the Bankruptcy Code must file such monetary cure claim with the Bankruptcy Court asserting all alleged amounts accrued through the Confirmation Date, if any (the "Cure Claim"), no later than thirty (30) days after the Confirmation Date (the "Cure Claim Submission Deadline").  Any party failing to submit a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting, or seeking to collect any amounts relating thereto against the Debtors or Reorganized Debtors.  In the case of a Cure Claim related to an unexpired lease of non-residential real property, such Cure Claim must include a breakdown by category of all amounts claimed, including, but not limited to, amounts for real estate taxes, common area maintenance, and rent.  The Debtors shall have thirty (30) days from the Cure Claims Submission Deadline or the date a Cure Claim is actually filed, whichever is later, to file an objection to the Cure Claim.  Any disputed Cure Claims shall be resolved either consensually by the parties or by the Bankruptcy Court.  Disputed Cure Claims shall be set for status at subsequent hearings following the Cure Claim Submission Deadline with separate evidentiary hearings to be set by the Bankruptcy Court as needed.  If the Debtors do not dispute a Cure Claim, then the Debtors shall pay the Cure Claim, if any, to the claimant within twenty (20) days of the Cure Claim Submission Deadline.  Disputed Cure Claims that are resolved by agreement or Final Order of the Bankruptcy Court shall be paid by the Debtors within twenty (20) days of such agreement or Final Order of the Bankruptcy Court; provided, that, the Debtors shall have the right to reject the executory contract or unexpired lease, effective as of the Confirmation Date (but

subject to the occurrence of the Effective Date) for a period of five (5) days after entry of a Final Order establishing an amount with respect to a Cure Claim in excess of that provided by the Debtors.

       **7.5**    **Rejection Damages Bar Date**.  Except as otherwise provided herein, if rejection of an executory contract or unexpired lease rejected pursuant to this Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected; provided, however, that, any Claim resulting from the rejection of an executory contract or unexpired lease within five (5) days after entry of a Final Order establishing an amount with respect to a Cure Claim in excess of that asserted by the Debtors, such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after receiving written notice of rejection.  Any Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as a General Unsecured Claim.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

       **8.1**    **Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date.

       **8.2**    **No Interest on Claims**.  Unless otherwise specifically provided for in this Plan, or the Confirmation Order, interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

       **8.3**    **Disbursing Agent**.  The Disbursing Agent shall make all distributions required under this Plan.

       **8.4**    **Claims Administration Responsibility**.

       (a)    *Reorganized Debtors*.  The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising or otherwise

resolving all Claims against the Debtors (the "Claims Administration"). Except as otherwise provided in Section 8.6, the Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the Claims Administration.

(b) *Claims Oversight Committee*. On the Effective Date, there shall be formed a Claims Oversight Committee. Notwithstanding anything to the contrary set forth herein or in the Confirmation Order, the Claims Oversight Committee shall monitor the Claims Administration conducted by the Reorganized Debtors, and address the Bankruptcy Court if the Claims Oversight Committee disagrees with the Reorganized Debtors' determinations with respect to Claims resolution; and monitor any stock adjustment process of Section 4.1(g) of this Plan and address the Bankruptcy Court with respect to such matters. The Claims Oversight Committee shall be comprised of three (3) members selected by the Creditors' Committee. For so long as the Claims Administration shall continue, the Reorganized Debtors shall make monthly reports to the Claims Oversight Committee and the administrative agent under the Restructured Debt Term Loan Agreement. The Claims Oversight Committee may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in these Chapter 11 Cases and/or retained by the Trustee or the Trust Advisory Board, and the Reorganized Debtors shall pay the reasonable costs and expenses of the Claims Oversight Committee and its members, including reasonable professional fees (provided, that except as otherwise agreed to by the Reorganized Debtors or ordered by the Bankruptcy Court, such aggregate fees shall not exceed $100,000 plus any unused Creditors' Trust Initial Funding as provided for in Section 10.3(d) of this Plan) in the ordinary course without further order of the Bankruptcy Court.

(c) *Claims Bar Date*. Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Section 7.5 of this Plan for the filing of such Claims, or (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to Article IX of this Plan, shall not be recognized by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by a Final Order of the Bankruptcy Court. Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, and the Debtors', Reorganized Debtors', the Claims Oversight Committee's and other parties in interest's rights to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

(d) *Filing of Objections*. Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the

Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or Reorganized Debtors effect service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address); or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

(e) *Determination of Claims.* Any Claim determined and liquidated pursuant to (i) a Final Order of the Bankruptcy Court, or (ii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan. Nothing contained in this Section 8.4 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors or the Claims Oversight Committee may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**8.5 Delivery of Distributions**. Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or the last known addresses of such Holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change in address. Distributions under this Plan to Holders of DIP Facility Claims shall be made to or at the direction of the DIP Agent and shall be distributed by the DIP Agent in accordance with the DIP Facility. Distributions under this Plan to Holders of First Lien Lender Claims shall be made to or at the direction of the First Lien Agent and shall be distributed in accordance with the First Lien Credit Agreement and this Plan. Distributions under this Plan to Holders of Allowed Second Lien Lender Claims shall be made to or at the direction of the Second Lien Agent and shall be distributed by the Second Lien Agent in accordance with the Second Lien Credit Agreement. Distributions under this Plan to all other Allowed Claimholders shall be made by the Disbursing Agent. If any Claimholder's distribution is returned as undeliverable, no further distributions to

such Claimholder shall be made unless and until the Disbursing Agent is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property on account of General Unsecured Claims shall revert to the Holders of General Unsecured Claims (excluding any Allowed First Lien Deficiency Claim) and shall be distributed to such Holders pursuant to the Plan. Any unclaimed Cash to be distributed to Holders of Class 8 Claims pursuant to this Plan shall result in a dollar for dollar increase in the Convenience Class Cap Amount. Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.6     Procedures for Treating and Resolving Disputed and Contingent Claims**.

(a)     *No Distributions Pending Allowance.*     No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)     *Distribution Reserve*.     The Debtors shall establish one or more Distribution Reserves of New Equity Interests and Cash for the purpose of effectuating distributions to Holders of Disputed Claims pending the allowance or disallowance of such Claims or Interests in accordance with this Plan. The Debtors or the Disbursing Agent shall establish a reserve to hold the New Equity Interests and Cash that would otherwise be distributed to Holders of Disputed Claims based on the amounts of such Claims or Interests estimated by agreement between the Debtors and the Claims Oversight Committee (or Final Order of the Bankruptcy Court upon a motion by the Debtors).

(c)     *Estimation of Claims for Distribution Reserve*.     The Debtors or the Disbursing Agent shall establish a reserve to hold the New Equity Interests and Cash that would otherwise be distributed to Holders of Disputed Claims based on the amount of such Claims or Interests estimated by agreement between the Debtors and the Claims Oversight Committee (or Final Order of the Bankruptcy Court upon a motion by the Debtors). Without limiting the foregoing, the Debtors, or the Reorganized Debtors, or the Claims Oversight Committee may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or the Reorganized Debtors' rejection of an executory

contract, pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated; provided, however, that if the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claims. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(d) *No Recourse to Debtors or Reorganized Debtors*. Any Disputed Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserve established on account of such Disputed Claim. In no event shall any Holder of a Disputed Claim have any recourse with respect to distributions made, or to be made, under the Plan to Holders of such Disputed Claims to any Debtor or Reorganized Debtor on account of such Disputed Claims, regardless of whether such Disputed Claim shall ultimately become an Allowed Claims or regardless of whether sufficient Cash or New Equity Interests or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

(e) *Distributions After Allowance.* Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of this Plan that govern distributions to such Claimholders. Subject to Section 8.2 hereof, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

(f)     *Fractional Equity Interests; Fractional Dollars.*  Payments of fractions of shares of New Equity Interests shall not be made.  Fractional shares of New Equity Interests that would otherwise be distributed under the Plan shall be rounded (up or down) to the nearest whole number of shares of New Equity Interests with fractions equal to or less than ½ being rounded down.  Any other provision of this Plan notwithstanding, neither the Reorganized Debtors nor the Disbursing Agent shall be required to make distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

## ARTICLE IX

## ALLOWANCE AND PAYMENT OF
## CERTAIN ADMINISTRATIVE CLAIMS

**9.1     DIP Facility Claims**.  On the Effective Date, DIP Facility Claims shall be paid in full in Cash, except that Deferred Commitment Fee Claims shall be satisfied pursuant to section 9.2 hereof.  To the extent that any DIP Facility Claim, by the terms of the DIP Facility, survives the termination thereof, remains contingent and has not been paid in full in Cash, then any such obligation shall survive the occurrence of the Effective Date.

**9.2     Deferred Commitment Fee Claims**.  On the Effective Date, all Deferred Commitment Fee Claims shall either (a) be paid in full in Cash or (b) satisfied by the deemed making of Restructured Debt Term Loans under the Restructured Debt Term Loan Agreement.

**9.3     Professional Claims**.

(a)     *Final Fee Applications.*  All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b)     *Payment of Interim Amounts.*  Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through such date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed

invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

(c)     On the Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals for whom a deposit was made.  The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)     Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).

**9.4     Substantial Contribution Compensation and Expenses Bar Date**. Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court, and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before a date which is forty-five (45) days after the Effective Date, or be forever barred from seeking such compensation or expense reimbursement.

**9.5     Other Administrative Claims**.  All other requests for payment of an Administrative Claim (other than as set forth in Sections 9.3 and 9.4 of this Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (a) which is paid or payable by any Debtor in the ordinary

course of business or (b) the payment of which has been approved by the Bankruptcy Court.

# ARTICLE X

## CREDITORS' TRUST

**10.1    Appointment of Trustee**.

(a)    The Trustee for the Creditors' Trust shall be designated by the Creditors' Committee.  Specifically, the Creditors' Committee shall file a notice on a date which is at least seven (7) days prior to the date the Bankruptcy Court establishes for the commencement of the Confirmation Hearing designating the Person who it has selected as the Trustee and seeking approval of such designation.  The Person designated as the Trustee shall file an affidavit contemporaneously with the Creditors' Committee's motion demonstrating that such Person is disinterested.  The Person so designated by the Creditors' Committee shall become the Trustee as of the Effective Date upon the Bankruptcy Court entering an order granting the motion after consideration of the same and any objections thereto at the Confirmation Hearing.

(b)    The Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in this Plan and the Trust Agreement.

**10.2    Assignment of Trust Assets to the Creditors' Trust**.    On the Effective Date, the Trust Assets shall be transferred to the Creditors' Trust, for and on behalf of the Trust Beneficiaries.  Only Cash proceeds of Trust Assets may be distributed to Trust Beneficiaries and "in-kind" distributions are not permitted.

**10.3    The Creditors' Trust**.

(a)    Without any further action of the directors, officers or shareholders of the Debtors or the Reorganized Debtors, on the Effective Date, the Trust Agreement, substantially in the form of <u>Exhibit H</u> to this Plan, shall become effective.  The Trustee shall accept the Creditors' Trust and sign the Trust Agreement on that date and the Creditors' Trust will then be deemed created and effective.

(b)    The duration of the Creditors' Trust will be limited to an initial term of three (3) years, subject to further extension solely for the purpose of permitting the Creditors' Trust to liquidate the Trust Assets and distribute the proceeds thereof to the Trust Beneficiaries.

(c)    The Trustee shall have full authority to take any steps necessary to administer the Trust Agreement, including, without limitation, the duty and obligation to liquidate the Trust Assets (having first obtained such approvals from the Trust Advisory Board as may be necessary, if any), as applicable, and, if

authorized by majority vote of those members of the Trust Advisory Board authorized to vote, to prosecute and settle the Trust Avoidance Claims, in such a manner so as reasonably to maximize the value of the Trust Assets.

(d)     All reasonable fees, costs and expenses associated with the administration of the Creditors' Trust and distribution to Trust Beneficiaries shall be the responsibility of and be paid by the Creditors' Trust first from initial funding to be provided by the Reorganized Debtors in the amount of $250,000 (the "Initial Funding") and then to the extent that the Initial Funding is exhausted by the Creditors' Trust, from the Trust Assets, to the extent necessary.  The Initial Funding shall be repaid, to the extent of available net recoveries, to the Debtors or Reorganized Debtors dollar for dollar from the first net proceeds realized from the Trust Avoidance Claims recoveries.  To the extent that less than the entire amount of the Initial Funding is utilized by the Trustee for expenses of the Creditors' Trust, any amounts not so utilized shall be made available to fund the expenses of the Claims Oversight Committee.

(e)     The Trustee in consultation with the Trust Advisory Board, may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary, including any professionals retained in the Chapter 11 Cases and/or retained by the Claims Oversight Committee or the Trust Advisory Board (collectively, the "Trustee Professionals"), in consultation with the Claims Oversight Committee, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation of Trust Assets, as applicable.  The Trustee Professionals shall continue to prepare monthly statements in the same manner and in the same detail as required pursuant to the Professional Fee Order, and the Trustee Professionals shall serve such statements on each member of the Trust Advisory Board.  In the event two or more members of the Trust Advisory Board object to the reasonableness of such fees and expenses, the matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

(f)     For U.S. federal income tax purposes, it is intended that the Creditors' Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by the Trust Beneficiaries.

(g)     The Trustee shall be responsible for filing all U.S. federal, state and local tax returns for the Creditors' Trust.

(h)     To the extent that there is an inconsistency or conflict between the description of the Creditors' Trust provided herein and the Trust Agreement, the Trust Agreement shall control.

### 10.4 The Trust Advisory Board.

(a) The Trust Advisory Board shall be comprised of three (3) members as designated by the Creditors' Committee. The Creditors' Committee shall give written notice of the identities of such members and file and serve such notice with the Bankruptcy Court, on a date that is not less than seven (7) days prior to the Confirmation Hearing; provided, however, that if and to the extent the Creditors' Committee fails to file and serve such notice, the Debtors shall designate the members of the Trust Advisory Board by announcing their identities at the Confirmation Hearing. The Trust Advisory Board shall adopt such bylaws as it may deem appropriate. The Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Creditors' Trust. Members of the Trust Advisory Board shall not be entitled to compensation from the Creditors' Trust. Members of the Trust Advisory Board shall be entitled to reimbursement of reasonable and necessary expenses. Any reimbursement of reasonable and necessary expenses of the Trust Advisory Board incurred by them in carrying out the purpose of the Trust Advisory Board shall be payable solely by the Creditors' Trust, including, but not limited to fees and expenses of such law firms, accounting firms, experts, advisors, consultants, investigators, auctioneers, appraisers or other professionals as it may deem necessary, including any professionals retained in the Chapter 11 Cases and/or retained by the Claims Oversight Committee or the Trustee.

(b) In the case of an inability or unwillingness of any member of the Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Trust Advisory Board. If any position on the Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Trustee without the requirement of a vote by the other members of the Trust Advisory Board.

(c) Upon the certification by the Trustee that all Trust Assets transferred into the Creditors' Trust have been distributed, abandoned or otherwise disposed of, the members of the Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(d) The Trust Advisory Board may, by majority vote, approve all settlements of Trust Avoidance Claims which the Trustee may propose; provided, however, that the Trustee may seek Bankruptcy Court approval of a settlement of a Trust Claim if the Trust Advisory Board fails to act on a proposed settlement of such Trust Claim within thirty (30) days of receiving notice of such proposed settlement by the Trustee.

(e) The Trust Advisory Board may, by majority vote, authorize the Trustee to invest the corpus of the Creditors' Trust in prudent investments other than those described in section 345 of the Bankruptcy Code.

(f) The Trustee may be removed by a two-thirds affirmative vote of the Trust Advisory Board or upon order of the Bankruptcy Court for good cause shown. In the event of the resignation or removal of the Trustee, the Trust Advisory Board shall, by majority vote, designate a person to serve as successor Trustee.

(g) The Trust Advisory Board shall govern its proceedings through the adoption of bylaws, which the Trust Advisory Board may adopt by majority vote. No provision of such bylaws shall supersede any provision of this Plan.

(h) In connection with the Trust Avoidance Claims that constitute the Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) (collectively, the "Privileges") transferred to the Creditors' Trust shall vest in the Trustee and the Trust Advisory Board and their representatives, and the Debtors, Reorganized Debtors, the Trustee and Trust Advisory Board are authorized to take all necessary actions to effectuate the transfer of such Privileges.

## ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Revesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, liens and Interests of creditors and equity security Holders (other than as expressly provided herein).  As of the Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

**11.2    Discharge of the Debtors**. Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, confirmation of this Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), the Debtors, the Reorganized Debtors and the Estates (a) from all Claims and Causes of Action, whether known or unknown, and (b) from liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, in each case regardless of whether any property has been distributed or retained pursuant to this Plan on account of such Claims, Causes of Action, rights, liabilities, liens, obligations and Interests, and in each case including, but not limited to, demands and (x) Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests that arose before the Confirmation Date, (y) any Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities),

liens, obligations and Interests to the extent such Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and (z) all Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, Cause of Action, right, liability, lien, obligation or Interests accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Effective Date occurring.

As of the Confirmation Date (but subject to the occurrence of the Effective Date), except as provided in this Plan or in the Confirmation Order or under the terms of the documents evidencing and orders approving the Reorganized Debtors' Credit Facilities all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date.  In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in Mark IV, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**11.3    Compromises and Settlements**.    Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims (a) against them and (b) that they have against other Persons.  The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date.  After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 11.1 of this Plan, without any need for Bankruptcy Court approval.

**11.4    Release of Certain Parties**.

(a)    Except with respect to the Trust Avoidance Claims, as of the Confirmation Date (but subject to the occurrence of the Effective Date), for good and

valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan or the Reorganized Debtors with respect to each of the Released Parties.

(b)     Except with respect to the Trust Avoidance Claims, as of the Confirmation Date (but subject to the occurrence of the Effective Date), for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge all claims and Causes of Action arising under section 547 of the Bankruptcy Code.

(c)     Notwithstanding anything to the contrary contained herein, nothing in this Plan shall be deemed to release any of the Debtors, or any of their Affiliates from their obligations under this Plan, the Reorganized Debtors' Credit Facilities, and the transactions contemplated hereby and thereby.

**11.5     Releases by Holders of Claims.  As of the Confirmation Date (but subject to the occurrence of the Effective Date), for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim that affirmatively votes in favor of this Plan hereby forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan (other than the rights under this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors,**

the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan or the Reorganized Debtors.

**11.6    Setoffs**.  Except with respect to Claims specifically Allowed under the Plan, including the First Lien Lender Secured Claims, the First Lien Lender Deficiency Claims and the Second Lien Lender Claims, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

**11.7    Exculpation and Limitation of Liability**.  Except as otherwise specifically provided in this Plan, the Released Parties shall not have or incur, and are hereby released from, any claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, each of the foregoing in their capacity as such, for any act or omission in connection with, relating to, or arising out of (a) the filing and prosecution of the Chapter 11 Cases, (b) the Reorganized Debtors' Credit Facilities and the documents related thereto, (c) the negotiation and filing of this Plan, (d) the pursuit of confirmation of this Plan, (e) the negotiation and pursuit of approval of the Disclosure Statement, (f) the consummation of this Plan, and (g) the administration of this Plan or the property to be distributed under this Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. Notwithstanding anything to the contrary contained herein, this Section 11.7 shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed in bad faith, gross negligence or willful misconduct.

**11.8    Indemnification Obligations**.  Except as specifically provided in Sections 6.4 and 6.8 of this Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights except those held by Persons who are Released Parties and who are included in either the definition of "Insured Persons" or the "Insureds" in any of the policies providing the D&O Insurance shall be released and discharged on and as of the Confirmation Date; <u>provided that</u> the Indemnification Rights excepted from the release and discharge shall remain in full force and effect on and after the Confirmation Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases; (b) the Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage for those Persons described in clause (a) of this Section 11.8 whose

Indemnification Rights are not being released and discharged on and as of the Cofirmation Date, for a period of five years after the Confirmation Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors or the Reorganized Debtors in at least the scope and amount as currently maintained by the Debtors (the "<u>Insurance Coverage</u>"); and (c) the Debtors or the Reorganized Debtors, as the case may be, hereby indemnify such Persons referred to in subclause (b) above to the extent of, and agree to pay for, any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

**11.9 Injunction. The satisfaction, release, and discharge pursuant to this <u>Article XI</u> of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## ARTICLE XII

## <u>CONDITIONS PRECEDENT</u>

**12.1 Conditions to Confirmation**.  The following are conditions precedent to confirmation of this Plan that must be satisfied unless waived in accordance with Section 12.3 of this Plan:

(a) The Bankruptcy Court shall have approved a disclosure statement with respect to this Plan in form and substance reasonably satisfactory to the Debtors, the First Lien Agent and the Creditors' Committee.

(b) The Confirmation Order, this Plan, and all exhibits and annexes to each of this Plan and the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

(c) The First Lien Agent shall be satisfied that, on or before the Effective Date, the restructuring of the obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to Mark IV IVHS Inc., and the obligations under the First Lien Credit Agreement with respect to Dayco Europe S.r.l., shall be completed on terms satisfactory to the First Lien Agent and the Creditors' Committee (but with respect to the Creditors' Committee, only to the

extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

**12.2 Conditions to Consummation**.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied unless waived in accordance with Section 12.3 of this Plan:

(a)  The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the rejection of unexpired leases and executory contracts by the Debtors as contemplated by Section 7.2 hereof.

(b)  The Debtors shall have entered into the Reorganized Debtors' Credit Facilities and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)  The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably satisfactory to the Debtors, the First Lien Lenders and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8), shall have been entered by the Bankruptcy Court on or before October 27, 2009, and shall be a Final Order.

(d)  All actions, documents and agreements necessary to implement this Plan shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Lenders and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent such actions, documents and agreements directly affect Class 7 Claims (other than the First Lien Lender Deficiency Claims) or Class 8) and shall have been effected or executed as applicable.

(e)  The Debtors shall have reduced their post Effective Date obligations in respect of the Legacy Liabilities to an amount reasonably satisfactory to the First Lien Lenders and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

(f)  The obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to Mark IV IVHS Inc., and the restructuring of the obligations under the First Lien Credit Agreement with respect to Dayco Europe S.r.l. shall have been completed on terms satisfactory to the First Lien Agent and the Creditors' Committee (but with respect to the Creditors' Committee, only to the extent directly affecting Claims in Class 7 (other than the First Lien Lender Deficiency Claims) or Class 8).

**12.3    Waiver of Conditions to Confirmation or Consummation**.  The conditions set forth in Sections 12.1 (other than 12.1(a)) and 12.2 (other than 12.2(b) and (c)) of this Plan may be waived by the Debtors subject to such waiver being reasonably satisfactory to the First Lien Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

## ARTICLE XIII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan (except in the case of the Restructured Debt Term Loans, the Exit Facility and the New Equity Interests, which shall be subject to the jurisdiction indicated in the definitive documentation thereof), including, among others, the following matters:

(a)    to hear and determine pending motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b)    to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

(c)    to adjudicate any and all disputes arising from the distribution of the New Equity Interests;

(d)    to ensure that distributions to Allowed Claimholders are accomplished as provided herein;

(e)    to hear and determine any and all objections to the allowance of Claims and the estimation of Claims, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Claim, in whole or in part;

(f)    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g)    to issue orders in aid of execution, implementation, or consummation of this Plan;

(h)     to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)     to hear and determine all applications for compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)     to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with this Plan; provided, however, that any dispute arising under or in connection with the Reorganized Debtors' Credit Facilities, the Registration Rights Agreement and the Stockholders' Agreement shall be dealt with in accordance with the provisions thereof.

(l)     to hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of its Estates, wherever located;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)     to hear any other matter not inconsistent with the Bankruptcy Code;

(o)     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(p)     to hear and determine all disputes involving the releases and exculpations granted herein and the injunctions established herein;

(q)     to enter a final decree closing the Chapter 11 Cases; and

(r)     to enforce all orders previously entered by the Bankruptcy Court.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and

determine disputes concerning Claims, Interests, and the Retained Actions and any motions to compromise or settle such disputes.

## ARTICLE XIV

## <u>MISCELLANEOUS PROVISIONS</u>

**14.1    Binding Effect**.  As of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Claimholders, all present and former Interestholders, other parties-in-interest and their respective heirs, successors, and assigns.

**14.2    Modification and Amendments**.  The Debtors may alter, amend, or modify this Plan or any Exhibits hereto under section 1127(a) of the Bankruptcy Code, in a form that is reasonably satisfactory to the First Lien Agent, at any time prior to the Confirmation Hearing.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**14.3    Withholding and Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**14.4    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**14.5    Creditors' Committee**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims.  The Professionals retained by the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with (a) the implementation of the transactions contemplated to occur on the Effective Date hereunder and (b) applications for allowance of compensation and

reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 9.3 hereof.

**14.6     Payment of Statutory Fees**.   All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation hearing, shall be paid on the Effective Date.  The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code as required by that section.

**14.7     Revocation, Withdrawal, or Non-Consummation**.

(a)     *Right to Revoke or Withdraw.*  Each Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Effective Date.

(b)     *Effect of Withdrawal, Revocation, or Non-Consummation.*  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement, or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

**14.8     Notices**.   Any notice required or permitted to be provided to the Debtors, the Creditors' Committee, the First Lien Agent or the DIP Agent under this Plan shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors:

MARK IV INDUSTRIES, INC.
One Towne Centre
501 John James Audubon Parkway
Amherst, New York 14226
Attn:   Chief Financial Officer

with copies to:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
Attn: J. Eric Ivester, Esq.
        Matthew M. Murphy, Esq.

If to the Creditors' Committee:

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Attn: Scott L. Hazan, Esq.
        Jenette A. Barrow-Bosshart, Esq.

If to the First Lien Agent or DIP Agent:

JPMORGAN CHASE BANK, N.A.
277 Park Avenue, 8th Floor
New York, New York 10017
Attn: Marina Flindell

with copies to:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue, 27th Floor
New York, New York 10017
Attn: Steven M. Fuhrman, Esq.

**14.9   Term of Injunctions or Stays**.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**14.10   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or in the relevant governing agreement, document or instrument, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan.

