```
-------------------------------------------------  x
In re:                                             :    Chapter 11
                                                   :
MARK IV INDUSTRIES, INC., et al.,                  :    Case No. 09-12795 (SMB)
                                                   :    Jointly Administered
                                      Debtors.     :
-------------------------------------------------  :
                                                   x
```

SUMMARY SHEET PURSUANT TO THE UNITED STATES TRUSTEE GUIDELINES FOR REVIEWING APPLICATIONS FOR COMPENSATION IN SUPPORT OF REQUEST FOR ALLOWANCE AND PAYMENT OF CONFIRMATION AND PERFORMANCE FEES TO ZOLFO COOPER MANAGEMENT, LLC

Name of Applicant:                           Zolfo Cooper Management, LLC

Authorized to Provide
Professional Services to:                    Debtors

Role in these Cases:                         Chief Restructuring Officer and Associate
                                             Directors of Restructuring for the Debtors

Date of Retention:                           Court Approval on May 27, 2009 (retroactive
                                             to April 30, 2009)

Period for Which Compensation                April 30, 2009 through September 23, 2009
is Sought:

Amount of Fees Sought in                     $1,000,000    Performance Fee
This Final Application:                      $  500,000    Confirmation Fee
                                             $1,500,000    Total Fee

```
----------------------------------------------------- x
In re:                                                 :    Chapter 11
                                                       :
MARK IV INDUSTRIES, INC., et al.,                      :    Case No. 09-12795 (SMB)
                                                       :    Jointly Administered
                                Debtors.               :
----------------------------------------------------- :
                                                       x
```

## APPLICATION BY ZOLFO COOPER MANAGEMENT LLC, RESTRUCTURING ADVISORS TO THE DEBTORS, FOR AN ODER ALLOWING PAYMENT OF THE CONFIRMATION AND PERFORMANCE FEES

## INTRODUCTION

1.      On February 13, 2009, Zolfo Cooper Management LLC ("Zolfo Cooper") was retained by MARK IV, LLC, Mark IV IVHS, Inc. and MARK IV GLOBAL HOLDING CORP. (the "Debtors"), to lead the restructuring efforts, as directed by the Board, and was authorized to make decisions with respect to all restructuring-related aspects of the business.

2.      On April 30, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Zolfo Cooper has served as crisis managers to the Debtors and as Chief Restructuring Officer ("CRO") of the Debtors, pursuant to an order entered by this Court on May 28, 2009 at docket item number 170 (the "Retention Order"). A copy of the Retention Order is attached hereto as Exhibit A.

3.      The Retention Order approved the Services Agreement entered into between Zolfo Cooper and the Debtors on April 30, 2009 (the "Services Agreement"). A copy of the Services Agreement is attached hereto as Exhibit B. Pursuant to items 4(b) and 4(c) of the Services Agreement, the Debtors agreed that, in addition to the hourly fees payable for the services it provided, Zolfo Cooper would be compensated for its efforts by payment of a Confirmation Fee and Performance Fee, which the Debtors understood and acknowledged were an integral part of Zolfo Cooper's compensation for the engagement.

4.      On September 23, 2009, this Court entered an order (the "Confirmation Order") confirming the First Amended Joint Plan of Reorganization of the Debtors and Debtors in Possession (the "Plan"), which Plan became effective on November 13, 2009. The services of Zolfo Cooper were integral to the successful reorganization of the Debtors and contributed significant direct and incremental value to the stakeholders. Zolfo Cooper's scope of services included the role of management, in the form of a CRO, to the Debtors in these cases, as well as providing services that were essential in preparing, negotiating and ultimately obtaining confirmation and

consummation of the Plan. The confirmation of the Plan and the extraordinary results achieved as a result of the services provided by Zolfo Cooper is the basis for the Confirmation and Performance Fees sought herein.

5.     At the time of the Chapter 11 filing, the Debtors faced unprecedented challenges. The auto industry was in turmoil, with great uncertainty around the financial position of two of the big three US automakers. On the heels of government auto bailouts, Chrysler filed for Chapter 11 on the same day as the Debtors and GM filed one month later.   Numerous other auto suppliers were either in bankruptcy or on the verge of filing.  In addition, the Debtors were facing strained credit markets. These dual threats to the Debtors presented significant challenges to a successful restructuring.

6.     Upon entering into this bankruptcy, there were four elements which were considered critical for the Debtor in order to successfully emerge: i) reaching plan confirmation on the earliest possible timetable, ii) emerging with a clean and de-levered balance sheet which included addressing the pre petition secured liabilities and a successful resolution of the legacy liabilities, particularly the Waynesville Retirees, iii) minimizing potential business disruption issues to the Company (both Debtors and non Debtors) caused by the Chapter 11 filing, and iv) obtaining exit financing which would position the Company for growth and provide the ability to manage the downturns in the auto sector.   Accordingly, it was extremely important to the Debtor and its Board of Directors to structure an engagement letter and fee structure with our firm that motivated and rewarded our efforts to accomplish the Debtors goals.

7.     Therefore, Zolfo Cooper and the Debtor negotiated a fee structure comprised of two separate components.  It was agreed that these two components would incentivize Zolfo Cooper and the Debtor to achieve the four elements listed above, and consequently, successfully emerge from Chapter 11.  These two components are:  i) a Confirmation Fee, whereby the awarded amount

would vary inversely with the time which the Debtor took to reach the plan confirmation, and ii) a Performance Fee which was triggered based on the Company's actual EBITDA performance as compared to budget as of the month of the plan confirmation. These two components were accompanied by an arrangement between Zolfo Cooper and the Debtor whereby on a rate times hours' basis, Zolfo Cooper professionals were limited to billing no more than 53 hours per week and the number of professionals utilized by Zolfo Cooper could only be increased with the Debtors' management's consent. Although this arrangement introduced an element of risk to Zolfo Cooper, it provided additional incentives to focus on a rapid and successful emergence.

8. A more detailed description of the components of the Zolfo Cooper Confirmation and Performance Fees follows:

    a. The Confirmation Fee component, as described and agreed upon in Section 4(b) of the Services Agreement, is a one-time, sliding scale fee which was earned upon confirmation of the plan of reorganization, subject to the following schedule of timing:

| Days from the petition date to plan confirmation | Confirmation Fee |
|---|---|
| 120 or less | $1,250,000 |
| 121 – 180 | $1,000,000 |
| 181 – 270 | $625,000 |
| 271 – 300 | $300,000 |
| 301 or more | $0 |

    b. The Performance Fee component, as described and agreed upon in section 4 (c) of the Services Agreement, is a one-time fee of $500,000, and is based on Mark IV's EBITDA performance compared to the 2010 fiscal year budget. Per the Services Agreement, the Performance Fee will be earned if the Debtor surpasses 90% of the fiscal year 2010 budget from the beginning of the fiscal year through the month end in which the plan is confirmed.

9.     This Court entered the Confirmation Order 146 days (less than 5 months) after the Petition Date, and the Debtors achieved an EBITDA 21% higher than the target 90% of FY 2010 budget (See Exhibit C). Based on the terms of the Services Agreement, Zolfo Cooper respectfully submits that Zolfo Cooper has earned, and this Court should award to Zolfo Cooper, the Confirmation and Performance Fees in the amount of $1.5 million.