**14.11   Waiver and Estoppel**.  Each Claimholder or Interestholder shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other Person, if such agreement was not

disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: New York, New York
     July 30, 2009

            MARK IV INDUSTRIES, INC. AND ITS
            AFFILIATES AND SUBSIDIARIES THAT ARE ALSO
            DEBTORS AND DEBTORS-IN-POSSESSION IN THE
            CHAPTER 11 CASES

            By:   */s/ Mark G. Barberio*_____
                  Mark G. Barberio
                  Vice President and Chief Financial Officer of
                  Mark IV Industries, Inc.

| | |
|---|---|
| J. Eric Ivester | Jay M. Goffman |
| Matthew M. Murphy | SKADDEN ARPS SLATE MEAGHER |
| SKADDEN ARPS SLATE MEAGHER |    & FLOM LLP |
|    & FLOM LLP | Four Times Square |
| 155 N. Wacker Drive, Suite 2700 | New York, New York 10036-6522 |
| Chicago, Illinois  60606-1720 | Telephone: (212) 735-3000 |
| Telephone: (312) 407-0700 | Facsimile: (212) 735-2000 |
| Facsimile: (312) 407-0411 | |

Attorneys for Debtors and Debtors-in-Possession

# Appendix B

## Historical Financial Results

**PricewaterhouseCoopers LLP**
1100 Bausch & Lomb Place
Rochester NY 14604-2705
Telephone (585) 232-4000
Facsimile (585) 454-6594

# Mark IV Industries, Inc.
## Consolidated Financial Statements
## February 28, 2009

### Audited Consolidated Financial Statements

**Report of Independent Auditors**

To the Board of Directors
of Mark IV Industries, Inc.:

In our opinion, the accompanying consolidated statements of operations, cash flows and shareholders' equity of Mark IV Industries, Inc. and its subsidiaries (Predecessor Company) present fairly, in all material respects, the results of their operations and their cash flows for the year ended February 28, 2007 and the period March 1, 2007 to December 21, 2007 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in *Note 2 - Acquisitions and Divestures*, the Company underwent a change in control effective December 21, 2007 (Acquisition Date). As a result, the underlying assets and liabilities of the Predecessor Company were fair valued in accordance with SFAS No. 141, *Business Combinations*, such that the pre- and post-December 21, 2007 assets and liabilities, results of operations, and statements of cash flows and changes in shareholder's equity reflect different bases of accounting and may not be comparable to consolidated financial statements after the Acquisition Date.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP
June 10, 2008

**PricewaterhouseCoopers LLP**
1100 Bausch & Lomb Place
Rochester NY 14604-2705
Telephone (585) 232-4000
Facsimile (585) 454-6594

**Report of Independent Auditors**

To the Board of Directors
of Mark IV Industries, Inc.:

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of operations, cash flows and shareholders' equity present fairly, in all material respects, the financial position of Mark IV Industries Inc. and its subsidiaries (Successor Company) at February 29, 2008 and February 28, 2009, and the results of their operations and their cash flows for the period December 21, 2007 to February 29, 2008 and for the year ended February 28, 2009 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 6 to the financial statements, the Company was not in compliance with certain of the covenants contained in the Company's First and Second Lien agreements, which defaults had not been waived by the lenders or otherwise cured, which raises substantial doubt about the Company's ability to continue as a going concern. Accordingly, the debt in default has been classified as currently payable on the accompanying balance sheet as of February 28, 2009. Apart from the financial statement reclassification of the debt as currently payable, the financial statements do not include any adjustments that might result from the outcome of this uncertainty. See also Note 12 to the consolidated financial statements.

As described in Notes 1 and 12 to the consolidated financial statements, on April 30, 2009, Mark IV Industries, Inc. and certain of its U.S. subsidiaries filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. The consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classification of liabilities that may result from the outcome of the Chapter 11 process.



PricewaterhouseCoopers LLP
June 2, 2009

MARK IV INDUSTRIES, INC.
CONSOLIDATED BALANCE SHEETS
(Dollars in thousands, except per share amount)

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 65,900 | $ 45,000 |
| Restricted cash | 2,500 | - |
| Trade accounts receivable, net | 166,800 | 272,600 |
| Inventories | 228,300 | 273,500 |
| Other current assets | 26,000 | 39,700 |
| Total current assets | 489,500 | 630,800 |
| Property, plant and equipment, net | 279,900 | 343,400 |
| Goodwill | 257,500 | 339,200 |
| Other intangible assets, net | 469,600 | 637,000 |
| Other non-current assets | 21,500 | 14,700 |
| TOTAL ASSETS | $ 1,518,000 | $ 1,965,100 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **Current Liabilities:** | | |
| Notes payable and current maturities | $ 49,600 | $ 63,700 |
| Debt in default | 942,800 | - |
| Accounts payable | 177,100 | 276,500 |
| Compensation related liabilities | 39,200 | 57,200 |
| Accrued interest | 10,900 | 15,600 |
| Other current liabilities | 70,000 | 94,000 |
| Total current liabilities | 1,289,600 | 507,000 |
| Long-term debt | 41,700 | 909,900 |
| Other non-current liabilities | 286,600 | 352,700 |
| Total liabilities | 1,617,900 | 1,769,600 |
| Commitments and contingencies (Note 11) | | |
| **Stockholder's Equity (Deficit):** | | |
| Common stock - $0.01 par value; 1,000 shares authorized, issued and outstanding | - | - |
| Additional paid-in capital | 135,000 | 135,000 |
| Retained earnings (deficit) | (124,200) | 22,900 |
| Accumulated other comprehensive income (loss) | (110,700) | 37,600 |
| Total stockholder's equity (deficit) | (99,000) | 195,500 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT) | $ 1,518,000 | $ 1,965,100 |

The accompanying notes are an integral part of these consolidated financial statements.

## MARK IV INDUSTRIES, INC.
### CONSOLIDATED STATEMENTS OF OPERATIONS
(Dollars in thousands)

| | Year Ended February 28, 2009 | Dec. 22, 2007 through Feb. 29, 2008 (a) | Mar. 1, 2007 through Dec. 21, 2007 (a) | Year Ended February 28, 2007 |
|---|---|---|---|---|
| Net sales | $ 1,293,100 | $ 281,000 | $ 1,112,700 | $ 1,243,800 |
| Operating costs: | | | | |
| Cost of products sold, exclusive of depreciation and amortization | 921,200 | 196,800 | 798,600 | 855,100 |
| Selling and administration | 215,600 | 35,700 | 176,300 | 180,500 |
| Research and development | 41,800 | 8,900 | 33,700 | 38,000 |
| Depreciation and amortization | 96,400 | 16,800 | 42,200 | 50,800 |
| Impairment of goodwill and indefinite-lived intangibles | 79,000 | - | 415,200 | - |
| Product liability settlement | - | - | 16,800 | - |
| Impairment of long-lived assets | - | - | 4,000 | - |
| Litigation charges, net | - | - | (1,000) | 9,500 |
| Acquisition-related costs | - | 700 | 7,100 | - |
| Management fee to related party | 4,100 | 400 | - | - |
| Total operating costs | 1,358,100 | 259,300 | 1,492,900 | 1,133,900 |
| Operating income (loss) | (65,000) | 21,700 | (380,200) | 109,900 |
| Interest expense | (96,800) | (18,900) | (76,500) | (82,700) |
| Loss on debt extinguishment | - | - | (900) | (24,500) |
| Gain on life insurance settlement | - | - | - | 9,200 |
| Other income, net | 9,800 | - | 4,500 | 5,600 |
| Income (loss) from continuing operations, before taxes | (152,000) | 2,800 | (453,100) | 17,500 |
| Provision for (benefit from) income taxes | (4,900) | (20,100) | 5,700 | 27,800 |
| Income (loss) from continuing operations | (147,100) | 22,900 | (458,800) | (10,300) |
| Loss from discontinued operations, net | - | - | (66,200) | (168,600) |
| Net income (loss) | $ (147,100) | $ 22,900 | $ (525,000) | $ (178,900) |

(a) Amounts represent fiscal 2008 activity before and after the Acquisition, as discussed in the accompanying notes.

The accompanying notes are an integral part of these consolidated financial statements.

B-5

## MARK IV INDUSTRIES, INC.
### CONSOLIDATED STATEMENTS OF CASH FLOWS
(Dollars in thousands)

| | Year Ended Feb. 28, 2009 | Dec. 22, 2007 through Feb. 29, 2008 (a) | Mar. 1, 2007 through Dec. 21, 2007 (a) | Year Ended Feb. 28, 2007 |
|---|---|---|---|---|
| Cash flows from operating activities: | | | | |
| Net income (loss) | $ (147,100) | $ 22,900 | $ (525,000) | $ (178,900) |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | |
| Depreciation and amortization | 96,400 | 16,800 | 45,500 | 76,700 |
| Deferred income taxes | (27,200) | (28,700) | (22,100) | (7,000) |
| Product liability settlement | - | - | 16,800 | - |
| Gain on fire insurance recovery | - | - | - | (6,500) |
| Fire insurance payments received, net | - | - | - | 19,300 |
| Loss on debt extinguishment | - | - | 900 | 24,500 |
| Gain on life insurance settlement | - | - | - | (9,200) |
| Gain on the sale of cost method investment | - | - | (5,100) | - |
| Loss on sale of other assets | - | - | - | 600 |
| U.S. retirement plan contributions less than (in excess of) expense | (13,100) | - | (10,100) | (42,200) |
| Non-cash interest charges, net | 2,300 | 100 | 1,900 | 3,300 |
| Non-cash income from foreign currency hedge | (7,900) | - | - | - |
| Property damage litigation payments, net | (200) | - | (12,500) | (15,500) |
| Payment of warranty claim | (3,100) | - | - | - |
| Portion of 7-1/2% Notes repayment representing interest | - | - | - | (56,900) |
| Impairment of long-lived assets | 300 | - | - | 63,800 |
| Impairment of goodwill and indefinite-lived intangible assets | 79,000 | - | 415,200 | 80,500 |
| Litigation charges, net | - | - | (1,000) | 9,500 |
| Environment insurance recovery | 2,300 | - | - | - |
| Loss on sale of discontinued operations | - | - | 64,300 | - |
| Payment of acquisition-related costs | (6,100) | - | - | - |
| Changes in assets and liabilities: | | | | |
| Accounts receivable | 77,400 | (21,400) | 4,100 | 19,500 |
| Inventories | 16,500 | 1,700 | (37,700) | (12,200) |
| Accounts payable | (64,600) | 33,400 | (45,300) | 17,800 |
| Compensation related liabilities | (11,800) | 3,600 | 12,900 | (9,700) |
| Decreases in other assets and increases in other liabilities | 11,100 | 29,400 | - | 2,300 |
| Increases in other assets and decreases in other liabilities | (24,000) | (3,500) | (39,000) | (26,800) |
| Net cash provided by (used in) operating activities | (20,000) | 56,400 | (136,200) | (51,600) |

(a) Amounts represent fiscal 2008 activity before and after the Acquisition, as discussed in the accompanying notes.

The accompanying notes are an integral part of these consolidated financial statements.

B-6

| | Year Ended Feb. 28, 2009 | Dec. 22, 2007 through Feb. 29, 2008 (a) | Mar. 1, 2007 through Dec. 21, 2007 (a) | Year Ended Feb. 28, 2007 (a) |
|---|---|---|---|---|
| Cash flows from investing activities: | | | | |
| Purchases of plant and equipment | (40,700) | (9,500) | (40,200) | (67,200) |
| Net proceeds from the sale of cost method investment | - | - | 8,400 | 4,600 |
| Net proceeds from the sale of other assets | 4,700 | - | - | 4,600 |
| Sale (purchase) of intangible assets | 600 | - | (300) | (500) |
| Investment in restricted cash | (2,500) | - | - | - |
| Net proceeds from sale of discontinued operations | - | 1,700 | 92,000 | - |
| Net cash provided by (used in) investing activities | (37,900) | (7,800) | 59,900 | (63,100) |
| Cash flows from financing activities: | | | | |
| Revolving credit facility borrowings, net | 56,000 | 13,900 | 94,800 | 31,700 |
| Changes in short-term bank borrowings, net | 2,600 | (15,300) | 26,300 | 6,200 |
| Proceeds from credit facility term loans | - | - | - | 897,100 |
| Proceeds from other long-term bank borrowings | 73,700 | - | - | - |
| Repayment of credit facility term loans | (31,800) | (1,800) | (137,200) | (621,800) |
| Repayment of 7-1/2% Notes | - | - | (2,900) | (190,200) |
| Repayment of other long-term debt, net | (10,300) | - | (1,800) | (7,900) |
| Payment of Acquisition costs | - | (16,700) | - | - |
| Payment of financing-related fees | (2,700) | - | (6,000) | (10,000) |
| Net cash provided by (used in) financing activities | 87,500 | (19,900) | (26,800) | 104,200 |
| Effect of exchange rates on cash | (8,700) | 2,300 | 11,900 | 2,800 |
| Net increase (decrease) in cash and cash equivalents | 20,000 | 31,000 | (91,200) | (7,700) |
| Cash and cash equivalents: | | | | |
| Beginning of the period | 45,000 | 14,000 | 105,200 | 112,900 |
| End of the period | $ 65,900 | $ 45,000 | $ 14,000 | $ 105,200 |

(b) Amounts represent fiscal 2008 activity before and after the Acquisition, as discussed in the accompanying notes.

The accompanying notes are an integral part of these consolidated financial statements.

| | Additional Paid-In Capital | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Stockholder's Equity (Deficit) |
|---|---|---|---|---|
| Balance at February 28, 2006 | $ 674,400 | $ (401,200) | $ 80,300 | $ 353,500 |
| Adjustment to adopt Staff Accounting Bulletin No. 108 | - | 4,500 | (12,800) | (8,300) |
| Balance at March 1, 2006 | 674,400 | (396,700) | 67,500 | 345,200 |
| Comprehensive loss in fiscal 2007: | | | | |
| Net loss | - | (178,900) | - | (178,900) |
| Other comprehensive income: | | | | |
| Currency translation adjustments | - | - | 45,800 | 45,800 |
| Minimum Canadian pension liability adjustment, net of tax expense of $400 | - | - | 900 | 900 |
| Minimum U.S. pension liability adjustment, net of tax expense of $3,200 | - | - | 5,400 | 5,400 |
| Total comprehensive loss | | | | (126,800) |
| Adjustment to adopt FASB Statement No. 158, net of tax benefit of $900 | - | - | (1,400) | (1,400) |
| Balance at February 28, 2007 | 674,400 | (575,600) | 118,200 | 217,000 |
| Comprehensive income (loss) from March 1, 2007 through December 21, 2007: | | | | |
| Net loss | - | (525,000) | - | (525,000) |
| Other comprehensive income: | | | | |
| Currency translation adjustments | - | - | 124,700 | 124,700 |
| Amortization of prior service cost and unrecognized gains and losses included in net period benefit cost, net of tax expense of $2,200 | - | - | 3,800 | 3,800 |
| Immediate recognition of prior service cost and unrecognized losses due to settlements and divestitures, net of tax expense of $7,800 | - | - | 13,200 | 13,200 |
| Net actuarial gains arising during the period, net of tax expense of $10,700 | - | - | 18,100 | 18,100 |
| Total comprehensive loss | | | | (365,200) |
| Balance at December 21, 2007 | 674,400 | (1,100,600) | 278,000 | (148,200) |
| Eliminate Acquisition Date stockholders' equity | (674,400) | 1,100,600 | (278,000) | 148,200 |
| Issuance of equity instruments | 135,000 | | | 135,000 |
| Comprehensive loss from December 22, 2007 through February 29, 2008: | | | | |
| Net income | - | 22,900 | - | 22,900 |
| Other comprehensive income: | | | | |
| Currency translation adjustments | - | - | 36,100 | 36,100 |
| Net actuarial gains arising during the period, net of tax expense of $900 | - | - | 1,500 | 1,500 |
| Total comprehensive income | | | | 60,500 |
| Balance at February 29, 2008 | 135,000 | 22,900 | 37,600 | 195,500 |
| Comprehensive income (loss) in fiscal 2009: | | | | |
| Net loss | - | (147,100) | - | (147,100) |
| Other comprehensive income (loss): | | | | |
| Currency translation adjustments | - | - | (154,800) | (154,800) |
| Net actuarial gains arising during the period, net of tax expense of $3,700 | - | - | 6,500 | 6,500 |
| Total comprehensive loss | | | | (295,600) |
| Balance at February 28, 2009 | $ 135,000 | $ (124,200) | $ (110,700) | $ (99,000) |

The accompanying notes are an integral part of these consolidated financial statements.

## 1. The Company and Basis of Presentation

A description of the Company and a summary of the significant accounting policies used in the preparation of the consolidated financial statements follow.

*The Company*

Mark IV Industries, Inc. and its subsidiaries ("Mark IV" or the "Company") is a diversified manufacturer of engineered systems and components utilizing mechanical power transmission, air admission, Radio Frequency Identification ("RFID"), information display, and other technologies that serve automotive, industrial and transportation markets. Mark IV's products are sold to customers in a broad range of applications including automotive products, transportation equipment, agricultural equipment, industrial machinery and construction equipment, as well as many niche applications. The Company's activities are located primarily in North America and Europe, and to a lesser extent in South America and the Asia-Pacific region.

*General*

The consolidated financial statements include the accounts of the Company and all of its subsidiaries and have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"), consistently applied and on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the normal course of business. The Company's financial statements do not include any adjustments related to assets or liabilities that may be necessary should the Company not be able to continue as a going concern. See further discussion in Notes 6 and 12. All significant intercompany transactions have been eliminated in consolidation.

As a result of the December 2007 Acquisition (as described in Note 2), there was a change in accounting basis, and significant differences in the capital structure of the Company were created. Therefore, the consolidated financial statements of the Company after December 21, 2007 may not be comparable to the Company's consolidated financial statements for periods prior to the Acquisition Date. Accordingly, black lines have been placed at appropriate places in the consolidated financial statements and notes to differentiate the amounts derived under separate bases of accounting before and after the December 2007 Acquisition.

*Bankruptcy Filing*

On April 30, 2009, the Company and certain of its United States ("U.S.") subsidiaries (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors will continue to operate their business as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Mark IV's non-U.S. and certain of its U.S. subsidiaries were not included in the filings and will continue their business operations without supervision from the U.S. Courts and will not be subject to the Chapter 11 requirements of the Bankruptcy Code.

American Institute of Certified Public Accountants Statement of Position No. 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code* ("SOP 90-7"), which is applicable to companies in Chapter 11, generally does not change the manner in which pre-filing financial statements are prepared. However, it does require that the financial statements for periods subsequent to the filing of the Chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Income, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statement of operations beginning in the quarter ending May 31, 2009. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from post-petition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, cash provided by reorganization items must be disclosed separately in the statement of cash flows. SOP 90-7 became applicable to the Company effective April 30, 2009, and the Company will segregate those items as outlined above for all reporting periods subsequent to such date.

See further discussion of the Company's Chapter 11 filing in Note 12.

*Reclassifications*

Certain items previously reported in specific financial statement captions have been reclassified to conform to the current year presentation.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect amounts reported in the financial statements and related notes. Significant estimates and assumptions in these consolidated financial statements include, but are not limited to, estimates of future cash flows and other assumptions associated with the goodwill and long-lived assets impairment tests, environmental and legal liabilities, income taxes and deferred tax valuation allowances, the determination of discount and other rate assumptions for pension and postretirement employee benefit expenses, and contingencies. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be different from these estimates.

*Consolidated Statements of Cash Flows Supplemental Disclosures*

All highly liquid investments with original maturities of 90 days or less are considered cash equivalents. The fair value of cash and cash equivalents approximates their carrying amount. The Company paid cash interest of approximately $100.1 million in fiscal 2009, $9.1 million in the period from December 22, 2007 through February 29, 2008, $88.8 million in the period from March 1, 2007 through December 21, 2007 and $99.1 million in fiscal 2007. The Company paid cash income taxes, net of refunds, related to continuing operations of approximately $17.9 million in fiscal 2009, $3.3 million in the period from December 22, 2007 through February 29, 2008, $24.6 million in the period from March 1, 2007 through December 21, 2007 and $26.9 million in fiscal 2007.

*Foreign Currency Translation*

Financial statements of international subsidiaries are translated into U.S. dollars using the exchange rates in effect at each balance sheet date for assets and liabilities and a weighted average exchange rate for each period for revenues, expenses, gains and losses. The local currency is the functional currency in all non-U.S. subsidiaries; accordingly, translation adjustments are recorded as accumulated other comprehensive income (loss), a component of shareholder's equity. Income taxes are generally not provided for foreign currency translation adjustments.

*Concentrations of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of periodic temporary investments of excess cash and trade receivables. The Company places its excess cash in bank deposits and high quality short-term money market instruments through several high credit quality financial institutions. The credit risk associated with trade receivables is minimal due to the Company's large customer base and ongoing control procedures which monitor the creditworthiness of customers. Historically, the Company has not experienced significant losses on trade receivables.

*Fair Value Measurement*

The Company uses fair value measurements in the preparation of its financial statements, which utilize various inputs including those that can be readily observable, corroborated or are generally unobservable. When feasible, the Company utilizes market-based data and valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. Additionally, the Company applies assumptions that market participants would use in pricing an asset or liability, including assumptions about risk.

*Accounts Receivable Sales*

The Company transfers certain accounts receivable to various third parties under its accounts receivable factoring programs. No special-purpose entities are used in these arrangements. The Company records such transfers as sales of accounts receivable, and removes such amounts from the consolidated balance sheet when it is considered to have surrendered control of such receivables under the provisions of SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a Replacement of SFAS No. 125.* The face amount of accounts receivable sold to third parties was $269.8 million for fiscal 2009, $49.9 million for the period from December 22, 2007 to February 29, 2008, $238.3 million for the period from March 1, 2007 to December 21, 2007 and $193.5 million for fiscal 2007. The Company incurred discounting fees associated with these sales of $5.2 million for fiscal 2009, $0.9 million for the period from December 22, 2007 to February 29, 2008, $4.1 million for the period from March 1, 2007 to December 21, 2007 and $2.9 million for fiscal 2007. These amounts are classified within interest expense in the accompanying consolidated statements of operations.

*Customer Incentives*

The Company provides certain incentives to its automotive aftermarket customers, primarily in the form of credits, in exchange for exclusivity periods of up to five years related to the sale of the Company's products. Incentives and rebates offered in the amount of $37.2 million in fiscal 2009, $5.3 million in the period from December 22, 2007 through February 29, 2008, $33.4 million in the period from March 1, 2007 through December 21, 2007 and $36.6 million in fiscal 2007, have been recorded as a reduction to sales. The Company also capitalizes certain other costs of incentives that result in a probable future economic benefit and amortizes such costs over the initial term of the agreements. The Company evaluates the recoverability of these assets by comparing actual sales pursuant to the agreements to those expected at the time the agreement was executed. No such costs were capitalized during fiscal 2009, the period from December 22, 2007 through February 29, 2008, the period from March 1, 2007 through December 21, 2007 or fiscal 2007. The amount of amortization, recorded as a reduction to sales pursuant to these agreements was $0.5 million in the period from March 1, 2007 through December 21, 2007 and $0.4 million in fiscal 2007. Subject assets were fully amortized as of February 29, 2008.

*Accounts Receivable*

Accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is the Company's best estimate of the amount of probable credit losses in the Company's existing accounts receivable. The Company determines the allowance based on a number of factors, including historical experience, credit-worthiness of customers and current market and economic conditions. The Company reviews the allowance for doubtful accounts on a regular basis. Account balances are charged against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote.

*Inventories*

Inventories are stated at the lower of cost or market, with cost determined on the last-in, first-out ("LIFO") method. A provision for excess and obsolete inventory is determined based on management's review of inventories on hand compared to estimated future usage and sales.

*Property, Plant and Equipment*

Property, plant and equipment are recorded at cost. The Company provides for depreciation of plant and equipment primarily on the straight-line method over its useful life, which approximates 30 years for buildings and 3 to 10 years for machinery and equipment. Improvements on leased property are amortized over the shorter of the lease term or useful lives, generally ranging from 3 to 10 years. Additions and improvements that substantially extend the useful life of property, plant and equipment are capitalized. The cost of property, plant and equipment retired or otherwise disposed of, and the accumulated depreciation thereon, are eliminated from the asset and related accumulated depreciation accounts, and any resulting gain or loss is reflected in income. Maintenance and repairs are charged to expense as incurred. The Company capitalizes interest on funds borrowed to finance facility construction. Amounts capitalized in fiscal 2009, the period from December 22, 2007 through February 29, 2008, the period from March 1, 2007 through December 21, 2007 and fiscal 2007 were not material.

## Goodwill and Other Intangible Assets

The Company accounts for goodwill and other intangible assets in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"). SFAS No. 142 requires that the Company assign its goodwill to its identified reporting units, defined as an operating segment or one level below an operating segment. SFAS No. 142 also requires the Company to compare the fair value of each reporting unit to its carrying amount on an annual basis to determine if there is potential impairment. The Company uses a discounted cash flow methodology for purposes of determining fair value in its impairment testing. This test is performed annually as of December 1. SFAS No. 142 also requires that the Company perform impairment tests when events or changes in circumstances occur that would more likely than not reduce the fair value of a reporting unit below its carrying amount. If the fair value of the reporting unit is less than its carrying amount, an impairment loss is recorded to the extent that the implied fair value of the goodwill within the reporting unit is less than its carrying amount.

## Impairment of Long-Lived Assets

Prior to the Acquisition (described in Note 2), the Company's amortizable intangible assets other than goodwill were recorded at cost and amortized over periods ranging from 40 years for trade names/marks, 5 to 7 years for customer backlog/order flow, 6 to 10 years for intellectual property, and 10 years for the aftermarket parts catalog. Subsequent to the Acquisition, the amortizable intangible assets, other than goodwill, are recorded at cost and amortized over periods ranging from 6 to 13 years for customer relationships, 11 years for customer backlog/order flow, 10 to 13 years for intellectual property, 5 to 8 years for aftermarket parts catalog, and 1 to 6 years for market leases. The Company's trademark/tradename assets have indefinite lives.

Long-lived assets, including property, plant and equipment, and certain identifiable intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The assessment of possible impairment is based on the ability to recover the carrying value of the asset or asset group from the expected future cash flows (undiscounted and without interest charges) of the related operations. The Company assesses the recoverability of the carrying value of long-lived assets at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. If these cash flows are less than the carrying value of such asset or asset group, an impairment loss is measured based on the difference between estimated fair value and carrying value. Assets to be disposed of are written-down to their fair market value. Fair values are based on assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

## Activity with Related Party

Pursuant to the Management Agreement (the "Agreement") dated December 21, 2007 between Sun Capital Partners, Inc. and the Company, a management fee is required to be paid on a quarterly basis to Sun Capital Partners, Inc. in an annual amount equal to the greater of (i) $2.0 million or (ii) 2% of earnings before interest, taxes, depreciation and amortization ("EBITDA"), as calculated pursuant to the Agreement. The management fee may not exceed $4.0 million in any fiscal year. One-half of the management fee due is deferred until the occurrence of a qualifying payment event, as defined within

the Agreement. For fiscal 2009 and the period from December 22, 2007 through February 29, 2008, the total management fee and associated expenses amounted to $4.1 million and $0.4 million, respectively. At February 28, 2009 and February 29, 2008, the Company's consolidated balance sheet included a non-current liability of $1.9 million and $0.2 million, respectively, associated with this deferred fee.