10.    At the time Zolfo Cooper's Retention Order was heard by the Court, the Debtor, its Board of Directors, the Senior Lenders and the Unsecured Creditors Committee supported the fee structure and the amounts set forth above. All of the foregoing constituents have represented to Zolfo Cooper and the Debtors that they continue to support the allowance and payment of the Confirmation Fee and the Performance Fee in the total sum of $1.5 million to Zolfo Cooper.

11.    Notwithstanding the forgoing, the Retention Order provides that allowance and payment of any success fee shall be subject to the reasonableness standard of review. Zolfo Cooper believes that for all the reasons set forth herein, it has met the applicable standards for allowance of the Confirmation Fee and the Performance Fee and, therefore, the Confirmation Fee and the Performance Fee should be awarded.

## SIGNIFICANT PROFESSIONAL SERVICES RENDERED

12.    The services that Zolfo Cooper has performed were substantial and necessary in this Chapter 11 case, and added material additional value. Zolfo Cooper performed such services with the minimum amount of duplication with the Debtors' other advisors. The following is a summary of significant professional services rendered by Zolfo Cooper to the Debtors as part of the bankruptcy process:

13.    Chapter 11 Process Management:

      a.     David Orlofsky served as CRO of the Debtors during the period of February 13, 2009 to November 13, 2009, providing leadership and guidance to the board

of directors, the senior management team, and to employees of the Debtors on restructuring related matters that impacted the Company.

14.  Legacy Liabilities:

    a.  Led the team that successfully reduced the legacy liabilities by $53.8 million, from $104.6 million to $50.8 million, and played a critical role in negotiations with the labor unions.

    b.  This reduction in legacy liabilities was accomplished without having to go through a protracted §1114 process with the Waynesville Retirees, who comprised the single largest portion of the legacy liabilities. By reaching a consensual agreement with the Waynesville Retirees, the Debtors were able to avoid a potentially long and expensive §1114 process that could have delayed the Debtors' successful emergence from bankruptcy.

15.  Chapter 11 Related Cash/Liquidity Management:

    a.  Advised and assisted the Debtors in developing a strategy to manage their global cash needs during periods of low liquidity such as prior to the filing. The Debtors had initially estimated a peak cash need requirement of $90 million. Zolfo Cooper's efforts directly contributed to the Debtors' peak cash need decreasing by $50 million to approximately $40 million. This $50 million improvement is primarily driven by credit facility and trade credit initiatives mentioned below, as well as by the $8 million improvement in the Company's EBITDA vs. forecast.

    b.  Supported the operating units in Europe in the procurement of overdraft facilities to replace the ~$10 million credit line contraction sustained when several banks pulled their facilities.

    c.  Supported the operating units in France and Italy in the procurement of additional working capital and factoring facilities, thus increasing their facility size by ~$3 million and ~$15 million, respectively.

    d.  Advised and assisted in the management of vendors and helped maintain and finally improve trade terms from most vendors and minimized trade contraction from others. The North America Powertrain and Aftermarket divisions improved days payable outstanding by 40% (from 32 to 40 days) and 11% (from 19 to 21 days), respectively, when comparing terms at emergence vs. terms pre-petition.

e. Evaluated the Debtor's cashflow forecasting process and implemented improvements.

16. Plan of Reorganization Development and Execution:

   a. Took a leading role in negotiating the framework of the Plan Term Sheet with the senior lenders in advance of the petition date, which helped smooth the bankruptcy process.

   b. Led negotiations with the creditors and their respective advisors that resulted in a revised, sustainable capital structure. The $946 million of first and second lien prepetition debt has been reduced by $718 million to $228 million. The revised capital structure enables the Debtor to emerge from Chapter 11 with a significantly reduced debt load which should provide ample opportunity for revenue and equity growth.

   c. Prepared exhibits to support the Plan, including the Debtor's liquidation analysis and various asset valuations for the purpose of supporting the "best interests" test included in the Disclosure Statement.

   d. Advised and assisted the Debtors and their outside counsel in the design and implementation of their restructuring transactions in connection with their emergence from Chapter 11 which included analyzing the financial impact of the Italian loan with regard to Italian usury laws, supporting the Debtors' in the funds flow planning, and maximizing tax benefits through debt allocation analyses.

   e. Led the negotiations related to the management incentive plan (the "MIP") with the Board of Directors, the creditors and their advisors' and provided analysis to support these negotiations.

17. Financing:

   a. Led the negotiations with the secured lenders in obtaining a principal and interest forbearance on various tranches of debt at the end of March/ early April, providing the Debtors' with adequate time and liquidity to focus on planning and preparing for the bankruptcy, which in turn contributed to the Debtors' successful emergence.

   b. Directed the process for sizing of the DIP financing. Directed and assisted management and other Debtor's advisors in finalizing the detailed terms of the

$90 million DIP financing agreement. Worked with the Debtors' management to identify, reconcile, analyze and modify the financial forecast, and led the negotiation with the DIP lenders and their advisor related to the financial covenants.

c.      Advised and assisted in the exit financing negotiations to secure a $145 million term loan and a $50 million ABL facility.  Played a lead role in negotiating the financial covenants which should provide adequate cushion for management to operate and grow the business.

d.      Actively participated in negotiations regarding the structures of the exit financing.  Assisted with the documentation of the exit financing and restructured debt facility agreements, prepared supporting schedules, and provided analyses (repayment of French debt, location of debt, etc) to support the negotiations.

e.      Actively participated in meetings with rating agencies in connection with obtaining a rating for the DIP and exit facilities and participated in presentations to potential participants to support efforts to syndicate these facilities.

18.    <u>Communication with Interested Parties:</u>

a.      Communicated critical information to the Debtors' Board of Directors and outside constituents, including prepetition and postpetition secured creditors, prepetition unsecured creditors, and labor unions and their respective advisors, related to the progress of the Chapter 11 case.

b.      Assisted the Debtors with communications with key customers and their advisors which helped provide confidence to key customers regarding the continuity of supply that helped the Debtors' to avoid having programs resourced.

c.      Assisted the Debtors with the development of a communications plan for employees to provide them with information regarding the Chapter 11 process, and the impact on the Debtors' and the Debtors' employees.

19.    <u>Executory Contracts:</u>

a.      Led the process to identify, review, and catalog over 400 contracts, and prepared summaries of their material terms.  Assembled a contract database for use in Chapter 11 reporting and daily operations.  Worked closely with

management and the contract review team to identify proposed resolutions and/or dispositions related to such contracts.

b.    Utilized the contract database to identify 201 items to reject and include on Exhibit O of the disclosure statement. It is estimated that the rejection of these items will reduce the Debtors' liabilities by approximately $18.5 million.

c.    Led the process to reject various contracts related to prior divestitures thus reducing the risk of future environmental liabilities.