As discussed in detail in Note 2, in December 2007 the Company was acquired by an affiliate of Sun Capital Partners, Inc. Subsequent to that change in ownership, affiliates of Sun Capital Partners, Inc. (the "Affiliates") acquired participation interests in certain of the Company's First and Second-Lien debt obligations in transactions which they negotiated with various third parties unrelated to the Company. As a result, as of February 28, 2009, approximately $59.9 million (principal amount) of the Company's obligations under its First and Second-Lien Credit Agreements have been acquired by the Affiliates. No additional obligations were acquired by the Affiliates subsequent to February 28, 2009.

As of February 28, 2007, the Company had a 9.9% equity investment in Société de Participations Ricordeau S.A. ("Ricordeau"), the acquirer of the Company's previously owned fuel and fluid handling business in Europe and South America. Since the Company did not exercise significant influence over the activities of Ricordeau, this investment was carried at an adjusted cost of $3.1 million and included in other non-current assets in the accompanying consolidated balance sheet at February 28, 2007. In May 2007, the Company sold its entire 9.9% equity investment to certain existing shareholders of Ricordeau. The Company received cash consideration of $8.6 million and paid costs of $0.2 million to complete the transaction. The Company recognized a gain of approximately $5.1 million related to this transaction and such amount has been included in "other income (loss), net" in the accompanying consolidated statement of operations for the period from March 1, 2007 through December 21, 2007.

## Warranty Costs

The Company recognizes expected warranty costs for products sold principally at the time of sale of the product based on management estimates of the amount that will eventually be required to settle such obligations. These accruals are based on several factors including past experience, production changes and various other considerations. The costs associated with warranty claims of a non-recurring nature are recognized as soon as evidence becomes available that enables the Company to make a determination that it has economic responsibility for costs incurred by a customer as a result of the product not meeting its warranted use. The estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims. Reserves for warranty costs are classified either in other current liabilities or other non-current liabilities, depending upon the expected timeframe in which the related costs will be expended by the Company.

## Pensions and Other Postretirement Employee Benefits

Pensions and other postretirement employee benefit costs and related liabilities and assets are dependent upon assumptions used in calculating such amounts. These assumptions include discount rates, expected returns on plan assets, health care cost trends, compensation and other factors. In accordance with GAAP, actual results that differ from the assumptions used are accumulated and amortized over future periods, and accordingly, generally affect recognized expense in future periods.

*Employee Termination Benefits and Other Exit Costs*

The Company continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company. This includes the realignment of its existing manufacturing capability, facility closures or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when the Company commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are terminated or when the Company ceases to use the facility and no longer derives economic benefit from the contract. All other exit costs are accrued when incurred. During fiscal 2009, the Company incurred employee termination benefits and other exit costs of $18.8 million. These costs are included within selling and administration costs in the accompanying consolidated statement of operations.

*Income Taxes*

The Company uses the asset and liability approach to account for income taxes. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of operating loss and credit carryforwards and differences between the carrying amounts of assets and liabilities and their respective tax bases using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized.

*Revenue Recognition*

The Company recognizes revenue when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when it has persuasive evidence of an arrangement, the products have been shipped to the customer, title and risk of loss related to the products have transferred, the sales price is fixed or determinable, and collectability is reasonably assured. The Company has contract situations where items are shipped throughout the term of the contract. In those instances, revenue and related costs are recognized as the units are delivered. At the time revenue is recognized, accruals are recorded, with the related reduction to revenue, for estimated product returns, allowances, and price discounts based upon historical experience and related terms of customer arrangements.

The Company enters into arrangements for the sale of equipment and installation, which are each accounted for as separate units of accounting. Consideration is allocated to the separate units of accounting based on each unit's relative fair value. Revenue is recognized on the equipment at the later of: (i) when title and risk of loss passes to the Company's customer, which is upon delivery, or (ii) when the Company demonstrates that the product meets customer requested specifications. Revenue is recognized on the installation upon completion.

*Tooling Costs*

The costs of company-owned tooling are capitalized as fixed assets and amortized over their estimated useful lives. In cases where the tooling is manufactured for and owned by the customer, the revenue derived from the customer-owned tooling is recognized as a sale upon acceptance of the tooling by the customer. Related costs, which tend to approximate the revenue amount, are recognized as an element of cost of products sold at the same time as the revenue is recognized.

*Legal Costs*

Legal and defense costs associated with pending general and product liability, claims, environmental matters and other claims are charged to expense as incurred and included as an element of selling and administrative expense.

*Research and Development Costs*

Research and development ("R&D") costs are charged to expense as incurred, and included as a separate line item in the accompanying consolidated statements of operations. Such R&D costs include salaries and related expenses of personnel committed to R&D activities, an allocation of related fixed overhead costs, as well as outside services and costs associated with the Company's R&D activities.

*Stock-Based Employee Compensation*

On March 1, 2006, the Company adopted SFAS No. 123R, *Share Base Payment*, which requires companies to measure and recognize compensation expense for all stock-based payments at fair value. The Company elected to use the "prospective" adoption transition method, which requires the Company to begin expensing share-based payments effective March 1, 2006. In accordance with the "prospective" adoption transition method, prior periods will not be restated to reflect, and do not include, the impact of SFAS No. 123R. Certain of Mark IV's employees participated in stock compensation plans of the Company's prior parent, MIV Holdings. However, as a result of the Acquisition, those compensation plans no longer had value. The Company has not recognized any compensation expense during any of the reporting periods through February 28, 2009.

*Debt Issuance Costs*

The costs related to the issuance or modification of long-term debt are deferred and amortized into interest expense over the life of each debt issue. Deferred amounts associated with debt extinguished prior to maturity are expensed.

*Derivative Instruments*

The Company follows SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended ("SFAS No. 133"). This statement requires the Company to recognize all derivative instruments as either assets or liabilities on their balance sheet at fair value.

On the date in which the Company enters into a derivative contract, the derivative is designated as a hedge of an identified exposure. The accounting for changes in the fair value of a derivative instrument depends on whether it has been designated and qualifies as part of a hedging relationship and, further, on the type of hedging relationship. The effectiveness of a hedging activity is determined by the ability of the contract to generate offsetting changes in fair value or cash flows of the hedged item with a correlation in the range of 80% to 125%. If the instrument is designated as a hedge and qualifies for hedge accounting treatment, the Company is required to measure effectiveness of its hedging relationships both at the hedge inception and on an ongoing basis.

The Company occasionally enters into currency forward contracts as a hedge for certain existing or anticipated business transactions, primarily intercompany transactions, denominated in currencies other than the U.S. dollar. These forward currency contracts are not cash flow hedges in accordance with SFAS No. 133; therefore, the mark-to-market adjustment is included in operating expense in the accompanying consolidated statement of operations. There were two currency forward contracts outstanding during fiscal 2008 or 2007, and accordingly, no mark-to-market adjustment has been recorded in the accompanying consolidated statements of operations for the period from December 22, 2007 to February 29, 2008, the period from March 1, 2007 to December 21, 2007 or fiscal 2007. The Company entered into a contract in June 2008 to hedge currency risk associated with the payment of future intercompany royalties, management fees and dividends denominated in Euros through July 2011. As of February 28, 2009, the outstanding notional amount of this contract totaled approximately 38.2 million Euro (approximately $48.7 million). The difference between the market rates on the settlement date compared to the market rates when the Company entered into the contract resulted in a realized gain of $1.9 million for fiscal 2009. The Company has also recorded an unrealized gain of $7.9 million in fiscal 2009, which represents the change in the market value of the instrument during the period. Both the realized and unrealized gains are included within other income (loss), net in the accompanying consolidated statement of operations.

The Company manages its interest rate risk through the use of interest rate cap, collar and swap agreements. These instruments are not used for trading purposes. The fair values of interest rate derivative contracts are recognized as other assets or current liabilities. There was no fair value associated with the interest rate cap and collar agreements at either February 28, 2009 or February 29, 2008. The fair value associated with the interest rate swap and cap agreements amounted to a liability of $3.5 million and $0 million at February 28, 2009 and February 29, 2008, respectively. None of the interest rate derivative contracts were designated as cash flow hedges, due to the contracts' ineffectiveness in the contracts. As a result, the changes in fair value on these contracts are recorded in earnings. During fiscal 2009, the period from December 22, 2007 to February 29, 2008, the period from March 1, 2007 to December 21, 2007 and fiscal 2007, the Company recorded non-cash pre-tax interest expense of $1.9 million, $0.1 million, $0.3 million and pre-tax income of $1.2 million, respectively, related to these interest rate derivative contracts.

*Effects of Recent Accounting Changes*

In December 2008, the Financial Accounting Standards Board ("FASB") issued FSP FAS 132(R)-1, *Employers' Disclosures about Postretirement Benefit Plan Assets*. The FSP required disclosure of additional information about investment allocation, fair values of major categories of assets, the

development of fair value measurements and concentrations of risk. The FSP is effective for fiscal years ending after December 15, 2009; however, earlier application is permitted. The Company is currently evaluating the impact FSP FAS 132(R)-1 will have on the disclosures to the consolidated financial statements.

In April 2008, the FASB issued Staff Position FSP FAS 142-3, *Determination of the Useful Life of Intangible Assets* ("FSP FAS 142-3"). The FSP amends the factors that should be considered in developing renewal or extension assumptions used to determine the useful life of a recognized intangible asset under SFAS No. 142. The intent of the FSP is to improve the consistency between the useful life of a recognized intangible asset under SFAS No. 142 and the period of expected cash flows used to measure the fair value of the assets under other accounting principles generally accepted in the United States of America. The FSP is effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years. Early adoption is prohibited. The guidance for determining the useful life of a recognized intangible asset shall be applied prospectively to intangible assets acquired after the effective date and the disclosure requirements shall be applied prospectively to all intangible assets recognized as of and subsequent to, the effective date. The Company will adopt FSP FAS 142-3 effective March 1, 2009 and is currently evaluating the impact FSP FAS 142-3 will have on the consolidated financial statements.

In March 2008, the FASB issued SFAS No. 161, *Disclosures about Derivative Instruments and Hedging Activities* ("SFAS No. 161"). SFAS No. 161 requires companies with derivative instruments to disclose information that would enable financial statement users to understand how and why a company uses derivative instruments, how derivative instruments and related hedged items are accounted for under SFAS No. 133, and how derivative instruments and related hedged items affect a company's financial position, financial performance and cash flows. The new requirements apply to derivative instruments and nonderivative instruments that are designated and qualify as hedging instruments and related hedged items accounted for under SFAS No. 133. SFAS No. 161 is effective for financial statements issued for fiscal years and interim periods beginning after November 15, 2008; however, early application is encouraged. The Company is currently evaluating the impact SFAS No. 161 will have on the disclosures to the consolidated financial statements.

In December 2007, the FASB issued SFAS No. 141 (Revised), *Business Combinations* ("SFAS No. 141(R)"), replacing SFAS No. 141, *Business Combinations* ("SFAS No. 141"). SFAS No. 141(R) retains the fundamental requirements of SFAS No. 141, broadens its scope by applying the acquisition method to all transactions and other events in which one entity obtains control over one or more other businesses, and requires, among other things, that assets acquired and liabilities assumed be measured at fair value as of the acquisition date, that liabilities related to contingent consideration recognized at the acquisition date and remeasured at fair value in each subsequent reporting period, that acquisition-related costs be expensed as incurred, and that income be recognized if the fair value of the net assets acquired exceeds the fair value of the consideration transferred. SFAS No. 141(R) is to be applied prospectively in financial statements issued for fiscal years beginning after December 15, 2008. SFAS No. 141(R) may have a material impact upon our financial position and/or results of operations in periods where acquisitions are consummated.

Also in December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements - an amendment of ARB No. 51* ("SFAS No. 160"). SFAS No. 160 amends ARB No. 51, *Consolidated Financial Statements*, to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that a noncontrolling interest in a subsidiary, which is sometimes referred to as a minority interest, is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. SFAS No. 160 is effective for fiscal years beginning on or after December 15, 2008. Since the Company does not presently have any relevant investment arrangements, its adoption of SFAS No. 160 is not expected to have any substantial effect on its consolidated financial position, results of operations or cash flows.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities Including an Amendment of FASB Statement No. 115* ("SFAS No. 159"). SFAS No. 159 permits a company to choose to measure many financial instruments and other items at fair value that are not currently required to be measured at fair value. The objective is to improve financial reporting by providing a company with the opportunity to mitigate volatility in reported earnings caused by measuring related assets and liabilities differently without having to apply complex hedge accounting rules and guidance. A company reports unrealized gains and losses in earnings at each subsequent reporting date on items for which the fair value option has been elected. The Company did not elect the fair value measurement option for any of its existing financial instruments other than those that are already being measured at fair value. The Company's adoption of SFAS No. 159 effective March 1, 2008 did not have any impact on its consolidated financial statements.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"). SFAS No. 157 addresses how companies should measure fair value when they are required to use a fair value measure for recognition and disclosure purposes under generally accepted accounting principles. SFAS No. 157 also expands disclosure requirements to include the methods and assumptions used to measure fair value and the effect of fair value measures on earnings. Refer to Note 9 for additional information, including the presentation of liabilities recorded at fair value in the Consolidated Balance Sheets. We have deferred the adoption of SFAS No. 157 with respect to nonfinancial assets and liabilities in accordance with the provisions of FSP FAS 157-2, *Effective Date of FASB Statement No. 157*. Items in this classification include goodwill, asset retirement obligations, intangible assets with indefinite lives, guarantees and certain other items.

In September 2006, the United States Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin No. 108 ("SAB No. 108"). SAB No. 108 provides interpretive guidance on the consideration of the effects of prior year misstatements in quantifying current year financial statement misstatements for the purpose of a materiality assessment. SAB No. 108 requires companies to quantify misstatement using both the balance sheet ("iron curtain") and income statement ("rollover method") approaches and to evaluate whether either approach results in an error that is material in light of quantitative and qualitative factors. When the effect of the initial adoption of SAB No. 108 is determined to be material, SAB No. 108 allows companies to record the effect as a cumulative-effect adjustment to the beginning-of-year retained earnings. The Company adopted SAB No. 108 during the fiscal year ended February 28, 2007 and recorded a net adjustment of $4.5 million to decrease the retained deficit balance at March 1, 2006.

In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans - An amendment of FASB Statements No. 87, 88, 106, and 132(R)* ("SFAS No. 158"). SFAS No. 158 requires employers to recognize the overfunded or underfunded status of a defined benefit postretirement plan as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which the changes occur through comprehensive income of a business entity and to measure the assets and obligations of a plan as of its fiscal year-end statement of financial position. The Company adopted SFAS No. 158 on February 28, 2007, with the exception of the change in measurement date, which it adopted as of the Acquisition Date. The adoption of SFAS No. 158 did not have a material impact on the Company's consolidated financial position or results of operations, and had no effect on its cash flows.

In June 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109* ("FIN 48"), which clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes*. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. On December 30, 2008, the FASB issued FSP FIN 48-3 relating to the adoption of FIN 48 for non-public enterprises. The FASB held that a nonpublic enterprise may defer the adoption of FIN 48 until years beginning after December 15, 2008 if the nonpublic enterprise has not applied the recognition, measurement, and disclosure provisions of FIN 48 in a full set of annual financial statements issued prior to the issuance of this FSP. The Company has elected to defer the adoption of FIN 48 until fiscal 2010. The Company's current accounting policy is to continue to follow the guidelines established in SFAS No. 5, *Accounting for Contingencies*, for evaluating uncertain tax positions. Management is currently evaluating the impact, if any, that the adoption of FIN 48 could have on the Company's consolidated financial statements.

## 2. Acquisition and Divestitures

On November 21, 2007, the Company's parent, MIV Holdings S.A. ("MIV Holdings"), an entity owned by funds controlled by BC Partners, other financial investors and the Company's management, entered into a Stock Purchase Agreement ("SPA") with Mark IV Global Holding Corp. ("Mark IV Global"), an entity owned by funds controlled by Sun Capital Partners, Inc. Under terms of the SPA, as subsequently amended, Mark IV Global would purchase 100% of the ownership equity of the Company from MIV Holdings. The Company's Credit Agreements required the Company's primary banking group (the "Lenders") to approve of the change-in-control. Completion of the transaction also required changes in the interest rates to be paid by the Company under the Credit Agreements, as well as changes in financial covenants related to such Credit Agreements. On December 21, 2007 (the "Acquisition Date"), the SPA became effective, with the Company becoming a wholly-owned subsidiary of Mark IV Global (the "Acquisition").

As a result of the Acquisition, the Company was required to revalue its assets and liabilities as of the Acquisition Date in accordance with SFAS No. 141, *Business Combinations* ("SFAS No. 141"). The Company engaged third-party appraisers to perform such analysis on certain of its assets and liabilities that embody a significant portion of the Company's global operations. The consolidated balance sheet

as of February 29, 2008 includes adjustments to the carrying values of certain assets and liabilities on a preliminary basis, as discussed further in the notes herein, with a corresponding adjustment to the excess of the purchase price over the historical carrying value of the Company's net assets. These amounts were finalized during fiscal 2009 based upon further analysis and final valuations made by the Company with the assistance of outside specialists.

The Company's determination and final allocation of the purchase price as of the Acquisition Date consists of the following (dollars in thousands):

Purchase Price Determination:

| | |
|---|---:|
| Amount paid directly to MIV Holdings | $ 75,000 |
| Capital contribution from Mark IV Global | 60,000 |
| Acquisition costs | 21,700 |
| Total purchase price | $ 156,700 |

Allocation of the Purchase Price:

| | |
|---|---:|
| Trade accounts receivable | $ 259,500 |
| Inventories | 289,200 |
| Other current assets | 37,700 |
| Property, plant and equipment | 322,200 |
| Goodwill | 337,300 |
| Other intangible assets | 623,600 |
| Other non-current assets | 16,100 |
| Accounts payable and other current liabilities | (394,400) |
| Deferred income taxes | (225,700) |
| Other non-current liabilities | (153,000) |
| Total indebtedness, net of cash | (955,800) |
| Total purchase price, including Acquisition-related costs | $ 156,700 |

The final allocation of the purchase price differs from the initial allocation disclosed in the consolidated financial statements as of February 29, 2008. These differences are primarily related to the completion of the final valuations associated with property, plant and equipment and the resolution or revised estimates of certain pre-acquisition legal and environmental contingencies, with the associated impacts on deferred taxes and goodwill.

The Company incurred costs pursuant to the SPA of approximately $21.7 million that have been included as a part of the above purchase price determination ("Acquisition costs"). These Acquisition costs consisted of investment banking, legal and professional fees totaling approximately $11.7 million, plus $10.0 million of transaction fees payable to Sun Capital Partners Management V, LLC. Relative to the transaction fees, $5.0 million were paid subsequent to the Acquisition Date, and the remaining $5.0 million has been deferred and will be payable upon the occurrence of a qualifying payment event, in the same manner as discussed previously in Note 1 for the deferred management fee payments. The

Company also incurred approximately $7.8 million of costs to effect the Acquisition ("Acquisition-related costs"), including legal and professional fees, compensation related arrangements with key management personnel, and various other costs. These Acquisition-related costs were expensed in the fourth quarter of fiscal 2008. None of the stated goodwill above is deductible for income tax purposes.

*Sale of Platform Business Segment*

In May 2007, the Company completed the sale of the majority of the assets and liabilities related to its Platform Business Segment to an entity also owned by funds controlled by Sun Capital Partners, Inc. The Company received cash proceeds of $9.0 million at closing, of which $1.0 million has been placed into escrow to cover certain contingent liabilities as of the closing date. Additionally, the Company received an additional $0.3 million in January 2008 resulting from the final net asset adjustment. The Company also transferred approximately $21.0 million of non-operating pension, environmental and other liabilities to the buyer of the Platform Business Segment, resulting in net consideration of approximately $29.3 million for the transaction. The Company recognized a loss of approximately $34.4 million on this transaction, with no related tax benefit, which has been included in the line item "loss from discontinued operations, net" in the accompanying consolidated statements of operations.

As more fully described in Note 8, as a result of the above-referenced transfer of pension liabilities, the Company was required to re-measure the benefit obligations and plan assets of the remaining U.S. Defined Benefit Pension Plans as of the transaction date. The re-measurement resulted in settlement related charges totaling approximately $21.0 million, which have been included in the above $34.4 million loss, with an offsetting impact in other comprehensive income ("OCI") in the period from March 1, 2007 through December 21, 2007. This adjustment primarily consists of an allocation of net actuarial losses through the divestiture date that had been recognized as an expense in OCI, but had not yet been recognized as an expense in the Company's primary income statement. This adjustment had no effect on the economics of the divestiture.

The historical results of operations of the Platform Business Segment, up until the May 25, 2007 transaction date, have been presented as a discontinued operation in the accompanying consolidated statements of operations for all periods presented.

*Sale of Power Train Business Segment*

In June 2007, the Company completed the sale of its Lombardini S.r.l. subsidiary (which made up the Company's Power Train Business Segment) for approximately $155.4 million. The purchase price consisted of a cash payment of approximately $84.0 million at closing, plus a final net asset adjustment payment in February 2008 of approximately $1.4 million, and the assumption of net debt by the buyer of approximately $70.0 million. As a result of this transaction, the Company recognized a loss of $29.9 million, with no related tax benefit, which has been included in the line item "loss from discontinued operations, net" in the accompanying consolidated statements of operations. As required by the Company's Credit Agreements, during the period from March 1, 2007 through December 21, 2007, the Company utilized a portion of the cash proceeds from this transaction to pay down approximately $5.5 million related to the Euro Term Loan A and approximately $15.9 million related to the U.S. Term Loan

MARK IV INDUSTRIES, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
FEBRUARY 28, 2009

MARK IV INDUSTRIES, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
FEBRUARY 28, 2009

B obligations under the Credit Agreements, as well as approximately $21.4 million to pay off debt under the Company's Credit Agreements that was specifically linked to the Power Train Business Segment.

The historical results of operations of the Power Train Business Segment, up until the June 22, 2007 transaction date, have been presented as a discontinued operation in the accompanying consolidated statements of operations for all periods presented.

Summarized selected financial information for the Company's Platform and Power Train Business Segments, which have been reported as discontinued operations, follows (dollars in thousands):

| | Mar. 1, 2007 through Dec. 21, 2007 | Year Ended February 28, 2007 |
|---|---|---|
| Net sales | $ 172,600 | $ 561,000 |
| Loss from discontinued operations, before taxes | (1,600) | (171,200) |
| Net loss on sale, before taxes (1) | (64,300) | - |
| Benefit from (provision for) income taxes | (300) | 2,600 |
| Loss from discontinued operations, net | $ (66,200) | $ (168,600) |

(1) Note that this line item includes pension settlement and related charges totaling approximately $20.9 million for the period March 1, 2007 through December 21, 2007, as previously discussed.

## 3. Accounts Receivable, Inventories and Other Balance Sheet Items

Accounts receivable are reflected net of allowances for doubtful accounts of approximately $4.2 million and $4.8 million at February 28, 2009 and February 29, 2008, respectively.

As a part of the accounting for the Acquisition, inventories were re-valued to their fair market value, resulting in a net increase in their carrying value of approximately $51.2 million as of the Acquisition Date. As a result of that adjustment, LIFO cost exceeded historical FIFO cost by approximately $38.5 million and $49.1 million at February 28, 2009 and February 29, 2008, respectively. FIFO cost approximates replacement cost at the balance sheet dates.

Details regarding the Company's inventories are as follows (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Raw materials | $ 53,500 | $ 66,000 |
| Work-in-process | 56,100 | 65,100 |
| Finished goods | 118,700 | 142,400 |
| Total inventories | $ 228,300 | $ 273,500 |

During the first quarter of fiscal 2007, there was a fire at a third-party distribution facility in Italy that was used to warehouse certain finished goods inventory of the Company's aftermarket products. The inventory that was destroyed in the fire had a FIFO-based cost of approximately $12.8 million and an estimated sales value to the Company's customers of approximately $20.6 million. Mark IV had insurance to cover business-interruption costs related to the fire, as well as the sales value of the inventory that was destroyed, less a nominal deductible amount. During fiscal 2007, the Company collected approximately $21.6 million from its insurers related to this claim, which represented $20.6 million related to the sales value of the inventory destroyed and $1.0 million to cover business-interruption costs. In total, the Company recognized a net gain of $6.5 million related to this event, which has been included in "other income, net" in the accompanying consolidated statement of operations for fiscal 2007.

Other current assets consist of the following (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Other prepaid expenses | $ 13,200 | $ 16,400 |
| Prepaid taxes | 6,100 | 14,100 |
| Non-trade receivables | 1,800 | 2,100 |
| Other items | 4,900 | 7,100 |
| Total other current assets | $ 26,000 | $ 39,700 |

Other current liabilities consist of the following (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Income taxes payable | $ 25,200 | $ 31,000 |
| Retiree healthcare obligations | 9,100 | 11,300 |
| Accrued operating expenses | 7,700 | 9,500 |
| Warranty accruals | 4,200 | 2,800 |
| Mark-to-market value of derivative financial instruments | 3,500 | - |
| Deferred tax liabilities | 3,200 | 7,000 |
| Insurance accruals | 2,300 | 2,700 |
| Litigation and environmental accruals | 1,200 | 3,200 |
| Accrued Acquisition and Acquisition-related costs | - | 6,100 |
| Product liability accrual | - | 4,100 |
| Other accrued liabilities | 13,600 | 16,300 |
| Total other current liabilities | $ 70,000 | $ 94,000 |

Other non-current liabilities consist of the following (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Deferred tax liabilities, net | $ 150,600 | $ 200,700 |
| Retiree healthcare liabilities (U.S.) | 68,000 | 79,800 |
| Staff leaving indemnity (Europe) | 26,100 | 31,500 |
| Insurance accruals | 7,100 | 4,600 |
| Litigation and environmental accruals | 6,900 | 3,600 |
| Deferred Acquisition costs and management fee to related party | 6,900 | 5,000 |
| Life insurance commitments, net | 4,800 | 4,900 |
| Pension liabilities (U.S.) | 2,100 | 8,900 |
| Other long-term liabilities | 14,100 | 13,700 |
| Total other non-current liabilities | $ 286,600 | $ 352,700 |

*Warranty Accruals*

A reconciliation of the changes in the Company's warranty accruals from continuing operations is as follows (dollars in thousands):

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 |
|---|---|---|---|
| Liability balance at the beginning of the period | $ 3,200 | $ 3,300 | $ 4,000 |
| Accruals for new and pre-existing warranties (including changes in estimates) | 3,500 | 900 | 4,500 |
| Settlements (in cash or in kind) made during the period | (1,700) | (1,100) | (5,300) |
| Currency translation adjustments | (500) | 100 | 100 |
| Liability balance at the end of the period | $ 4,500 | $ 3,200 | $ 3,300 |
| Amount classified in other current liabilities | $ 4,200 | $ 2,800 | $ 3,200 |
| Amount classified in other non-current liabilities | $ 300 | $ 400 | $ 100 |

*Life Insurance Settlement*

The Company is required to maintain life insurance policies on certain of its current and former executive officers. These policies provide a split benefit upon the death of the insured that results in the Company receiving reimbursement for the cumulative amounts of its premiums paid on such policies,

with the executives' beneficiaries receiving the balance of the insured value (the "Split-Dollar Policies"). The Company accounts for these arrangements by recording a net non-current liability primarily consisting of: (i) the present value of the future premium payments to be made to keep the policies in force, (ii) plus the loans taken out by the Company against such policies, (iii) less the discounted cumulative premiums paid to date on such policies.