20.    <u>Claims Process:</u>

a.    Advised and assisted the Debtors and their outside counsel in implementing an intensive claims resolution process. Worked closely with the Debtors and their outside counsel and claims agent to identify claims for objection on both a substantive and non-substantive basis and to prepare affidavits in support of motions to disallow such claims as required. Developed a claims settlement process to facilitate the timely consensual resolution of claims.

b.    Advised and assisted the Debtors in their efforts to reconcile and negotiate 30 reclamation claims totaling $5.8 million. Participated actively with the Debtors and their outside counsel to resolve and reconcile disputes related to such claims.

c.    Assisted in maintaining a database of approximately 1,650 filed and 1,300 scheduled claims, totaling $5.5 billion. Assisted in matching vendor filed claims to scheduled amounts and multiple claims filed by single vendors. Also assisted in categorizing claims into major and minor categories for ease of reconciliation, updating amounts of foreign currency conversions, and reviewing accuracy of Debtor entities and claims filed against them. Currently assisting in tracking claims transferred to third parties, claims settled by vendor agreements, claims withdrawn by vendors and other general tasks associated with managing a database of this size.

d.    Advised and assisted the Debtors in their efforts to manage the U.S. vendor base by signing approximately 100 non-critical vendor agreements. These agreements resulted in the expedited payment of $1.2 million of 503(b)(9) claims in exchange for vendor trade credit and for not disrupting supply during the pendency of the case.

21.    <u>Vendor Management:</u>

a.     Communicated with and provided guidance to the Debtors' financial staff on a daily basis regarding questions and issues related to the segregation of prepetition liabilities and the implementation and review of payment procedures to prevent unauthorized payment of prepetition invoices.

b.     Assisted the Debtors' purchasing group in managing their vendor relationships to mitigate the impact of the Chapter 11 filings. Participated in direct negotiations with key suppliers related to Chapter 11 issues, and managed the disposition of the Debtors' authority to pay prepetition amounts under certain of their first day orders. These activities contributed directly to minimizing the impact of the Chapter 11 filing and ensuring the delivery of raw materials. With an uninterrupted flow of raw materials, the Debtors did not miss any shipments to customers.

c.     Compiled reporting related to settlements with customers and payment of prepetition amounts under first day orders. Negotiated and administered settlements of adequate assurance demands by the Debtors' utility providers.

d.     Worked with the Debtor's management to identify Critical Vendors and directly negotiated a 45% reduction to the $7.0 million in total claims of the critical vendors, resulting in a reduction of $3.3 million in the Debtor's critical vendor payments.

e.     Limited Debtor's peak North American supplier contraction to approximately $13 million through negotiations and communications with suppliers.

22.     <u>U.S. Trustee / Court Reporting Requirements:</u>

a.     Led the process to develop and prepare the Debtors' Statement of Financial Affairs and Schedules for each of the 18 Debtors, which were filed on June 16, 2009. Collected, reconciled and analyzed the data, prepared and reviewed with the Debtors the draft documents, and coordinated the filing of those documents with outside counsel.

b.     Assisted the Debtors' in the preparation and review of MOR Schedules.

23.     <u>DIP Agreement Related Budget Reporting:</u>

a.     Directed the preparation of 13-week cash forecasts in compliance with reporting requirements under the postpetition credit agreement and integrated Chapter 11 related items into the 13 week cashflow forecasting process.

b.      Developed and directed the implementation of ongoing analyses of cash flows including reconciling, forecasting and reporting actual cash flow performance against projected cash flow and provided reporting as required by the postpetition secured creditors.

c.      Advised and assisted management of the Debtors' accounting staff to support increased reporting requirements of the Chapter 11 cases and ensured delivery of such reporting on a timely basis. Provided support to the Debtors in the preparation of external monthly reporting packages for distribution to constituents.

## VALUE AND BENEFIT CONFERRED

24.      The results achieved in this case were exceptional given the circumstances that faced the Debtors at the commencement of the case. Although the efforts of Zolfo Cooper are not the sole cause of such success, and the efforts of the Debtors and their other professionals also were extraordinary under the circumstances, Zolfo Cooper's efforts contributed substantially to the success of this case. Briefly highlighted below are the results delivered through the services provided by Zolfo Cooper that demonstrate the reasonableness of the Confirmation and Performance Fee.

25.      As set forth above, there were four critical elements which drove the successful outcome of this case. The first critical element was the rapid exit from Chapter 11. This rapid emergence contributed to the Debtor incurring less professional fees, as the Debtor was paying between $2 million and $3 million per month in professional fees for all advisors, including Zolfo Cooper. In addition, several customers placed the Debtor on "new business hold" immediately upon the Debtor entering Chapter 11, and only released the "new business hold" at emergence. Hence, the rapid emergence reduced the period of time during which the Debtor was exposed to losing new business. Furthermore, Zolfo Cooper was able to minimize the value deterioration associated with the Chapter 11 process by having the plan confirmed in less than 6 months.

26.     The second critical element for the successful outcome of this case was the emergence with a strengthened balance sheet. When Zolfo Cooper was first engaged by the Debtor, the Company had over $1 billion of debt. In order to provide the Debtor with relief, Zolfo Cooper took the helm as CRO and negotiated key financial terms and covenants of the restructured debt, including the conversion of $946 million of prepetition first and second lien bank debt to $228 million of post petition debt. In addition, Zolfo Cooper, and Mr. Orlofsky in particular, were instrumental in reducing the Debtors' legacy liabilities by $53.8 million, from $104.6 million to $50.8 million, and leading the negotiations with the Waynesville Retirees regarding their medical benefits, which comprised almost half of the Debtors' total legacy liabilities. The legacy liabilities were the largest uncertainty of the case, and Mr. Orlofsky and his team were able to reduce these liabilities, without having to go through a protracted and expensive §1114 process.      These two efforts enabled the Debtors' to emerge from Chapter 11 with a strengthened balance sheet.

27.     The third critical element was minimizing the potential business disruptions due to the Chapter 11. Zolfo Cooper played a critical role in achieving this objective by negotiating and communicating with vendors and customers so that the supply of parts and payment terms did not change significantly and adversely impact the day to day operations. These efforts directly contributed to (i) limiting the liquidity contraction in North America to $12 million through (supplier payment term contraction avoidance), and (ii) fully offsetting the $10 million liquidity loss in Europe through negotiations with creditors (new overdraft facility capacity). The Debtors had initially estimated a peak cash need requirement of $90 million. However, Zolfo Cooper's efforts contributed directly to the Debtors's peak cash need decreasing by approximately $50 million to $40 million. This additional liquidity was essential for the Debtors to continue running their day to day operations during the Chapter 11 period without

impacting customer shipments or destroying value. In addition, this extra liquidity reduced the total size of the exit financing.

28. Finally, the fourth critical element was arranging exit financing which would position the Company for growth and enable the Company to manage future downturns in the auto sector. Zolfo Cooper, and Mr. Orlofsky in particular, took a leading role in negotiating the Debtors' Exit Financing. Following the filing of the Debtors' Plan on July 30, 2009, the Debtors', through Zolfo Cooper and the Debtors' other financial advisors, executed a competitive process to obtain an exit financing commitment. Ultimately, the Debtors elected to proceed with the $145 million exit facility and the $50 million ABL facility. Zolfo Cooper was able to negotiate very competitive pricing and structure terms, providing the Company with ample liquidity and positioning the Company for growth upon emergence.

29. The above contributions show that the approval of the Confirmation and Performance Fees is both warranted and appropriate because (i) the Services Agreement provides for the payment of these fees and (ii) the extraordinary results of these cases have largely been driven by Zolfo Cooper.

## STANDARDS OF REVIEW

30. Zolfo Cooper hereby represents that the professional fees sought for the Final Fee Period and the Success Fee are reasonable under the standards established in Sections 330 and 331 of the Bankruptcy Code.