In August 2006, the Company entered into an agreement with a former executive and his trust to effectively terminate and settle the Company's obligations related to that former executive's Split-Dollar Policies. Pursuant to this agreement, the Company: (i) agreed to pay the issuer of the policies approximately $4.1 million in three equal installments (the Company paid $1.4 million upon the execution of the agreement and $1.4 million in March 2007, and paid the remaining installment in March 2008); (ii) transferred its ownership interest in the policies to the former executive's trust; and (iii) was relieved of all its past, present and future obligations related to the policies. As a result, the Company recorded a gain of approximately $9.2 million on this transaction and has included such amount on the separate line item "gain on life insurance settlement" in the accompanying consolidated statement of operations for fiscal 2007.

## 4. Property, Plant and Equipment

Property, plant and equipment consist of the following (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Land and land improvements | $ 22,400 | $ 27,100 |
| Buildings | 81,000 | 88,800 |
| Machinery and equipment | 226,900 | 234,800 |
| Total property, plant and equipment | 330,300 | 350,700 |
| Less accumulated depreciation | 50,400 | 7,300 |
| Property, plant and equipment, net | $ 279,900 | $ 343,400 |

As a result of the Acquisition, a preliminary valuation of property, plant and equipment was prepared by the Company using valuations consisting of various appraisals and other valuation techniques prepared by third-party valuation specialists. Based on these preliminary valuations, the Company's gross carrying value of property, plant and equipment at February 29, 2008 reflects the estimated fair market value of its fixed assets as of the Acquisition Date, as well as the cost of any subsequent additions. The final valuation was completed during fiscal 2009 and the gross carrying value of property, plant and equipment at February 28, 2009 reflects the final fair market values.

Costs related to construction-in-progress are primarily attributable to equipment and tooling activities and are included in machinery and equipment in the above table. Depreciation expense related to continuing operations was approximately $49.2 million in fiscal 2009, $7.6 million in the period from December 22, 2007 to February 29, 2008, $37.5 million in the period from March 1, 2007 to December 21, 2007 and $39.4 million in fiscal 2007.

During the period ended December 21, 2007, the Company recorded a charge of $4.0 million to write-down the net book value associated with certain idle long-lived assets to their estimated fair values. This impairment has been included in "impairment of long-lived asset" in the accompanying consolidated statement of operations for the period from March 1, 2007 through December 21, 2007.

During the first quarter of fiscal 2007, the Company completed a sale of certain assets (for net cash proceeds of approximately $4.6 million and realized a loss on the sale of approximately $0.6 million. This loss on the sale of assets has been included in "other income (loss), net" in the accompanying consolidated statement of operations for fiscal 2007.

During fiscal 2007, the Company concluded that there was a current expectation that it was more-likely-than-not that certain long-lived assets would be sold or otherwise disposed of significantly before the end of their previously estimated useful lives. Due to this expectation, the Company concluded that an event of impairment, as defined by SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, had occurred which required that the Company test certain long-lived assets other than goodwill for impairment. As a result of the Company's impairment evaluation, the Company recorded a charge of $63.8 million related to the long-lived assets of the Platform division to write-down certain long-lived assets held for use to their estimated fair values, primarily related to its property, plant and equipment. This charge has been included as a part of the results of the discontinued operations shown separately in the accompanying consolidated statement of operations for fiscal 2007.

## 5. Goodwill and Other Intangible Assets

### Goodwill

Goodwill resulting from the Acquisition has been determined in accordance with SFAS No. 141, based on the final determination of the fair market value of the Company's other assets and liabilities. The remaining portion of the purchase price in excess of the net carrying value of the Company's other tangible and intangible assets and liabilities as of the Acquisition Date was allocated to goodwill.

A summary of the changes in the carrying amount of the Company's goodwill is as follows (dollars in thousands):

| | |
|---|---|
| Balance at February 29, 2008 | $ 339,200 |
| Purchase accounting adjustments | 11,000 |
| Impairment charges | (38,600) |
| Currency translation | (54,100) |
| Balance at February 28, 2009 | $ 257,500 |

The preliminary allocations and changes at February 29, 2008, are as follows (dollars in thousands):

| | |
|---|---|
| New balance at acquisition date | $ 326,300 |
| Currency translation | 12,900 |
| Balance at February 29, 2008 | $ 339,200 |

Goodwill is tested for impairment at least annually at a level of reporting defined as a reporting unit. The Company uses a discounted cash flow methodology for purposes of determining fair value in its impairment testing, as well as the services of a third-party valuation firm.

### Fiscal 2009 Impairment Test

Annual impairment testing for fiscal 2009 was performed on December 1, 2008. The Company recognized a $25.7 million goodwill impairment charge related to its Heavy Duty European ("HDE") reporting unit, which represents the elimination of a substantial portion of the remaining goodwill assigned to this reporting unit. This charge is a result of lower projected revenue and earnings and is a direct result of the significant global economic downturn in the latter half of fiscal 2009. The global economic downturn which began in North America and spread to all geographic regions in which the Company operates has directly impacted the agriculture and other heavy duty markets in which this reporting unit serves primarily in Western Europe and, to a lesser extent, Eastern Europe. The reporting unit, as a direct result of these volume reductions and an estimate of a longer cycle economic recovery, has lowered the projections of its revenues and earnings for future years. These projections form the basis for the valuation support of the underlying goodwill of the business, and resulted in the reduction of the underlying goodwill related to reporting unit.

The impairment test for the Company's Air Intake North America ("AICNA") reporting unit indicated impairment had occurred in the amount of $12.9 million. This charge results primarily from lower projected earnings of this reporting unit as a result of the unit volume reduction in car builds in the original equipment manufacturer ("OEM") market in North America which was a direct result of the significant economic downturn in the latter half of fiscal 2009. The reporting unit, as a direct result of these volume reductions and an estimate of a longer cycle economic recovery, has lowered the projections of its revenues and earnings for future years, and resulted in the reduction of the underlying goodwill related to this reporting unit.

### Fiscal 2008 Impairment Test

Annual impairment testing for fiscal 2008 was performed as of December 1, 2007, just prior to the Acquisition Date. The impairment test for the Company's IVHS reporting unit ("IVHS") indicated an impairment had occurred in the amount of $321.9 million. This significant charge was due in part to the movement in the exchange rate of the Canadian dollar, which increased the goodwill value by approximately $66.0 million during fiscal 2008, and approximately $170.0 million on a cumulative basis since its initial determination. The absence of a corresponding increase in value of the underlying business was due to the predominant U.S. revenue base of this Canadian-based operating unit. More substantively, the IVHS revenue (and related earnings) fell off significantly in the latter part of fiscal

2008. The primary cause of the revenue decline is believed to be a function of delays in IVHS customers' efforts to initiate replacement programs for transponders in service, which totaled approximately 17.0 million units as of the testing date. As a result, the Company lowered its revenue and earnings projections for future years. Since the projections form the basis for the valuation supporting the underlying value of the goodwill related to the IVHS reporting unit, the end result was a significant reduction in the underlying value of the goodwill of the business. Additionally, the valuation specialists identified a significant unrecognized value (for accounting purposes) associated with the IVHS reporting unit's customer base, which had the accounting effect of requiring a further reduction to the carrying value of the goodwill. The charge also includes approximately $3.7 million related to the elimination of all of the goodwill related to the NRD reporting unit.

The Company also recognized a $70.4 million goodwill impairment charge representing the elimination of the entire balance related to the North American Aftermarket Business reporting unit. This charge results primarily from lower projected earnings for this reporting unit, reflecting the effects of increased pricing pressures and working capital requirements experienced by this reporting unit, primarily related to its larger retail customers, as well as an excess capacity in the supplier base for these customers. The charge is also a function of the offsetting adjustment required for the value of other unrecognized assets, similar to the element discussed above for the IVHS reporting unit.

The testing also identified $19.2 million goodwill impairment charge was required relating to the North American Power Transmission reporting unit, and represents the elimination of the remaining goodwill value assigned to this reporting unit as well. This charge results primarily from lower projected earnings reflecting the effects of the increased pricing pressures experienced with the unit's OEM customers, as well as these customers' loss of market share to their competitors, and the overall poor economic environment in the North American automotive OEM sector.

*Fiscal 2007 Impairment Test*

Annual impairment testing for fiscal 2007 resulted in a total goodwill impairment loss of $80.5 million, of which approximately $49.4 million was related to certain Power Train reporting units and $31.1 million was related to certain Platform reporting units. The impairment loss within the Company's Power Train reporting units was caused primarily by an erosion of previously anticipated operating margin percentages due to higher manufacturing costs and a stagnant agriculture market which many of its products are sold into. In addition, these reporting units' cash flows were negatively affected by delays in the anticipated penetration into new geographic markets, primarily in India. The impairment loss within the Company's Platform reporting units was primarily attributable to erosion of previously anticipated operating margins as a result of increased raw material costs and manufacturing inefficiencies which resulted in negative cash flows and lower anticipated future growth. These impairment charges have been included as a part of the results of the discontinued operations shown separately in the accompanying consolidated statement of operations for fiscal 2007.

*Other Intangible Assets*

As a result of the Acquisition, valuations of the Company's intangible assets other than goodwill as of the Acquisition Date were prepared by the Company using valuations prepared by third-party valuation specialists.

Other identifiable intangible assets consist of the following (dollars in thousands):

| February 28, 2009 | Gross Value | Accumulated Amortization | Cumulative Translation Adjustments | Net Balance | Estimated Life |
|---|---|---|---|---|---|
| Customer relationships | $ 309,800 | $ (38,800) | $ (24,300) | $ 246,700 | 6 – 13 years |
| Trade names/marks | 108,100 | - | (12,000) | 96,100 | Indefinite |
| Customer backlog/order flow | 72,700 | (7,900) | (7,500) | 57,300 | 11 years |
| Intellectual property | 82,500 | (9,000) | (8,200) | 65,300 | 10 – 13 years |
| Aftermarket catalog | 5,700 | (1,000) | (300) | 4,400 | 5 – 8 years |
| Market lease | (600) | 300 | 100 | (200) | 1 – 6 years |
| Total | $ 578,200 | $ (56,400) | $ (52,200) | $ 469,600 | |

| February 29, 2008 | Gross Value | Accumulated Amortization | Cumulative Translation Adjustments | Net Balance |
|---|---|---|---|---|
| Customer relationships | $ 309,800 | $ (6,300) | $ 12,100 | $ 315,600 |
| Trade names/marks | 152,900 | - | 6,400 | 159,300 |
| Customer backlog/order flow | 72,700 | (1,300) | 600 | 72,000 |
| Intellectual property | 82,500 | (1,400) | 4,000 | 85,100 |
| Aftermarket catalog | 5,700 | (200) | 100 | 5,600 |
| Market lease | (600) | - | - | (600) |
| Total | $ 623,000 | $ (9,200) | $ 23,200 | $ 637,000 |

The Company accounts for its other non-amortizable intangible assets in accordance with SFAS No. 142. In accordance with SFAS No. 142, the Company considers its tradename intangible assets as indefinite-life intangible assets that do not require amortization. The annual impairment test for fiscal 2009 for these intangible assets was performed at December 1, 2008 by comparing the fair value of the tradename assets to their carrying amount. The Company estimated the fair value of tradenames using the relief-from-royalty approach, which is a standard form of discounted cash flow analysis typically used for the valuation of tradenames. The Company recognized a $40.4 million impairment charge as a result of the carrying value of its various tradenames exceeding the fair value. This amount consists of impairment of the gross value of tradenames of $44.8 million, net of the $4.4 million impact on cumulative translation adjustments. The impairment of the Company's tradename assets is primarily related to the recent significant declines in the U.S. and international financial markets and the resulting

impact of such events on current and anticipated future economic conditions and customer behavior. The impairment charge reflects lower revenues and profitability projections associated with the Company's tradename assets in the near term, a longer cycle of estimated market recovery and lower estimated market royalty expectations in light of current general economic conditions. There was no impairment charge in fiscal 2008 related to other intangible assets.

As discussed in Note 4, during fiscal 2007, the Company recognized a $63.8 million impairment charge related to long-lived assets other than goodwill in certain Platform reporting unites. Of this amount, $4.7 million was attributable to trade names within other identifiable intangible assets.

Amortization expense related to the Company's identified amortizable intangible assets of continuing operations was approximately $47.2 million in fiscal 2009, $9.2 million in the period from December 22, 2007 through February 29, 2008, $4.7 million in the period from March 1, 2007 through December 21, 2007, and $11.4 million in fiscal 2007. Amortization expense associated with the Company's identified amortizable intangible assets is expected to be approximately $47.2 million in fiscal 2010, $47.3 million in fiscal 2011, $47.3 million in fiscal 2012, $47.3 million in fiscal 2013, and $47.3 million in fiscal 2014.

## 6. Debt

As further described in subsequent paragraphs, the Company's First and Second Lien Credit Agreements contain financial covenants based on consolidated leverage ratios and interest coverage ratios, which are required to be tested at each quarter-end. The Company was not in compliance with certain of these ratios as of February 28, 2009, which defaults have not been waived by the lenders or otherwise cured.

Additionally, pursuant to affirmative covenants contained in the agreements associated with the Credit Agreements, the Company is required to provide audited annual financial statements within a prescribed period of time after the end of each fiscal year without a "going concern" audit report or like qualification or exception. On June 2, 2009, the Company's auditors included an explanatory paragraph in its audit report on the Company's fiscal 2009 consolidated financial statements indicating substantial doubt about the Company's ability to continue as a going concern. The receipt of such an explanatory statement constitutes a default under the Company's First and Second Lien Credit Agreements as of February 28, 2009.

The aforementioned has resulted in the classification of $920.4 million of long-term debt as a current liability in accordance with the requirements of SFAS No. 78, *Classification of Obligations That Are Callable by the Creditor*. Additionally, $22.4 million associated with these instruments in default which would have been classified within Current maturities of long-term debt due to the contractual maturity dates has also been classified as Debt in default at February 28, 2009.

The Company's indebtedness consists of the following (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Notes payable | $ 37,200 | $ 41,200 |
| Current maturities of long-term debt | 12,400 | 22,500 |
| Notes payable and current maturities | $ 49,600 | $ 63,700 |
| Debt in default: | | |
| Revolving Credit Facility | $ 130,000 | $ - |
| Euro Term Loan A | 23,400 | - |
| U.S. Term Loan B | 641,200 | - |
| Second Lien Term Loan | 148,200 | - |
| Total debt in default | $ 942,800 | $ - |
| Senior debt: | | |
| Revolving Credit Facility | $ - | $ 80,000 |
| Euro Term Loan A | - | 50,400 |
| U.S. Term Loan B | - | 649,100 |
| Second Lien Term Loan | - | 150,000 |
| Total senior debt | - | 929,500 |
| Less current maturities (included above) | - | (22,100) |
| Net senior debt | - | 907,400 |
| Subordinated debt: | | |
| Italian mortgage loan | 19,600 | - |
| French-based debt | 31,700 | - |
| Other Italian-based debt | 4,600 | 2,600 |
| Other borrowing arrangements | - | 300 |
| Total subordinated debt | 55,900 | 2,900 |
| Less current maturities (included above) | (12,400) | (400) |
| Less deferred financing fees | (1,800) | - |
| Net subordinated debt | 41,700 | 2,500 |
| Total long-term debt | $ 41,700 | $ 909,900 |

The Company had outstanding standby letters of credit and surety bonds amounting to approximately $18.8 million and $22.7 million at February 28, 2009 and February 29, 2008, respectively. Such instruments represent conditional commitments of the Company in which a third-party has guaranteed the Company's ability to satisfy certain liabilities and performance obligations in the future. In view of the contingent nature of these commitments, they are not reflected in the Company's consolidated balance sheets, but do reduce availability under the Company's Revolving Credit Facility. Additionally, the Company had other guarantees outstanding in the amount of $1.4 million and $2.7 million at February 28, 2009 and February 29, 2008, respectively, related to the performance of the work of an international subsidiary on certain long-term contracts. Such guarantees are not reflected in the

Company's consolidated balance sheets and do not reduce the availability under the Company's Revolving Credit Facility.

In June 2008, the Company secured a mortgage loan in Italy and received net proceeds of approximately $25 million. The loan bears interest at a European short-term interest rate plus 1.50% and expires in March 2015. In July 2008, a French subsidiary of the Company entered into an unsecured loan arrangement with a Dutch-based lender for an aggregate principal amount of 29.5 million Euros. The loan expires in July 2012. The loan agreement requires the maintenance of leverage and fixed charge coverage ratios at the subsidiary's level which are less stringent than those required by the Credit Agreement. As required by the Company's Credit Agreements, during fiscal 2009, the Company utilized a portion of the cash proceeds from the French facility to pay down approximately $0.3 million related to the Euro Term Loan A, $7.9 million related to the U.S. Term Loan B, $20.6 million related to the Revolving Credit Facility and $1.8 million related to the Second Lien Term Loan. The Company incurred a prepayment penalty of approximately $0.2 million associated with this transaction. The issuance of these loans was allowed under the Credit Agreement. The defaults under the First and Second Lien Credit Agreements also resulted in cross-default of the obligations under the financing arrangement in France, however such cross-defaults have been waived by the lenders and therefore these obligations continue to be classified within Current maturities and Long-term debt at February 28, 2009 based upon the scheduled maturity dates. See further discussion in Note 12.

As discussed in Note 1, the Company enters into interest rate derivative contracts to hedge against the effects of adverse changes in interest rates on consolidated results of operations and future cash outflows for interest. These contracts include interest rate swap agreements that convert a portion of variable rate debt to fixed rate debt. At February 28, 2009 and February 29, 2008, the Company had $369.1 million and $36.5 million, respectively, of variable rate borrowings under the First and Second Lien Term Loans that were fixed rate debt pursuant to these agreements. Subsequent to February 28, 2009, an unfavorable interest rate swap in the notional amount of $250 million was cancelled, with a closing value of $16.6 million. The Company also enters into interest rate cap and collar agreements to mitigate the risk of rising interest rates on a portion of its variable rate debt. At February 28, 2009, the Company had an interest rate cap agreement in place related to $100.0 million of variable rate debt, with a cap rate of 4.25%. At February 29, 2008, the Company had an interest rate collar agreement in place related to $400.0 million of variable rate debt, with a floor strike rate of 4.70% and a cap strike rate of 5.50%.

*Fiscal 2008 Amendment Activity*

As identified in Note 2, the Company received from its banking group (the "Lenders") an amendment of its Credit Agreement in December 2007 (the "December Amendment") which, among other things: (i) allowed for the change-in-control from MIV Holdings under the SPA, (ii) provided changes in the financial covenants which it must meet, beginning with its third fiscal quarter ended November 30, 2007; (iii) eliminated the Consolidated Fixed Charge Ratio covenant; (iv) increased the Excess Cash Flow Percentage ("ECF Percentage") covenant to 75%, provided that the ECF Percentage shall be reduced to 50% in respect to any fiscal year if the Consolidated Leverage Ratio as of the last day of such fiscal year is less than 3.0 to 1.0; and (v) increased the interest rates the Company must pay on its borrowings under the Credit Agreements, effective as of the December 21, 2007 Acquisition Date.

At the time of the refinancing activities described above, the unamortized deferred financing costs related to the term loan arrangements and the Revolving Credit Facility totaled approximately $4.3 million and $1.0 million, respectively. These costs represent fees paid by the Company to the creditors as part of a previous issuance or modification of debt. In accordance with Accounting Principles Board Opinion 21, *Interest on Receivables and Payables*, such costs constitute a debt discount, and as such are classified in the accompanying consolidated balance sheet as a reduction of the face or maturity amount of the related liability. Management performed calculations on the term loan arrangements in accordance with Emerging Issues Task Force ("EITF") Issue No. 96-19, *Debtor's Accounting for a Modification or Exchange of Debt Instruments*, and determined that $0.3 million of unamortized costs associated with the term loan arrangements should be included in the loss on debt extinguishment, and the remaining $4.0 million should be amortized over the life of the amended term loan arrangements. Management performed calculations on the Revolving Credit Facility in accordance with EITF Issue No. 98-14, *Debtor's Accounting for Changes in Line-of-Credit or Revolving-Debt Arrangements*, and determined that none of these costs should be included in the loss on debt extinguishment, and the entire amount should be amortized over the remaining life of the Revolving Credit Facility.

The Company also incurred incremental costs of approximately $6.0 million to accomplish the amendments of the First and Second Lien Credit Agreements. Management allocated these costs to the term loan arrangements and the Revolving Credit Facility based upon those respective instruments' pro rata share of the total borrowing capacity of the arrangements impacted, which resulted in an allocation of $3.9 million to the U.S. Term Loan B, $0.3 million to the Euro Term Loan A, $0.9 million to the Second Lien Term Loan, and $0.9 million to the Revolving Credit Facility. In accordance with the above-referenced accounting pronouncements, management determined that $3.4 million of the costs allocated to the U.S. Term Loan B, $0.3 million allocated to the Euro Term Loan A, $0.8 million allocated to the Second Lien Term Loan, and $0.9 million allocated to the Revolving Credit Facility should be capitalized and amortized over their respective remaining lives of the borrowing arrangement, and that the remaining $0.6 million of costs allocated to these instruments should be included in the loss on debt extinguishment.

As a result of the amendments described above related to the First and Second Lien Credit Agreements, the Company recorded a $0.9 million loss on debt extinguishment. This amount has been included in the separate line item "loss on debt extinguishment" in the accompanying consolidated statement of operations for the period from March 1, 2007 through December 21, 2007.

In conjunction with the Acquisition described in Note 2, which occurred on December 21, 2007, the Company was required to revalue its assets and liabilities as of the Acquisition Date. As the face amount of the debt outstanding represents its fair value at the Acquisition Date, these costs have been eliminated in the opening balance sheet as of December 21, 2007.

In June 2007, the Company received from the Lenders an amendment of its Credit Agreements (the "June Amendment") which provided less restrictive covenants than those previously required for fiscal 2008 and increased the amount of factoring it was allowed to transact. In connection with the June Amendment, the Company incurred costs of approximately $0.6 million, which are included in "other income (loss) net" in the accompanying consolidated statements of operations for the period March 1, 2007 through December 21, 2007.

As a result of the December Amendment, borrowings under the Company's First Lien Credit Agreement bear interest at an annual rate equal to, at the Company's option: (i) the prime rate plus a margin (the applicable margin) of 3.25% for the Revolving Credit Facility and Euro Term Loan A and equal to 3.50% for the U.S. Term Loan B, or (ii) the euro currency rate plus the applicable margin of 4.25% for the Revolving Credit Facility and Euro Term Loan A and equal to 4.50% for the U.S. Term Loan B.

The actual weighted-average interest rate on such borrowings outstanding under the Company's First Lien Credit Agreement as of February 28, 2009 was approximately 6.46%, which was approximately 200 basis points higher than it would have been under the rates provided for prior to the Acquisition and the December Amendment. The Company is also required to pay a commitment fee at an annual rate of 0.50% of the unutilized total borrowings under the Revolving Credit Facility. The Revolving Credit Facility expires in June 2010 and permits borrowings of up to $150.0 million, with $50.0 million of that amount available to be denominated in euros. The Euro Term Loan A expires in March 2010.

Borrowings under this First Lien Credit Agreement are guaranteed by the Company's significant subsidiaries and collateralized by the pledge of the capital stock of the Company and certain of the Company's subsidiaries, and certain other assets of the Company.

Prepayments of the U.S. Term Loan B made prior to December 21, 2008 and 2009 require a prepayment premium of 2.0% and 1.0% of the principal amount, respectively. There is no prepayment premium on the Euro Term Loan A.

As a result of the December Amendment, borrowings under the Second Lien Credit Agreement will bear interest at an annual rate equal to, at the Company's option: (i) the greater of (a) the prime rate or (b) the federal funds effective rate plus 0.50% each, plus a margin of 7.50%; or (ii) the euro currency rate plus a margin of 8.50%. The actual weighted-average interest rate on such borrowings outstanding under the Company's Second Lien Credit Agreement as of February 28, 2009 was approximately 10.39%, which was approximately 275 basis points higher than it would have been under the rates provided for prior to the Acquisition and the December Amendment. Borrowings under this Second Lien Credit Agreement are guaranteed by the Company's significant subsidiaries and collateralized by the pledge of the capital stock of the Company and certain of the Company's subsidiaries, and certain other assets of the Company, on a secondary basis to the First Lien Credit Agreement. Prepayment of any amount under the Second Lien Credit Agreement made prior to December 21, 2008 and 2009 require a prepayment premium of 2.0% and 1.0%, respectively.

The Credit Agreements provide for customary events of default, including: (1) nonpayment of principal or interest; (2) defaults under certain other agreements or instruments of indebtedness; (3) noncompliance with covenants; (4) breaches of representations and warranties; (5) bankruptcy-related events or dissolution; (6) judgments in excess of specified amounts; (7) invalidity of guarantees or impairment of security interests in collateral; and (8) certain change of control events. In addition, the Company is required to comply with specified financial ratios and tests, including a maximum total leverage ratio for its First and Second Lien Credit Agreements, as well as a minimum interest coverage ratio for its First Lien Credit Agreement. As a result of the December Amendment, as of February 28, 2009, the First Lien Credit Agreement required that the Company have a maximum Consolidated Leverage Ratio ("Leverage Ratio") of 6.0 to 1.0 (actual ratio was 6.19 to 1.0), and a minimum Consolidated Interest Coverage Ratio ("Interest Ratio") of 1.55 to 1.0 (actual ratio was 1.66 to 1.0). Also as a result of the December Amendment, as of February 28, 2009, the Second Lien Credit

Agreement required that the Company have a maximum Consolidated Leverage Ratio ("Second Lien Leverage Ratio") of 6.25 to 1.0 (actual ratio was 6.19 to 1.0). The ratios are calculated each fiscal quarter based on the Company's latest four quarters of financial data, and become more restrictive over time. The impact of the failure to satisfy certain of these ratios as of February 28, 2009 has been discussed above.