31. In particular, under Section 330 (a)(3)(F) of the Bankruptcy Code, the standard for review for reasonableness of professional fees is the cost of comparable services in a non-bankruptcy setting. Inasmuch as success fees are a normal part of Zolfo Cooper's fee structure, both within and outside of bankruptcy, approval of the Success Fee is appropriate to assure comparable compensation for comparable services.

32.     Recent examples of bankruptcy success fees, proposed or awarded to ZC, and other persons and firms, include the following:

- Enron Corp., a Chapter 11 case in the Southern District of New York. Stephen F. Cooper and ZC were awarded a success fee of $12.5 million. In re Enron Corp., 2006 WL 1030421 (Bankr. S.D.N.Y. 2006).

- Northwestern Corp., a Chapter 11 case in the District of Delaware. Lazard Freres & Co. LLC, financial advisor to the Debtor, was awarded a transaction (or success) fee of $2.75 million, "which brings it in the line with the transaction fee of the financial advisors employed by the Official Committee of the Unsecured Creditors." In re Northwestern Corp. 324 B.R. 538, 547-48 (Bankr. D. Del. 2005), rev'd, 344 B.R. 40 (D. Del. 2006) (it was error to reduce the success fee; full $5.5 million awarded).

- Warnaco, a Chapter 11 Case in the Southern District of New York. Alvarez & Marsal, was awarded a success fee of $2.25 million. Warnaco Proxy Statement, filed April 2003.

- Dura Automotive Systems Inc., a Chapter 11 case in the District of Delaware. AlixPartners, LLC., financial advisors for the Debtor, was awarded a success fee of $2.1 million.  In re Dura Automotive Systems Inc., Case No. 06-11202 (KJC), Omnibus Order Approving Fifth and Final Interim Fee Application Requests, filed November 25, 2008.

- Calpine Corporation, a Chapter 11 case in the Southern District of New York. AlixPartners was awarded a success fee of $6.0 million. In re Calpine Corp., Case No. 05-60200 (BRL), SDNY, Order Granting Application of Professionals for Allowance of Eighth Interim and Final Compensation of Services Rendered and Reimbursement of Actual and Necessary Expenses, filed Mar. 27, 2008.

- Dana Corporation, a Chapter 11 case in the Southern District of New York. AlixPartners was awarded a success fee of $4.0 million. In re Dana Corp., Case No. 06-10354 (BRL), SDNY, Order Granting Application of Professionals for Allowance of Interim and Final Compensation of Services Rendered and Reimbursement of Actual and Necessary Expenses, filed May 28, 2008.

33.     In short, success fees are a normal part of a compensation for firms such as Zolfo Cooper, which provide financial advisor, crisis and interim management and turnaround services to debtors, and may be approved on that basis alone. In addition, however, approval of the Success Fee in this case is particularly warranted because the services provided by Zolfo Cooper resulted

in real, demonstrable and significant incremental value to the Debtors and their estates. These efforts and contributions were a key enabler of the successful outcome of these proceedings.

WHEREFORE, Zolfo Cooper respectfully requests that this Court enter an order awarding Zolfo Cooper a final allowance of its Confirmation Fee in the amount of $1,000,000.00 and Performance Fee in the amount of $500,000.00, and grant such other and further relief as is just or appropriate.

Dated: November 25, 2009
New York, New York

ZOLFO COOPER, LLC

By: David Orlofsky
    Managing Director

## VERIFICATION

STATE OF NEW YORK )
                      )    SS:
NEW YORK COUNTY )

David Orlofsky, after being duly sworn according to law, deposes and says:

1.      I am a Managing Director of, Zolfo Cooper, LLC, the parent company of the applicant firm Zolfo Cooper Management, LLC.

2.      I have personally performed many of the management services described herein and I am familiar with all other work performed on behalf of the professionals and paraprofessionals in the firm.

3.      The facts set forth in the foregoing Application are true and correct to the best of my knowledge, information and belief.

DAVID ORLOFSKY

SWORN TO AND SUBSCRIBED before me this 25th day of November 2009.

Notary Public
My Commission Expires: 7-23-13

Maria E. D'elia
Notary Public, State of NY
No 01PA6061899
Qualified in Queens County
Commission Expires
July 23, 2013

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------

In re:

MARK IV INDUSTRIES, INC., <u>et</u> <u>al.</u>,

       Debtors.

------------------------------------------------------

) 
) Chapter 11
)
) Case No. 09-12795 (SMB)
)
) (Jointly Administered)
)

### ORDER APPROVING THE SERVICES AGREEMENT BETWEEN MARK IV INDUSTRIES, INC., ET AL., DAVID ORLOFSKY, AND ZOLFO COOPER MANAGEMENT, LLC NUNC PRO TUNC TO THE PETITION DATE

Upon the motion (the "<u>Motion</u>")[1] of the Debtors for entry of an order approving

the services agreement (the "<u>Agreement</u>"), a copy of which is attached hereto as <u>Exhibit 1</u>, by

and between the Debtors, Zolfo Cooper Management, LLC ("<u>Zolfo Cooper</u>") and David

Orlofsky ("<u>Orlofsky</u>") wherein the Debtors shall engage Zolfo Cooper and Orlofsky to provide

the Debtors with the services of Orlofsky as Chief Restructuring Officer ("<u>CRO</u>" or "<u>Executive</u>

<u>Officer</u>"), and additional individuals provided by Zolfo Cooper (the "<u>Associate Directors of</u>

<u>Restructuring</u>"), who will perform other services required of Zolfo Cooper and Orlofsky.; and

the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and

other parties in interest; and the Debtors having provided appropriate notice of the Motion and

the opportunity for a hearing on this Motion under the circumstances and no other or future

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is GRANTED as set forth in this Order.

2.     The Debtors shall be, and hereby are, authorized to employ Zolfo Cooper and Orlofsky to provide management services to the Debtors on the terms and conditions set forth in the Agreement subject to the following terms, which apply notwithstanding anything in the Motion, the Agreement, or any exhibit(s) related thereto to the contrary:

(a)     Zolfo Cooper and its affiliates shall not act in any other capacity (for example, and without limitation, as a financial advisor, claims agent/claims administrator, or investor/acquirer) in connection with the above-captioned cases.

(b)     In the event the Debtors seek to have Zolfo Cooper personnel assume executive officer positions that are different than the Executive Officers, or to materially change the terms of the Agreement, as modified herein, by either (i) modifying the functions of the Executive Officers, (ii) adding new Executive Officers, or (iii) altering or expanding the scope of the Agreement as modified herein, a motion to modify the retention shall be filed.

(c)     Zolfo Cooper shall file with the Court with copies to the Office of the United States Trustee for the Southern District of New York ("U.S. Trustee") and all official committees a report of staffing on the engagement for the previous month. Such report shall include the names and functions filled of the individuals assigned. All staffing shall be subject to review by the Court in the event an objection is filed.

(d)     No principal, employee or independent contractor of Zolfo Cooper or its affiliates shall serve as a director of any of the above-captioned Debtor(s) during the pendency of the above-captioned cases.

(e)     Zolfo Cooper shall file with the Court, and provide notice to the U.S. Trustee and all official committees, reports of compensation earned and expenses incurred on a monthly basis. Such reports shall contain summary charts which describe the

2

time incurred and services provided, identify the compensation earned by each executive officer and staff employee provided and itemize the expenses incurred. Time records shall (i) be appended to the reports, (ii) contain detailed time entries describing the task(s) performed, (iii) be organized by project category and (iv) the time entries shall identify the time spent completing each task in 1/10/hour increments and the corresponding charge (time multiplied by hourly rate) for each task. All compensation shall be subject to review by the Court in the event an objection is filed.