*Fiscal 2007 Amendment and Re-financing Activities*

During fiscal 2007, the Company re-financed substantially all of its Senior and Senior Subordinated Debt. As a result of these refinancing transactions, during the fiscal year ended February 28, 2007, the Company recorded a loss on debt extinguishment of $24.5 million. In connection with this refinancing, a tender offer for certain long-term notes was completed. These notes had been adjusted to fair value in connection with an earlier acquisition, resulting in an adjustment that was being amortized over the remaining term of the notes. The fair value adjustment of $56.9 million has been included as a separate line item "portion of 7-1/2% Notes repayment representing interest" in the accompanying consolidated statement of cash flows for the fiscal year ended February 28, 2007 as an operating cash outflow.

The Company's interest expense is made up of the following primary elements (dollars in thousands):

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| Cash-based charges | $ 93,900 | $ 18,800 | $ 79,200 | $ 93,600 |
| Amortization related to the 7-1/2% Notes | - | - | 100 | 3,200 |
| Interest rate swap mark-to-market adjustments (income) | - | - | 300 | (1,200) |
| Other non-cash charges, net | 1,900 | 100 | 1,500 | 1,300 |
| Total | 96,800 | 18,900 | 81,100 | 96,900 |
| Less amounts allocated to discontinued operations | - | - | (4,600) | (14,200) |
| Total continuing operations | $ 96,800 | $ 18,900 | $ 76,500 | $ 82,700 |

The cash-based charges in the table above are presented net of interest income of approximately $1.8 million in fiscal 2009, $0.1 million in the period from December 22, 2007 through February 29, 2008, $1.3 million in the period from March 1, 2007 through December 21, 2007 and $1.3 million in fiscal 2007.

The allocation of interest expense to discontinued operations was based on a pro-rata percentage of net assets related to the discontinued operations in relationship to the Company's consolidated net assets at the respective period-end.

Annual maturities of total debt (including notes payable) for the next five fiscal years and thereafter are as follows (dollars in thousands):

| | |
|---|---|
| 2010 (1) | $ 992,400 |
| 2011 | 8,200 |
| 2012 | 8,100 |
| 2013 | 19,900 |
| 2014 | 3,400 |
| 2015 and thereafter | 3,900 |

(1) Debt for which the Company is in default as of February 28, 2009 has been classified as current, as previously discussed.

## 7. Income Taxes

Income (loss) from continuing operations, before taxes, and the related provision for (benefit from) income taxes were as follows (dollars in thousands):

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| Income (loss) from continuing operations, before taxes: | | | | |
| United States | $ (75,900) | $ (6,300) | $ (308,300) | $ (48,900) |
| International | (76,100) | 9,100 | (144,800) | 66,400 |
| Total income (loss) from continuing operations, before income taxes | $ (152,000) | $ 2,800 | $ (453,100) | $ 17,500 |
| Provision for (benefit from) income taxes from continuing operations: | | | | |
| Current: | | | | |
| United States - Federal | $ - | $ 200 | $ 600 | $ (200) |
| United States - State | 300 | 100 | 400 | 800 |
| International | 22,000 | 8,300 | 26,800 | 31,900 |
| Total current | 22,300 | 8,600 | 27,800 | 32,500 |
| Deferred: | | | | |
| United States | (7,200) | (1,100) | (20,900) | (3,200) |
| International | (20,000) | (27,600) | (1,200) | (1,500) |
| Total deferred | (27,200) | (28,700) | (22,100) | (4,700) |
| Total provision for (benefit from) income taxes from continuing operations | $ (4,900) | $ (20,100) | $ 5,700 | $ 27,800 |

The provision for (benefit from) income taxes from continuing operations differs from the amounts computed using the United States statutory income tax rate as follows (dollars in thousands):

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| Expected tax expense (benefit) at U.S. statutory income tax rate | $ (53,200) | $ 1,000 | $ (158,600) | $ 6,100 |
| State and local taxes | 300 | 100 | 400 | 800 |
| Unremitted earnings and international tax differences | (1,400) | (3,100) | 2,800 | (9,400) |
| Statutory international income tax rate changes | 4,500 | (17,900) | (100) | (200) |
| Interest earned on U.S. federal tax refund | 12,100 | - | - | - |
| Goodwill impairment | - | - | 143,500 | - |
| Tax benefit related to U.S. income included in other comprehensive income | (3,500) | (1,100) | (20,900) | (3,200) |
| Permanent adjustment related to life insurance settlement | - | - | (500) | (3,700) |
| U.S. permanent adjustments and other items, net | 300 | (800) | (3,500) | (2,000) |
| Change in valuation allowance | 36,000 | 1,700 | 42,600 | 39,400 |
| Total provision for (benefit from) income taxes from continuing operations | $ (4,900) | $ (20,100) | $ 5,700 | $ 27,800 |

The tax effects of temporary differences which give rise to deferred tax assets (liabilities) consist of the following (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Deferred tax assets: | | |
| Accounts receivable related | $ 3,500 | $ 4,200 |
| Insurance related liabilities | 6,400 | 5,600 |
| Compensation related liabilities | 3,400 | 3,600 |
| Pension and post-retirement related items | 34,200 | 40,400 |
| Net operating loss carryforwards | 295,300 | 283,900 |
| Tax credit carryforwards | 21,900 | 23,000 |
| Other | 5,300 | 6,500 |
| Gross deferred tax assets | 370,000 | 367,200 |
| Valuation allowance | (316,600) | (309,200) |
| Total deferred tax assets | 53,400 | 58,000 |
| Deferred tax liabilities: | | |
| Inventory related | (10,100) | (13,800) |
| Fixed and intangible assets | (197,100) | (251,900) |
| Total deferred tax liabilities | (207,200) | (265,700) |
| Net deferred tax liabilities | $ (153,800) | $ (207,700) |

As discussed in Note 2, effective December 21, 2007, the Company was acquired by an affiliate of Sun Capital Partners Inc. Due to this change in control, an Internal Revenue Code ("IRC") §382 Net Operating Losses ("NOL") limitation is applicable in the U.S. The estimated U.S. NOL limitation is a range of approximately $6.8 to $12.4 million per year for the first 5 years after acquisition and approximately $3.4 million per year for years 6 through 20.

Based upon the Company's historical net earnings performance, management previously determined that it was appropriate to establish a valuation allowance against all of the Company's net deferred tax assets in the U.S. As discussed in Note 2, the Company was acquired on December 21, 2007. The Acquisition accounting created an increase in the book value of assets under SFAS No. 141 and a related deferred tax liability was recorded, allowing a portion of the U.S. valuation allowance to be reversed. The Company will continue the practice of recording a valuation allowance in the future until such time as an appropriate level of accounting income is sustained in the U.S. that enables the Company to conclude that it is more likely than not that a portion of the net deferred tax assets would be realizable.

Effective December 24, 2007, Italy reduced the statutory income tax rate. As a result, the Company recognized a $17.9 million income tax benefit in the period ended February 29, 2008 as a result of the revaluation of certain of its deferred tax assets and liabilities which were impacted by this change. Although a significant portion of these deferred tax assets and liabilities were recorded as of the December 21, 2007 Acquisition date, SFAS 109 requires the deferred tax effect of tax rate changes to be included in income tax expense (benefit) in the period of enactment.

The Internal Revenue Service ("IRS") has finalized its examination of the Company's Federal income tax returns through fiscal 2006. The results of the examination left one un-agreed item which was formally appealed as of November 2007. The Company is awaiting a final appeals report that resolves the appealed issue in the Company's favor. The IRS examination of the Company's Federal income tax returns for its fiscal years 2007 and 2008 began during fiscal year 2009 and will continue on through fiscal year 2010.

U.S. net operating losses at the end of fiscal 2009 were approximately $466.6 million and have a carryover period of 12 to 20 years. The tax credit carryforwards include approximately $3.5 million of General Business credits, which began to expire in fiscal 2009 at the rate of approximately $0.6 million per year. The tax credit carryforwards also include approximately $18.2 million of U.S. Alternative Minimum Tax Credits, which have no expiration date. A valuation allowance will continue to be applied to operating losses in the U.S. until their utilization becomes more likely than not.

Net operating losses outside of the U.S. were approximately $458.5 million at the end of fiscal 2009, and have various expiration periods ranging from 3 years to an unlimited carryover period. Approximately $451.0 million of these losses as of February 28, 2009 were generated in countries where the ultimate use of the losses is not more likely than not. As a result, the valuation allowance as of February 28, 2009 includes approximately $130.0 million related to the tax effect of these losses. A valuation allowance will continue to be applied to operating losses in these jurisdictions until their utilization becomes more likely than not.

Temporary differences related to the Company's international subsidiaries total approximately $740.8 million at February 28, 2009, and relate primarily to activities in Italy, France and Canada. These temporary (i.e., outside basis) differences relate to undistributed earnings, cumulative translation adjustments, and the higher outside book basis resulting from the Acquisition on December 21, 2007. U.S. deferred tax liabilities have not been recognized for these outside basis differences (including undistributed earnings) as they are essentially permanent in duration because such amounts have been indefinitely reinvested.

The Company and its subsidiaries' income tax returns are routinely examined by various tax authorities. In management's opinion, adequate provision for income taxes has been made for all open years in accordance with SFAS No. 5, *Accounting for Contingencies*. A degree of judgment is required in determining the Company's effective tax rate and in evaluating the Company's tax positions. The Company establishes reserves when, despite significant support for the Company's filing position, a belief exists that these positions may be challenged by the respective tax jurisdiction. The reserves are adjusted upon the occurrence of external, identifiable events, including the settlement of the related tax audit year with the tax authorities, including the IRS where applicable. A change in the Company's tax reserves is not expected to have a material impact on the effective tax rate or operating results.

In June 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109* ("FIN 48"), which clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes*. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a

tax return. FIN 48 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. On December 30, 2008, the FASB issued FSP FIN 48-3 relating to the adoption of FIN 48 for non-public enterprises. The FASB held that a non-public enterprise may defer the adoption of FIN 48 until years beginning after December 15, 2008 if the non-public enterprise has not applied the recognition, measurement, and disclosure provisions of FIN 48 in a full set of annual financial statements issued prior to the issuance of this FSP. The Company has elected to defer the adoption of FIN 48 until fiscal 2010. The Company's current accounting policy is to continue to follow the guidelines established in SFAS No. 5, *Accounting for Contingencies*, for evaluating uncertain tax positions. Management is currently evaluating the impact, if any, that the adoption of FIN 48 could have on the Company's consolidated financial statements.

## 8. Pension and Other Postretirement Benefit Plans

The Company has a master defined benefit pension plan in the U.S. which previously covered substantially all of its employees in the U.S., as well as a number of retirees from its current operations. The plan also covers a significant number of retirees and future retirees from operations in the U.S. previously owned by the Company or their predecessors. In February 2007, all employees of the Company's continuing operations who were participants in the plan were advised by Mark IV that their participation in the plan would be frozen as of March 31, 2007. In addition to this funded defined benefit pension plan, the Company also has one unfunded defined benefit plan in the U.S, with a nominal liability. The Company uses the last day of February as the measurement date for its U.S. defined benefit plans.

As discussed in Note 2, the Company completed the sale of the majority of the assets and liabilities related to its Platform Business Segment in May 2007. In connection with this sale, the Company also transferred approximately $18.4 million of net unfunded obligations related to its pension plans to the buyer of the Platform Business Segment. This settlement income has been included within "loss from discontinued operations, net" in the accompanying consolidated statement of operations. The net amount transferred was made up of approximately $19.7 million of assets and $38.1 million of obligations. As a result of the transfer of the obligations, the Company was required to re-measure the remaining benefit obligations and plan assets as of the transaction date. The re-measurement resulted in settlement and related charges totaling approximately $20.9 million (with no associated tax benefit), which have also been included in "loss from discontinued operations, net" in the accompanying consolidated statement of operations, with an offsetting impact in OCI in the period March 1, 2007 through December 21, 2007. Of the total charges, the Company incurred a settlement loss of approximately $20.3 million resulting from the recognition of a portion of the cumulative net losses related to the plan prior to the settlement. Such losses had been previously accumulated in OCI. This settlement loss was calculated based upon the proportion of the benefit obligations transferred to the buyer of the Platform Business Segment, as compared to the total benefit obligations before such transfer occurred. The additional $0.6 million charge related to the immediate recognition of the remaining unamortized prior service cost associated with a group of employees transferred to the buyer of the Platform Business Segment. This prior service cost had also been previously accumulated in OCI.

As a part of the re-measurement calculations in May 2007, the Company utilized a discount rate of 6.0% to measure the remaining obligations of the plans, and also applied the same discount rate to determine

net periodic pension expense for the period of May 26, 2007 to December 21, 2007. The Company recognized a net gain of approximately $4.9 million related to this re-measurement, which was accounted for as a reduction in the unfunded status of the plans with an offsetting increase in OCI. The net gain recognized included $11.0 million related to the change in discount rate from 5.75% to 6.0%, and $2.7 million of other actuarial gains, offset somewhat by an $8.9 million loss related to investment earnings less than the underlying 5.0% annual return assumption.

As a result of the Acquisition discussed in Note 2, the Company was required to re-measure the benefit obligations and plan assets again as of the December 21, 2007 Acquisition Date. The Company utilized a discount rate of 6.5% to measure the plans' obligations, and the net periodic expense for the period from December 21, 2007 to February 29, 2008. The Company recognized a gain of approximately $26.2 million as a result of the December 2007 re-measurement, with $15.1 million related to the change in the discount rate, and the $11.1 million balance related primarily to investment earnings in excess of the underlying 5.0% annual return assumption. This net gain was recognized as a further reduction in the unfunded status of the plans, with a corresponding increase in OCI prior to the purchase accounting adjustments required as of the Acquisition Date.

For purposes of its year-end reporting, the Company re-measured its benefit obligations and plan assets again as of February 29, 2008, using a discount rate of 6.25%. As a result of this year-end re-measurement, the Company recognized a gain of approximately $3.0 million, which included a loss of $7.3 million related to the change in the discount rate from 6.5% to 6.25%, which was more than offset by a gain of $10.3 million related to investment earnings in excess of the underlying 5.0% annual return assumption.

Information concerning the Company's defined benefit pension plans in the U.S. follows (dollars in thousands):

**U.S. Defined Benefit Pension Plans**

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 |
|---|---|---|---|
| **Change in Benefit Obligations:** | | | |
| Benefit obligations at the beginning of the period | $ 359,300 | $ 352,900 | $ 430,700 |
| Service cost | - | - | 500 |
| Interest cost | 21,500 | 4,300 | 18,500 |
| Change in discount rate (gain) | (22,700) | 7,300 | (26,200) |
| Other actuarial (gains) losses, net | 2,000 | - | (2,600) |
| Benefits paid | (31,900) | (5,200) | (29,900) |
| Liabilities transferred with divestiture | - | - | (38,100) |
| Benefit obligations at the end of the period | $ 328,200 | $ 359,300 | $ 352,900 |
| **Change in Plan Assets:** | | | |
| Fair value of plan assets at the beginning of the period | $ 350,500 | $ 342,200 | $ 350,300 |
| Actual return on plan assets, net | (2,400) | 13,500 | 15,700 |
| Benefits paid | (31,900) | (5,200) | (29,900) |
| Company contributions | 9,700 | - | 25,800 |
| Assets transferred with divestiture | - | - | (19,700) |
| Fair value of plan assets at the end of the period | $ 325,900 | $ 350,500 | $ 342,200 |
| Unfunded status at end of period | $ (2,300) | $ (8,800) | $ (10,700) |

**U.S. Defined Benefit Pension Plans**

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| **Amounts Recognized in the Consolidated Balance Sheets:** | | | | |
| Accrued benefit liability - current | $ (200) | $ (200) | $ (200) | |
| Accrued benefit liability - non-current | (2,100) | (8,600) | (10,500) | |
| Amount recognized | $ (2,300) | $ (8,800) | $ (10,700) | |
| **Amounts Recognized in AOCI:** | | | | |
| Actuarial losses (gains) | $ (2,400) | $ (3,000) | $ 170,100 | |
| **Net Periodic Benefit Cost:** | | | | |
| Service cost | $ - | $ - | $ 500 | $ 4,500 |
| Interest cost | 21,500 | 4,300 | 18,500 | 24,300 |
| Expected return on plan assets | (18,800) | (3,200) | (13,500) | (24,600) |
| Settlement and curtailment expense | - | - | 2,600 | - |
| Amortization of losses | - | - | 6,000 | 8,400 |
| Total | 2,700 | 1,100 | 14,100 | 12,600 |
| Discontinued operations | - | - | 3,300 | 2,700 |
| Continuing operations | $ 2,700 | $ 1,100 | $ 10,800 | $ 9,900 |
| **Other Changes in Plan Assets and Benefit Obligations Recognized in OCI:** | | | | |
| Net actuarial gains (losses) | $ (600) | $ 3,000 | $ 31,100 | |
| Amortization of losses | - | - | 6,000 | |
| Settlement and related charges | - | - | 21,000 | |
| Total gain (loss) recognized in OCI | $ (600) | $ 3,000 | $ 58,100 | |
| Total gains (losses) recognized in net periodic benefit cost and OCI | $ (3,300) | $ 1,900 | $ 44,000 | $ 44,000 |

Also included in fiscal 2007 is a curtailment gain of $4.1 million related to the impact of freezing participation in the U.S. defined benefit pension plan as discussed previously.

The Company does not expect to recognize any of the $2.4 million of actuarial gains for these plans included in Accumulated Other Comprehensive Income ("AOCI") as of February 28, 2009 as a component of net periodic pension expense in fiscal 2010.

The projected benefit obligations ("PBO") for these plans exceeded the fair value of the plans' assets as of February 28, 2009 and February 29, 2008, as reflected in the preceding tables (unfunded status). The accumulated benefit obligations ("ABO") for these plans at February 28, 2009 were the same as the PBO amounts as of those dates.

*Other U.S. Postretirement Benefit Plans*

The Company has other postretirement benefit plans in the U.S. which provide health and life insurance benefits to a number of existing retirees under the provisions of a number of different plans. Participants in such plans are retirees from operations previously owned by the Company or their predecessors, as well as retirees from the Company's current operations. Contributions currently required to be paid by the retirees towards the cost of such plans range from zero to 100%, based in certain cases on caps established by the Company to limit its contribution to the cost of such plans.

Information concerning these other U.S. postretirement benefit plans, which use a measurement date of the last day of February, consists of the following (dollars in thousands):

| | | Other U.S. Postretirement Benefit Plans | |
| --- | --- | --- | --- |
| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 |
| **Change in Benefit Obligations:** | | | |
| Benefit obligations at the beginning of the period | $ 91,100 | $ 92,200 | $ 95,000 |
| Interest cost | 5,200 | 1,000 | 4,100 |
| Change in discount rate (gain) | (11,000) | 1,800 | (3,400) |
| Proceeds from Medicare subsidy | 1,000 | - | 1,400 |
| Liabilities transferred with divestiture | - | - | (600) |
| Other actuarial losses (gains), net | 900 | (1,600) | 4,600 |
| Benefits and expenses paid | (12,100) | (2,700) | (10,600) |
| Reimbursements from participants | 2,000 | 400 | 1,700 |
| Benefit obligations at the end of the period | $ 77,100 | $ 91,100 | $ 92,200 |
| **Change in Plan Assets:** | | | |
| Fair value of plan assets at the beginning of the period | $ - | $ - | $ - |
| Contributions from the Company | 10,100 | 2,300 | 8,900 |
| Reimbursements from participants | 2,000 | 400 | 1,700 |
| Payments made by the Company | (12,100) | (2,700) | (10,600) |
| Fair value of plan assets at the end of the period | $ - | $ - | $ - |
| Unfunded status at end of period | $ (77,100) | $ (91,100) | $ (92,200) |
| **Amounts Recognized in the Consolidated Balance Sheets:** | | | |
| Accrued benefit liability - current | $ (9,100) | $ (11,300) | $ (9,700) |
| Accrued benefit liability - non-current | (68,000) | (79,800) | (82,500) |
| Amount recognized | $ (77,100) | $ (91,100) | $ (92,200) |
| **Amounts Recognized in AOCI:** | | | |
| Actuarial losses (gains) | $ (9,900) | $ 200 | $ 900 |
| Prior service gains | - | - | (500) |
| Amount recognized | $ (9,900) | $ 200 | $ 400 |

|  | U.S. Postretirement Benefits | | | |
|  | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| **Net Periodic Benefit Cost:** | | | | |
| **Continuing Operations:** | | | | |
| Service cost | $ - | $ - | $ - | $ - |
| Interest cost | 5,200 | 1,000 | 4,100 | 5,000 |
| Expected return on plan assets | - | - | - | - |
| Amortization of prior service gains | - | - | (100) | (200) |
| Total | $ 5,200 | $ 1,000 | $ 4,000 | $ 4,800 |
| **Other Changes in Plan Assets and Benefit Obligations Recognized in OCI:** | | | | |
| Net actuarial gains (losses) | $ 10,100 | $ (200) | $ (1,200) | $ - |
| Amortization of prior service gains | - | - | (100) | - |
| Total gains (losses) recognized in OCI | $ 10,100 | $ (200) | $ (1,300) | $ - |
| Total gains (losses) recognized in net periodic benefit cost and OCI | $ 4,900 | $ (1,200) | $ (5,300) | $ - |

The Company expects to recognize approximately $0.2 million of the net actuarial gains for these plans included in AOCI as of February 28, 2009 as a component of net period benefit cost in fiscal 2010.

*Canadian Defined Benefit Pension Plans*

The Company also sponsors a number of defined benefit pension plans covering certain of its active and former employees in Canada. Information concerning these plans, which use a measurement date of the last day of February, follows (dollars in thousands):

|  | Canadian Defined Benefit Pension Plans | | |
|  | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 |
|---|---|---|---|
| **Change in Benefit Obligations:** | | | |
| Benefit obligations at the beginning of the period | $ 36,000 | $ 36,600 | $ 31,300 |
| Service cost | 900 | 200 | 900 |
| Interest cost | 1,900 | 400 | 1,500 |
| Other actuarial gains, net | (8,800) | (1,000) | (1,100) |
| Benefits paid | (1,800) | (500) | (1,200) |
| Curtailments | (100) | | - |
| Obligations settled | (500) | - | (500) |
| Currency translation | (6,800) | 300 | 5,700 |
| Benefit obligations at the end of the period | $ 20,800 | $ 36,000 | $ 36,600 |
| **Change in Plan Assets:** | | | |
| Fair value of plan assets at the beginning of the period | $ 34,100 | $ 35,000 | $ 29,600 |
| Actual return on plan assets, net | (6,300) | (900) | (200) |
| Benefits paid | (1,800) | (500) | (1,300) |
| Company contributions | 1,900 | 200 | 2,000 |
| Settlement payments | (600) | - | (500) |
| Currency translation | (6,600) | 300 | 5,400 |
| Fair value of plan assets at the end of the period | $ 20,700 | $ 34,100 | $ 35,000 |
| Unfunded status at end of period | $ 100 | $ (1,900) | $ (1,600) |

### Canadian Defined Benefit Pension Plans

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | 2007 |
|---|---|---|---|---|
| Amounts Recognized in the Consolidated Balance Sheets: | | | | |
| Prepaid pension asset – non-current | $ 100 | $ 500 | $ 400 | |
| Accrued benefit liability – current | - | - | - | |
| Accrued benefit liability – non-current | (200) | (2,400) | (2,000) | |
| Amount recognized | $ 100 | $ (1,900) | $ (1,600) | |
| | | | | |
| Amounts Recognized in AOCI: | | | | |
| Actuarial losses (gains), net | $ 100 | $ 400 | $ 6,300 | |
| Prior service costs | - | - | 200 | |
| Amount recognized | $ 100 | $ 400 | $ 6,500 | |

### Canadian Pension Benefits

| | Fiscal 2009 | Dec. 22, 2007 Through Feb. 29, 2008 | Mar. 1, 2007 Through Dec. 21, 2007 | 2007 |
|---|---|---|---|---|
| Net Periodic Pension Expense: | | | | |
| Service Cost | $ 900 | $ 200 | $ 900 | $ 1,400 |
| Interest Cost | 1,900 | 400 | 1,500 | 1,800 |
| Expected return on plan assets | (2,300) | (500) | (2,100) | (2,200) |
| Settlement loss | 200 | - | 100 | 200 |
| Curtailment gain | (100) | - | - | - |
| Amortization of unrecognized losses | - | - | 200 | 300 |
| Net periodic pension expense | $ 600 | $ 100 | $ 600 | $ 1,500 |
| | | | | |
| Other Changes in Plan Assets and Benefit Obligations Recognized in OCI: | | | | |
| Net actuarial gains (losses) | $ 100 | $ (400) | $ (1,100) | |
| Amortization of losses | - | - | 200 | |
| Settlement loss | 200 | - | - | |
| Total gains (losses) recognized in OCI | $ 300 | $ (400) | $ (900) | |
| | | | | |
| Total loss recognized in net periodic benefit cost and OCI | $ (300) | $ (500) | $ (1,500) | |

The Company does not expect to recognize any of the $0.1 million of net actuarial losses for these plans included in AOCI as of February 28, 2009 as a component of net periodic pension expense in fiscal 2010.

The Canadian plans had related ABO of $19.2 million and $32.4 million at February 28, 2009 and February 28, 2008, respectively.