(f)     Success fees, transaction fees, or other back-end fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and are not being pre-approved by entry of this Order. No success fee, transaction fee or back-end fee shall be sought upon conversion of the case, dismissal of the case for cause, or appointment of a trustee.

(g)     The indemnification provisions described in the Agreement are approved. The Debtors are permitted to indemnify those persons serving as executive officers on the same terms as provided to the Debtors other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' D&O policy, as authorized by the Debtors' Board of Directors.

(h)     For a period of three years after the conclusion of the engagement, neither Zolfo Cooper, Orlofsky nor any of their affiliates shall make any investments in the Debtors or the reorganized Debtors.

(i)     Zolfo Cooper shall disclose any and all facts that may have a bearing on whether the firm, its subsidiaries and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest. The obligation to disclose identified in this subparagraph is a continuing obligation.

(j)     Notwithstanding anything in paragraph 2 of the Agreement to the contrary, Zolfo Cooper employees who are appointed officers of the Debtors shall be subject to all duties and obligations pertaining to their status as officers under applicable law.

(k)     Notwithstanding anything in paragraph 4 of the Agreement to the contrary, the Debtors are not obligated to reimburse Zolfo Cooper, Orlofsky or the Associate Directors of Restructuring's expenses for legal counsel.

3.     All compensation and reimbursement due to, and other rights of Zolfo Cooper and Orlofsky in accordance with the Agreement as modified by this Order, including without limitation indemnification obligations, shall be treated and allowed (subject to the compensation review procedures identified in this Order) as administrative expenses in

accordance with Section 503 of the Bankruptcy Code and shall be paid in accordance with the Agreement.

4.    Zolfo Cooper shall apply its prepetition retainer to allowed fees and expenses prior to seeking payment from the Debtors' cash flows.

5.    All time periods set forth in this Order shall be calculated in accordance with Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

6.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

7.    Notwithstanding the possible applicability of Rules 6004(h), 7062, 9014 of the Federal Rules of Bankruptcy Procedure or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.


Dated: New York, New York
          May 27, 2009


                               /s/   **STUART M. BERNSTEIN**
                                  UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

# Exhibit 1

## SERVICES AGREEMENT

This SERVICES AGREEMENT (the "Agreement") dated as of April 30, 2009, is made by and between Mark IV Industries, Inc. and by certain of its U.S. its subsidiaries and affiliates ("Mark IV" or the "Company") and David Orlofsky ("Orlofsky") and Zolfo Cooper Management, LLC ("ZC"), a New Jersey limited liability company relating to Mark IV and certain of its U.S. affiliates and subsidiaries (collectively with Mark IV, the "Debtors").

### Recitals:

WHEREAS, the parties hereto desire to enter into this Agreement to set forth the basis on which Orlofsky and ZC will perform management services for the Debtors, all as set forth more fully in this Agreement.

NOW, THEREFORE, in consideration of the premises and covenants set forth herein, and intending to be legally bound hereby, the parties to this Agreement hereby agree as follows:

1. **Engagement.** The Debtors hereby engage Orlofsky and ZC and Orlofsky and ZC hereby accept such engagement, on the terms and conditions set forth in this Agreement. The Debtors are hereby acquiring from ZC the services of Orlofsky and additional individuals to work for the Debtors (the "Associate Directors of Restructuring") as set forth below. All compensation for the services and actions of Orlofsky, ZC and the Associate Directors of Restructuring under this Agreement will be paid to ZC.

2. **Duties.**

   (a) The Debtors represent to Orlofsky and ZC that its Board of Directors (the "Board") has duly adopted the resolution (the "Resolution") appended hereto and incorporated herein by reference approving the terms of this Agreement and electing Orlofsky as the Chief Restructuring Officer. ZC will assign Associate Directors of Restructuring to serve in various capacities with the Debtors and to perform other services required of ZC hereunder.

   (b) Pursuant to and except as limited by the terms of such Resolution, Orlofsky will lead the restructuring efforts as directed by the Board and shall be authorized to make decisions related to such efforts, with respect to all restructuring related aspects of the business, as Orlofsky and ZC deem necessary or appropriate in their discretion in a manner consistent with the business judgment rule and the provisions of local law and the United States Bankruptcy Code applicable to the obligations of persons acting on behalf of corporations, subject only to appropriate governance by the Board in accordance with the Debtors' charters, Bylaws, other governing documents (if any) (collectively the "Constitutive Documents") and applicable state law. Orlofsky, ZC and Associate Directors of Restructuring (individually, a "Representative" and collectively, the "Representatives") shall not have any authority to make

decisions with respect to hiring or terminating officers, executing transactions or otherwise committing the Debtors or its resources other than in the ordinary course of business unless set forth in the Resolution or otherwise approved by the Board and, if required, the United States Bankruptcy Court for the Southern District of of New York (the "Bankruptcy Court"). All decisions of Orlofsky and ZC shall be discussed to the extent Orlofsky and ZC deem reasonably appropriate with the member or members of the Debtors's management that Orlofsky, in the exercise of his sole discretion, determines to be appropriate prior to the implementation of such decisions and shall be implemented by the management of the Debtors (other than ZC or the Representatives), and any dispute between such management and Orlofsky and ZC regarding the implementation of such decisions shall be resolved definitively by the Board.

(c)     Orlofsky and ZC shall not be obligated to be available to perform services hereunder for any specific minimum number of hours or at any specific location during any period, it being understood that Orlofsky and ZC shall be obligated to furnish such hours of service as they deem necessary in their sole discretion to perform their duties on behalf of ZC hereunder. ZC shall cause Associate Directors of Restructuring to devote a portion of their business time to the performance of services for the Debtors hereunder on behalf of ZC, as deemed necessary

(d)     In undertaking to provide the services set forth herein, Orlofsky and ZC do not guarantee or otherwise provide any assurances that it will succeed in building the Debtors' operational and financial health and stability and, except for the amount referenced in Section 4(b) hereof, the Debtors' obligation to provide the compensation specified under Section 4 hereof shall not be conditioned upon any particular results being obtained by Orlofsky and ZC.

(e)     In view of the Debtors' precarious present circumstances, the Debtors acknowledge that Representatives may be required to make decisions with respect to extraordinary measures quickly and that the depth of their analyses of the information on which their decisions will be based may be limited in some respects due to the availability of information, time constraints and other factors. Moreover, each Representative shall be entitled, in performing their duties hereunder on behalf of ZC, to rely on information disclosed or supplied to them without verification or warranty of accuracy or validity.

(f)     Orlofsky and ZC will endeavor to keep the Board fully apprised of their findings, plans and activities.