The following information is for the Canadian defined benefit pension plans where the PBO at February 28, 2009 and February 29, 2008 exceeded the related fair value of plan assets (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Projected benefit obligations | $ 8,300 | $ 26,700 |
| Fair value of plan assets | $ 8,100 | $ 24,200 |

The following information is for the Canadian defined benefit pension plans where the ABO at February 28, 2009 and February 29, 2008 exceeded the related fair value of plan assets (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Accumulated benefit obligations | $ 5,900 | N/A |
| Fair value of plan assets | $ 5,800 | N/A |

#### Assumptions

The weighted-average actuarial assumptions utilized in determining the preceding amounts for the Company's defined benefit pension plans were as follows:

| | U.S. Plans | | | Canadian Plans | | | |
|---|---|---|---|---|---|---|---|
| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
| Discount rate: | | | | | | | |
| To determine expense | 6.25% | 6.50% | 5.75%–6.00% | 6.00% | 5.50% | 5.25% | 5.25% |
| To measure period-end obligations | 7.25% | 6.25% | 6.50% | 8.00% | 6.00% | 5.50% | 5.25% |
| Expected return on plan assets – to determine expense | 5.50% | 5.00% | 5.00% | 7.75% | 8.00% | 7.75% | 8.00% |
| Rate of compensation increase: | | | | | | | |
| To determine expense | N/A | N/A | 3.00% | 3.00% | 2.75% | 2.75% | 3.00% |
| To measure period-end obligations | N/A | N/A | N/A | 3.25% | 3.00% | 3.00% | 3.00% |

The actuarial assumptions utilized in determining the preceding amounts for the Company's other U.S. postretirement benefit plans were as follows:

| | Fiscal 2009 | Dec. 22, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| Discount rate: | | | | |
| To determine expense | 6.00% | 6.25% | 5.75% | 5.75% |
| To measure period-end obligations | 7.75% | 6.00% | 6.25% | 5.75% |
| Rate of compensation increase | N/A | N/A | N/A | 3.00% |
| Health care cost trend rate assumed for the next year | 8.00% | 8.50% | 8.50% | 9.00% |
| Rate that the cost trend rate gradually declines to | 5.00% | 5.00% | 5.00% | 4.75% |
| Year that the rate reaches the ultimate trend rate | 2015 | 2015 | 2015 | 2013 |

Assumed health care cost trend rates can have a significant impact on the amounts reported for the Company's other U.S. Postretirement Benefit Plans. A percentage point change in the assumed health care cost trend rates would have the following effects (dollars in thousands):

| | 1% Increase | 1% Decrease |
|---|---|---|
| Postretirement benefit obligations | $ 4,300 | $ (3,700) |
| Net periodic benefit cost | $ 300 | $ (300) |

**Plan Assets**

The actual weighted-average investment allocation for the U.S. and Canadian defined benefit pension plans, by asset category, as of February 28, 2009 and February 29, 2008 follows:

| | Defined Benefit Pension Plans | | | |
|---|---|---|---|---|
| | U.S. Plans | | Canadian Plans | |
| | February 28, 2009 | February 29, 2008 | February 28, 2009 | February 29, 2008 |
| Fixed income investments | 96.9% | 94.2% | 33.0% | 32.5% |
| Equity securities | - | - | 48.0% | 57.4% |
| Other investments | 3.1% | 5.8% | 19.0% | 10.1% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

The targeted weighted-average investment allocation for the U.S. and Canadian defined benefit pension plans, by asset category, as of February 28, 2009 and February 29, 2008 follows:

| | Defined Benefit Pension Plans | | | |
|---|---|---|---|---|
| | U.S. Plans | | Canadian Plans | |
| Investment Category | February 28, 2009 | February 29, 2008 | February 28, 2009 | February 29, 2008 |
| Fixed income | 100.0% | 95.0% | 40.0% | 40.0% |
| Equity securities | - | - | 60.0% | 60.0% |
| Alternative investments | - | 5.0% | - | - |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

During the latter part of fiscal 2007, the Company changed its asset allocation policy for its U.S. Plans and liquidated a substantial portion of its equity portfolio, which included global equities and alternative investment strategies, as well as high yield investments and replaced them with a long duration Treasury bond portfolio designed to match the interest rate sensitivities of the plans' liabilities. As a result of this change in the asset allocation policy, the Company lowered its expected long-term rate of return assumption for fiscal 2008 to 5.0% in order to appropriately reflect the likely asset return for such a heavily-weighted fixed income portfolio. During fiscal 2009, the Company changed its asset allocation policy for its U.S. Plans and liquidated approximately one-quarter of its long duration Treasury bond portfolio and replaced them with a long duration corporate bond portfolio designed to better match the returns to the discount rate used for funding purposes and liability / expense measurement. As a result, the expected long-term rate of return assumption used to determine net periodic benefit cost for fiscal 2009 was increased to 5.5%.

For the Canadian defined benefit pension plans, the Company considers the current level of expected returns on risk free investments (primarily government bonds), the historical level of the risk premium associated with the other asset classes in which the portfolio is invested and the expectations for future returns of each asset class. Since the portfolio's investment policy is to invest in funds that actively manage certain asset classes where the potential exists to outperform the broader market, the expected returns for those asset classes are adjusted to reflect the expected additional returns. The expected return for each asset class is then weighted based upon the target asset allocation to develop the expected long-term rate of return on assets assumption for the portfolio. As a result, through fiscal 2007 the Company utilized an 8.0% annual return assumption. Due to changes in the general economic environment in Canada in the latter part of fiscal 2007 and continuing through fiscal 2009, the Company determined it was appropriate to reduce its annual return assumption to 7.75% for the calculation of net periodic benefit cost for fiscal 2009.

**Cash Flow Data**

The Company currently anticipates making no contributions to its U.S. defined benefit pension plans and contributions to its Canadian defined benefit pension plans of approximately $1.4 million during fiscal 2010. The Company also expects to make contributions to its other postretirement benefit plans, net of retiree contributions, of approximately $9.1 million in fiscal 2010.

The following represents the net benefit payments which are expected to be paid to, or for the benefit of, retirees, and the gross amounts of Medicare Part D federal subsidy expected to be received for the periods indicated (dollars in thousands):

| Fiscal Years | U.S. Defined Benefit Pension Plans | Canadian Defined Benefit Pension Plans | Other U.S. Postretirement Benefit Plans | Expected Federal Subsidy for Other U.S. Postretirement Benefit Plans |
|---|---|---|---|---|
| 2010 | $ 29,000 | $ 1,200 | $ 9,100 | $ 1,100 |
| 2011 | 28,500 | 1,200 | 9,100 | 1,100 |
| 2012 | 28,100 | 1,300 | 9,100 | 1,100 |
| 2013 | 27,800 | 1,300 | 8,900 | 1,100 |
| 2014 | 27,500 | 1,400 | 8,800 | 1,100 |
| 2015-2019 | 135,100 | 8,900 | 40,200 | 4,800 |

*Defined Contribution Plans*

The Company also has defined contribution pension plans for a significant number of its employees in the United States, as well as for certain of its employees outside of the United States. The Company's contributions to these plans are based on various percentages of compensation, and in some instances, are based upon the amount of the employees' contributions to the plans and the Company's achievement of certain annual performance hurdles. As a replacement for the U.S. defined benefit pension plan that was frozen at the beginning of fiscal 2008, the employees who lost that benefit were advised that it would be replaced by a defined contribution pension benefit that would provide them with a mandatory contribution from Mark IV equal to 3.25% of their compensation as well as an additional discretionary Mark IV contribution of up to 1.0% of their compensation if certain earnings performance hurdles are achieved by Mark IV. The annual cost of all of the Company's defined contribution plans amounted to approximately $2.3 million in fiscal 2009, $0.7 million in the period from December 22, 2008 through February 29, 2008, $3.8 million in the period from March 1, 2007 through December 21, 2007 and $0.5 million in fiscal 2007.

*Employee Benefit Plans in Italy*

The Company also maintains a deferred salary plan or leaving indemnity ("TFR") for certain of its operations in Italy. The TFR provides a lump-sum payment to participants (or their heirs) upon separation or death. The lump-sum payment represents annual allocations equal to approximately 7.5% of each participant's annual gross salary, with each allocation increased annually thereafter at an interest rate equivalent to 75% of the inflation rate in Italy, plus 1.5%. Participants begin to accumulate benefits as of the date of hire and are 100% vested in the accumulated balance. Through February 28, 2007, the TFR benefits were substantially paid by the Company upon the employee's termination. As a result of legislation in Italy, beginning in fiscal 2008, the TFR liability has been funded by the Company on a more current basis. The related liability recorded in the accompanying consolidated balance sheets related to the Company's continuing operations amounted to $22.3 million and $27.4 million at February 28, 2009 and February 29, 2008, respectively. The related expense was $4.7 million in fiscal

2009. Comparable expense amounts in fiscal 2008 and 2007 were $9.4 million and $7.5 million respectively. Related TFR payments were $5.5 million, $11.2 million, and $6.0 million during fiscal 2009, 2008 and 2007, respectively.

*Other Defined Benefit Pension Plans*

The Company also maintains retirement benefit plans for future retirees of certain of its French operations ("the French Plans"). Benefits granted under these plans are primarily based upon years of service and age at retirement, with a benefit formula specific to each plan. Such benefits are paid in lump-sum upon the participant's retirement. Participants do not vest in any benefits prior to actually reaching a specified retirement age. The French Plans are not funded on a current basis. The associated benefit obligations recorded in the accompanying consolidated balance sheets amounted to $2.5 million and $3.1 million at February 28, 2009 and February 29, 2008, respectively. Net periodic benefit cost related to these plans was $0.4 million in fiscal 2009, $0.1 million in the period from December 22, 2008 through February 29, 2008, $0.3 million in the period from March 1, 2007 through December 21, 2007, and $0.3 million in fiscal 2007. Benefit payments under the French Plans were $0.2 million in fiscal 2009, less than $0.1 million in the period from December 22, 2008 through February 29, 2008, $0.2 million in the period from March 1, 2007 through December 21, 2007, and $0.2 million in fiscal 2007.

**9. Fair Value Measurements**

The Company adopted SFAS No. 157 on March 1, 2008. SFAS No. 157 defines fair value, establishes a framework for measuring fair value, and expands disclosures about fair value measurements. SFAS No. 157 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value should be based on assumptions that market participants would use, including a consideration of non-performance risk.

In determining fair value, the Company uses various valuation techniques and prioritizes the use of observable inputs. The availability of observable inputs varies from instrument to instrument and depends on a variety of factors including the type of instrument, whether the instrument is actively traded and other characteristics particular to the transaction. For many financial instruments, pricing inputs are readily observable in the market, the valuation methodology used is widely accepted by market participants and the valuation does not require significant management discretion. For other financial instruments, pricing inputs are less observable in the marketplace and may require management judgment.

The inputs used to measure fair value are assessed using a three-tier hierarchy based on the extent to which inputs used in measuring fair value are observable in the market. Level 1 inputs include quoted prices for identical instruments and are the most observable. Level 2 inputs include quoted prices for similar assets and related observable inputs such as interest rates, currency exchange rates, commodity rates, and yield curves. Level 3 inputs are not observable in the market and include management's judgments about the assumptions market participants would use in pricing the asset or liability. The use

of observable and unobservable inputs is reflected in the hierarchy assessment disclosed in the table below.

*Derivative Financial Instruments*

As part of its risk management strategy, the Company enters into derivative transactions to mitigate exposures. These derivative instruments include interest rate swaps and caps and currency forwards. The Company's derivatives are not exchange-traded and are over-the-counter customized derivative transactions.

The fair value of derivatives is estimated using projected future cash flows, which are discounted to a present value using market-based expectations for interest rates or foreign exchange rates and the contractual terms of the derivative instruments.

An adjustment for non-performance risk is included in the recognized measure of fair value of derivative instruments. The adjustment reflects the full credit default spread ("CDS") and recovery rate applied to a net exposure, by counterparty. The counterparty's CDS and recovery rate is used when a derivative is in a net asset position, while an estimate of the Company's CDS and recovery rate is used when a derivative is a net liability position. At February 28, 2009, the adjustment for non-performance risk reduced derivative assets by $0.2 million and reduced derivative liabilities by $16.9 million.

The following table summarizes the fair values of financial instruments measured at fair value on a recurring basis at February 28, 2009 (dollars in thousands):

| | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|
| **Assets:** | | |
| Foreign currency instruments | $ 7,900 | $ - |
| **Liabilities:** | | |
| Interest rate swaps | $ - | $ (3,500) |

The following table summarizes the changes in Level 3 financial instruments measured at fair value on a recurring basis for the year ended February 28, 2009 (dollars in thousands):

| | |
|---|---|
| Fair value at March 1, 2008 | $ - |
| Cash received at inception from counterparties | (1,600) |
| Total realized gains on settlement | 400 |
| Total unrealized losses | (2,300) |
| Net transfers into (out of) Level 3 | - |
| Fair value at February 28, 2009 | $ (3,500) |

Certain elements of the Company's long-term debt are potentially tradable in the secondary private-debt market; however, to the Company's knowledge, the trading activity is infrequent and at a fairly low level of its total long-term debt outstanding. The indicative fair value for the borrowings under the First Lien Credit Agreement was estimated to be approximately 28% and 80% of its carrying value as of February 28, 2009 and February 29, 2008, respectively. The indicative fair value for borrowings under the Company's Second Lien Credit Agreement was estimated to be approximately 5% and 55% as of February 28, 2009 and February 29, 2008, respectively. An adjustment for the Company's non-performance risk was also incorporated in the indicative fair values disclosed above.

The following table summarizes the fair value information about long-term variable rate debt at February 28, 2009 and February 29, 2008 (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Carrying amount – liability | $ 940,100 | $ 909,900 |
| Fair value – liability | $ 243,300 | $ 712,600 |

At February 28, 2009 and February 29, 2008, the carrying amount of variable rate debt exceeds the fair value due to the tighter U.S. credit markets, and the increased risk of default associated with the Company's debt instruments.

The following table summarizes the fair value information about long-term fixed rate debt at February 28, 2009 and February 29, 2008 (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Carrying amount – liability | $ 22,000 | $ - |
| Fair value – liability | $ 22,000 | $ - |

**10. Stockholder's Equity and Stock Options**

*Stockholder's Equity*

The components of AOCI are as follows (dollars in thousands):

| | February 28, 2009 | February 29, 2008 |
|---|---|---|
| Currency translation adjustments | $ (118,700) | $ 36,100 |
| Unrecognized net actuarial gains (losses) | 8,000 | 1,500 |
| Accumulated other comprehensive Income (loss) | $ (110,700) | $ 37,600 |

*Stock Options*

On March 1, 2006, the Company adopted SFAS No. 123R, which requires companies to measure and recognize compensation expense for all stock-based payments at fair value. The Company elected to use the "prospective" adoption transition method, which requires the Company to begin expensing share-based payments effective March 1, 2006. In accordance with the "prospective" adoption transition method, prior periods will not be restated to reflect, and do not include, the impact of SFAS No. 123R. Certain of Mark IV's employees participated in stock compensation plans of the Company's prior parent, MIV Holdings. However, as a result of the Acquisition, those compensation plans became worthless. The Company has not recognized any compensation expense during any of the reporting periods through February 28, 2009.

## 11. Commitments and Contingencies

*Operating Leases*

The Company has operating leases which expire at various dates through 2018 with, in some instances, cost escalation and renewal provisions. Total rental expense under operating leases related to continuing operations was approximately $14.4 million in fiscal 2009, $2.9 million in the period from December 22, 2007 through February 29, 2008, $12.2 million in the period from March 1, 2007 through December 21, 2007 and $13.6 million in fiscal 2007. Future minimum rental payments under operating leases existing as of February 28, 2009 are approximately $14.7 million in fiscal 2010, $12.6 million in fiscal 2011, $11.9 million in fiscal 2012, $11.3 million in fiscal 2013, $11.1 million in fiscal 2014 and $21.3 million in fiscal 2015 and thereafter. As of February 28, 2009, the Company has recorded asset retirement obligations totaling approximately $0.5 million relating to obligations under certain of these lease arrangements.

*Property Damage Litigation Claims*

A number of homeowners' insurance companies have pursued recovery of payments from the Company on a substantial number of subrogated claims associated with property damages allegedly caused by faulty washing machine hose produced by the Company's previously divested fluid management business unit.

During fiscal 2006, the Company reached a settlement agreement with one of the primary plaintiffs in these claims which resulted in a payment by the Company of $17.0 million in March 2006. The payment was in full settlement of all claims from this insurer (past, present and future) related to the Company's hose which were alleged to exceed $142.1 million as of the date of settlement. The Company received reimbursement of $5.5 million of these costs from its insurers during fiscal 2006, and an additional $3.0 million from its insurers in the first half of fiscal 2007. In fiscal 2006, the Company recorded a reserve of $23.0 million, which included the $17.0 million settlement, approximately $2.0 million in legal costs associated with these claims, and a $4.0 million reserve related to other claims outstanding at February 28, 2006.

During the latter part of fiscal 2007 and the first quarter of fiscal 2008, the Company prepared for and substantially completed the trial court process with a second significant plaintiff, on what turned out to be approximately $30.3 million of alleged claims. Based upon advice from its counsel, the Company determined it appropriate to attempt to settle these claims rather than allow the jury to continue to deliberate their findings. As a result, the Company reached an agreement to settle all claims from this plaintiff (including future claims), at a cost of approximately $5.5 million, with full payment made to the plaintiff in August 2007. The Company was required to recognize an additional reserve of approximately $1.5 million to cover the new settlement that occurred. The Company also determined an $8.0 million reserve, representing management's best estimate of its exposure for the remaining claims outstanding, was necessary. As a result, the Company recorded an additional expense of $9.5 million for the outstanding claims in fiscal 2007.

During September 2007, the Company reached an informal agreement to settle substantially all remaining claims at a cost of $6.8 million. A formal agreement was reached with full payment made to the plaintiff in December 2007. In February 2008, the Company reached agreement with one of its insurers and accepted payment from them of approximately $1.0 million in full settlement of the Company's claims against its insurer for these claims.

The net effect of these claims has been included in the accompanying consolidated statements of operations as "Litigation charges, net," and consisted of the following (dollars in thousands):

| | Fiscal 2009 | Dec. 21, 2007 through Feb. 29, 2008 | Mar. 1, 2007 through Dec. 21, 2007 | Fiscal 2007 |
|---|---|---|---|---|
| Gross claims settled or anticipated, and related costs | $ 300 | $ - | $ - | $ 9,500 |
| Insurance recovery recognized | - | - | (1,000) | - |
| Net charges (income) | $ 300 | $ - | $ (1,000) | $ 9,500 |

As of February 28, 2009, there are approximately $4.3 million in alleged claims outstanding. The Company expects to be able to settle these claims at rates consistent with past settlements and has recorded an additional reserve of $0.3 million representing management's best estimate of its exposure associated with these claims. As these claims relate to the pre-acquisition period, this incremental reserve has been recorded as part of the final allocation of the purchase price. The total reserve for these matters is $0.5 million and $0.3 million at February 28, 2009 and February 29, 2008, respectively.

*Product Liability Issues*

The Company has been named as a defendant in a number of litigation actions related to damages allegedly arising from the failure of certain product manufactured by the Company which were incorporated within retail gasoline fuel delivery systems. The aggregated initial demands were in excess of $2 billion. Each of these actions was initiated prior to the Acquisition Date.

During fiscal 2009, the Company reached settlement agreements on certain of these actions for a total payment of $0.85 million, with contribution by the Company of less than $0.2 million. The Company

expects to be able to settle the remaining claims for approximately $2.4 million, exclusive of any potential insurance recovery, discussed more fully in the following paragraph. As it is probable that a liability has been incurred in light of the current year settlements for similar matters, and that liability can be reasonably estimated during the allocation period, this reserve has been recorded as part of the final allocation of the purchase price.

The Company believes there is insurance coverage for these matters. However, the insurance carriers have interpreted the terms of the insurance coverage in a manner which is in contrast to the Company's interpretation. The duty to defend the matters has been accepted under a Reservation of Rights by the insurers. An agreement was reached by the insurers for a cost sharing of the defense of the claims, with the Company sharing 14.5% on only one of the matters. The insurers have also applied separate deductibles for each of the matters and one of the insurers has denied indemnity contribution for all matters settled to this point. The Company has initiated legal action against the insurance providers. Until this issue has been resolved in the Company's favor, no anticipated receivable from the insurers will be recognized in the Company's consolidated financial statements.

During the fiscal year ended February 29, 2008, the Company reached a Settlement Agreement ("the Settlement") with one of its European OEM customers regarding alleged quality issues on product manufactured and purchased from the Company. The customer alleged that such quality issues resulted in their customers incurring damages to the engines in their vehicles. Both parties agreed to the Settlement without acknowledging specific fault to either party. The Settlement was reached to avoid timely and expensive testing, continuing negotiations, potential legal expenses and other burdens arising from the claims. In addition, both parties have a long standing relationship which they would like to move forward with regard to future projects without the encumbrances of this issue. Therefore, the Settlement called for the Company to pay approximately $17.7 million to the customer for quality issues already identified and any quality issues identified in the future regarding certain of the products manufactured by the Company. The first of two payments to be made under the Settlement of $14.8 million was made in December 2007, with the balance paid during fiscal 2009. As a result of this Settlement, the Company recorded a pre-tax charge of $16.8 million ($10.6 million after-tax) that has been presented separately as "Product Liability Settlement" in the accompanying consolidated statement of operations for the period from March 1, 2007 through December 21, 2007.

The Company has primary insurance coverage for product liability issues, as well as supplemental excess insurance policies for such issues (the "Insurance Coverage"). The Company believes its Insurance Coverage is relevant to this claim, and it should be sufficient to offset a substantial portion of the costs attributable to the Settlement. However, the Company's primary insurance provider has declined coverage for this matter, and litigation action has now been initiated by the Company against them. The Company's excess insurance provider has indicated they will not form an opinion as to their coverage responsibility until the coverage issue with the primary insurer has been resolved in the Company's favor. Until this issue has been resolved in the Company's favor, no anticipated receivable from the insurers will be recognized in the Company's consolidated financial statements.

*Other Legal Proceedings*

Prior to fiscal 2008, the Company settled a number of claims from former employees for occupational diseases allegedly resulting from, or expected to result in the future from, past exposure to asbestos at a facility which had been closed in the late 1990's. The Company's decision to settle was based upon its assessment of the future litigation costs to pursue its position, litigation risk associated with its arguments, and the inter-action of possible reimbursement considerations relative to the Company's insurance carriers and other third parties. Approximately 100 additional claims have been made in fiscal 2008 and 2009 related to this same facility. The Company has evaluated these claims and based on the status of the claims and settlement discussions finalized to date, has established an incremental reserve of $2.6 million at February 28, 2009. As these claims relate to the pre-Acquisition period, this liability has been recorded as a part of the final allocation of the purchase price.

A former subsidiary of the Company ("Vapor"), is alleged to have exposed its employees and users of products manufactured at Vapor to asbestos used by Vapor in its manufacturing processes in periods prior to the Company's acquisition of Vapor in 1990. As part of the Company's agreement to acquire Vapor, the related Share Purchase Agreement required Brunswick Corporation ("Brunswick"), the seller of Vapor, to indemnify the Company against all claims related to asbestos exposure, including those that might arise subsequent thereto. During the period in which the Company owned Vapor, it received a number of claims alleging occupational diseases resulting from, or expected to result from, past exposure to asbestos. All such claims have been forwarded to Brunswick, who has accepted such claims and assumed responsibility for their defense. The Company sold Vapor in fiscal 1997, and provided certain indemnification protections to the buyer of Vapor against similar claims that might be received by the buyer thereafter. All such claims forwarded to the Company by the buyer have been forwarded in turn to Brunswick, who has accepted such claims and assumed responsibility for their defense as provided for under the original indemnification agreements with the Company. As of February 29, 2008 the Company has forwarded over 8,000 asbestos-related claims to Brunswick under its indemnification agreement. The Company has no available information to enable it to quantify the range of exposure related to these claims. However, the Company has no reason to believe Brunswick will not be able to meet its indemnification responsibilities to the Company. As a result, the Company does not believe it has any financial exposure related to the ultimate resolution of these claims.

*Other Litigation Charges*

The Company recognized other litigation charges (income) related to legacy liability matters (unrelated to the Company's current operating activities) of approximately $1.2 million in fiscal 2009, $0.1 million in the period from December 22, 2007 through February 29, 2008, $0.8 million in the period from March 1, 2007 through December 21, 2007 and ($3.0) million in fiscal 2007. The fiscal 2007 amount includes the reversal of a $3.3 million liability as a result of a favorable appeal of a legal claim against the Company. Such charges (income) are included in selling and administration in the accompanying consolidated statements of operations.

*Environmental Matters*

The Company is subject to numerous federal, state, local and other statutory environmental laws and regulations governing its operations, including the handling, transportation and disposal of its products, and its non-hazardous and hazardous substances and wastes, as well as emissions and discharges into the environment, including discharges to air, surface water and groundwater. Failure to comply with such laws and regulations could result in costs for corrective action, penalties or the imposition of other liabilities. Changes in laws or the interpretation thereof or the development of new facts could also cause the Company to incur additional capital and operating expenditures to maintain compliance with environmental laws and regulations. The Company is also subject to laws and regulations that impose liability and cleanup responsibility for releases of hazardous substances into the environment without regard to fault or knowledge about the condition or action causing the liability. Under certain of these laws and regulations, such liabilities can be imposed for cleanup of previously owned or operated properties, or properties to which substances or wastes were sent by current or former operations of the Company. The presence of contamination from such substances or wastes could also adversely affect the Company's ability to sell or lease its properties, or to use them as collateral for financing. From time to time, the Company has incurred and is incurring costs and obligations for correcting environmental noncompliance matters and for remediation at or relating to certain of its properties. The Company believes that it has complied with, or is currently complying with its environmental obligations to date and that such liabilities will not have a material adverse effect on its business or financial performance, except as discussed in the following paragraph.

A former subsidiary of the Company has been named within a group of defendants who are alleged to have caused contamination and pollution of the water shed basin in Orange County, California. Damages in excess of $140 million are being sought to recover compensatory and other damages, including all necessary funds to investigate, monitor, remediate, abate, or contain contamination of groundwater within the district. This action was commenced during fiscal 2006 and has been actively defended throughout the duration. While the Company believes it has valid defenses in its favor to refute the allegations, based on the status of the matter and settlement discussions to date, it has concluded that it is probable that exposure exists for this matter and has recorded a $2.3 million reserve for management's best estimate of the exposure associated with this claim. As this matter meets the definition of a preacquisition contingency under the relevant accounting guidance, this reserve has been recorded a part of the final allocation of the purchase price.

One of the Company's manufacturing facilities currently uses low-level radioactive source materials in its manufacturing processes to produce products such as electrostatic control devices and smoke-detector ionization elements. The production, storage and transportation of these radioactive materials are subject to federal, state and local laws and regulations. Federal and state regulations also limit the amount of exposure the Company's employees may have to radiation and radioactive materials. The Company has obtained the necessary licenses and approvals required for the business and believes it is in compliance with all applicable regulations concerning radioactive materials and employee safety. The Company has radioactive materials that are a by-product of its current and past manufacturing activities at this site, since there are no readily available disposal sites in the United States for such low-level radioactive waste materials. The Company is currently working with the federal government for the transfer of the waste to a federally operated site; however, by its nature, the process for completing

such arrangements is lengthy and there can be no assurance as to when the government will approve and schedule such a transfer. The Company estimates the cost to dispose of such materials to be approximately $0.4 million in fiscal 2009, $0.4 million in the period from March 1, 2007 through December 21, 2007 and $3.2 million in fiscal 2007. Such charges are included in selling and administration in the accompanying consolidated statements of operations.

such site will be in the range of $0.6 million, and such amount has been recognized as a liability in the Company's consolidated balance sheet. If the Company were to discontinue the activities at this facility, such an action would require the Company to decontaminate and decommission the facility. The Company accounts for this asset retirement obligation in accordance with the provision of SFAS No. 143, *Accounting for Asset Retirement Obligations* ("SFAS No. 143"). SFAS No. 143 requires entities to record the fair value of a liability for an asset retirement obligation in the period in which it is incurred. When the Company recognized this initially, it capitalized the estimated cost of retiring the asset as part of the carrying amount of the related long-lived assets. Over time, the liability is adjusted to its present value each period and the capitalized cost is depreciated over the useful life of the related asset. The asset retirement obligation associated with decommissioning this facility amounted to $2.4 million and $2.1 million at February 28, 2009 and February 29, 2008, respectively. The amounts have been classified as non-current liabilities in the accompanying consolidated balance sheets. The increase from the prior year was due to a revision in the underlying assumptions related to the amount and timing of decommissioning costs based on current expectations.