**3.     Term.**  The term of ZC's engagement hereunder shall commence on the date hereof and shall continue on a month to month basis until terminated by either party at the end of any such month upon written notice to the other party given at least ten days prior to the end of such month.   Notwithstanding the foregoing, ZC's responsibilities to provide interim management services pursuant to Section 2 hereof shall not commence until i) this Agreement has been approved by the Bankruptcy Court, ii) this Agreement has been fully executed, iii) the Debtors have furnished insurance policies, as detailed in Section 7 (c) below, to ZC and ZC has determined that such policies are acceptable to ZC or if such policies do exist, cannot be located or determined, or are not acceptable to ZC, the Debtors have agreed to purchase (supplemental) directors, officers and corporate liability insurance, fiduciary liability insurance and employment practices insurance coverages acceptable to ZC, and iv) the Debtors have paid all payroll taxes, sales and use taxes or other trust fund taxes (collectively "Payroll and Taxes") of the Debtors due as of the commencement of this Agreement and has arranged a mechanism to insure the continued payment of Payroll and Taxes of the Debtors which have accrued and accrue and become due thereafter during the term of this Agreement, acceptable, in all respects, to ZC. Subsequent to the date hereof and pending compliance with the foregoing condition precedent, Orlofsky and ZC will consult with the Board and the Debtors' existing senior management in an advisory capacity with respect to matters that fall within the purview of the responsibilities of the Debtors' Chief Restructuring Officer.  Notwithstanding the foregoing, Orlofsky and ZC may terminate this Agreement, immediately and without notice, if either of conditions i), ii) or iii) above shall have been recinded, modified or are no longer in effect.

**4.     Compensation.**  Orlofsky and ZC 's compensation hereunder shall consist of the following:

**(a)     Standard Hourly Rates.**  Our fees for the services will be based on the hours charged at our standard hourly rates that are in effect when the services are rendered; our rates generally are revised semi-annually.   The billing rates for professionals who may be assigned to this engagement in effect as of January 1, 2009, and which may be revised July 1, 2009, are as follows:

| | |
|---|---|
| Managing Directors | $720 - $785 |
| Professional Staff | $220 - $695 |
| Support Personnel | $ 50 - $295 |

Notwithstanding the foregoing, the hours charged by Orlofsky and Associate Directors of Restructuring providing services under this Agreement shall not exceed 53 hours per week per person. Additionally, as agreed, ZC shall only charge the Debtors one-half of the actual time spent by Orlofsky and each Associate Director of Restructuring for their time commuting to and from the Debtors. In addition to Orlofsky as the Chief Restructuring Officer, ZC and Orlofsky will require the services of three (3) Associate Directors of Restructuring at the start of the engagement. In the event that Orlofsky and ZC deem there is a need for additional personnel to complete the services required by the Debtors, Orlofsky and ZC will discuss staffing requirements with management prior to Orlofsky and ZC providing additional Associate Directors of Restructuring. In the event that the Debtors, Orlofsky and ZC are unable to agree upon staffing requirements, such decisions shall be resolved definitively by the Board.

(b)     Confirmation Fee – A confirmation fee (the "Confirmation Fee") will be payable in cash upon confirmation of a plan of reorganization. In the event that a plan of reorganization is confirmed, the Debtors shall pay, upon confirmation of the plan, a Confirmation Fee subject to the following schedule of timing:

| Days (on or within days from the petiton date) | Confirmation Fee (in thousands) |
|---|---|
| 120 | $1,250 |
| 121 to 180 | $1,000 |
| 181 to 270 | $625 |
| 271 to 300 | $300 |
| > 301 | $0 |

(c)     Performance Fee – A performance fee (the "Performance Fee") will be payable in cash based on Mark IV's EBITDA performance against its fiscal year 2010 operating plan through the period in which the plan of reorganization is confirmed, calculated using a methodology consistent with the way the Debtors' budget was prepared. Budgeted foreign currency rates will be used to eliminate the F/X impact on EBITDA. The Debtors' Chief Financial Officer or other non-Zolfo Cooper officer of the Debtors will approve the Debtors' actual results and the calculation of performance vs. budget. If the plan of reorganization is confirmed before the end of fiscal 2010, the EBITDA will be measured through and including the fiscal month the plan is confirmed. The Debtors shall pay a Performance Fee, upon confirmation of a plan, according to the following schedule:

| Percent of Operating Plan Achieved | Performance Fee (in thousands) |
|---|---|
| > 90% | $500 |

A schedule of the monthly operating plan for fiscal 2010 is included in Appendix A.

It is understood and agreed that no one fee set forth above in 4(b) and 4(c) above precludes the payment of any other fee set forth above, and all fees are in addition to and not in lieu of any hourly fees paid to ZC by the Debtors.

(d)     Expenses – Reimbursement of Orlofsky, Associate Directors of Restructuring and ZC's reasonable out-of-pocket expenses including, but not limited to, costs of travel, reproduction, legal counsel (including legal counsel retained to draft and enforce this Agreement), any applicable state sales or excise tax and other direct expenses.

(e)     Retainer - ZC received a prepetition retainer of $200,000.  Prior to the petition date, ZC drew down on the retainer to cover all outstanding pre-petition fees and expenses incurred through the petition date. ZC will apply its remaining retainer balance to allowed post-petition fees and expenses prior to seeking payment from the Debtors' cash flows.

The Debtors shall pay to ZC the compensation set forth in Sections 4(a) and 4(c) hereof based upon the submission of monthly invoices by ZC setting forth the number of hours each day expended by the Representatives on behalf of the Debtors, a general description of the services provided and a detailed listing of the expenses sought to be reimbursed. Our invoices are payable upon receipt.  The compensation provided for in this Agreement shall constitute full payment for the services to be rendered by ZC to the Debtors hereunder.

The Debtors acknowledge and agree that the hours worked, the results achieved and the ultimate benefit to the Debtors of the work performed in connection with this engagement may be variable and that Debtors, Orlofsky and ZC have taken this into account in setting the fees hereunder.  No fee payable to any other person or entity by the Debtors or any other party shall affect any fee payable to ZC hereunder.

5.     **Confidentiality.**

(a)     The Debtors, including the Board, shall treat any information received from Orlofsky and ZC or a Representative as confidential and, except as specified in this Section 5(a), will not publish, distribute or otherwise disclose in any manner any information developed by or received from Orlofsky and ZC or a Representative without Orlofsky and ZC's or such Representative's prior written approval.  Such approval shall not be required if either (i) the information sought is required to be disclosed by an order binding on Orlofsky and ZC or a Representative and issued by a court having competent jurisdiction over Orlofsky and ZC and such Representative and such information is disclosed only pursuant to the terms of such order or (ii) the information is otherwise publicly available other than through disclosure by a party in breach of a confidentiality obligation with respect thereto.

(b)     Orlofsky, ZC and each Representative agrees to treat any information received from the Debtors or their representatives with utmost confidentiality, and except as provided in this letter, will not publish, distribute or disclose in any manner any information developed by or received from the Debtors or their representatives without the Debtors' prior

approval.  Such approval shall not be unreasonably withheld.  The Debtors' approval is not needed if either the information sought is required to be disclosed by an order binding on Orlofsky and ZC, issued by a court having competent jurisdiction over Orlofsky and ZC (unless such order specifies that the information to be disclosed is to be placed under seal), or such information is otherwise publicly available.

## 6. Representations and Warranties.

As an inducement to Orlofsky and ZC to enter into this Agreement, the Debtors represent and warrants to Orlofsky and ZC as follows:

(a)  The Debtors are a corporation duly organized and validly existing under the laws of the jurisdiction in which it was organized and has all requisite corporate power to enter into this Agreement.