Certain federal and state environmental superfund statutes generally impose joint and several liabilities on present and former owners and operators, transporters and generators for remediation of contaminated properties, regardless of fault. The Company has been designated as a potentially responsible party under these statutes at a number of sites. Based on the facts currently known to management, the Company expects that the costs of remedial actions at the sites where it has been named a potentially responsible party will not have a material adverse effect on its financial position, results of operations or cash flows.

The Company's facilities are also subject to many other federal, state, local and statutory requirements relating to the protection of the environment, and the Company has made, and will continue to make, expenditures to comply with these provisions. The Company believes that its facilities are in material compliance with these laws and regulations, and that future compliance with these laws and regulations will not have a material adverse affect on its financial position, results of operations or cash flows.

*Other Environmental Charges*

The Company recognized environmental charges related to legacy liability matters (unrelated to the Company's current operating activities) of approximately $0.4 million in fiscal 2009, $0.4 million in the period from December 22, 2007 through February 29, 2008, $2.3 million in the period from March 1, 2007 through December 21, 2007 and $3.2 million in fiscal 2007. Such charges are included in selling and administration in the accompanying consolidated statements of operations.

At February 28, 2009, the Company's consolidated balance sheet included a liability of approximately $5.9 million to cover future remediation and other required environmental expenditures, which have been estimated to be in the range of $3.9 million to $8.2 million.

During the year ended February 28, 2009, the Company received cash proceeds of $2.4 million in reimbursement from an insurer for remediation-related costs incurred in prior periods when coverage existed. A receivable had previously been established for this anticipated recovery.

*Other Contingency Considerations*

The Company continues to be involved in various other litigation and environmental-related issues. In the Company's opinion, the ultimate cost to resolve such matters will not have a material adverse effect on its business, results of operations or financial condition.

**12.  Subsequent Events**

Events have occurred subsequent to February 28, 2009 that, although they do not impact the reported balances or results of operations as of that date, are material to the Company's ongoing operations. These events are listed below.

*Forbearance Agreements*

On March 18, 2009, the Company entered into a forbearance agreement with its lenders under its First Lien Credit Agreement in order to afford the Company an opportunity to propose a restructuring of their obligations under the Credit Agreement. The lenders agreed to forbear from taking any enforcement action as a result of the occurrence and continuation of certain identified scheduled defaults during the forbearance period, which is defined within the agreement. The scheduled defaults include the failure of the borrowers or any subsidiaries thereof to pay scheduled principal and interest when due during the forbearance period. Should any defaults occur during the forbearance period that were not identified as scheduled defaults, the lenders may initiate enforcement action, including to declare immediately due and payable all of the loans under the First Lien Credit Agreement, including all accrued interest thereon. At the end of the forbearance period, all principal and interest which would have been due during the forbearance period is required to be paid in full. If such payments are not made following the forbearance period, this would constitute an event of default and could result in the full debt under the First Lien Credit Agreement being considered due and payable. On March 18, 2009, a forbearance agreement was executed between the Company and the counterparty to one of its interest rate swap arrangements, with terms similar to the First Lien forbearance agreement. However, as part of this agreement, the Company and the counterparty agreed to terminate the interest rate swap arrangement and established a closing value of the instrument of $16.6 million due to the counterparty.

On March 24, 2009, a waiver and forbearance agreement was executed between one of the Company's French subsidiaries and its Dutch-based lender with terms similar to the First Lien forbearance agreement. The agreement also waived any defaults identified as "scheduled defaults" as defined within the agreement. As the borrower under this loan is a non-filing entity, payments of principal and interest will continue to be made as scheduled during the forbearance period.

As a condition to the forbearance agreement with the lenders to the First Lien Credit Agreement, the Company may not make any principal or interest payments due under the Second Lien Credit Agreement. No forbearance agreement has been executed with the lenders under the Company's

Second Lien Credit Agreement. Accordingly, as a result of non-payment of interest due under the Second Lien Credit Agreement, the Company experienced an event of default under the Second Lien Credit Agreement in March 2009.

The Company's bankruptcy filing under Chapter 11 represents an event of default under each of the loan agreements referenced above. As this was not a scheduled default provided for in the respective forbearance agreements, the forbearance agreements terminated on April 30, 2009. In anticipation of the Chapter 11 filing, on April 29, 2009, the Company entered into a forbearance agreement with its lenders under the First Lien Credit Agreement. The lenders agreed to forbear from taking enforcement action against the non-filing entities to the Credit Agreement, including the Italian borrower. The agreement also consented to the execution of the DIP Credit Facility (defined and described below) by the non-filing entities. Any event of default that would have arisen as a result of the non-filing entities executing or being party to the DIP Credit Facility was waived during the forbearance period, which is as defined in the agreement. In addition, on April 29, 2009, one of the Company's French subsidiaries entered into an agreement with its lenders, waiving any events of default under that loan that would have resulted from the Chapter 11 filing or any cross-defaults associated with any other indebtedness.

*Bankruptcy Filing*

On April 30, 2009, Mark IV and certain of its U.S. subsidiaries (the "Debtors") filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York for relief under Chapter 11 of the United States Bankruptcy Code. The reorganization cases are being jointly administered under the caption "In re Mark IV Industries, Inc., Case No. 09-12795". The Debtors will continue to operate their business as a "debtor-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Mark IV's non-U.S. subsidiaries were not included in the filings and will continue their business operations without supervision from the U.S. Courts and will not be subject to the Chapter 11 requirements of the Bankruptcy Code. At hearings held in May 2009, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management and retention of professionals.

The Debtors are operating pursuant to Chapter 11 under the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability (i) to comply with the terms and conditions of the DIP financing agreement described below; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to reduce post-retirement benefit and other costs and liabilities not associated with continuing operations through the bankruptcy process; (iv) to generate sufficient cash flow from operations and; (v) to obtain financing sources to meet the Company's future obligations. These matters create uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability and classification of liabilities that might result from the outcome of these uncertainties. In addition, a plan of reorganization could materially change amounts reported in the Company's consolidated financial statements. The consolidated financial statements as of February 28, 2009 do not give effect to any adjustments to the carrying value of assets and liabilities that may become necessary as a consequence of reorganization under Chapter 11.

The Chapter 11 filings triggered defaults on substantially all debt obligations of the Debtors. However, under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization.

Upon the emergence from Chapter 11 and in accordance with the provisions of §108 of the Internal Revenue Code, the Company will be required to apply any cancellation of debt income against tax attributes existing at that date. The method used to allocate cancellation of debt income may have a material effect on the tax attributes, and thus the Company's future tax position. Management is currently evaluating the impact that the allocation of the cancellation of debt income could have on the Company's consolidated financial statements.

*DIP Financing*

On May 4, 2009, the Company and its primary U.S., Italian and Canadian subsidiaries entered into a Credit and Guarantee Agreement (the "DIP Credit Facility") to borrow up to $90 million from a syndicate of lenders arranged by J.P. Morgan Securities Inc., and JPMorgan Chase Bank, N.A., for which JPMorgan Chase Bank, N.A. is the administrative agent and syndication agent. The DIP Credit Facility is a term loan facility to be made available to the individual borrowers by lenders within the borrowers' local country. The U.S. and Canadian term loans bear interest at an annual rate equal to, at the Company's option: (i) the ABR plus a margin (the "applicable margin") of 4.00%; or (ii) the Eurocurrency rate plus the applicable margin of 5.00%. The ABR is equal to the greatest of (a) the Prime Rate; (b) the Federal Funds Effective Rate plus 0.5%; or (c) the 1-month Eurocurrency rate plus 1%. The Euro currency rate is the greater of 3.5% or LIBOR. The Italian term loans bear interest at an annual rate equal to the Eurocurrency rate plus 3.5%. The DIP Credit Facility will expire on the earlier of (i) May 4, 2010; (ii) 45 days after the date of the interim order of the Court approving the transactions contemplated in the DIP Credit Facility if no final order has been entered prior to the end of such period; (iii) the effective date of the Reorganization Plan which is reasonably satisfactory to the lenders; or (iv) the acceleration of the loans under the DIP Credit Facility and the termination of the commitments thereunder as provided for in the agreement. Borrowings under the DIP Credit Facility are prepayable at the Company's option without premium or penalty.

The DIP Credit Facility provides the lenders with (i) guarantees of the obligations of all of the borrowers by Mark IV Global, the Company and the direct and indirect domestic subsidiaries of the Company (except for Mark IV IVHS, Inc.), (ii) guarantees of the obligations of the Italian borrower by the direct and indirect Luxembourg subsidiaries of the Company, and (iii) guarantees of the obligations of the Canadian borrower by the direct and indirect Canadian subsidiaries of the Company (except for Mark IV Air Intake Systems Corp) and Mark IV Holdings B.V. The obligations of the U.S. borrower and the guaranty obligations of the U.S. subsidiaries are secured by a priming lien on substantially all tangible and intangible assets of the U.S. borrower and the U.S. subsidiaries that are guarantors. The Canadian borrower and the Canadian subsidiaries that are guarantors have pledged substantially all of their tangible and intangible assets in support of their respective borrowing and guarantee obligations. The Luxembourg subsidiaries have pledged the stock of their subsidiaries in support of their guarantee

obligations. The Italian borrower will pledge certain assets, including the stock of its French subsidiary, in support of its borrowing obligations.

The DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on the Company's financial and business operations, including the ability to, among other things, incur or secure other debt, make investments, or sell assets or operations. Additionally, the DIP Credit Facility includes negative covenants that prohibit the payment of dividends to any entity that is not party to the DIP Credit Facility.

The DIP Credit Facility includes negative covenants that require the Company to, among other things, (i) maintain a minimum consolidated fixed charge coverage ratio at the last day of each quarter beginning with the quarter ending May 31, 2009; (ii) maintain cumulative minimum consolidated EBITDA for each test period beginning on March 1, 2009 and ending on the last day of each fiscal month through April 30, 2010; (iii) maintain minimum liquidity levels; and (iv) provide a limitation on the amount of permitted capital expenditures for the period beginning March 1, 2009 and ending on February 28, 2010. The levels associated with each of these covenants are as set forth in the DIP Credit Facility. The DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type.

The DIP Credit Facility also requires mandatory prepayments from Asset Sales and Recovery Events (each, as defined in the DIP Credit Facility), except to the extent that the net proceeds received in connection with such Recovery Event are applied within two months of receipt thereof to purchase assets useful to the operations of the Company.

The foregoing description of the DIP Credit Facility is a general description only.

**Appendix C**

**Financial Projections**

# FINANCIAL PROJECTIONS

For purposes of developing the Plan and evaluating its feasibility, the following financial projections (the "Projections") were prepared by the Debtors. The Projections reflect the Debtors' estimate of the expected consolidated financial position, results of operations, and cash flows of the Reorganized Company (on a consolidated basis, including all Debtor and non-Debtor subsidiaries and affiliates of Mark IV) for fiscal years 2010 through 2014. Accordingly, the Projections reflect management's judgment, as of the date of this Disclosure Statement, of expected future operating and business conditions, which are subject to change.

The Debtors do not, as a matter of course, publish their business plans and strategies or forward looking projections of financial position, results from operations, and cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to the holders of Claims or Interests after the date of this Disclosure Statement appendix, or to include such information in documents required to be filed with the Securities and Exchange Commission (the "SEC") or to otherwise make such information public.

All estimates and assumptions shown in the Projections were developed by management with assistance from various professionals. The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections. The Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Although the Debtors are of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, such as (i) global automotive volumes; (ii) unplanned plant shutdowns in both Europe and North America; (iii) price increases for raw materials; (iv) competitive pressures on Mark IV customers resulting in the Debtors being asked to reduce prices and/or stretch out payment terms; and (v) supplier pressures, particularly from sole-source providers, whose financial situations influence and dictate the Debtors' businesses. Despite the Debtors' efforts to foresee and plan for the effects of changes in these circumstances, the Debtors cannot predict their impact with certainty. Consequently, actual financial results could vary significantly from projected results.

THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED.

THE PROJECTED FINANCIAL INFORMATION WAS PREPARED BY THE DEBTORS; IT HAS NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT ACCOUNTANTS. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE PROJECTIONS ARE STATED BELOW.

THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS AND QUALIFICATIONS CONTAINED HEREIN, THE RISK FACTORS DESCRIBED IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT AND THE HISTORICAL AUDITED CONSOLIDATED FINANCIAL STATEMENTS FOR THE COMPANY ON A CONSOLIDATED BASIS FOR THE LAST THREE FISCAL YEARS CONTAINED IN APPENDIX B TO THIS DISCLOSURE STATEMENT.

As the Projections reflect annual estimated results, the Debtors have assumed, for the purpose of the Projections, that the Plan will be confirmed and consummated and that the initial distributions pursuant to the Plan will take place on or around October 31, 2009.

Please note that the reorganization may not be accounted for in accordance with "fresh start" accounting rules as per the American Institute of Certified Public Accountant's Statement of Position 90-7, therefore the Projections do not reflect any "fresh start" adjustments. At the time of emergence, the Company may be required to implement fresh start accounting and therefore actual results may be materially different from those presented herein.

The following Projections are included herein:

➢ Projected Consolidated Balance Sheets of the Reorganized Company for each of the fiscal years ending February 28th or 29th for the period from 2010 through 2014.

➢ Projected Consolidated Statements of Income of the Reorganized Company for each of the fiscal years ending February 28th or 29th for the period from 2010 through 2014.

➢ Projected Consolidated Statements of Cash Flow of the Reorganized Company for each of the fiscal years ending February 28th or 29th for the period from 2010 through 2014.

The Projections have been prepared on the basis of generally accepted accounting principles consistent with those currently utilized by the Company in the preparation of its consolidated financial statements, unless noted in the following assumptions. The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

WHILE THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT ANY PROJECTIONS WILL BE REALIZED.

## A. GENERAL ASSUMPTIONS

## FISCAL YEARS 2010 THROUGH 2014 PLAN PROJECTIONS - MAJOR ASSUMPTIONS

The Business Plan assumes certain specific economic and business conditions for the fiscal year 2010 through fiscal year 2014 period, with general assumptions based upon future industry volume indicators, historic growth and estimated directions of specific markets based on information available in the first half of calendar year 2009.

**General:**

❖ *Methodology*: The Projected Consolidated Statements of Income, capital expenditures and working capital were built on a "bottoms-up" basis for the Business Units (by region and operating segment).

❖ *Plan Consummation and Effective Date*: The Projections are based on the assumption that the Plan will be confirmed and consummated as of October 31, 2009.

❖ *Industry*: Please refer to Article III of this Disclosure Statement for an overview of the Debtors' businesses.

**Projected Consolidated Statement of Operations:**

❖ *Revenues*: Revenue estimates for the Power Transmission and Air Intake & Cooling Business Units are based upon several factors including management's estimate of the Company's ability to win and retain customer contracts for both current parts as well as parts in development. The Company's projections are based on third party forecasts (e.g., CSM, JD Power, Rhein report) and adjusted downward given the economic environment to reflect an approximate effective build rate volume of 8.5 to 9.0 million engines for North America and 9.5 to 10.0 million engines in Western Europe for 2009 (primarily FY 2010). It is important to note, however, that the Company's volumes cannot be looked at on a platform by platform basis because: (i) engines are used on several platforms and (ii) multiple engines can be used on the same platform. Aftermarket revenue in North America is projected by estimating SKU demand for major US retailers; due to the fragmented nature of distributors, aftermarket forecasts in Europe and ROW are based on input taken directly from the sales team.

Management utilizes a similar methodology when developing projections for IDS, which are based on aircraft, bus and rail spending and volumes. IVHS's revenue is based on the replacement cycle for its tags and state government spending.

Please note that all revenue and margin estimates across all Business Units are based on customer contracts on hand and management's assessment of the likelihood of the continuation of such contracts and the successful renewal or securing of new contracts.

❖ *Contribution Margin:* The Projections reflect a modest decline in contribution margins driven by declines in the Automotive and Industrial segments (with the exception of the aftermarket business, which is expected to remain flat versus historical performance), offset by increases in IDS due to strong backlog. In addition, manufacturing efficiencies in the IVHS and Power Transmission Business Units, combined with targeted reductions in direct labor costs due to volume declines are expected to reduce variable costs.

❖ *Manufacturing Fixed Overhead and Selling & Administrative Expense*: The Projections reflect reductions in Manufacturing Fixed Overhead and Selling & Administrative Expenses over the historical performance which is primarily driven by the Debtors' on-going programs to streamline, consolidate and simplify overall business processes.

❖ *Corporate Overhead*: Corporate overhead primarily represents costs associated with the administrative functions located in Amherst, New York. These costs include management compensation expense, treasury and human resources costs, legal costs, and travel expenses. During FY 2009, Mark IV eliminated approximately $6.0 million in corporate overhead by consolidating its European back office functions.

❖ *Income Taxes*: While consolidated pre-tax income is projected to be negative for FY 2010, the Company does pay income taxes due to Mark IV's geographic diversity. The Company is expected to generate positive pre-tax income in every region except for the United States. The foreign tax rates vary between 30% and 33%.

Due to debt relief from its First Lien Lenders and Second Lien Lenders, Mark IV expects to realize income associated with the cancellation of indebtedness, which will eliminate the Reorganized Company's tax attributes as of the Effective Date. As a result, Mark IV is in the process of structuring the Reorganized Company in order to maximize the tax attributes before the Effective Date.

**Projected Consolidated Balance Sheet and Statement of Cash Flows:**

❖    *Debt*: The balances under the DIP Financing are as contemplated in the Plan.  The Projections assume the Reorganized Company will enter into an Exit Facility in the amount of $100 million, the proceeds of which will be used to pay down the estimated DIP borrowings as of the Effective Date, administrative and priority claims expected to be funded at the Effective Date, transaction fees, and provide the Company with additional liquidity post-emergence to fund seasonal working capital needs on an ongoing basis.  The Projections also reflect Restructured Debt Term Loans of $225 million.

❖    *Legacy Liabilities*: The Projections assume a material reduction of certain of the Debtors' Legacy Liabilities.

❖    *Cash*: It is assumed that interest of 2.0% will be earned on surplus cash balances.  The Exit Facility is assumed to be necessary to enable the Reorganized Company to fund part of the distributions under the Plan and, if necessary, working capital and operating needs.

❖    *New Equity Interests*: New Equity Interests of the Reorganized Company will initially be issued pursuant to the Plan, subject to increases due to the Management Equity Incentive Plan, as defined in the Plan.

❖    *Working Capital*: Balances for accounts receivable, inventory, and accounts payable are built up at the divisional level and then adjusted at the consolidated level for items such as factoring.

❖    *Capital Expenditures*: Capital expenditures are expected to remain relatively constant at approximately $30 to $32 million per annum.

## Projected Consolidated Balance Sheet

*($ in millions)*
**FX Rate @ Euro = $1.40**

| | | Fiscal Year Ending February, | | | |
|---|---|---|---|---|---|
| | **FY 2010E** | **FY 2011E** | **FY 2012E** | **FY 2013E** | **FY 2014E** |
| **Assets** | | | | | |
| Current Assets | | | | | |
| Cash | $40.0 | $40.1 | $43.3 | $46.9 | $76.5 |
| Accounts Receivable | 220.3 | 231.2 | 262.4 | 272.3 | 282.4 |
| Inventory | 244.6 | 263.0 | 280.0 | 283.8 | 289.7 |
| Other Current Assets | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 |
| Total Current Assets | 529.4 | 558.8 | 610.3 | 627.5 | 673.2 |
| | | | | | |
| PP&E | $276.3 | $257.8 | $241.2 | $223.3 | $204.2 |
| Other Non-Current Assets | 23.6 | 23.6 | 23.6 | 23.6 | 23.6 |
| Goodwill & Intangible Assets | 786.8 | 738.1 | 689.5 | 640.9 | 592.2 |
| | | | | | |
| **Total Assets** | $1,616.1 | $1,578.3 | $1,564.5 | $1,515.2 | $1,493.1 |
| | | | | | |
| **Liabilities & Shareholders' Equity** | | | | | |
| Current Liabilities | | | | | |
| Accounts Payable | $215.2 | $239.0 | $261.0 | $264.3 | $271.2 |
| Accrued Expenses | 56.7 | 56.7 | 56.7 | 56.7 | 56.7 |
| Other Current Liabilities | 64.4 | 64.4 | 64.4 | 64.4 | 64.4 |
| Total Current Liabilities | 336.3 | 360.1 | 382.1 | 385.4 | 392.3 |
| | | | | | |
| Exit Facility | $35.1 | $0.0 | $0.0 | $0.0 | $0.0 |
| Cerberus Bonds | 32.3 | 28.5 | 24.6 | - | - |
| Chieti Mortgage | 19.4 | 16.2 | 13.1 | 9.9 | 6.7 |
| Notes Payable | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 |
| Restructured Debt Term Loans | 225.8 | 226.1 | 194.6 | 137.6 | 70.3 |
| Total Debt | 363.8 | 322.0 | 283.5 | 198.7 | 128.2 |
| | | | | | |
| Legacy Liabilities | $66.2 | $70.5 | $62.3 | $62.2 | $60.8 |
| Other Long Term Liabilities | 194.7 | 194.7 | 194.7 | 194.7 | 194.7 |
| Total Long Term Liabilities | 260.8 | 265.2 | 257.0 | 256.9 | 255.5 |
| | | | | | |
| **Total Shareholders' Equity** | 655.1 | 631.0 | 641.9 | 674.2 | 717.1 |
| | | | | | |
| **Total Liabilities and Shareholders' Equity** | $1,616.1 | $1,578.3 | $1,564.5 | $1,515.2 | $1,493.1 |

## Projected Consolidated Income Statement

*($ in millions)*
**FX Rate @ Euro = $1.40**

| | Fiscal Year Ending February, | | | | |
|---|---|---|---|---|---|
| | **FY 2010E** | **FY 2011E** | **FY 2012E** | **FY 2013E** | **FY 2014E** |
| **Net Outside Sales** | **$1,218.6** | **$1,339.5** | **$1,452.3** | **$1,491.1** | **$1,530.8** |
| Total Variable Costs | 783.3 | 862.6 | 936.0 | 958.3 | 982.8 |
| **Contribution Margin** | **435.4** | **476.9** | **516.3** | **532.7** | **548.0** |
| Manufacturing Fixed Overhead | 122.7 | 125.6 | 125.5 | 120.9 | 124.5 |
| Total Cost of Goods Sold | 905.9 | 988.2 | 1,061.6 | 1,079.2 | 1,107.3 |
| **Gross Margin** | **312.7** | **351.3** | **390.8** | **411.8** | **423.5** |
| Selling & Administration | $144.4 | $146.3 | $150.8 | $154.6 | $158.4 |
| Other Operating Expenses | 143.0 | 143.6 | 144.4 | 146.8 | 149.3 |
| **Operating Income** | **$25.3** | **$61.4** | **$95.6** | **$110.5** | **$115.8** |
| Net Interest Expense | $25.4 | $35.2 | $31.9 | $25.2 | $17.3 |
| Other Non-Operating Expenses | 71.0 | 27.6 | 22.2 | 15.0 | 15.0 |
| Pre-Tax Income | (71.1) | (1.5) | 41.4 | 70.2 | 83.5 |
| Income Taxes | 14.8 | 20.3 | 28.3 | 35.7 | 38.4 |
| **Net Income / (loss)** | **($85.8)** | **($21.8)** | **$13.1** | **$34.5** | **$45.1** |
| **EBITDA** | **$124.6** | **$161.6** | **$195.9** | **$212.0** | **$218.6** |

## Projected Consolidated Cash Flow Statement

*($ in millions)*
**FX Rate @ Euro = $1.40**

| | Fiscal Year Ending February, | | | | |
|---|---|---|---|---|---|
| | **FY 2010E** | **FY 2011E** | **FY 2012E** | **FY 2013E** | **FY 2014E** |
| Net Income / (loss) | ($85.8) | ($21.8) | $13.1 | $34.5 | $45.1 |
| | | | | | |
| **Cash Flow from Operations:** | | | | | |
| Depreciation & Amortization | $99.3 | $100.3 | $100.3 | $101.6 | $102.8 |
| (Increase) / Decrease in Accounts Receivable | (45.6) | (32.9) | (31.3) | (9.9) | (10.1) |
| (Increase) / Decrease in Inventory | 17.5 | (18.3) | (17.0) | (3.8) | (6.0) |
| Increase / (Decrease) in Accounts Payable | 34.5 | 23.8 | 22.0 | 3.2 | 6.9 |
| Increase / (Decrease) in Other Current Assets & Liabilities | (7.4) | 22.0 | 0.0 | 0.0 | 0.0 |
| Legacy Liability Cash Requirement | (13.8) | (13.2) | (25.1) | (16.8) | (18.1) |
| Increase / (Decrease) in Legacy Liability Accrual (Non-Cash) | 16.2 | 15.3 | 14.8 | 14.5 | 14.5 |
| Increase / (Decrease) in Other | 0.8 | 2.3 | 2.4 | 2.1 | 1.5 |
| **Net Cash Provided by (Used in) Operating Activities** | 15.7 | 77.4 | 79.1 | 125.5 | 136.7 |
| | | | | | |
| **Cash Flow from Investing Activities:** | | | | | |
| Capital Expenditures | (34.9) | (33.1) | (35.0) | (35.0) | (35.0) |
| **Cash Provided by (used in) Investing Activities** | **(34.9)** | **(33.1)** | **(35.0)** | **(35.0)** | **(35.0)** |
| | | | | | |
| **Cash Flow from Financing Activities:** | | | | | |
| Borrowings | $22.8 | ($35.1) | $0.0 | $0.0 | $0.0 |
| Repayments | (7.0) | (9.0) | (40.9) | (86.9) | (72.0) |
| **Cash Provided by (Used in) Financing Activities** | **15.8** | **(44.1)** | **(40.9)** | **(86.9)** | **(72.0)** |
| | | | | | |
| Total Change in Cash | (3.5) | 0.1 | 3.2 | 3.6 | 29.6 |
| Beginning Cash Balance | 43.5 | 40.0 | 40.1 | 43.3 | 46.9 |
| **Ending Cash Balance** | **$40.0** | **$40.1** | **$43.3** | **$46.9** | **$76.5** |

**Appendix D**

**Valuation Analysis**

**VALUATION ANALYSIS**

**A.      Projected Financial Statements.**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  This standard is referred to as "feasibility."  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.