(b)  Subject to receipt of the approval by the Bankruptcy Court of the execution by the Debtors of this Agreement, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated herein or therein nor compliance by the Debtors with any of the provisions hereof or thereof will: (i) violate any order, writ, injunction, decree, law, statute, rule or regulation applicable to it or (ii) require the consent, approval, permission or other authorization of, or qualification or filing with or notice to, any court, arbitrator or other tribunal or any governmental, administrative, regulatory or self-regulatory agency or any other third party.

(c)  Subject to approval by the Bankruptcy Court and execution by the Debtors of this Agreement, this Agreement has been duly authorized, executed and delivered by the Debtors and constitutes the legal, valid and binding agreement of the Debtors, enforceable in accordance with its terms.

(d)  No oral representation made or document furnished to Orlofsky and ZC by any officer, employee or other representative of the Debtors contains any untrue statement of a material fact or omits to state a fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.  There is no fact known to the Debtors that materially and adversely affects or that may reasonably and foreseeably be expected to materially or adversely affect the business, operations, affairs, conditions, prospects or properties of the Debtors that has not been communicated to ZC prior to the date hereof.

**7.      Indemnification.**

(a)      The Debtors shall indemnify and hold harmless Orlofsky, ZC, the Associate Directors of Restructuring, and its principals, and other ZC employees, representatives or agents (including counsel) (collectively, the "ZC Indemnitees") from and against any and all losses, claims, damages, liabilities, penalties, judgments, awards, costs, fees, expenses and disbursements, including without limitation, the costs, fees, expenses and disbursements, as and when incurred, from the first dollar, of investigating, preparing or defending any action, suit, proceeding or investigation (whether or not in connection with proceedings or litigation in which any ZC Indemnitee is a party)(any such amount being hereinafter sometimes referred to as an "Indemnifiable Loss"), directly or indirectly caused by, relating to, based upon, arising out of or in connection with this engagement of Orlofsky and ZC by the Debtors or the performance by Orlofsky and ZC of any services rendered pursuant to such engagement, unless there is a final non-appealable order of a Court of competent jurisdiction, at the trial level, finding ZC Indemnitees directly liable for gross negligence or willful misconduct.

(b)      If Orlofsky, ZC, Representatives or any principal or agent of ZC is required to testify, prepare for and/or appear at a deposition or produce documents at any time after the expiration or termination of this Agreement at any administrative or judicial proceeding relating to any services provided by Orlofsky and ZC hereunder, then ZC shall be entitled to be compensated by the Debtors for Orlofsky and ZC 's associated time charges at the regular hourly rates in effect at the time and to be reimbursed for reasonable out-of-pocket expenses, including counsel fees.

(c)      The Debtors have furnished to Orlofsky and ZC a true, correct and complete copy of  the Directors, Officers and Private Debtors Liability Insurance, including Employment Practices Insurance ("D&O/EPL"), Policy No. 007040320, issued by AIG, National Union Fire Insurance Debtors, Excess D&O/EPLPolicy No. DOC967627801, issued by Zurich American Insuance Debtors, and Side A D&O Policy No. 007005696, issued by National Union Fire Insurance Debtors, collectively (the "Policies" and the "Insurers").  The Debtors represent that the Policies are in full force and effect and that no event has occurred that constitutes or, with the passage of time or notice would constitute, an event of default thereunder or that would otherwise give the Insurers any right to cancel such Policies. Promptly and in any event within two business days of the Debtors approving this Agreement, the Debtors shall notify the Insurers of the election of Orlofsky as the Chief Restructuring Officer and of the appointment of any Associate Directors of Restructuring who become an officer of the Debtors.  The Debtors shall cause its insurance broker to send copies of all documentation and other communications regarding the Policies, including without limitation any renewal or cancellation thereof, to the attention of  ZC, in the manner set forth herein, and Orlofsky, ZC and any Associate Directors of Restructuring who become officers of the Debtors shall have all indemnities available to the officers of the Debtors pursuant to the Debtors' Constitutive Documents.  The Debtors shall maintain directors and officers liability insurance coverage, employment practices insurance coverage and fiduciary liability insurance coverage

comparable to terms (including without limitation the provisions or any similar provision regarding extension of the discovery period thereunder) and amounts as provided under the Policies during the term of this Agreement, with any such replacement coverage being obtained from an insurer with a rating from a nationally recognized rating agency not lower than that of the Insurer. Upon any cancellation or nonrenewal of the Policies by the Insurers, the Debtors shall exercise its rights under the applicable clause of the Policies to extend the claim period for a one-year "discovery period" and shall exercise such rights and pay the premium required thereunder within the 30-day period specified therein. The Debtors shall use commercially reasonable efforts, in connection with the next renewal of the Policies, to negotiate to extend the discovery period set forth in the Policies from one to three years.

(d) The Debtors shall indemnify, to the fullest extent provided by law, any person who was or is a defendant or is threatened to be made a defendant to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director, officer or employee of the Debtors. Such amendments shall be presented to Orlofsky and ZC for approval, which shall not be unreasonably withheld, and shall be filed with the State of Delaware and approved by the Debtors's shareholders and directors, as required, within (2) days of the date hereof.

**8.    Limitations on Liability.**    The Debtors agree that Orlofsky, ZC and its personnel will not be liable to the Debtors for any claims, liabilities, or expenses relating to this engagement in excess of the fees paid by them to Orlofsky and ZC pursuant to this Agreement, unless there is a final non-appealable order of a Court of competent jurisdiction, at the trial level, finding Orlofsky and ZC directly liable for gross negligence or willful misconduct. In no event will Orlofsky, Associate Directors of Restructuring and ZC, or their personnel be liable for consequential, special, indirect, incidental, punitive or exemplary loss, damages or expenses relating to this engagement. These limitations on liability provisions extend to the employees, representatives, agents and counsel of and ZC. The limitation on liability and indemnification contained in this agreement shall survive the completion or termination of this Agreement.

**9.    Independent Contractor / Benefits; Taxes.**    The parties intend that Orlofsky and ZC shall render services hereunder as an independent contractor, and nothing herein shall be construed to be inconsistent with this relationship or status. Orlofsky and ZC shall not be entitled to any benefits paid by the Debtors to their employees. Orlofsky and ZC shall be solely responsible for any tax consequences applicable to Orlofsky and ZC by reason of this Agreement and the relationship established hereunder, and the Debtors shall not be responsible for the payment of any federal, state or local taxes or contributions imposed under any employment insurance, social security, income tax or other tax law or regulation with respect to Orlofsky and ZC 's performance of management services hereunder. The parties agree that, subject to the terms and provisions of this Agreement, Orlofsky and ZC may perform any duties hereunder and set Orlofsky and ZC 's own work schedule without day-to-day supervision by the Debtors.

**10.**     **Offer of Employment**.   The Debtors agree to promptly notify ZC if it extends (or solicits the possible interest in receiving) an offer of employment to an  employee or principal of ZC and agrees that it will pay ZC a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus, to be paid to ZC's former principal or employee that the Debtors hire at any time up to one year subsequent to the date of the final invoice rendered by Orlofsky and ZC with respect to this Agreement.   Notwithstanding the foregoing, the parties agree that the provision herein shall not restrict or otherwise prohibit the Debtors from hiring or employing or having hiring or employment discussions with any person who (i) contacts the Debtors  without any solicitation by the Debtors, (ii) is no longer engaged or employed by ZC or (iii) responds to a general solicitation for employment, by the Debtors or their agents, in newspapers, trade journals, the Internet or by any similar media and provided further that no such general solicitation shall constitute a breach of any agreement with ZC.