The Projections, which are set forth in Appendix C to this Disclosure Statement, should be read in conjunction with Article VIII of this Disclosure Statement, the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows), and the historical consolidated financial information (including the notes and schedules thereto) set forth in Appendix B to this Disclosure Statement.

The Projections assume that the Plan will be confirmed and consummated as of October 31, 2009 with Allowed Claims and Allowed Interests treated as described in the Plan.  Except as otherwise provided in the Plan, expenses incurred as a result of the Chapter 11 Cases are assumed to be paid on the Effective Date.  If the Debtors do not emerge from chapter 11 prior to October 31, 2009, additional Administrative Expenses will be incurred until such time as a plan of reorganization is confirmed and becomes effective.  Such additional Administrative Expenses could significantly impact the Reorganized Company's cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections.

It is important to note that the Projections and estimates of equity values for the Reorganized Company may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Reorganized Company.  These assumptions include, among other things, growth of business, the automotive volumes, labor and other operating costs, regulatory environment, inflation, and the level of investment required for capital expenditures and working capital.  Please refer to Article VIII of this Disclosure Statement for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimates of equity value for the Reorganized Company are not intended to reflect the equity values that may be attainable in public or private markets.  They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.  ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, (I) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF THE NEW EQUITY INTERESTS OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (II) INCLUDE SUCH UPDATED INFORMATION IN ANY

DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (III) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, AFTER CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE MATERIAL ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE DEBTORS, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE.

## B.   Valuation.

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

In conjunction with formulating the Plan, the Debtors determined that it would be necessary to estimate the post-confirmation going concern enterprise value for the Reorganized Company. The Debtors requested that Houlihan Lokey advise them with respect to the reorganization value of the Reorganized Company on a going concern basis. Solely for purposes of the Plan, the estimated range of reorganization value of the Reorganized Company was assumed to be $580 million to $730 million (with a midpoint value of $655 million) as of July 15, 2009. This estimated reorganization value includes value provided by each of the Company's four main business units: Power Transmission, Air Intake & Cooling, IVHS, and IDS. Houlihan Lokey's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF OCTOBER 31, 2009, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE COMPANY AVAILABLE TO HOULIHAN LOKEY AS OF JULY 15, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of the Reorganized Company of between $580 million and $730 million less assumed total net debt of $508 million, Houlihan Lokey has estimated the range of equity value for the Reorganized Company between approximately $72 million and $222 million, with a mid-point equity value of $147 million.

The foregoing estimate of the reorganization value of the Reorganized Company is based on a number of assumptions, including a successful implementation of Mark IV's business plan, the achievement of the forecasts reflected in the Projections (including contracts on hand to date and management's assessment of the likelihood of the continuation of such contracts and the successful renewal or securing of new contracts), access to the Exit Facility and Restructured Debt Term Loans, the continuing leadership of the existing management team, market conditions as of July 15, 2009 continuing through the assumed Effective Date of October 31, 2009, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Projected Financial Information prepared by the management of Mark IV and included in the Financial Appendix that is <u>Appendix C</u> to this Disclosure Statement, Houlihan Lokey assumed that such Projected Financial Information has been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of Mark IV as to the future operating and financial performance of the Reorganized Company and its debt and Legacy Liabilities at exit. Houlihan Lokey's estimate of a range of reorganization values assumes that Mark IV's Projections will be achieved by the Reorganized Company in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecasted by the management of Mark IV are significantly better than the recent historical results of operations of Mark IV. As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Company performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projected Financial Information, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED COMPANY, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF MARK IV FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF MARK IV, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY MARK IV'S MANAGEMENT AND WHICH RELATE TO MARK IV'S BUSINESSES AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF MARK IV TO DISCUSS MARK IV'S OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESSES OF MARK IV;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE AUTOMOTIVE INDUSTRY;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESSES; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF MARK IV'S BUSINESSES, OPERATING ASSETS AND LIABILITIES AND REORGANIZED MARK IV'S BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY MARK IV, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF MARK IV WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED COMPANY, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED COMPANY. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED COMPANY THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED COMPANY SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

## C.    Valuation Methodology.

Houlihan Lokey performed a variety of analyses and considered a variety of factors in preparing the valuation of the Reorganized Company.  Several generally accepted valuation techniques for estimating the Reorganized Company's enterprise value were used.  Houlihan Lokey conducted a consolidated valuation and a sum of parts valuation for each of Mark IV's four main business units and relied primarily on three methodologies: comparable public company analysis, discounted cash flow analysis, and precedent transactions analysis.  Houlihan Lokey's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Company's enterprise value.

In preparing its valuation estimate, Houlihan Lokey performed a variety of analyses and considered a variety of factors, some of which are described herein.  The following summary does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions.  The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances.  As a result, the process involved in preparing a valuation is not readily summarized.

(a)    *Comparable Public Company Analysis*.  A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company.  It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows.  The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement.  In addition, each company's performance, profitability, margins, leverage and business trends are also examined.  Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company.  Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, supply base, location of markets, growth prospects, market presence, size, and scale of operations.  The selection of truly comparable companies is often difficult and subject to interpretation.  However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, the following publicly traded companies in the automotive industry were deemed generally comparable to Mark IV's four business units in some or all of the factors described above and were selected:

- Power Transmission: ATC Technology Corporation, Bando Chemical Industries, Ltd., Brembo SpA,Continental AG, Dorman Products, Inc., Federal-Mogul Corp., Magna International, Inc., Mitsuboshi Belting Ltd., and Tomkins plc;

- Air Intake & Cooling: BorgWarner Inc., ElringKlinger AG, Keihin Crop., MGI Coutier SA, and Rheinmetall AG;

- IVHS: DRI Corporation, Kapsch TrafficCom AG, Q-Free ASA, Serco Group plc, and Telvent Git S.A.; and

- IDS: Daktronics Inc., DRI Corporation, Kapsch TrafficCom AG, and Lacroix SA.

Houlihan Lokey excluded several companies that were deemed not comparable because of size and status of comparable companies, among other things. Houlihan Lokey analyzed the current and historical trading value for the comparable companies as a multiple of actual fiscal year 2009 and projected fiscal year 2010 earnings. The derived multiples were applied to the Company's earnings to determine the range of Enterprise Value.

(b)     *Discounted Cash Flow Approach.*   The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to consolidated Mark IV. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections). Houlihan Lokey's discounted cash flow valuation is based on the business plan Projections of Mark IV's operating results. Houlihan Lokey discounted the projected cash flows and terminal value using Mark IV's estimated weighted average cost of capital.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because Mark IV's Projections reflect significant assumptions made by Mark IV's management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of Mark IV's Projections.

(c)     *Precedent Transactions Analysis.*   Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to Mark IV. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to Mark IV. Due to Mark IV's unique businesses and the current status of the M&A and financing markets, many of the recent precedent transactions were not comparable. Therefore, Houlihan Lokey relied more heavily on the comparable public company and discounted cash flow approaches.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that manifest itself in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The

reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY HOULIHAN LOKEY REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED COMPANY ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED COMPANY ASSOCIATED WITH HOULIHAN LOKEY'S VALUATION ANALYSIS.

**Appendix E**

**Liquidation Analysis**

# Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that the Bankruptcy Court find, as a condition to Confirmation, that each Claimholder or Interestholder in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a Chapter 7 Trustee would generate if each Debtor's Chapter 11 Case were converted to a Chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting Claimholder or Interestholder would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7; and (3) compare each Claimholder's and Interestholder's Liquidation Distribution to the distribution under the Plan (the "Plan Distribution") that such Claimholder or Interestholder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtors' management, together with Zolfo Cooper Management, LLC ("ZC"), the Debtors' restructuring consultants, prepared this Liquidation Analysis.

The board of directors of Mark IV and the Debtors' counsel have agreed that the scenario which will be presented for the "best interests" test will be a partial liquidation scenario in which certain Business Units are deemed to have been sold as going concerns. It is believed that this approach is a more realistic outcome than a distressed sale liquidation of all of the assets because several Business Units are significantly more valuable as going concerns and could be sold in a relatively short period of time (albeit at discounted values).

This Liquidation Analysis presents both high and low estimates of Liquidation Proceeds representing a range of management's assumptions relating to the Liquidation Proceeds realized and the costs incurred during a liquidation. However, the midpoint of each scenario was used to offset the risks, opportunities and uncertainties which occur during any liquidation. It is assumed that the liquidation would be performed over a period of six months, and that several of the Company's Business Units would be sold as going concerns.

The Business Units that will be deemed to have been sold as going concerns for the purposes of this Liquidation Analysis are Dayco Europe/ROW, AIC (including Systemes Moteurs and AIC Canada) ("AIC") and IVHS. Sales proceeds for these entities have been calculated using risk adjusted fiscal year 2010 EBITDA values to reflect the current economic environment. In addition, the multiples that have been used reflect the impact of selling in a shortened period of time.

To the extent that the proceeds from the sale or liquidation of all the assets of a particular legal entity is less than the claims on such assets, it is assumed that no sister or parent company will be liable for the difference and the unsecured creditors of that entity will be impaired.

Mark IV's end of May balance sheet shows an aggregate book value of each of the Debtors' assets on a consolidated basis of approximately $1.6 billion. This $1.6 billion is not an accurate indicator of liquidation value of the Debtors' assets because it reflects book value not liquidation or fair market value.

---

[1] Unless otherwise stated, any capitalized term used herein shall have the meaning assigned to such term herein or, if no meaning is so assigned, the meaning assigned to such term in this Disclosure Statement.

These book values are historical values adjusted in accordance with certain accounting rules. As a result, book value, especially in the context of a liquidation, is dramatically different than the value that could be realized in a distressed sale. For example, the book value of the total assets reported in the balance sheet includes goodwill of $756.2 million, which is not expected to accrete any value to the Debtors' Estates. In addition to goodwill, there are other significant adjustments to book value that are outlined in the notes below.

The statements in this Liquidation Analysis, including estimates of Allowed Claims, were prepared solely to assist the Bankruptcy Court in making the findings required under section 1129(a)(7) and they may not be used or relied upon for any other purpose.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THIS LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THIS LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THIS LIQUIDATION ANALYSIS.

Based upon the distributions contemplated by the Plan and the agreement of the First Lien Lenders to limit their deficiency claim to 50% of the aggregate amount of all Allowed General Unsecured Claims (up to a maximum amount of $485 million), Holders of Allowed General Unsecured Claims in Class 7 will receive value of $17.6 million (12% of the estimated value of the New Equity Interests calculated using the midpoint of the valuation of the Reorganized Company as set forth in Appendix D of this Disclosure Statement) or 3.5% of $500 million – the estimated aggregate amount of Allowed General Unsecured Claims in the Debtors' Chapter 11 Cases. Furthermore, Holders of Allowed General Unsecured Convenience Class Claims will either receive (a) Cash equal to the lesser of (i) 25% of their Claim, or (ii) their Pro Rata share of the Convenience Class Cap Amount, or (b) their Pro Rata share of the New Equity Interests.

In a liquidation, only the general unsecured creditors of Dayco Products LLC and Luminator Holding L.P. would receive a distribution, because the only assets of the Debtors with any meaningful value that are unencumbered is 34% of Dayco Products LLC's interest in certain of the Company's non-US affiliates and Luminator Holding L.P.'s interest in IDS Far East Holdings SRL. The Debtors have calculated the distribution percentages set forth above on an aggregate basis including amounts of Allowed General Unsecured Claims at other Debtors in addition to Dayco Products LLC and Luminator Holding L.P. However, as this Liquidation Analysis shows, even if the Debtors were only to consider recoveries to the creditors of Dayco Products LLC and Luminator Holding L.P., respectively, such creditors will receive a greater recovery pursuant to the Plan than they would in a hypothetical liquidation.

**Liquidation Analysis - Dayco**

*Amounts in '000s*

| | Midpoint |
|---|---|
| **US** | |
| Mark IV Industries Inc Gross Proceeds (Excludes IVHS Assets) | $ 112,134 |
| Include IVHS Going Concern Proceeds | 35,841 |
| Payment of US DIP | (35,000) |
| Intercompany Loan Collection | 9,407 |
| Wind-down Costs (adjusted for IVHS) | (4,510) |
| **Total US Residual Net Proceeds** | **$ 117,872** |
| | |
| **Canada** | |
| Canadian IDS and subs Asset Gross Proceeds (incl. SLE and Focon) | $ 25,448 |
| Repayment of Canadian DIP | (25,000) |
| Intercompany Loan Repayment from France | 15,186 |
| Wind-down Costs | (731) |
| Current Liabilities | (9,701) |
| **Canadian Asset Net Proceeds** | **$ 5,203** |
| | |
| **Dayco Europe** | |
| Systemes Moteurs Gross Proceeds (incl. AIC Canada) | $ 46,021 |
| Intercompany Loan Repayment | (10,434) |
| Wind-down Costs | - |
| Payment of Cerberus Debt | (32,699) |
| Current Liabilities | - |
| **Subtotal Systemes Moteurs Net Proceeds** | **$ 2,889** |
| | |
| Dayco SRL Europe Gross Proceeds (Excl. Systemes Mot.) | $ 143,473 |
| Systemes Moteurs Net Proceeds (incl. AIC Canada) | 2,889 |
| Payment of Italian DIP | (30,000) |
| Intercompany Loan Repayment | (13,935) |
| Wind-down Costs | - |
| Euro Revolver | (46,197) |
| Euro Term Loan A | (29,531) |
| Payment of Chieti Mortgage | (22,820) |
| Overdraft and working capital lines in Europe | - |
| Current Liabilities (excludes overdraft and w/c lines) | - |
| **Dayco Europe Net Proceeds** | **$ 3,878** |
| | |
| **Other Foreign Subs of Dayco Products LLC** | |
| Mark IV Industries Holding (Germany) Gross Proceeds | $ 14,164 |
| Mark IV Holdings Luxembourg(Incl Dayco Canada) Gross Proceeds | 8,747 |
| Mark IV AB Sweden Gross Proceeds | 177 |
| Mark IV Holdings BV Gross Proceeds | 18 |
| Controladora Dayco SA de CV Gross Proceeds | 3,962 |
| Other Current Liabilities | (9,335) |
| Other wind-down costs | (1,087) |
| **Other Foreign Sub Net Proceeds of Dayco Products LLC** | **$ 16,647** |
| | |
| **Total Non-US Residual Net Proceeds** | **$ 25,728** |
| | |
| **Total Proceeds Available to U.S. Pre-petition Creditors** | **$ 143,600** |
| | |
| *Memo:* | |
| **Encumbered Proceeds available to U.S. Creditors** | |
| US Net Proceeds | $ 117,872 |
| 66% of Foreign Net Proceeds | $ 16,980 |
| **Unencumbered Proceeds available to U.S. Creditors** | |
| 34% of Foreign Net Proceeds | $ 8,747 |

**Liquidation Recoveries - Dayco**

*Amounts in '000s*

**First Lien Claims**

| | |
|---|---:|
| US Revolving Credit Facility | $ (81,100) |
| US Term Loan B | (641,167) |
| Other Secured & Accrued but Unpaid Interest | (60,000) |
| Euro Revolver | (46,197) |
| Euro Term Loan A | (29,531) |
| **Total First Lien Claims** | **$(857,995)** |
| | |
| US Residual Net Proceeds (excludes Luminator) | $ 117,872 |
| Proceeds delivered to Senior Lender from Euro Tranches | 75,728 |
| 66% of Non-US Residual Net Proceeds (excludes Luminator subs) | 16,980 |
| **Total Encumbered Recovery** | **$ 210,580** |
| | |
| **Deficiency Claim** | **$(647,415)** |

**Unsecured Claims**

| | |
|---|---:|
| First Lien Deficiency Claim | $(647,415) |
| Second Lien Deficiency Claim | (148,227) |
| General Unsecured Claims | (50,000) |
| **Total Unsecured Claims** | **$(845,642)** |
| | |
| Non-pledged Non-US Assets excluding Luminator (34%) | $ 8,747 |
| | |
| Non-pledged Non-US Assets (34%) | $ 8,747 [1] |

**Pro Rata Recoveries to Holders of Unsecured Claims - Dayco**

| | |
|---|---:|
| First Lien Lenders | 77% |
| Second Lien Lenders | 18% |
| General Unsecured Creditors | 6% |
| **Total Unsecured Claims** | **100%** |

**Recovery to First Lien Lenders - Dayco**

| | |
|---|---:|
| Encumbered Recovery | $ 210,580 |
| Unencumbered Recovery | 6,697 |
| **Total** | **$ 217,277** |
| **% Recovery to First Lien Lenders** | **25.3%** |

**Recovery to Second Lien Lenders - Dayco**

| | |
|---|---:|
| Unencumbered Recovery | $ 1,533 |
| **Total** | **$ 1,533** |
| **% Recovery to Second Lien Lenders** | **1.0%** |

**Recovery to General Unsecured Creditors - Dayco**

| | |
|---|---:|
| Unencumbered Recovery | $ 517 |
| **Total** | **$ 517** |
| **% Recovery to Unsecured Creditors** | **1.0%** |

[1] The amount of non-pledged, non-US assets available for distribution to unsecured creditors of Dayco Products LLC does not take into account any diminution of value claims to which the DIP Lenders may be entitled.

| Liquidation Analysis - Luminator | |
|---|---|
| Amounts in '000s | |
| **US Luminator** | **Midpoint** |
| Mark IV Luminator Holding L.P. | $ 21,957 |
| Wind-down Costs (Luminator) | (841) |
| **Luminator US Residual Net Proceeds** | **$ 21,115** |
| **Luminator Foreign Assets** | |
| IDS far East Holdings | 69 |
| Shanghai Maening Electromechanical | 2,020 |
| Wind-down Costs | (52) |
| Current Liabilities | - |
| **Luminator Foreign Asset Net Proceeds** | **$ 2,036** |
| **Luminator Non-US Residual Net Proceeds** | **$ 2,036** |
| **Luminator Proceeds Available to U.S. Pre-petition Creditors** | **$ 23,151** |
| ***Memo:*** | |
| **Encumbered Proceeds available to U.S. Creditors** | |
| US Net Proceeds | $ 21,115 |
| 66% of Foreign Net Proceeds | $ 1,344 |
| **Unencumbered Proceeds available to U.S. Creditors** | |
| 34% of Foreign Net Proceeds | $ 692 |

| Liquidation Recoveries - Luminator | | |
|---|---|---|
| *Amounts in '000s* | | |
| **First Lien Claim - Luminator** | | |
| First Lien Claims on Luminator Assets | **$ (640,718)** | |
| | | |
| Luminator Encumbered Recovery | $ 22,459 | |
| | | |
| **Deficiency Claim** | **$ (618,259)** | |
| | | |
| **Unsecured Claims - Luminator** | | |
| First Lien Deficiency Claim | $ (618,259) | |
| Second Lien Deficiency Claim | (146,693) | |
| General Unsecured Claims - Luminator | (2,200) | |
| **Total Unsecured Claims** | **$ (767,152)** | |
| | | |
| Luminator Non-pledged Non-US Assets (34%) | $ 692 | |
| | | |
| Luminator Non-pledged Non-US Assets (34%) | $ 692 | [1] |
| | | |
| **Pro Rata Recoveries to Holders of Unsecured Claims - Luminator** | | |
| First Lien Lenders | 81% | |
| Second Lien Lenders | 19% | |
| General Unsecured Creditors | 0.3% | |
| **Total Unsecured Claims** | **100%** | |
| | | |
| **Recovery to First Lien Lenders - Luminator** | | |
| Encumbered Recovery | $ 22,459 | |
| Unencumbered Recovery | 558 | |
| **Total** | **$ 23,017** | |
| **% Recovery to First Lien Lenders** | **3.7%** | |
| | | |
| **Recovery to Second Lien Lenders - Luminator** | | |
| Unencumbered Recovery | $ 132 | |
| **Total** | **$ 132** | |
| **% Recovery to Second Lien Lenders** | **0.1%** | |
| | | |
| **Recovery to General Unsecured Creditors - Luminator** | | |
| Unencumbered Recovery | $ 2 | |
| **Total** | **$ 2** | |
| **% Recovery to Unsecured Creditors** | **0.1%** | |

[1] The amount of non-pledged, non-US assets available for distribution to unsecured creditors of Luminator Holding L.P. does not take into account any diminution of value claims to which the DIP Lenders may be entitled.

| Combined Liquidation Recoveries | |
|---|---|
| **Amounts in '000s** | |
| **Recovery to First Lien Lenders** | |
| Encumbered Recovery - Dayco | $ 210,580 |
| Unencumbered Recovery - Dayco | 6,697 |
| Encumbered Recovery - Luminator | 22,459 |
| Unencumbered Recovery - Luminator | 558 |
| **Total** | **$ 240,294** |
| **% Recovery to First Lien Lenders** | **28.0%** |
| | |
| **Recovery to Second Lien Lenders** | |
| Unencumbered Recovery - Dayco | $ 1,533 |
| Unencumbered Recovery - Luminator | $ 132 |
| **Total** | **$ 1,666** |
| **% Recovery to Second Lien Lenders** | **1.1%** |
| | |
| **Recovery to General Unsecured Creditors** | |
| Unencumbered Recovery - Dayco | $ 517 |
| Unencumbered Recovery - Luminator | $ 2 |
| **Total** | **$ 519** |
| **% Recovery to Unsecured Creditors** | **1.0%** |

## LIQUIDATION ANALYSIS NOTES

1. *Basis for Valuation*

   Value estimates were derived from the actual account balances reported in the May 2009 balance sheet.

2. *Cash*

   The estimated cash balance was derived from the actual May cash balance of approximately $61.4 million, plus $39.6 million in cash ($45.0 less $5.4 million in fees) at the end of May for illustrative purposes in the recovery schedules provided in this analysis. Note that the additional $45.0 million of DIP loans was included as a super priority claim against the estate.

3. *Net Accounts Receivable*

   In the May 2009 balance sheet, the Debtors reported an Accounts Receivable balance of approximately $243.1 million. The above balance was netted against the reserve for accounts receivable losses, which had a balance of $(20.3) million. Thus, the Net Accounts Receivable balance was $222.7 million. Recoveries for Net Accounts Receivable were assumed to be 65% in the low scenario and 95% in the high scenario.

4. *Inventory*

   Proceeds from the various inventory accounts were based on the May 2009 balance sheet:

   - The Finished Goods Inventory balance at the end of May was $137.3 million, and recoveries were assumed to be 30% on the low scenario and 60% in the high scenario.

- The Work In Process Inventory balance at the end of May was $35.2 million, and recoveries were assumed to be 0% in the low scenario and 5% in the high scenario.

- The Raw Materials inventory balances at the end of May were $63.7 million, and recoveries were assumed to be 40% in the low scenario and 70% in the high scenario.

- The Tooling inventory balances at the end of May were $31.0 million, and recoveries were assumed to be 0% in the low scenario and 5% in the high scenario.

- The Inventory in Transit balances were $3.7 million at the end of May and the recoveries were assumed to be 20% in the low scenario and 50% in the high scenario.

5. *Wind-down Costs*

This analysis assumed wind-down costs would be between $6.4 million and $8.0 million assuming a six month wind-down including payroll, professional fees, occupancy and utilities, and legacy liabilities. The following schedule illustrates the wind-down costs on a monthly basis.

| Liquidation Analysis Wind-down Cash-flows | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Amounts in '000s* | | | | | | | |
| | **Month** | | | | | | |
| **Wind-down Schedule Midpoint** | **1** | **2** | **3** | **4** | **5** | **6** | **Total** |
| Payroll | $2,864 | $728 | $364 | $364 | $73 | $0 | **$4,393** |
| Occupancy & Utilities | 75 | 25 | 25 | 13 | 13 | 13 | **163** |
| Professional Fees | 932 | 621 | 414 | 207 | 207 | 207 | **2,589** |
| Legacy Activities | 50 | 6 | 6 | 6 | 6 | - | **76** |
| Total | **$3,922** | **$1,381** | **$810** | **$590** | **$299** | **$220** | **$7,221** |

6. *Going Concern Sales*

Dayco Europe/ROW, AIC (Systemes Moteurs and AIC Canada), and IVHS were assumed to be sold as going concerns. The multipliers and EBITDA values used to calculate the sale proceeds from these entities reflect the current economic environment and the impact of selling in a compressed time period.

7. *Goodwill*

In the May 2009 balance sheet, the Debtors reported a Goodwill Balance of approximately $756.2 million. Goodwill is estimated to have no liquidation recovery value and was removed from the balance sheet for this analysis.

8. *Gross Property, Plant and Equipment ("PP&E")*

In the May 2009 balance sheet, the gross PP&E balance was $726.2 million. Accumulated depreciation was ignored in this scenario due to the fact that recoveries of PP&E were set at 10% and 20% in the low and high scenarios. The main driver behind such low recoveries is due to the specialized nature of the Debtors' manufacturing equipment and the current economic environment.

9. *Recovery Results*

Using the balance sheet recovery, wind-down costs and going concern sale assumptions detailed in this document, it is expected that there will be approximately $166.8 million in proceeds available to U.S. prepetition creditors for distribution. The proceeds available from the liquidation and going

concern sales of the U.S. entities, net of the US DIP repayment and the wind-down costs, total $139.0 million.

The proceeds available to the prepetition creditors from the foreign entities, net of the required DIP repayments, other debt repayments and wind-down costs were approximately $27.8 million. The First Lien Lenders have a lien on 66% of the foreign stock; therefore, the First Lien Lenders were entitled to $18.3 million of the proceeds available from the sale and liquidation of the foreign entities. The remaining 34% or $9.4 million of the proceeds from the foreign proceeds was unencumbered.

It was estimated that the First Lien Lenders would receive a recovery of approximately $240.3 million or 28.0% of their total claim. The total recovery from encumbered assets is estimated to be $233.0 million. However, due to the First Lien Lenders' deficiency claim of $618.3 million ($858.0 million in First Lien Lender Claims less $217.3 million of First Lien Lender recoveries after the Dayco Products LLC liquidation less $22.5 million of encumbered recoveries at Luminator), the First Lien Lenders would receive 77% or $7.3 million of the unencumbered amount. It is estimated that the Second Lien Lenders and the remaining General Unsecured Claimholders would receive recoveries of approximately 1.1% and 1.0%, respectively.

10. *First Lien and Second Lien Claims*

First Lien Lender Claims amount to $858.0 million, while Second Lien Lender Claims are $148.2 million.

11. *Other Secured Claims*

Other secured claims include the Chieti mortgage of $22.8 million.

12. *Unsecured Claims*

Unsecured claims include $52.2 million of estimated unsecured claims in the U.S. In addition, the First Lien Lenders' deficiency claim of $618.3 million, and the Second Lien Lenders' deficiency claim of $146.7 million also form part of the pool of unsecured claims.