**11.**     **Trial.**   The Debtors agree that neither it nor any of its assignees or successors shall (a) seek a jury trial in any lawsuit, proceeding, counterclaim or any other action in which there is a reasonable likelihood that Orlofsky and ZC will be made a party based upon, or arising out of or in connection with the engagement of Orlofsky and ZC by the Debtors or any services rendered pursuant to such engagement, or (b) seek to consolidate any such action with any other action in which a jury trial cannot be or has not been waived.   The provisions of this paragraph have been fully discussed by the Debtors, Orlofsky and ZC and these provisions shall be subject to no exceptions.   Neither party has agreed with or represented to the other that the provisions of this section will not be fully enforced in all instances.

**12.**     **Jurisdiction.**   The Debtors hereby irrevocably and unconditionally (a) submit for themselves and their property in any legal action or proceeding relating to the engagement of Orlofsky and ZC by the Debtors or any services rendered pursuant to such engagement, to the non-exclusive general jurisdiction of the State of New York, the Courts of United States of America for the Southern District of New York, and appellate courts from any thereof; (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; (c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Debtors at their address set forth above or at such other address of which Orlofsky and ZC shall have been notified pursuant thereto; (d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and (e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this subsection any special, exemplary or punitive or consequential damages.

**13.**     **Survival of Agreement.**   Except as provided in this Agreement, the obligations set forth under the above captioned Confidentiality, Indemnification, Limitation on Liability,

Compensation, Offer of Employment, Trial, and Jurisdiction sections shall survive the expiration, termination, or supersession of this agreement.

**14.    Conflicts.**  Orlofsky and ZC we confirm that no employee of ZC[1] has any financial interest or business connection with the Debtors.  However, in the case of public companies, ZC employees may own publicly traded shares and bonds. Additionally, we have run an initial conflict check through ZC's relationship database ("Database"), which is an Access computer database containing names of individuals and entities that are present or recent former clients of ZC.  ZC then reviewed those results, which review was completed under the supervision of the in-house General Counsel of ZC.  A summary of such relationships is set forth in Schedule 1 to the Declaration of David Orlofsky. The Debtors understand and agree that their names will be added to ZC's Database.

**15.    Amendments.**  Any amendment to this Agreement shall be made in writing and signed by the parties hereto.

**16.    Enforceability.**  If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law as if such provision had been originally incorporated herein as so modified or restricted or as if such provision had not been originally incorporated herein, as the case may be.

**17.    Construction.**  This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York.

**18.    Notices.**  All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered in person or duly sent by certified mail, postage prepaid; by an overnight delivery service, charges prepaid; or by confirmed telecopy; addressed to such party at the address set forth below or such other address as may hereafter be designated in writing by the addressee to the addressor:

---

[1] The "Zolfo Cooper" trademark name is owned by ZC Holdings, LLC, ZC's parent company, and it is used in the United States by ZC and its subsidiaries.  The Zolfo Cooper trademark is used in Europe and in the British Virgin Islands ("BVI") under license by ZC in Europe and BVI. ZC Holdings, LLC and its subsidiaries are not related to and do not share ownership interests with Zolfo Cooper in Europe and BVI.

If to the Debtors:

Mark IV Industries, Inc.
One Town Centre, PO Box 810
501 John James Audubon Pkwy
Amherst, NY 14226-0810
Attention: _____

If to ZC or Orlofsky:

Zolfo Cooper Management, LLC
101 Eisenhower Parkway, 3rd Floor
Roseland, NJ  07068
Attention:  Elizabeth S. Kardos


Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

       **19.**    **Waivers.**  No claim or right arising out of a breach or default under this Agreement shall be discharged in whole or in part by a waiver of that claim or right unless the waiver is supported by consideration and is in writing and executed by the aggrieved party hereto or his or its duly authorized agent.  A waiver by any party hereto of a breach or default by the other party hereto of any provision of this Agreement shall not be deemed a waiver of future compliance therewith, and such provisions shall remain in full force and effect.

       **20.**    **Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same instrument.

       **21.**    **Disclosure.**  Notwithstanding anything to the contrary contained herein, ZC shall have the right to disclose its retention by the Debtors or the successful completion of its services hereunder in advertisements describing its services placed, at its own expense, in financial and other newspapers or otherwise.

       **22.**    **Entire Agreement.** This Agreement and the other documents delivered pursuant hereto, if any, constitute the full and entire understanding and agreement among the parties hereto with regard to the subjects hereof and thereof and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.

IN WITNESS WHEREOF, this Agreement has been executed by the parties as of the date first above written.

MARK IV INDUSTRIES, INC.


By: _____
      Name
      Title:


ZOLFO COOPER MANAGEMENT, LLC


By: _____
      Elizabeth S. Kardos
      Title: Managing Director


DAVID ORLOFSKY


By: _____
      David Orlofsky

APPENDIX A

| FY 2010 Operating Plan | |
| --- | --- |
| Month | EBITDA (in thousands) |
| March | $6,479 |
| April | $8,582 |
| May | $8,116 |
| June | $11,568 |
| July | $11,816 |
| August | $7,428 |
| September | $16,474 |
| October | $17,272 |
| November | $15,883 |
| December | $13,471 |
| January | $19,059 |
| February | $19,697 |
| Total | $155,844 |

Notes:
A.   FY 2010 covers the period from March 1, 2009 to February 28, 2010
B.   EBITDA figures assume Euro/USD FX Rate $1.40, CDN/USD FX Rate $1.00

# EXHIBIT C

# CERTIFICATE OF RESPONSIBLE OFFICER OF MARK IV INDUSTRIES, INC.

Pursuant to section 4(c) of the SERVICES AGREEMENT dated as of April 30, 2009 (the "ZC Services Agreement") (unless otherwise defined herein, capitalized terms are used herein as defined in the ZC Services Agreement), between MARK IV INDUSTRIES, INC., ET AL., DAVID ORLOFSKY, and ZOLFO COOPER MANAGEMENT, LLC, the undersigned, duly elected, qualified and acting Chief Financial Officer of Mark IV, hereby certifies on behalf of Mark IV and its subsidiaries that the Plan of Reorganization was confirmed on Friday, September 23, 2009 (the "Confirmation Date"), Mark IV's EBITDA year to date performance against its fiscal year 2010 operating plan through September 2009, calculated as directed in the ZC Services Agreement, exceeds 90% of the operating plan, as shown below.

Dated: November 24, 2009

IN WITNESS WHEREOF, I have set my name.

By:

Name: Mark Barberio
Title: Chief Financial Officer of Mark IV
Industries, Inc.

Mark IV Operating Plan EBITDA Actual vs. Operating Plan
*USD '000s at PEG*

| EBITDA | Operating Plan | Actual |
|--------|---------------:|-------:|
| March  | 6,479  | 8,240  |
| April  | 8,582  | 10,306 |
| May    | 8,116  | 10,648 |
| June   | 11,568 | 10,759 |
| July   | 11,816 | 11,936 |
| August | 7,428  | 9,927  |
| Sept   | 16,474 | 16,367 |
| **Total** | **70,463** | **78,184** |

| | |
|---|---:|
| **Target (90% of Plan)** | 63,417 |
| **Actual** | 78,184 |

1